UNITED STATES DISTRICT COURT

for the

EASTERN DISTRICT OF WISCONSIN

JUSTIN BLAKE,

Plaintiff,

vs.                                    Case No. 22 CV 970

DAVID BETH, et al.,

Defendants.

DEPOSITION OF:

JESSICA BERGMANN, taken at the instance of the Plaintiff, on April 15, 2024, commencing at 12:00 p.m. and concluding at 2:00 p.m., at 2745 North Dr. Martin Luther King Drive, Suite 202, Milwaukee, Wisconsin, before Nancy Ann Bellino, Stenographer and Notary Public.

APPEARANCES:

KIMBERLEY CY. MOTLEY, ESQ.
Motley Legal Services
P.O. Box 1433
Charlotte, NC 28106
704-763-5413
kmotley@motleylegal.com

appeared on behalf of the Plaintiff,
JUSTIN BLAKE;


BRIANNA MEYER, ESQ.
Crivello & Carlson
710 North Plankinton Avenue
Suite 500
Milwaukee, WI 53202
414-271-7722
BMeyer@CrivelloLaw.com

appeared on behalf of the Defendants,
DAVID BETH, COUNTY OF KENOSHA, et al.;


BRIAN BAIRD, ESQ.
Borgelt, Powell, Peterson & Frauen, S.C.
1243 North 10th Street
Suite 300
Milwaukee, WI 53205
414-287-9184
bwbaird@borgelt.com

appeared on behalf of the Defendants,
JESSICA BERGMANN, VISITING NURSE COMMUNITY CARE,
INC., and KENOSHA VISITING NURSE ASSOCIATION.

INDEX

Testimony taken of JESSICA BERGMANN

Direct Examination by Ms. Motley                    4
Cross Examination by Ms. Meyer                     78
Redirect Examination by Ms. Motley                 80


Reporter's Certificate                             86
Errata Sheet                                       87
Certification Letter                               88



EXHIBITS

Number                                           Page

  1              Detailed Job Description          16

  2              Standard of Conduct               17

  3              Photograph                        44

  4              Group Photograph                  46

  5              Restraint Checks Log              51

(Witness duly sworn.)

JESSICA BERGMANN,

called as a witness on behalf of the Plaintiff, having been first duly sworn on oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MOTLEY:

Q    Good morning, Ms. Bergmann.

A    Hi.

Q    Hi.  Have you ever been deposed before?

A    No.

Q    Okay.  So let me just give you a few ground rules.
First -- Are you okay?  Do you want a minute?

A    No.  This will probably happen.  It's okay.

Q    I'm sorry.

A    It's okay.

Q    I'm not going to be mean to you, I promise.

A    Sorry.

Q    Is it okay if I call you Ms. Bergmann?

A    Sure.

Q    Okay.  Just to let you know, this is not a criminal matter.  So some ground rules with the deposition.
Number one, we have this wonderful court reporter here today.  So she's going to be taking down everything that we say.  Do you understand that?

A    Yes.

Q   Okay.  And as part of her job, it's important that only one person talks at a time so that she can take what everyone is saying down.  Do you understand that?

A   Yes.

Q   And for some questions, either your counsel or the counsel for the County may object to the question.

When that happens, if you could please stop talking so that the lawyers can put the objections on the record, that would be great.

A   Sure.

Q   Okay.  Do you have any questions for me?

A   No.

Q   Are you okay to get started?

A   Yes.

Q   Okay.  Thank you.

So, Ms. Bergmann, could you please explain to us sort of your professional background?

A   So how far back?

Q   Well, how long have you been working in the healthcare field?

A   My first healthcare job is I worked at Wisconsin Specialty Surgery Center; but I was just doing clerical stuff, no patient care, really.

Q   Okay.

A   And then after that I graduated nursing school in 2018.

And my first job was at the Kenosha County Jail as a nurse.

Q    And you graduated from nursing in 2018?

A    Yes.

Q    And where did you graduate from?

A    Rockford University.

Q    And where is that?

A    Rockford, Illinois.

Q    Okay.  Thank you.  And what was your degree?

A    Bachelor's of Science in Nursing.

Q    And so when did you start working at the Kenosha County Jail?

A    August of 2018.

Q    Now, with regards to your working -- Before you worked at Kenosha County Jail, had you taken any training programs in dealing with healthcare for inmates or anything like that?

A    No.

Q    Who do you currently work for?

A    I work with Ascension At Home together with Compassus.

Q    So from August, 2018 until April 25th of 2021, who did you work for?

A    VNCC.

Q    And what does VNCC stand for?

A    Visiting Nurse Correctional something.  I don't know what the second C stands for.

Q    Would it be Visiting Nurse Community Care?

A    That might be it.  Sorry.

Q    Okay.  And then did you ever work for KVNC?

MR. BAIRD:  KVNA.

MS. MOTLEY:  Right.

BY MS. MOTLEY:

Q    KVNA.

A    I don't think so.

Q    Okay.  Do you know who they are?

A    I understand that they're a visiting nurse association. It's where I like talk to the -- There's a building and I talked to the HR people there.  So I thought that I was affiliated with them, but I guess not.

Q    I see.  Okay.  So I'm trying to get an understanding of that relationship.

A    Yeah.

Q    So as far as you know, from August, 2018 until April 25, 2021, you worked for VNCC?

A    Correct.

Q    And you did not work for KVNA?

A    Not to my knowledge.

Q    Okay.  But there's some sort of affiliation between --

A    Yeah.  Like they share a building, or at least I think they shared a building.  So the building that I would go into for like interviews and stuff, it said KVNA.  I think that's where a lot of the confusion was.

Q I see. Okay. And what is your relationship -- Who is NaphCare?

A So NaphCare is the company that took over the contract. I believe it was May 1st of 2021.

Q I see. So NaphCare on May 1, 2021 took over the healthcare contract that VNCC had with Kenosha County?

A Yes.

Q Okay. I see. And so prior to May 1st of 2021, did you work for NaphCare or have any affiliation with NaphCare?

A So the charting previously was all paper charting. And then we made the transition to electronic charting, which was through NaphCare's like technology called TechCare. So there was people from NaphCare that like trained us on how to use the software.

Q Okay. And the people from NaphCare that trained you to use the software, was that prior to April 25th of 2021?

A For training on the software, yes.

Q Okay. So I notice some of the documents have NaphCare in the heading.

A Yes. I saw that, too. And it does seem confusing.

Q Okay. And so you went to school at Rockford University for nursing.

Could you please explain some of the classes that you took?

A Fundamentals in nursing, pharmacology, there was a

geriatrics class, med-surg nursing, mental health nursing.  And I'm sure there was others.

Q    Okay.  And how long were you in school for nursing?

A    From 2014 through 2018.

Q    Okay.  And prior to that did you go to school for nursing?

A    No.

Q    And you always went to Rockford University?

A    Correct.  I never attended a different college.

Q    Okay.  Now, I know you have a lot more experience with nursing and training now as opposed to April 25th of 2021.  A lot of my questions are going to focus on, to the best of your ability, your knowledge from 2018 -- or prior to April 25, 2021, okay?

So prior to April 25th of 2021 did you receive any sort of training in working with people within the Kenosha County Jail?

A    Yeah, we were trained.

Q    Could you please sort of talk about that training?

A    It was mainly on-the-job training.  I was trained by a nurse on day shift.  And then since I worked night shift -- After a while, they moved me to night shift.  And I was trained a little bit more on night shift.  And then there was continuing education modules.  I believe it was through a software called Relias, as well as there were staff meetings.  I don't remember

how frequent those were, but there was training in those as well.

Q    Okay.  And with regards to the on-the-job training with the nurse on the day shift, who was that?

A    It was -- So typically there was two nurses working.  And it was just kind of whoever was available.

I know I was trained with Guadalupe Ramiro on day shift.  I know there was also Rick, his last name is like Banulas, something like that.  And then mainly on night shift it was Tiffany Ortega.

Q    And what were the working hours for the day shift?

A    Six to 6.

Q    And what about the night shift?

A    Six p to 6 a.

Q    And so when you talk about the continuing -- Talk to us about sort of the on-the-job training that you received at Kenosha County Jail.  What did that consist of?

A    I just kind of shadowed the nurse.  And they would explain to me what they did as they did it.

Q    So what things did you see?

A    Well, there would be sick call.  So anyone that had a -- wrote a medical request and requested to be seen by the nurse, they would show me how those type of assessments were done.  We would respond to emergencies.  We would do medication pass.  And we would also do assessments in the intake area for

those that qualified for the parameters of the assessment.

Q    Okay.  And with regards to -- Do you still work at the Kenosha County Jail?

A    No.

Q    Okay.  When did you stop working there?

A    June of '21.

Q    And that's when you started working for Ascension?

A    No.  I worked at Froedtert South Hospital in Pleasant Prairie.

Q    All right.  And do you remember the date that you started working there?

A    No.  It was early June, though.

Q    Okay.  So you no longer worked for VNCC after June of 2021?

A    Actually, the contract ended in April.  So in May, NaphCare took over and I worked with them for a brief period.

Q    I see.  Okay.  That makes sense.  So let's talk about -- a little bit jumping back to you shadowing a nurse.

You said you would do sick calls.  What does that entail?

A    So people would just write medical requests for common ailments like, I have a headache, I have back pain, I have dental pain, stuff like that.  And we'd have protocols that we could prescribe under the doctor.

Q    Okay.  And typically who were your patients?

A    Inmates.

Q    Would you ever service sort of staff members as well?

A    No.

Q    So your patients were solely inmates?

A    Yes.

Q    And how would you refer to them?  Were they patients, were they inmates, or both?

A    Interchangeable.  Yeah.

Q    Okay.  And then you said you dealt with medical emergency requests and medication passes.

Could you please explain that to us?

A    So from the medication pass, people that are prescribed medications, we would go to each of the blocks and if anyone needed medications they would come up to the medication cart. We would see what they're prescribed and then give them those medications.

We would also do, during that time, other things.  Like if people were on detox protocols, we would do an assessment on them kind of just in the hallway.  People that were on the mental health watches, we would just do -- we would ask them if they're having any thoughts of self-harm or harming anyone else. We would give TB tests sometimes during med pass for those that needed the TB test.

Q    Okay.  And then you said you did assessments in intake. What does that entail?

A    So when people first go to the intake area when they're booked, they get asked some medical questions; stuff like, do you have asthma?  Do you have diabetes?  Certain people that fell within the parameters of that would need to be seen by a nurse.

Q    Okay.

A    So it would just be a focused assessment on that.

Then eventually they did pivot to everyone gets a physical while in the intake area.  I don't recall when that transition was, if that was when NaphCare started coming or maybe a little bit before that.

Q    I see.  So you said when people are booked they are questioned giving medical care during that booking procedure.

A    Right.

Q    And you were sort of a nurse in Kenosha County during the unique time of COVID; correct?

A    Yes.

Q    And I've seen videos.

Were you always required to wear a mask during that time, do you recall?

A    There was times where we were supposed to wear masks.  Eventually, they started lifting some of the requirements for that.  I don't know exactly when they started pivoting with that.

Q    Okay.  Do you recall -- You just said you don't know

Case 2:22-cv-00970-PP    Filed 01/20/25    Page 13 of 98    Document 74-15

when you were required to wear a mask?

A   Yeah.  No, I don't know.

Q   Okay.  So with the sort of intake medical screening, was that process always in place while you were employed there?

A   Yes.  But then they did add extra steps once COVID was a thing.  There was additional questions.  And if people answered yes to COVID-type questions, we would assess those people immediately as well.

Q   Okay.

A   There was a period that anyone that had any kind of COVID symptom, we would send directly to the hospital.  But they eventually lightened up on that because then we would have been sending everyone to the hospital.

Q   Okay.  I see.  So then on April 25th of 2021, was that when they were doing the initial sort of medical and COVID questions in that time period?

A   I think so, but I'm not a hundred percent sure.  I would think so, though.

Q   And what was the -- I know this is tedious, but please explain to us what questions you would have to ask.

A   So it actually wasn't the nurses that asked the questions.  When the cops would bring in the inmates, the officers had a list of questions to ask them.

I don't know everything that was on that list, but it was like stuff like, are you having a cough?  Have you been

exposed to anyone with COVID? And if they said yes to those things, the officer would call the nurse to come down and the nurse would just come and see if they were okay to -- safe enough to come into the jail.

Q I see. Okay. And then would you be required to talk to all the inmates that were arrested during that time period of April 25th of 2021?

A Not necessarily. If they were going to be released immediately, they didn't need to get a physical. And if there was nothing on their screening that prompted the ARS staff to call the nurse, then I would not have seen them.

Q Okay. So let's jump back to the hiring process.

Do you recall what the hiring process of VNCC entailed?

A I know I interviewed. I think it was only one interview.

Q Okay. And do you recall was Kenosha County part of that interviewing process?

A They were not.

Q Okay. Do you recall how many people or who interviewed you?

A Honestly, I don't. I believe my boss was there, Denise Galaney. But I can't remember if there was anyone else that was there.

Q Okay. And what was your job title while you were working from 2018 until April 25th of 2021?

A    I think it was just registered nurse.

Q    Okay.  So would it be correct to say you were a correctional health nurse?

A    Sure, yeah.

Q    Okay.  And you were given a detailed job description; correct?

A    Most likely.

Q    Okay.  So I'd like to show you what's going to be marked as Exhibit 1.

A    I see my name is written.

(Exhibit 1 marked for I.D.)

BY MS. MOTLEY:

Q    So I'm showing you what's been marked as Exhibit 1.

Do you recall seeing this document?

A    I do not, but I recognize that is my handwriting on there and my signature.

Q    So this is -- It looks like the detailed job description given to you by VNCC; correct?

A    Yes.

Q    And it shows on Page 3 that you signed this on August 13th of 2018.

A    Yes.

Q    And you would say this is your signature and this is the document you received?

A    Yes.

Q Okay. Great. Thank you.

Now, in working with VNCC, they also had a Standard of Conduct; correct?

A Yes.

MS. MOTLEY: So I'm going to mark this as Exhibit 2.

(Exhibit 2 marked for I.D.)

BY MS. MOTLEY:

Q So I'm showing you what's been marked as Exhibit 2, the Standard of Conduct.

Do you recall seeing this document?

A I don't recall, but I acknowledge that that is my signature and my handwriting. So I must have.

Q Okay. Great. Thank you.

And for this document, it looks like you signed it on April 13th of 2020; correct?

A Yes.

Q Okay, great.

So could you please share with us some of your job responsibilities while working at the Kenosha County Jail?

A The medication pass; performing assessments on patients, whether that be the intake assessment or detox assessments; as well as responding to emergencies. Sometimes it was assembling charts also, getting together the paperwork that was relevant to the patients.

Q Would you also provide mental health services?

A     No.

Q     Did you have someone that you could refer inmates to for those services?

A     Yes.  We had a team of mental health professionals. They typically were not there on my shift, though.

Q     And when you say they typically were not there during your shift, are you talking about the night shift from 6 p.m. to 6 a.m.?

A     Yes.

Q     Okay.  When would they typically be there?

A     I'm not sure.  I know definitely on the day shift.  I don't know exactly what their hours were since I was not there, but sometimes they would be there late charting.

Q     Okay.  And did you also have doctors that were available to you?

A     There was either a doctor or a nurse practitioner on call.

Q     Okay.  At all times?

A     At all times.

Q     Okay.  So do you recall who the doctor on call for April 25th of 2021 was?

A     No.  However, it had to be either Dr. Kevin Kremms and then the nurse practitioner was Julie Haifman.

Q     So it would be one or the other?

A     Typically, yes.

Q    Okay.  But not both?

A    I don't believe so.

Q    I see.  Okay.  And so you mentioned before that you would have to do physical examinations.

Could you please explain what that was?

A    Just a general assessment of the major body systems, getting vital signs, really just making sure that they were stable enough to be incarcerated.

Q    Okay.  And you had to do this for every inmate that came in?

A    The policy was a physical within -- it had to be offered within seven days of incarceration.

So sometimes the physical would be completed before they were sent to the housing unit.  Other times they would come up on the physical list and we would ask them when we would conduct our sick call if they were interested in coming down to the Health Services Unit for an assessment.

Q    Okay.  And you would ask inmates if they wanted to come down to the Health Services Unit for an assessment?

A    Yes.

Q    Okay.  So during COVID, which was the April 25, 2021 period, did you have to do physicals for inmates on a regular basis because of that unique time period?

A    I don't think that there was a change in the frequency of physicals, but they could always submit a medical request to

be seen, if there was a need.  And I believe we also did COVID tests at that time.  There was a period where we were doing them on everyone that came in, but I don't recall when that started.

Q    Okay.  And do you recall what the COVID test consisted of?

A    It was a nasal swab.

Q    I see.  Both nasals?

A    I don't remember.

Q    Okay.  And for those tests, where would you conduct those tests?

A    Typically in the triage room which is in the intake area.  Zone One is what they call it.

Q    Okay.  So please explain to us sort of when an inmate is driven in being arrested -- Could you please explain the process from when they're driven in and walking to the facility to when they're put in a jail cell?

A    I can't really speak on that because I wasn't really a part of them like getting housed like that.  The only time I'm really involved in that process is if I'm called -- or if there's a medical concern.  So I can't really say that I know everything it is to get them like --

Q    So during COVID, though, was there a heightened sort of need for you to assess medical issues?

A    It's hard to say.  Every day was different.  So some days there was more need for nurses than others, probably

considering they were doing the extra screening. So that probably prompted us to come see them more often than previously.

Q Okay. And what extra screening are you talking about?

A The one that the officers conduct when they come in.

Q And the extra screening, you're talking about the extra medical questions that officers would conduct of inmates during that time?

A Yes.

Q Okay. And I think you referred to that earlier where you would ask if they had symptoms of COVID, things like that; right?

A I didn't ask, the officers would.

Q And do you recall what else the officers would ask?

A In what sense?

Q During that extra screening in Zone One.

A I really don't 'cuz -- Yeah. I don't remember what was on that paper. And it was never our responsibility to ask them those questions.

Q I see. Okay. So did you ever sort of interact with inmates in Zone One?

A Yes.

Q Okay. And when would you do that?

A When I was prompted to by the officers calling. If it was -- Whether it be someone that answered in the affirmative to

some of the COVID symptoms; or, if during the booking process, if they said yes to one of the -- like diabetes or heart disease or something like that, I would come down for that. And then again if the officers called like -- for example, if someone was put in the restraint chair, I would go down and ensure that the restraints were correctly fitting.

Q    And who would typically call you down to sort of -- in Zone One to give medical help?

A    Any of the correctional officers that was working in that area.

Q    And if they called you down, did you have to confer with your supervisor or could you just go right down?

A    I could just go right down.

Q    Okay. And then when you would interact with inmates, would you write a report for all your interactions?

A    I would document on what was relevant and necessary.

Q    And where would you typically document that?

A    Once it was the electronic charting, on the software that we would use there, TechCare.

Q    Okay. Was that that NaphCare charting?

A    Yes.

Q    Okay. Got it. And so you've seen inmates that were restrained before; correct?

A    Yes.

Q    Okay. And so could you please talk to us about the

training that you received on that?

A    Just pretty much the same as anything else, just on-the-job training. Really, just ensuring that the restraints were not too tight as to impede circulation.

Q    And what other training did you receive with regards to restraining of inmates?

A    Me, as the nurse, I don't do any of the restraining. So it's really just the physical assessment when they're in the chair. And I know it's every two hours while they're in the chair. And any time that they're taken out of the chair for whatever reason and are placed back in the chair, we check again to make sure that the restraints are okay.

Q    Okay. And so you mentioned that you had on-the-job training with regards to restraints; correct?

A    Yes.

Q    Was that on-the-job training solely by other medical professionals who also worked for VNCC?

A    Correct.

Q    Okay. Did you get any on-the-job training with regards to restraints from Kenosha County?

A    No.

Q    And what types of sort of restraints did you see being used on inmates at Kenosha County Jail?

A    Like in regards to just the restraint chair?

Q    Any restraint. Just all restraints you've seen.

A    Handcuffs, primarily.  Certain individuals would have a belt that was like attached to their handcuffs.  I've seen leg shackles before, too.  And then the restraint chair.  And that's really all I can think of.

Q    Did you ever see any mouth restraints?

A    Oh, there was spit guards that could be used, if needed.

Q    Okay.  But the spit guards weren't used on everybody?

A    Correct.

Q    Okay.  And then with regards to the belt on the handcuffs, would that be for people that could like walk?

A    I'm not really sure what their criteria was for the belt.  I just know that I've seen it.

Q    Okay.  I guess a better question is:  For those that had handcuffs that were handcuffed to their belt, they weren't in the Emergency Restraint Chair necessarily; correct?

A    Not that I've seen.

Q    Okay.  So those are two different restraints?

A    Like the belt restraint with the handcuffs?

Q    Yes.

A    Yeah.

Q    Okay.  Got it.  And then with regards to the leg shackles, you saw people that were out of the ERC chair --
Sorry.

Did you refer to the Emergency Restraint Chair as the

ERC chair?

A    I might have.  I know the terms are interchangeable, ERC and the Emergency Restraint Chair.

Q    So when you say restraint chair, you're talking about the ERC?

A    Correct.

Q    And the Emergency Restraint Chair.

A    Yes.

Q    Just so we have the record.

A    Absolutely.

Q    Okay.  So when people had leg shackles -- or when you saw leg shackles being used as a restraint, did you see that for people that weren't in the ERC?

A    Correct.  I've never seen anyone with leg shackles in the Emergency Restraint Chair, I believe.  But I'm not certain that that was only used for transportation outside of the jail, like people that were destined to go to a different location.

Q    I see.  And then in terms of other types of restraints, did you ever see inmates being put in their own jail cell, for instance?

A    Oh, certainly.

Q    Okay.  Did you ever see any other types of restraints, that you can think of?

A    Not that I can think of.

Q    Okay.  And typically with the handcuffs, would they be

in front or behind?

A   It just depended.  I've seen it both ways.

Q   Okay.  And what was the basis that you would see why an inmate would be required to have -- or an officer would put a spit guard on an inmate, for instance?

MS. MEYER:  Object to foundation.

MR. BAIRD:  Join.  You can answer, if you know.

THE WITNESS:  Okay.  Typically, if they were threatening to spit or already did spit.

BY MS. MOTLEY:

Q   And did you ever recommend any restraints for any inmates?

A   No.

Q   And typically who would be the one that would determine the restraints that an inmate would have?

A   The correctional staff.  As a matter of fact, I was trained that we don't have any say in that, whether they go in the chair or go out of the chair.

Q   Okay.  And with regards to if a correctional staff member determined that a person needed a spit guard, would they inform you, generally, the basis for that?

A   Not necessarily.

Q   And if someone was in the Emergency Restraint Chair, would the staff member communicate to you why they were in the restraint chair?

A    Not necessarily.

Q    Okay.  And the same goes for leg shackles.

Would you be informed as to why someone had leg shackles on them?

A    Never.

Q    Okay.  And is it fair to say that you saw -- Well, you tell me.

About how many inmates did you see being put in the Emergency Restraint Chair?

A    Like me actively seeing them get placed in the chair?

MR. BAIRD:  Yeah, right.  First, I would object as to vague with respect to time.  And then also with respect to what it is you're talking about her actually actively doing.

MS. MEYER:  Join.

MS. MOTLEY:  Okay.  I'll withdraw.

BY MS. MOTLEY:

Q    So in 2021, just focusing on that year from January of 2021 until you no longer worked at the Kenosha County Jail, did you see inmates being put into the Emergency Restraint Chair?

A    I don't recall.

Q    During that same time period do you recall seeing inmates in the Emergency Restraint Chair?

A    Yes.

Q    Okay.  And what was the basis during that time period

for a person to be put in the Emergency Restraint Chair?

MS. MEYER: Object to foundation.

MR. BAIRD: Join. You can answer, if you know.

THE WITNESS: Because it was mainly a security thing. I don't really know all the criteria that they used to place someone in the restraint chair.

BY MS. MOTLEY:

Q What were you told for some of the inmates put in the Emergency Restraint Chair?

A It can be -- Well, if they were a risk for harming themselves or others. If they had items that were not allowed in the holding cells and there wasn't a safe way for us to get rid of them; us, I mean the correctional staff. And that's all I really know from a nursing perspective.

Q Did you ever see anyone in the Emergency Restraint Chair that was combative?

A In what time period?

Q During the same time period.

A I don't recall.

Q Do you ever recall seeing someone in the Emergency Restraint Chair ever that was combative?

A Yes.

Q Okay. Did you ever see anyone being put in the Emergency Restraint Chair that was violent?

A Yes.

Q   Did you ever see anyone being put in the Emergency Restraint Chair who was resisting arrest?

MS. MEYER:  I'm going to object to form and foundation.

MR. BAIRD:  Join.  You can answer, if you know.

THE WITNESS:  If they were already in our custody, they would have already been arrested; so I don't think so.

BY MS. MOTLEY:

Q   Do you recall if anyone had been put in the Emergency Restraint Chair that was trying to get out of it?

MS. MEYER:  Object to form and foundation.

MR. BAIRD:  Join.  You can answer, if you know.

THE WITNESS:  At times I've seen people struggle against the restraints in an attempt to get out.

BY MS. MOTLEY:

Q   Okay.  Did you ever have to recommend someone being put in the Emergency Restraint Chair?

A   No.

Q   Did you ever have to -- or recommend that an inmate be restrained for medical reasons?

A   No.

Q   Do you know if that ever happened in your time there?

A   Not that I know of.  It was very much emphasized that the nursing staff doesn't do anything with the restraints.  And it's strictly the safety and security thing.  Upon reviewing some of the policies, I did see that it says medical, but I have

never seen that in practice.

Q  Okay.  Were you ever trained on how the Emergency Restraint Chair is supposed to be used?

A  No.

Q  Did you receive -- Now, what causes a person, to your knowledge, to be put in the Emergency Restraint Chair?

MS. MEYER:  Objection.

MR. BAIRD:  Objection.  Form, foundation.  You can answer, if you know.

MS. MEYER:  I'll join.

THE WITNESS:  Typically, safety and security.

BY MS. MOTLEY:

Q  Safety and security of the person in the chair?

A  As well as the staff.

Q  Okay.  And you would agree that every single inmate was not put in the ERC; correct?

A  I would agree.

Q  Thank you.  And do you know -- Every inmate that you dealt with had HIPAA protection; correct?

A  Yes.

Q  And so I just want to clarify.  I want to use the right terminology.

If you interacted with an inmate, did that person then become a patient?

MR. BAIRD:  Objection.

MS. MOTLEY: Let me withdraw it.

BY MS. MOTLEY:

Q    What I'm trying to understand is when was the line crossed for a person that was an inmate that then became a patient for you?  What did you have to do in order for those titles to change?  Or did they change?  Does that make sense?

MR. BAIRD: I still object on foundation grounds.  But you can answer, if you know what she's asking.

MS. MOTLEY: Let me withdraw.

BY MS. MOTLEY:

Q    Every person that was arrested during your shift while you were working at the Kenosha County Jail, were they all patients of yours?

MR. BAIRD: Same objection.  You can answer, if you know.

THE WITNESS: Yeah.  I don't really know the answer to that.

BY MS. MOTLEY:

Q    So you're working from 6 a.m. to 6 p.m.; correct?

A    Correct.

Q    So if some person was arrested but you never interacted with them nor other medical professionals interacted with them, would they be considered a patient?

MR. BAIRD: Objection, foundation.  You can answer, if you know.

THE WITNESS:  To me, that almost sounds like a philosophical question.  I don't really know the answer to that.

BY MS. MOTLEY:

Q    Okay.  Did you ever refer to inmates -- Did inmates ever become patients of yours?

MR. BAIRD:  Objection, foundation.

THE WITNESS:  I don't really know how to answer that question.

BY MS. MOTLEY:

Q    Okay.  Did inmates whom you provided medical care have the protection of HIPAA?

MS. MEYER:  Objection.  Asked and answered.

MR. BAIRD:  It also calls for a legal conclusion.  But you can answer, if you know.

THE WITNESS:  I know that there's HIPAA protections in place.  I don't really know how else to answer that question.

BY MS. MOTLEY:

Q    Okay.  So is it fair to say that every single person that was arrested during your shift and brought to the Kenosha County Jail was your patient?

MS. MEYER:  Objection.  Asked and answered.

THE WITNESS:  Yeah.  I still don't know the answer to that question.

BY MS. MOTLEY:

Q    Okay.  Well, why don't you characterize to us who would

Case 2:22-cv-00970-PP    Filed 01/20/25    Page 32 of 98    Document 74-15

be deemed as a patient while you were working at the Kenosha County Jail.

MR. BAIRD: Objection, form. It's unclear who deems them and what the title means. But, again, to the extent that you know what the question is getting at, you can answer.

THE WITNESS: I really don't know.

BY MS. MOTLEY:

Q You documented interactions with inmates; correct?

A Correct.

Q Okay. And when you documented interactions with inmates, was that person a patient of yours when you would do that?

MR. BAIRD: Objection, foundation. You can answer, if you know.

THE WITNESS: I still don't know the answer to that question.

BY MS. MOTLEY:

Q Okay. On April 25th of 2021 who were all the medical professionals who were working with you that day?

A It was only me.

Q And that was from 6 a.m. -- or 6 p.m. to 6 a.m.?

A Correct.

Q Okay. Great. And who supervised you that day?

A Night shift didn't have a supervisor onsite, but we could call our supervisor if there was a need.

Q    Okay.  And where was your supervisor?  Just not onsite?

A    I assume at home.

Q    Okay.  And they would come if there was an emergency and you called them?

A    If there was a need for them to come.

Q    Okay.  And do you recall calling a supervisor on April 25th through April 26th of 2021?

A    No.

Q    And for your shift that began on April 25th of 2021 and ended April 26th of 2021, there was no supervisor onsite; correct?

A    Correct.

Q    And during that shift you were the only medical professional working during that shift; correct?

A    Yes.

Q    Okay.  And so if you ever saw an officer doing something unlawful to an inmate while they were at Kenosha County Jail, was there a mechanism in place for you to report that?

MS. MEYER:  I'm going to object to the extent of form and foundation.

MR. BAIRD:  Join.  You can answer, if you know.

THE WITNESS:  I don't know.

BY MS. MOTLEY:

Q    If there was any misconduct by other healthcare

professionals that worked at the Kenosha County Jail, what could you do about that?

MS. MEYER: Same objection.

MR. BAIRD: Join.

THE WITNESS: I could report it to my supervisor.

BY MS. MOTLEY:

Q What if your supervisor was the one that was engaging in misconduct?

A I believe there was a chain of command that we could follow.

Q Who would be the next person?

A I don't recall -- Actually, I think there was a Patrick Topp that was the president. I don't know when that ended. But I know there was someone above my boss.

Q So your chain of command, if there was misconduct by other healthcare professionals, would be within the VNCC sort of chain of command structure?

A Probably. I've never encountered that, so I never really fully explored that.

Q Okay. Were you trained on where or how to report misconduct that happened at the Kenosha County Jail by medical professionals?

A I don't recall.

Q Okay. Do you know who we can ask that could recall that?

A    No.

Q    Do you recall with regards to training on sort of misconduct by medical professionals -- What are all the trainings that you took with VNCC?

MR. BAIRD:  Objection.  Form as it relates to what that means with VNCC, if it's under VNCC's authority or someone else.

MS. MOTLEY:  I'll withdraw.

BY MS. MOTLEY:

Q    With regards to your professional background and you as an employee with VNCC, you participated in trainings; correct?

A    Yes.

Q    Did you participate in any trainings as it relates to reporting misconduct?

A    I don't recall.

Q    Okay.  Typically with the trainings that you were involved -- Well, what trainings do you recall that you were part of as an employee with VNCC?

A    I know that there was a module that we would go on for Relias, it was called.  I really can't tell you -- It was standard things, but I really -- I'm blanking right now.

Q    What is Relias?

A    It's like a training thing.  I don't know.  It has like information about each subject that they want you trained on and then you would answer questions.

Q    Okay.  And was there a test that you had to take after

this training?

A    I think so.

Q    Okay.  Was there a quiz that you would have to take also after the training?

A    Yeah.  Like I think there was questions.

Q    Okay.  And would you have to sign something or type in your signature that you completed the training?

A    I don't recall.  But I believe we would log in under our user names so it would be associated with us.

Q    Okay.  And do you recall how long these modules were?

A    They varied in length.  Some were like five minutes, other ones were like half an hour, I would guess.

Q    Okay.  And when did you take these modules as an employee of -- When did you participate in these modules as an employee of VNCC?

A    Whenever I was told there was new modules to be done. I'd say, at a minimum, yearly; but I don't know for sure.

Q    So in doing these modules was it just at one sitting that you would do it yearly?

A    It was just something that we would do on our down time at work, if you had time to do some modules.  So just depending on how the night went, you could get a good amount done.

Q    Okay.  So do you recall taking any modules as it relates to reporting misconduct of healthcare professionals?

A    I don't recall.

Q    And these were all modules that were controlled or that you were told to do through VNCC; correct?

A    I believe so.

Q    Okay.  Were you ever asked to participate in any training by Kenosha County?

A    The only training with them that I can recall is like cyber security training.

Q    Okay.  And was that involving sort of professional communication?

A    I think it was more with regards to identifying phishing attacks and that kind of thing.

Q    Do you recall when you received that training?

A    No.

Q    Do you recall if it was in 2021?

A    I do not.

Q    Do you recall how many times you participated in that training?

A    I would think yearly, but I'm not sure.

Q    Okay.  Do you recall if VNCC had a training record for you?

A    I don't know.

Q    Do you know who would have the training record that you completed?

A    No.

Q    Okay.  If you saw an officer that was engaged in

misconduct, who would you report that to?

MS. MEYER:  Object to form, foundation, asked and answered.

MR. BAIRD:  Join.

THE WITNESS:  I don't know.

BY MS. MOTLEY:

Q    Did you ever report an officer for misconduct?

MS. MEYER:  Same objection -- Well, not asked and answered, but form and foundation.

THE WITNESS:  Not that I recall.

BY MS. MOTLEY:

Q    Do you recall ever reporting another healthcare professional for misconduct?

MR. BAIRD:  Asked and answered.  You can answer, if you remember.

THE WITNESS:  Not that I recall.

BY MS. MOTLEY:

Q    Is there anything that we can look at that may help refresh your memory on those trainings?

A    I don't know who would have kept the documents or who they'd go to, so I'm not sure.

Q    So you don't recall if you reported misconduct of a health care professional?

MS. MEYER:  Asked and answered.

MR. BAIRD:  Same objection.  You can answer, if you

have a different answer.

THE WITNESS:  No.

BY MS. MOTLEY:

Q    And you don't recall if you reported misconduct of an officer or you did not ever report misconduct of an officer?

MS. MEYER:  Asked and answered now three times.

THE WITNESS:  I don't recall.

BY MS. MOTLEY:

Q    Do you recall ever in your career reporting misconduct of anyone?

MR. BAIRD:  Objection, form.  But to the extent you understand, you can answer.

MS. MEYER:  Join.

THE WITNESS:  I don't recall.

BY MS. MOTLEY:

Q    Do you recall ever reporting misconduct of an inmate?

A    Misconduct in what sense from an inmate?

Q    If they behaved inappropriately with you.

A    Our interactions were supervised by a correctional officer.  So they would intervene, if necessary.

Q    Okay.  So you've never reported misconduct by an inmate?

A    Not that I recall.

Q    Do you recall if an inmate ever behaved violently with you?

A   I've had coffee thrown on me before. I've had someone that said they were COVID positive and blew in my face. But that's the extent of anything really bad that I experienced.

Q   Do you recall as an employee with VNCC taking any trainings as it relates to patients' constitutional rights?

A   I don't recall.

Q   Did you take any training as it relates to use of force while you were an employee of VNCC?

A   I don't think so. My capacity on the job, there was never an instance that I ever should have been applying force.

Q   What did you understand use of force to mean?

MS. MEYER: I'm just going to object to the extent it calls for a legal conclusion. But if you have an answer, go ahead.

THE WITNESS: I guess I've never really thought about what use of force meant. But like physically touching someone for some reason, would be my guess. That's my best guess.

BY MS. MOTLEY:

Q   Okay. Were you ever directed to read the manual as it relates to the Emergency Restraint Chair?

A   I don't recall.

Q   Did you ever participate in putting an inmate in the Emergency Restraint Chair?

MS. MEYER: Asked and answered.

THE WITNESS: Never.

BY MS. MOTLEY:

Q    Now let's go to April 25th of 2021.  Do you recall working that day?

A    Yes.

Q    Do you recall what your hours were that day?

A    It should have been 6 to 6, 6 p.m. to 6 a.m.

Q    Okay.  And do you recall on that day -- and I may have asked this -- was there a supervisor onsite that day?

MS. MEYER:  Asked and answered.  But, obviously, go ahead.

THE WITNESS:  For VNCC, there was not.

BY MS. MOTLEY:

Q    Okay.  Was there a supervisor with Kenosha County for you on that day?

A    No.

Q    Okay.  And on that day do you recall interacting with any inmates?

A    Yes.  From what I recall, I interacted with Mr. Blake when I was checking his restraints.  And I would have done med pass that night, so I would have interacted with every person that needed medication.

Q    Okay.  And other than talking with your lawyer, what did you do to prepare for today's deposition?

A    I reviewed some of the documents, but not all of them.

Q    What documents did you review?

A    Whatever I was sent by Brian.  I know there were some videos of that night.  I saw the Incident Report of Mr. Blake getting put in the chair.

Q    Anything else?

A    I think that's it.

Q    Okay.  Could you please describe Mr. Blake to us?

A    Like what he looked like?

Q    Yes.

A    I know he was an African American male.  And that's really all I remember, truly.

Q    Okay.  And what I want to show to you is a publically-available picture of Justin Blake, if you could please confirm if that's who you believe Justin Blake to be.

MS. MEYER:  I'm going to object.  Form, foundation.  We have no idea when this picture was taken.  We don't know if this is what he looked like on the date in question.

THE WITNESS:  Yeah.  And with the sunglasses, it's hard to identify.  I believe it probably is, but I can't say with a hundred percent certainty.

BY MS. MOTLEY:

Q    Okay.  Do you recall Justin Blake having long hair, as depicted in this picture?

A    I don't recall, honestly.

Q    Do you recall what he was wearing?

A    No.

Q    I have another picture.

STENOGRAPHER:  Do you want this marked?

MS. MOTLEY:  This one, no.  Don't worry about this one. I'm just trying to have her identify him.

MR. BAIRD:  So this one has not been marked?

MS. MOTLEY:  No.  Literally, this isn't a trick question.

BY MS. MOTLEY:

Q    Do you recall Justin Blake looking as the person in this picture?

A    From what I recall, yes, that appears to be him.

MR. BAIRD:  And, for the record, we're referring to the second of two photos that you've presented to the witness.

We haven't marked either yet, though; correct?

MS. MOTLEY:  Yes.  So I would like to mark this exhibit as Exhibit 3.

(Exhibit 3 marked for I.D.)

BY MS. MOTLEY:

Q    Do you recall interacting with a Joseph Cardinelli on April 25th or April 26th of 2021?

A    I do not.

Q    Do you recall interacting with a Jonathan Baker on April 25th through April 26th of 2021?

A    I do not.

Q    Do you know why Mr. Blake was arrested?

MS. MEYER: Object to foundation.

MR. BAIRD: Join. You can answer, if you know.

THE WITNESS: Not exactly.

BY MS. MOTLEY:

Q What did you know about why Mr. Blake was at the Kenosha County Jail on April 25th of 2021?

A All I really knew was that there was some protesting going on outside of the courthouse and he got arrested as a result.

Q Do you recall who told you that?

A No.

Q And did you know that before interacting with Mr. Blake on that date?

A I don't recall.

Q Do you recall what you were wearing on April 25th of 2021?

A Just scrubs. I don't remember what color or anything.

Q Okay. And at 11:14 p.m. on April 25th of 2021, you were working at the Kenosha County Jail; correct?

A Yes.

Q So I would like to show you a picture.

Do you recall what officers were working on April 25, 2021?

A I don't remember all of them.

Q So what I want to show to you is a screen shot of a

picture of the Kenosha County Jail on April 25th of 2021.

Do you see yourself in that picture?

A    Yes.

MS. MOTLEY:  I'd like to mark this as Exhibit 4, please.

(Exhibit 4 marked for I.D.)

BY MS. MOTLEY:

Q    For Exhibit 4, could you please write your name where you are on that picture?

MS. MEYER:  Let's have her use the marked exhibit.

THE WITNESS:  Just like write my name by myself?

BY MS. MOTLEY:

Q    Write your name above where you are.

A    Is Jessica okay?

Q    Yeah.  Or you can put your initials J.B..  Mark it as J.B.

A    I tried to do it not on the dark area.

Q    Thank you.  So, for the record, you've marked J.B. above the picture of a woman standing that's wearing a white mask; correct?

A    I don't mean to be splitting hairs, but I actually think it's yellow.

Q    Okay.  But --

A    Yes, that's me.

Q    Okay.  Great.  Now, on this same picture do you see

Justin Blake?

A    Yes.

Q    Could you please mark Blake above his picture.

And then in this picture, do you recognize any of the other people in the picture?

A    Yes.

Q    Who do you recognize?

A    I recognize corporal Martini, Gloria Galvan, Jacob DiCello and Dereemeyun Haynes.

Q    Okay.

A    The other three individuals standing behind me, I don't know who they are.

Q    So you said corporal Martini.

A    Uh-huh.

Q    Could you please near that person mark where he is and maybe draw an arrow?

MR. BAIRD:  And maybe because it's clearest, it would be easiest just behind him so we can see your writing.

THE WITNESS:  Just Martini?

BY MS. MOTLEY:

Q    Yes.  That's fine.

And you mentioned you know where Gloria Galvan is?

A    Yes.

Q    Could you please mark where she is?

A    Can I just write Galvan?

Q You can put G.G. And maybe put an arrow so it's clear.

And who else do you recognize in this picture?

A Jacob DiCello.

Q Could you please mark where Jacob DiCello is?

A Just J.D.?

Q Yes, that's fine.

A I'll put an arrow by him, too.

Q Okay. And then there's one other person.

A Dereemeyun Haynes.

Q Dereemeyun Haynes, okay.

Could you please mark where Dereemeyun Haynes is in this picture?

A (Indicating).

Q Thank you. For the record, Dereemeyun Haynes is the African American man who is standing; correct?

A Yes.

Q Okay. And then who is the Caucasian man who is crouched down?

A That would be Jacob DiCello.

Q Okay. So for the record, Jacob DiCello is the Caucasian man who is crouched down to the left of Jacob Blake -- I'm sorry, Justin Blake; correct?

A Correct.

Q And then to the right of Justin Blake is a woman who is standing but sort of is bent over. That is Gloria Galvan;

correct?

A    I believe so.

Q    Okay.  And then there's a Caucasian man who is standing to the right of Gloria Galvan with a white mask that is corporal Martini; correct?

A    Yes.

Q    Okay.  Now, do you know, who is the man that's standing to the right of corporal Martini?

A    I do not.

Q    And, do you know, who are the two gentlemen that are standing to the right of you in this picture?

A    I'm not sure.

Q    Okay.  Thank you.

Now, on this date, could you please describe what Mr. Blake was wearing?

A    I don't recall.  From this photo it looks like he was wearing a white-collared button-up.

Q    Okay.  And at some point you were interacting with Mr. Blake on April 25th of 2021; is that correct?

A    Yes.

Q    Okay.  Do you recall your first interactions with him?

A    Not specifically.  It's kind of an umbrella thing, I would say, to people when they are placed in a restraint chair. I just will introduce myself as the nurse.  And I just say that I'll just be checking the restraints to ensure they're a proper

fit.

Q    Okay.

MR. BAIRD:  And just to -- I apologize.  I should have caught it while you were questioning.

But when you referred to the white buttoned-down shirt in the photo, you were referring to Exhibit 3, not Exhibit 4?

THE WITNESS:  Yes.

MS. MOTLEY:  Thank you.  Good catch.

BY MS. MOTLEY:

Q    Do you recall who told you to come to interact with Mr. Blake on that date?

A    I do not.

Q    Okay.  Do you recall if you came on your own?

A    I don't think I did.

Q    Okay.  Now, could you please explain to us your interactions with Mr. Blake on April 25th of 2021?

A    Based on my charting that I did, I would have interacted with him each time that I checked his restraints.  I don't remember us exchanging any words.

Q    And that's on April 25th of 2021; correct?

A    Yes.  And going into the 26th as well.

Q    Yeah.  I'm going to break it up.

A    Okay.

Q    So on April 26th of 2021, do you recall interacting with Mr. Blake?

A    I believe my restraint checks ended -- some of the them were on the 26th.  So there would have been similar interactions.

Q    Could you please explain to us what those interactions were on April 26th of 2021?

A    I just would have been going to him and just ensuring proper fit of the restraints.  Yeah.  I don't really know if there was much more I can provide than that.

Q    So in your interactions with Mr. Blake, did you document all your interactions with Mr. Blake that day?

A    Yes.

Q    Would it refresh your memory to look at your report that you documented that day?

A    Sure.  Maybe.

Q    Okay.

MS. MOTLEY:  I believe this is Exhibit 5.

(Exhibit 5 marked for I.D.)

BY MS. MOTLEY:

Q    Do you recall this document that's in front of you?

A    Yes.

Q    What is this document?

A    This is the Restraints Check Log that I would have done for each time I checked his restraints.

Q    Okay.  Did you write any other reports with regards to your interactions with Mr. Blake, other than this document?

A     Not that I recall.

Q     And why did you create this document?

A     It was our policy to document for restraint checks.

Q     And do you recall if -- Did you document sort of Mr. Blake's demeanor?

A     I see there's -- Well, let me review this.  Yes.

Q     Okay.  How did you note his demeanor that day?

A     For the first three checks, it looks like I did quiet and calm.

MR. BAIRD:  Just make sure you're answering the question as phrased.  I think the question was how did you note his demeanor.

THE WITNESS:  How did I know?

BY MS. MOTLEY:

Q     Okay. I'll rephrase.

What was Mr. Blake's demeanor that day on April 25th and 26th?

A     From what I recall, calm and quiet.

Q     Do you recall him being assaultive?

MS. MEYER:  I'd object that it seeks a legal conclusion.

MR. BAIRD:  And I would join and also throw in a general form objection.  But you can answer, if you understand what she's getting at.

MS. MOTLEY:  I'll withdraw.

BY MS. MOTLEY:

Q    If Mr. Blake was assaultive that day, you would have noted it in this document; correct?

MS. MEYER:  Just so I -- Assaultive or assaulted?

MS. MOTLEY:  Assaultive.  Sorry.

THE WITNESS:  So if his behavior was assaultive?

BY MS. MOTLEY:

Q    Yes.

A    Yes.

Q    And did you note his behavior as being assaultive?

A    No.

Q    If Mr. Blake exhibited self-injurious behavior, you would have noted that on this document; correct?

A    I didn't witness any self-injurious behavior.  But I only saw him for not that long; so, no, I did not witness him being that way.

Q    How long did you see Mr. Blake on April 25th through April 26th?

A    The checks don't usually take that long.  Probably like around a minute or so for each check.

Q    So it looks like, according to this document, you interacted with him four times; correct?

A    Yes.

Q    So is it fair to say that you interacted with him for about four minutes from April 25th through April 26th?

A    That sounds right.

Q    Okay.  So I note on this document on the last page --
So you first interacted with Mr. Blake on actually April 25th of
2021; correct?

A    Yes.

Q    Okay.  So that's a typo where it says April 26, 2021 at
23:09.

A    I can actually see all the way to the right it says it
was a late entry.  So I think that's what that was gearing at.
But, yeah, that would have been the 25th.

Q    Okay.  Got it.

     And so do you recall when you put that entry in?

A    No.  It would have been that same shift though.

Q    Okay.  Is it possible that was put in at the 2:05 a.m.
entry?

A    Yeah, that's very possible.

Q    Okay.  So you didn't witness Mr. Blake having
destructive behavior; correct?

A    Correct.

Q    You only exhibited Mr. Blake, according to this, being
quiet and calm, sleeping and alert and responsive; correct?

A    Correct.

Q    And you never gave Mr. Blake any medication; correct?

A    Correct.

Q    So with regards to the Comments section, you would

agree that this document is a true and accurate description of what you observed of Mr. Justin Blake on April 25, 2021 through April 26, 2021; correct?

A     Correct.

Q     All right.  So you never gave any medications; correct?

A     Correct.

Q     And with regards to -- You noted that you had verbal interactions with Mr. Blake starting at 11:09 p.m. on April 25th of 2021; correct?

A     Correct.

Q     And what did that verbal interaction consist of?

A     Like I said before, usually I would just do like kind of an overall, hi, I'm the nurse, I'm here to check your restraints to make sure they fit.  I don't recall if he responded to me.

Q     And then at 3:45 a.m. on April 26th of 2021, it says, according to the code:  Fluids offered and verbal interaction.

Nos. 2 and 7 are noted; correct?

A     Yeah.

Q     So could you please explain to us that verbal interaction?

A     I probably asked him if he wanted fluids.

Q     Okay.  And you woke him up; correct?

A     It looks like he woke up from -- I don't know if it was maybe the sound of the door or what, but I don't recall like,

you know, purposely waking him or anything.

Q   Okay.  And when you typically go check on him, do you do that by yourself or do you need somebody else with you?

A   An officer is always there.

Q   Why?

A   It's policy.

Q   That's just normal policy?

A   Right.

Q   Okay.  Do you recall did you ever call any of the offsite supervisors to come onsite to help with Mr. Blake?

A   No.

Q   Did you call any mental health professionals to help with Mr. Blake that day?

A   I wouldn't have access to a mental health professional.  They weren't like on call or anything.

Q   Okay.  So mental health services were not available to him on April 25, 2021 through April 26th of 2021?

MS. MEYER:  I'd object.  That misstates the testimony.

THE WITNESS:  To my knowledge, there was not access to mental health at that time.

BY MS. MOTLEY:

Q   Okay.  And did you observe Mr. Blake being searched by anyone on that date?

A   Not that I recall.

Q   Okay.  Do you recall asking Mr. Blake any questions?

A     I don't remember.

Q     What medical treatment did you provide to him on April 25th through April 26th of 2021?

A     Just ensuring that the restraints were not too tight.

Q     Did you observe whether or not the restraints were too tight on him?

A     I initially couldn't remember.  But I did watch the video of when he first gets -- I think it's when he first gets put in the chair.  You can see me asking the officer to loosen one of the restraints.

Q     If the officer did not loosen one of the restraints, is there some sort of complaint mechanism that you'd go to to report that misconduct?

        MS. MEYER:  Asked and answered.

        THE WITNESS:  I'm not sure.  I've never encountered that situation.

BY MS. MOTLEY:

Q     So you've never had to complain against an officer for putting the restraints too tightly on an inmate?

        MS. MEYER:  Same objection.

        MR. BAIRD:  Objection as to form in terms of what complaint means.  But to the extent you know what she's getting at, you can answer.

        THE WITNESS:  Whenever I've asked an officer to loosen the restraints on the restraint chair, they loosen them.

BY MS. MOTLEY:

Q   Okay.  And did you smell any alcohol?

A   I don't recall.

Q   If you did, you would you would have documented that; correct?

A   I'm not sure if I would have.

Q   Okay.  But you didn't see anything that was -- Did you see anything that was alarming to you in terms of how Mr. Blake was being treated?

MS. MEYER:  Object to form and object to foundation.

MR. BAIRD:  Join.  You can answer, if you know.

THE WITNESS:  By the time I was there, I was just checking the restraints.  It didn't seem like anything was really going on.

BY MS. MOTLEY:

Q   Was this the first time you've ever interacted with Mr. Justin Blake?

A   That first restraint check?

Q   Just in life.

Before April 25th of 2021 had you ever had any interactions with Justin Blake?

A   I don't believe so.

Q   Okay.  And since April 26th of 2021 have you had any interactions with Mr. Justin Blake?

A   No.

Q So that was the one and only time -- Well, you answered.

Did you object to Mr. Blake being put in the chair?

A It wouldn't have been my role to do that.

Q Did you object to Mr. Blake being put in the chair?

MS. MEYER: Asked and answered.

MS. MOTLEY: She didn't answer.

THE WITNESS: It wasn't within my scope to do that, so I couldn't do that.

BY MS. MOTLEY:

Q The question is: Did you object to Justin Blake being put in the chair?

A It wouldn't have been my place to do that, so I couldn't have done that.

Q You're not answering the question. The question is very simple. It's a yes or no question.

Did you object to Mr. Blake being put in the chair?

A No.

Q Do you know if anyone else objected to Mr. Blake being put in the chair?

A I have no idea.

Q Did you approve of Mr. Blake being put in the chair?

MS. MEYER: Object to form.

MR. BAIRD: Join.

THE WITNESS: I was never asked.

BY MS. MOTLEY:

Q   Did anyone ever tell you why he was being put in the chair?

A   I don't recall.

Q   Did you ever ask?

A   I don't recall.

Q   Do you know if there were any other methods of restraints that were used against Mr. Blake?

A   I don't know.

Q   Did you ask?

A   I don't think so.

Q   Did you use any efforts to limit the amount of force that was used against Mr. Blake on that date?

MS. MEYER:  Object to form.

THE WITNESS:  As a nurse, I don't have any say in that.

BY MS. MOTLEY:

Q   Okay.  So the question is a yes or no.

Did you use any efforts to limit the amount of force used against Mr. Blake on that date?

MS. MEYER:  Same objection.

MR. BAIRD:  Join.

THE WITNESS:  I don't believe I was even down there when he was being placed in the chair.  So --

BY MS. MOTLEY:

Q   So the question is:  Did you use any efforts to limit

the amount of force used against Mr. Blake?

MS. MEYER:  Just for the record, same objection.

THE WITNESS:  I don't think so.

BY MS. MOTLEY:

Q    Do you know, was this the least restrictive amount of force used against Mr. Blake?

MS. MEYER:  Object to foundation and form.

MR. BAIRD:  Join.  You can answer, if you know.

THE WITNESS:  I have no idea.

BY MS. MOTLEY:

Q    Okay.  Did you ask?

A    No.

Q    Did you know that he was arrested for a non-criminal violation?

MS. MEYER:  Object to form.

MR. BAIRD:  And foundation.  You can answer, if you know.

THE WITNESS:  No.

BY MS. MOTLEY:

Q    Did you know why he had been arrested?

MS. MEYER:  Object to form and foundation.

MR. BAIRD:  Same.  You can answer, if you know.

THE WITNESS:  Nothing more than beyond what I had already said about something with a protest.

BY MS. MOTLEY:

Q Okay. So as far as you know, he was being arrested for something with regards to protest?

A That's it, yeah.

Q Okay. Do you recall where Mr. Blake was placed while he was in the chair?

STENOGRAPHER: I'm sorry?

BY MS. MOTLEY:

Q Do you recall where Mr. Blake was placed after he was put in the chair?

A Like what cell he was moved to?

Q Yes.

A No.

Q Okay. Do you recall who moved him?

A No.

Q Were you part of the process of moving him?

A No.

Q Is that something that you would have been part of the process of, normally?

A Never.

Q Okay. Do you recall what Mr. Blake was wearing?

MS. MEYER: Asked and answered multiple times.

MR. BAIRD: Same objection. You can answer, if you remember.

THE WITNESS: Yeah. What I said before. I don't

remember. But looking at the photos, I could see he was probably wearing a white button-down.

BY MS. MOTLEY:

Q But in the photo, which is Exhibit 4, it looks like --

MS. MEYER: It might be easier to look at the marked version.

MR. BAIRD: Yeah. Why don't we get them marked first and then refer to each exhibit.

BY MS. MOTLEY:

Q So looking at Exhibit 4, it looks as though Mr. Blake is wearing a black shirt; correct?

A Correct.

Q Okay. Does that look to be like -- Well, you can't really tell that much.

Do you recall if Mr. Blake was wearing shoes while he was in the chair?

A I don't recall.

Q Okay. Do you know if he was wearing a belt?

A I don't recall.

Q Do you remember if he was wearing any jewelry?

A I do not recall.

Q Do you recall if he was wearing glasses?

A No, I don't recall.

Q Who was the person that supervises you to make sure -- At that point in time, April 25th and 26th, who was the person

that was supervising you to make sure you're doing everything that you're supposed to do?

A    I was the only medical staff there.  I suppose if corrections had extra -- the correctional side of the staff had concerns, they could go to their supervisor.  But there was no one there on VNCC's side supervising me.

Q    And what guidelines or handbooks were you supposed to follow as an employee of VNCC in dealing with someone like Mr. Blake who was put in the Emergency Restraint Chair?

A    There were policies available to us in the Health Services Unit.

Q    And with what's been marked as Exhibit 5, is this a typical document that you would complete if someone was put in the Emergency Restraint Chair?

A    I believe so.  We had gone to the electronic charting not too long ago, so I charted on -- I did the documentation on what I thought was correct.

Q    Okay.  And is this documentation also what you'd use with regards to anyone that's put in restraints?

A    You're asking like if on that date if another person was placed in restraints, would they also receive the same charting?

Q    Let me rephrase.

So I see on the top of this document it says Restraint Checks; right?

A    Yes.

Q    So is this a document that you would fill out if someone was being restrained?

A    Yes.

Q    Okay.  Did anyone other than your lawyer ever question or investigate sort of what you did this day as it relates to Mr. Blake?

MS. MEYER:  Object to foundation.

MR. BAIRD:  Join.  You can answer, if you know.

THE WITNESS:  I'm confused by the question.

BY MS. MOTLEY:

Q    Okay.  Was there anyone within VNCC that ever talked to you about their concern of how you interacted with Mr. Blake on this date?

A    No.

Q    Was there anyone with Kenosha County that ever talked to you of their concern with how you interacted with Mr. Blake on this day?

A    No.

Q    Did you ever recommend that Mr. Blake not be restrained on April 25, 2021?

MS. MEYER:  Object to form.

MR. BAIRD:  Object, asked and answered as well.  You can answer, if you know.

THE WITNESS:  No.  Because it was not my role.

BY MS. MOTLEY:

Q    Did you ever recommend that Mr. Blake not be restrained on April 26th of 2021?

MS. MEYER:  Same objection.

MR. BAIRD:  Join.  You can answer, if you know.

THE WITNESS:  No.  Because it was not my role.

BY MS. MOTLEY:

Q    Do you recall why Mr. Blake was taken out of the Emergency Restraint Chair in the early morning hours of April 26th of 2021?

MS. MEYER:  Object to foundation and form.

MR. BAIRD:  Join.  You can answer, if you know.

THE WITNESS:  No.  Because I'm not the one that decides when they go in and out of the chair.  All the officers do is call me to let me know when he is out.

BY MS. MOTLEY:

Q    Okay.  As far as you know, was there any clinical justification for Mr. Blake -- medical clinical justification for Mr. Blake to be put into the restraint chair?

MS. MEYER:  Object to foundation.

MR. BAIRD:  Join.  You can answer, if you know.

THE WITNESS:  No.  He was not placed in there for medical reasons.

BY MS. MOTLEY:

Q    In terms of what you observed, did you ever observe on

April 25th or April 26, 2021 Mr. Blake being uncooperative with the restraints that were put on him in the chair?

MS. MEYER: Object to form.

THE WITNESS: Not that I recall. But I wasn't there for the entirety of the situation.

BY MS. MOTLEY:

Q Okay. Do you recall why Mr. Blake was put in a single cell by himself?

MS. MEYER: Object to foundation.

THE WITNESS: I have no idea why the officers house inmates or patients where they house them.

BY MS. MOTLEY:

Q Okay. Did you ever talk to Mr. Blake about being compliant while he was in the Emergency Restraint Chair on April 25, 2021?

MS. MEYER: Object to form.

THE WITNESS: No. Because it was not my role.

BY MS. MOTLEY:

Q Other than talking to Mr. Blake when you initially interacted with him at about 11:09 p.m. on April 25th of 2021, according to your notes you next interacted with him verbally at 12:18 on April 26th; is that correct?

A Yes.

Q What did you say to him?

MS. MEYER: I think we may have gone down this road

already.  Asked and answered.

MS. MOTLEY:  I don't believe we have.

MR. BAIRD:  Yeah.  I'll join.  But you can answer, if you remember.

THE WITNESS:  I don't recall exactly.  But typically what I would say when I would check on people's restraints is, hi, I'm the nurse.  I'm just going to make sure your restraints aren't too tight, or something along those lines.

BY MS. MOTLEY:

Q    So that happened on 11:09 p.m.  So I'm talking about the second interaction with him when he was in the cell.

A    Yeah.

Q    Did you talk to him?

A    Probably.  I don't remember the exact nature of everything.  But whenever I go in there, it's usually what I say.

Q    Okay.  So you would have went inside the cell when you talk to somebody; correct?

A    Yes.

Q    Okay.  So if you didn't go inside the cell, then you weren't talking to him; correct?

MS. MEYER:  I think that mischaracterizes her testimony.

MS. MOTLEY:  Well, I'm just trying to get clarification.

MS. MEYER:  That's fine.

THE WITNESS:  Probably not.  It's not that it was like impossible to.  There's a chance that I could have, but it would have been like with an officer.  But I don't recall doing that.

BY MS. MOTLEY:

Q   Okay.  So as far as you know, Mr. Blake was cooperative with what you witnessed; correct?

MS. MEYER:  Object to form.

THE WITNESS:  Not my place to say.

BY MS. MOTLEY:

Q   My question is this:  Did you witness Mr. Blake being uncooperative on April 25th of 2021?

MS. MEYER:  Same objection.  And I'll add foundation too.

MR. BAIRD:  Yeah.  And I'll object to form in particular about what cooperativeness means.  But to the extent you understand what she's getting at, you can answer.

THE WITNESS:  Yeah.  I don't know what they dictate cooperative or uncooperative as.  So I don't know how to analyze what those signs would be.

BY MS. MOTLEY:

Q   So I'm asking you, I'm not asking them.

So with regards to you, have you ever dealt with an inmate that was uncooperative?

MS. MEYER:  I'm going to object to form and foundation

again.  She just said she doesn't know the criteria.

MS. MOTLEY:  She said she doesn't know their criteria.  I'm asking for her to answer the question.

BY MS. MOTLEY:

Q    So my question to you is:  Have you ever dealt with an inmate that was uncooperative?

MS. MEYER:  Same objection.  I'll just make it a standing objection for this line so I don't have to interrupt.

MR. BAIRD:  I'll join.  You can answer, if you know what she's talking about.

THE WITNESS:  Yeah.  I guess I'm not really understanding the question from my perspective then.

BY MS. MOTLEY:

Q    Do you know what the word uncooperative means?

A    In a layman's sense.

Q    And what does it mean?

A    Someone that is not willing to cooperate.

Q    Okay.  So when the inmate threw coffee on you, were they being cooperative or uncooperative?

A    I mean, it's not that they weren't cooperating as much as being violent.

Q    So they were being both.  They were being violent; correct?

A    Violent is one thing.

Q    And also uncooperative; correct?

A    There wasn't anything that I was asking him to do to cooperate with.

Q    Okay.  Did you witness Mr. Blake being uncooperative with any of the officers on April 25, 2021?

MR. BAIRD:  Objection.  It's so vague as to what that means.  If you can break it down, that might be helpful.

MS. MEYER:  Join.

BY MS. MOTLEY:

Q    Do you recall Mr. Blake not following any of the officers' commands on April 25, 2021?

MS. MEYER:  I'd object to foundation.  We don't even know if she heard anything.

MR. BAIRD:  Right.  Join.  But to the extent that you have personal knowledge, you can answer.  I can have her read the question back if it's been lost in your mind.

THE WITNESS:  Yeah.

BY MS. MOTLEY:

Q    Do you have any personal knowledge or did you witness Mr. Blake not following any of the officers' commands on April 25th of 2021?

A    I don't even think that I was present for any of the commands.  So there was nothing to cooperate or be uncooperative with.

Q    Do you recall Mr. Blake being given any commands by any officers on April 25, 2021?

A    I don't recall.

Q    Do you recall Mr. Blake being given any officers' commands on April 26th of 2021?

A    Not that I can recall.

Q    When you were checking Mr. Blake's restraints on April 25th of 2021, he was already in the chair; correct?

A    Yes.

Q    Okay.  When did you first -- I know I asked this, but I want to refresh my memory.

When did you first see Mr. Blake on April 25th of 2021?

A    I believe it was that first restraint check.

Q    And he was already in the chair?

A    Yes.

Q    And when is the last time that you saw Mr. Blake on April 26th of 2021?

A    I would assume my last restraint check.  I don't recall seeing him any other time after that.

Q    Okay.  And that would have been April 26, 2021 at 3:45 a.m.?

A    Yes.

Q    Okay.  And on April 25th of 2021 did you have a lot of patients that day?

MS. MEYER:  Object to form.

MR. BAIRD:  Yeah.  I would join.  To the extent that you know.

THE WITNESS: Yeah. I don't recall. It was a long time ago.

BY MS. MOTLEY:

Q So why did you put late entries in on April 25th of 2021?

A Probably because I couldn't chart them in real time.

Q Do you recall why you couldn't do that?

A No. I was the only nurse working that night, so it would stand to reason that I might have been busy.

Q Okay. How far away was Mr. Blake while he was in his cell to where you would chart information?

A There was two locations. There was a computer like right in the zone area, which wasn't far at all. And then there was also an area upstairs that I could chart.

Q Was it just like one floor up?

A Yes.

Q Okay. Do you recall if April 25, 2021 through April 26, 2021 was a particularly unusually busy day for you?

A I don't recall.

Q Do you recall seeing Mr. Blake being discharged?

A You mean taken out of the chair?

Q Sorry. Good question.

Do you recall Mr. Blake being taken out of the chair permanently on April 26, 2021?

A I don't believe so.

Q    Because you left at 6 a.m. that day; correct?

A    Yes.  Well, around that time.

Q    Okay.  And do you recall before you left if Mr. Blake had been taken out of the chair permanently?

A    According to my documentation, he would have been -- from what I said, he was removed from the ERC at 5:38, which would have been still on my shift.

Q    Okay.  But that's not something you would have put under the Restraint Checks page, the first page?

A    That he was taken out?

Q    Yes.

A    I don't think so.

Q    Okay.  I'm just wondering if that's something you would typically put on this page.

A    These we only used a handful of times from the transition of paper to electronic charting.  So it's hard for me to remember like everything that was even an option to go on this page.

Q    Okay.  So other than being put in the Emergency Restraint Chair, what were other less restrictive means that were attempted on Mr. Blake?

MS. MEYER:  Objection to foundation and form.

MR. BAIRD:  Join.  You can answer, if you remember.

THE WITNESS:  I don't know.

BY MS. MOTLEY:

Q Okay. So if you look on Page 2 under Less Restrictive Means Attempted, do you see that?

A Uh-huh.

Q You checked Other; correct?

A Uh-huh.

MR. BAIRD: Yes?

THE WITNESS: Yes.

BY MS. MOTLEY:

Q So what are you talking about? What were the Other that you're talking about?

A So in Other, I wrote: Applied by correctional staff. That was like my way of saying this wasn't a medical decision. So it wasn't my place to have any less restrictive means.

Q So if you -- just to be clear because I've heard you say it's not my place -- if you saw an inmate that had restraints of any kind that were too tight, it's your position that it would not have been your place to inform a correctional officer of that?

MR. BAIRD: Objection, misstates previous testimony. But you can answer, if you know.

THE WITNESS: No. That's not what I'm saying at all. I'm just saying it was not my choice that he went in the chair. I can tell them to loosen the restraints if they're too tight.

BY MS. MOTLEY:

Q But you can't tell them that the restraints for anybody are just too tight, period, unless you're actually directly dealing with them?

MR. BAIRD: Objection.

MS. MOTLEY: I'll withdraw. Never mind.

BY MS. MOTLEY:

Q With regards to the restraints that were applied, according to this document restraints were applied to right arm, left arm, right leg, left leg; correct?

A Correct.

Q All right. And you noted that those restraints were applied by detention staff; correct?

A Correct.

Q Okay. Do you know why all those restraints were necessary to be used on Mr. Blake on April 25th of 2021?

MS. MEYER: Object to form and foundation.

MR. BAIRD: Join.

THE WITNESS: No.

BY MS. MOTLEY:

Q Do you recall if the restraint was used over his shoulders within the Emergency Restraint Chair?

A From what I recall, there was an over-the-shoulder restraint as well.

Q So that was a fifth restraint that was applied to him;

correct?

A     I believe so.

Q     Do you recall if there was any other restraint that was applied to Mr. Blake on April 25th of 2021?

A     I believe there's also one that goes across the waist.

Q     Okay.  So he had six restraints, according to what you recall?

A     I believe so.

Q     And on this, there weren't any safety precautions that were necessary to Mr. Blake; correct?  On this page it has Safety Precautions.  Do you see that?

A     Oh, okay.  Yes, I see it.

Q     And there weren't any safety precautions that you checked that were necessary to be applied to Mr. Blake on this date; correct?

A     I'm just reviewing this for a moment.

Q     Sorry.

A     Of the four things listed there -- the suicide smock, suicide blanket, underclothes only and clothing removed -- none of those things happened.  And it also wouldn't be my place to say whether they do or don't happen.

Q     Okay.  No.  I'm just trying to understand why you checked certain boxes and didn't check certain boxes.

A     Yeah.

Q     So if there were any other safety precautions that were

applied to Mr. Blake, is this where you would have noted them?

A    I think it's just asking like about those four things specifically.  Because I don't see an option to say Other.  I think that these kind of systems just come as a blanket.  And they make more sense for some facilities and not other facilities.  So of those four items, those were not enacted.

Q    Okay.  Thank you.

MS. MOTLEY:  I have nothing further.

MS. MEYER:  I have a couple of questions for you.

CROSS EXAMINATION

BY MS. MEYER:

Q    We haven't formally met yet.  I'm Bri Meyer.  I represent the county defendants in this case.  And I will try not to take more than five minutes.

A    Do what you got to do.

Q    So way at the beginning of your deposition attorney Motley was asking you questions about different criteria for placing inmates in the ERC.

Do you remember that line of questioning?

A    Vaguely.

Q    Okay.  Do you remember testifying that if an inmate was at risk of harm to themselves or others, sometimes that's why they would be put in the ERC?

A    Yes.

Q    Do you remember testifying that if an inmate had items

on them that could cause harm, that's a reason they could be put in the ERC?

A    Yes.

Q    Okay.  Are there more reasons that maybe you don't even know about of why an inmate could be placed in an ERC?

MS. MOTLEY:  Objection, vague.

THE WITNESS:  Absolutely, I'm certain there's reasons that I don't know.  Anyone could be placed in a restraint chair.

BY MS. MEYER:

Q    You don't proclaim to be an ERC master; right?

A    Exactly.

Q    Okay.  And then I'll jump forward.

You gave a little bit of testimony about when an inmate is initially put into an ERC, you come over and you let them know if the restraints need to be loosened; is that right?

MS. MOTLEY:  Objection, misstates testimony.

THE WITNESS:  Say that again?

BY MS. MEYER:

Q    Sorry.  I'll rephrase because that was a bad question.

You had testified that when an individual is initially put in an ERC -- I'll make it specific to Mr. Blake -- you had told the officers that one of the restraints might need to be loosened.  Do I have that right?

A    Yes.

Q    And did the officers then loosen that restraint?

A    Yes.  As supported by the video.

MS. MEYER:  I don't have any other questions.  Thank you.

MR. BAIRD:  I don't think I have any, but let me just check my notes real quick.

Do you have any follow-up?

MS. MOTLEY:  I do.

MR. BAIRD:  Okay.  Go ahead.

REDIRECT EXAMINATION

BY MS. MOTLEY:

Q    So you said -- Which officer did you tell to loosen the restraints?

A    I believe from the video, from what I recall, I think it was officer Galvan.

Q    Okay.  And are you sure that she loosened the restraints?

A    Yes.  Because then I recheck it afterwards to ensure that it's a proper fit.

Q    And how do you test whether or not it's -- because it's just a feel test; correct?

A    Uh-huh.  So the way we're trained is to be able to get at least one finger in between the patient and the restraint.  And then there's also looking for signs of inadequate circulation which would be swelling, cold extremities, pain, redness, that kind of thing.

Q So when I asked you earlier, you said -- you testified that you didn't recall if Mr. Blake had any items on him that he wasn't supposed to; correct?

A I don't know about that. I wouldn't know if he did or would or wouldn't have items.

Q Okay. How many times did you check Mr. Blake's restraints while he was under arrest?

A While he was under arrest?

Q Yes.

A Not while he was under arrest. But when he was in custody, the four times that I documented.

Q So those four times. You checked the restraints four times?

A Yes.

Q And that would be in the video?

A I don't know if all of the restraint checks would be in the video. I don't know if where he was had camera access.

Q Your earlier testimony was that for some of these checks, you don't recall if you verbally talked to him.

A Well, if I charted that I did, I must have.

Q Okay. So that was incorrect.

You testified earlier that you don't know if you verbally talked to him.

A I think what I was trying to say is I don't remember exactly what I said.

Q    Okay.  You also testified that every time you verbally talked to him, you weren't necessarily in the room; correct?

MR. BAIRD:  Objection, misstates previous testimony.

MS. MEYER:  Join.

MR. BAIRD:  You can answer, if you remember.

BY MS. MOTLEY:

Q    So you're saying for 11:09, you checked his restraints physically.

A    Yes.

Q    And then at 12:18 on April 26, 2021, you also checked his restraints.

A    Yes.

Q    And on April 26, 2021 at 2:05 a.m., you checked his restraints for a third time.

A    Yes.

Q    And then on April 26, 2021 at 3:45 a.m., you checked his restraints for a fourth time.

A    Yes.

Q    And these were all videos that you saw that you reviewed for today to confirm that; correct?

MR. BAIRD:  Objection, misstates her previous testimony.

MS. MEYER:  Join.

MS. MOTLEY:  I disagree.  She said she looked at videos.  She never really said what videos.  And, frankly, we

have videos of all this time period.

BY MS. MOTLEY:

Q So what --

A Yeah. So way earlier I said that I've seen some of the videos. So I know I saw one video in particular where I'm checking one of the restraints and I see the officer loosen it. And, honestly, I think that was the first time. I can't say for a hundred percent sure. I don't know if the other incidents are on video because I have not reviewed all of the video.

Q Okay. But when you said earlier that a person is not supposed to be in this chair for more than two hours, that means you're supposed to be checking the restraints every two hours; correct?

MR. BAIRD: Objection, misstates previous testimony.

MS. MEYER: Join.

MS. MOTLEY: Sorry.

BY MS. MOTLEY:

Q Please explain to us what you meant when you said earlier about an inmate is not supposed to be in the ERC chair for two hours, or something to that effect.

MR. BAIRD: Objection, misstates previous testimony.

MS. MEYER: Join.

BY MS. MOTLEY:

Q Please clarify.

A Yeah. I didn't say that. I don't have any say in how

long or short they're placed in the chair.  I just have to check for a minimum of every two hours just to ensure that the restraints fit okay.

Q    Okay.  So you have to check for a minimum of every two hours to make sure the restraints are fine?

A    Yes.  Or as needed or if they are out of the chair and then come back in.

Q    Okay.  And that's checking all the restraints.

A    Uh-huh.

Q    Okay.

MR. BAIRD:  Yes?

THE WITNESS:  Yes.

MS. MOTLEY:  I have nothing further.  Thank you.

MS. MEYER:  I don't have anything further.

MR. BAIRD:  Nothing for me.

MS. MOTLEY:  I do have a couple follow-ups.  Sorry.

BY MS. MOTLEY:

Q    Why do you have to check every two hours the restraints?

A    I think that's just per policy.  I'm not sure.

Q    What policy?

A    It would be VNCC's policy, I believe.  It's the way I was trained.

Q    Who trained you on this?

A    Any of the people that trained me before.  I don't

recall exactly who, but it could have been Quadalupe, it could have been Tiffany.  I don't recall for sure.

    Q    But not Kenosha County; correct?

    A    Not Kenosha County.

         MS. MOTLEY:  Thank you.  I have nothing further.

         STENOGRAPHER:  Signature?

         MR. BAIRD:  Why don't we reserve, just to be safe.

         STENOGRAPHER:  Are you taking the transcript?

         MOTLEY:  Yes, please.  Can I get the mini?

         MS. MEYER:  I'll do a condensed.  Thank you.

         MR. BAIRD:  Great.  And I'll take a copy.

                              (Proceedings end at 2:00 p.m.)

STATE OF WISCONSIN   )
                     )  SS.
WALWORTH COUNTY      )

        I, NANCY ANN BELLINO, Stenographer in and for the State of Wisconsin, do hereby certify that the foregoing is a true and correct transcript of all the proceedings had in the above-entitled matter and the same are contained in my original machine shorthand notes on the said deposition.

Dated at Walworth, Wisconsin on April 22, 2024.

_____

                    NANCY ANN BELLINO

                      ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

IN RE:   Justin Blake v. David Beth, et al.
CASE NO. 22 CV 970

WITNESS:  JESSICA BERGMANN
TAKEN:  APRIL 15, 2024

PAGE     LINE          CHANGE              REASON FOR CHANGE
_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true.

_____     _____
Date                 JESSICA BERGMANN
April 22, 2024
Brian Baird, Esq.
c/o Borgelt, Powell, Peterson & Frauen, S.C.
bwbaird@borgelt.com

WITNESS: JESSICA BERGMANN
RE: Blake vs. Beth, et al.
Case No: 22 CV 970
Type of Proceedings: Deposition on April 15, 2024

The transcript of the above proceeding is now available and requires signature by the witness.

Please have the witness read his deposition and note any corrections on the Errata Sheet above.

Once completed, please print, sign and return the Errata Sheet to our office for distribution to all parties.

If you are in need of assistance, please contact Established Reporting Solutions at 414-460-3363.
.
If the witness does not read and sign the transcript within a reasonable amount of time, the original transcript may be filed with the Clerk of the court.

If the witness wishes to waive his/her signature now, please have the witness sign in the blank at the bottom of this letter and return to the e-mail address listed below.

Very truly yours,

_____
NANCY ANN BELLINO
nbellinocsr1@gmail.com

I do hereby waive my signature

_____
    JESSICA BERGMANN

**'**

'21 [1] - 11:6
'cuz [1] - 21:17

**1**

1 [5] - 3:12, 8:5, 16:9, 16:11, 16:13
10th [1] - 2:16
11:09 [4] - 55:8, 67:20, 68:10, 82:7
11:14 [1] - 45:18
1243 [1] - 2:16
12:00 [1] - 1:12
12:18 [2] - 67:22, 82:10
13th [2] - 16:21, 17:15
1433 [1] - 2:4
15 [3] - 1:12, 87:5, 88:5
16 [1] - 3:12
17 [1] - 3:13
1st [2] - 8:4, 8:8

**2**

2 [6] - 3:13, 17:5, 17:6, 17:8, 55:18, 75:2
2014 [1] - 9:4
2018 [9] - 5:25, 6:2, 6:12, 6:19, 7:16, 9:4, 9:13, 15:25, 16:21
202 [1] - 1:14
2020 [1] - 17:15
2021 [72] - 6:19, 7:17, 8:4, 8:5, 8:8, 8:16, 9:11, 9:13, 9:15, 11:14, 14:14, 15:7, 15:25, 18:21, 19:21, 27:17, 27:18, 33:18, 34:7, 34:9, 34:10, 38:14, 42:2, 44:20, 44:23, 45:6, 45:16, 45:18, 45:23, 46:1, 49:19, 50:16, 50:20, 50:24, 51:5, 54:4, 54:6, 55:2, 55:3, 55:9, 55:16, 56:17, 57:3, 58:20, 58:23, 65:21, 66:3, 66:10, 67:1, 67:15, 67:20, 69:12, 71:4, 71:10, 71:20, 71:25, 72:3, 72:6, 72:10, 72:15, 72:18, 72:21, 73:5, 73:17, 73:18, 73:24, 76:16, 77:4, 82:10, 82:13, 82:16
2024 [5] - 1:12, 86:13, 87:5, 88:1, 88:5
22 [5] - 1:6, 86:13, 87:3, 88:1, 88:4
23:09 [1] - 54:7
25 [12] - 7:17, 9:13, 19:21, 45:22, 55:2, 56:17, 65:21, 67:15, 71:4, 71:10, 71:25, 73:17
25th [40] - 6:19, 8:16, 9:11, 9:15, 14:14, 15:7, 15:25, 18:21, 33:18, 34:7, 34:9, 42:2, 44:20, 44:23, 45:6, 45:15, 45:18, 46:1, 49:19, 50:16, 50:20, 52:16, 53:17, 53:25, 54:3, 54:10, 55:8, 57:3, 58:20, 63:25, 67:1, 67:20, 69:12, 71:20, 72:6, 72:10, 72:21, 73:4, 76:16, 77:4
26 [9] - 54:6, 55:3, 67:1, 72:18, 73:18, 73:24, 82:10, 82:13, 82:16
26th [21] - 34:7, 34:10, 44:20, 44:23, 50:21, 50:24, 51:2, 51:5, 52:17, 53:18, 53:25, 55:16, 56:17, 57:3, 58:23, 63:25, 66:3, 66:10, 67:22, 72:3, 72:15
2745 [1] - 1:13
28106 [1] - 2:4
2:00 [2] - 1:13, 85:13
2:05 [2] - 54:14, 82:13

**3**

3 [5] - 3:14, 16:20, 44:16, 44:17, 50:6
300 [1] - 2:17
3:45 [3] - 55:16, 72:19, 82:16

**4**

4 [8] - 3:3, 3:15, 46:4, 46:6, 46:8, 50:6, 63:4, 63:10
414-271-7722 [1] - 2:11
414-287-9184 [1] - 2:18
414-460-3363 [1] - 88:11
44 [1] - 3:14

46 [1] - 3:15

**5**

5 [4] - 3:16, 51:16, 51:17, 64:12
500 [1] - 2:10
51 [1] - 3:16
53202 [1] - 2:11
53205 [1] - 2:17
5:38 [1] - 74:6

**6**

6 [14] - 10:12, 10:14, 18:7, 18:8, 31:19, 33:21, 42:6, 74:1

**7**

7 [1] - 55:18
704-763-5413 [1] - 2:5
710 [1] - 2:10
78 [1] - 3:4

**8**

80 [1] - 3:4
86 [1] - 3:6
87 [1] - 3:6
88 [1] - 3:7

**9**

970 [3] - 1:6, 87:3, 88:4

**A**

a.m [11] - 18:8, 31:19, 33:21, 42:6, 54:14, 55:16, 72:19, 74:1, 82:13, 82:16
ability [1] - 9:13
able [1] - 80:21
above-entitled [1] - 86:8
absolutely [2] - 25:10, 79:7
access [3] - 56:14, 56:19, 81:17
according [7] - 53:21, 54:20, 55:17, 67:21, 74:5, 76:9, 77:6
accurate [1] - 55:1
acknowledge [1] - 17:11
actively [2] - 27:10, 27:13
add [2] - 14:5, 69:13

additional [1] - 14:6
address [1] - 88:15
affiliated [1] - 7:11
affiliation [2] - 7:21, 8:9
African [2] - 43:9, 48:15
afterwards [1] - 80:17
ago [2] - 64:16, 73:2
agree [3] - 30:15, 30:17, 55:1
ahead [3] - 41:14, 42:10, 80:8
ailments [1] - 11:22
al [4] - 1:7, 2:13, 87:3, 88:4
alarming [1] - 58:8
alcohol [1] - 58:2
alert [1] - 54:21
allowed [1] - 28:11
almost [1] - 32:1
American [2] - 43:9, 48:15
amount [6] - 37:22, 60:12, 60:18, 61:1, 61:5, 88:13
analyze [1] - 69:19
Ann [1] - 1:14
ANN [3] - 86:5, 86:18, 88:18
answer [46] - 26:7, 28:3, 29:4, 29:11, 30:9, 31:8, 31:14, 31:16, 31:24, 32:2, 32:7, 32:14, 32:16, 32:22, 33:5, 33:13, 33:15, 34:22, 36:24, 39:14, 39:25, 40:1, 40:12, 41:13, 45:2, 52:23, 57:23, 58:11, 59:7, 61:8, 61:16, 61:22, 62:23, 65:9, 65:24, 66:5, 66:12, 66:21, 68:3, 69:17, 70:3, 70:9, 71:14, 74:23, 75:21, 82:5
answered [17] - 14:7, 21:25, 32:12, 32:21, 39:3, 39:9, 39:14, 39:24, 40:6, 41:24, 42:9, 57:14, 59:2, 59:6, 62:22, 65:23, 68:1
answering [2] - 52:10, 59:15
apologize [1] - 50:3
appeared [3] - 2:6, 2:13, 2:19
applied [8] - 75:12, 76:8, 76:9, 76:13, 76:25, 77:4, 77:14, 78:1
applying [1] - 41:10
approve [1] - 59:22
APRIL [1] - 87:5
April [83] - 1:12, 6:19, 7:17, 8:16, 9:11, 9:13, 9:15, 11:15, 14:14, 15:7, 15:25, 17:15, 18:21, 19:21, 33:18, 34:7, 34:9, 34:10, 42:2, 44:20, 44:23, 45:6, 45:15, 45:18, 45:22, 46:1, 49:19, 50:16, 50:20, 50:24, 51:5, 52:16, 53:17, 53:18, 53:25, 54:3, 54:6, 55:2, 55:3, 55:8, 55:16, 56:17, 57:3, 58:20, 58:23, 63:25, 65:21, 66:3, 66:10, 67:1, 67:15, 67:20, 67:22, 69:12, 71:4, 71:10, 71:20, 71:25, 72:3, 72:6, 72:10, 72:15, 72:18, 72:21, 73:4, 73:17, 73:18, 73:24, 76:16, 77:4, 82:10, 82:13, 82:16, 86:13, 88:1, 88:5
area [8] - 10:25, 13:1, 13:9, 20:12, 22:10, 46:17, 73:13, 73:14
arm [2] - 76:9, 76:10
arrest [4] - 29:2, 81:7, 81:8, 81:10
arrested [11] - 15:6, 20:14, 29:6, 31:11, 31:21, 32:19, 44:25, 45:8, 61:13, 61:20, 62:2
arrow [3] - 47:16, 48:1, 48:7
ARS [1] - 15:10
Ascension [2] - 6:18, 11:7
assaulted [1] - 53:4
assaultive [5] - 52:19, 53:2, 53:5, 53:6, 53:10
Assaultive [1] - 53:4
assembling [1] - 17:23
assess [2] - 14:7, 20:23
assessment [8] - 11:1, 12:18, 13:7, 17:21, 19:6, 19:17, 19:19, 23:8

assessments [5] - 10:23, 10:25, 12:24, 17:20, 17:22
assistance [1] - 88:11
associated [1] - 37:9
ASSOCIATION [1] - 2:20
association [1] - 7:9
assume [2] - 34:2, 72:16
asthma [1] - 13:3
attached [1] - 24:2
attacks [1] - 38:11
attempt [1] - 29:13
attempted [1] - 74:21
Attempted [1] - 75:3
attended [1] - 9:9
attorney [1] - 78:16
August [4] - 6:12, 6:19, 7:16, 16:21
authority [1] - 36:6
available [6] - 10:6, 18:15, 43:12, 56:16, 64:10, 88:6
Avenue [1] - 2:10

## B

Bachelor's [1] - 6:9
background [2] - 5:17, 36:9
bad [2] - 41:3, 79:19
Baird [1] - 88:1
BAIRD [66] - 2:15, 7:3, 26:7, 27:11, 28:3, 29:4, 29:11, 30:8, 30:25, 31:7, 31:14, 31:24, 32:6, 32:13, 33:3, 33:13, 34:22, 35:4, 36:5, 39:4, 39:14, 39:25, 40:11, 44:5, 44:12, 45:2, 47:17, 50:3, 52:10, 52:22, 57:21, 58:11, 59:24, 60:21, 61:8, 61:16, 61:22, 62:23, 63:7, 65:9, 65:23, 66:5, 66:12, 66:21, 68:3, 69:15, 70:9, 71:5, 71:13, 72:24, 74:23, 75:7, 75:20, 76:5, 76:18, 80:4, 80:8, 82:3, 82:5, 82:21, 83:14, 83:21, 84:11, 84:15, 85:7, 85:11
Baker [1] - 44:22
Banulas [1] - 10:9
based [1] - 50:17
basis [4] - 19:23, 26:3,

26:21, 27:25
became [1] - 31:4
become [2] - 30:24, 32:5
began [1] - 34:9
beginning [1] - 78:16
behalf [4] - 2:6, 2:13, 2:19, 4:3
behaved [2] - 40:18, 40:24
behavior [5] - 53:6, 53:10, 53:12, 53:14, 54:18
behind [3] - 26:1, 47:11, 47:18
BELLINO [3] - 86:5, 86:18, 88:18
Bellino [1] - 1:14
below [1] - 88:16
belt [6] - 24:2, 24:10, 24:13, 24:15, 24:19, 63:18
bent [1] - 48:25
Bergmann [3] - 4:7, 4:18, 5:16
BERGMANN [8] - 1:11, 2:20, 3:2, 4:2, 87:4, 87:24, 88:3, 88:21
best [2] - 9:12, 41:17
Beth [2] - 87:3, 88:4
BETH [2] - 1:7, 2:13
better [1] - 24:14
between [2] - 7:21, 80:22
beyond [1] - 61:23
bit [4] - 9:23, 11:18, 13:11, 79:13
black [1] - 63:11
Blake [92] - 42:18, 43:2, 43:6, 43:12, 43:13, 43:21, 44:9, 44:25, 45:5, 45:12, 47:1, 47:3, 48:21, 48:22, 48:24, 49:15, 49:19, 50:11, 50:16, 50:25, 51:9, 51:10, 51:25, 53:2, 53:12, 53:17, 54:3, 54:17, 54:20, 54:23, 55:2, 55:8, 56:10, 56:13, 56:22, 56:25, 58:8, 58:17, 58:21, 58:24, 59:3, 59:5, 59:11, 59:17, 59:19, 59:22, 60:8, 60:13, 60:19, 61:1, 61:6, 62:5, 62:9, 62:21, 63:10, 63:15, 64:9, 65:7, 65:13, 65:17, 65:20,

66:2, 66:8, 66:18, 66:19, 67:1, 67:7, 67:13, 67:19, 69:6, 69:11, 71:3, 71:9, 71:19, 71:24, 72:2, 72:10, 72:14, 73:10, 73:20, 73:23, 74:3, 74:21, 76:16, 77:4, 77:10, 77:14, 78:1, 79:21, 81:2, 87:3, 88:4
BLAKE [2] - 1:4, 2:7
Blake's [4] - 52:5, 52:16, 72:5, 81:6
blank [1] - 88:15
blanket [2] - 77:19, 78:4
blanking [1] - 36:20
blew [1] - 41:2
blocks [1] - 12:13
BMeyer@ CrivelloLaw.com [1] - 2:12
body [1] - 19:6
booked [2] - 13:2, 13:12
booking [2] - 13:13, 22:1
Borgelt [2] - 2:16, 88:2
boss [2] - 15:21, 35:14
bottom [1] - 88:15
Box [1] - 2:4
boxes [1] - 77:23
break [2] - 50:22, 71:6
Bri [1] - 78:12
BRIAN [1] - 2:15
Brian [2] - 43:1, 88:1
BRIANNA [1] - 2:9
brief [1] - 11:16
bring [1] - 14:22
brought [1] - 32:19
building [4] - 7:10, 7:22, 7:23
busy [2] - 73:9, 73:18
button [2] - 49:17, 63:2
button-down [1] - 63:2
button-up [1] - 49:17
buttoned [1] - 50:5
buttoned-down [1] - 50:5
bwbaird@borgelt. com [2] - 2:18, 88:2
BY [89] - 4:6, 7:5, 16:12, 17:7, 26:10, 27:16, 28:7, 29:7, 29:14, 30:12, 31:2, 31:10, 31:18, 32:3,

32:9, 32:17, 32:24, 33:7, 33:17, 34:24, 35:6, 36:8, 39:6, 39:11, 39:17, 40:3, 40:8, 40:15, 41:18, 42:1, 42:12, 43:20, 44:8, 44:18, 45:4, 46:7, 46:12, 47:20, 50:9, 51:18, 52:14, 53:1, 53:7, 56:21, 57:17, 58:1, 58:15, 59:10, 60:1, 60:16, 60:24, 61:4, 61:10, 61:19, 62:1, 62:8, 63:3, 63:9, 65:11, 66:1, 66:7, 66:16, 66:24, 67:6, 67:12, 67:18, 68:9, 69:5, 69:10, 69:21, 70:4, 70:13, 71:8, 71:17, 73:3, 75:1, 75:9, 76:1, 76:7, 76:20, 78:11, 79:9, 79:18, 80:10, 82:6, 83:2, 83:17, 83:23, 84:17

## C

c/o [1] - 88:2
calm [3] - 52:9, 52:18, 54:21
camera [1] - 81:17
capacity [1] - 41:9
Cardinelli [1] - 44:19
CARE [1] - 2:20
care [4] - 5:23, 13:13, 32:10, 39:23
Care [1] - 6:25
career [1] - 40:9
Carlson [1] - 2:9
cart [1] - 12:14
Case [2] - 1:6, 88:4
CASE [1] - 87:3
case [1] - 78:13
catch [1] - 50:8
Caucasian [3] - 48:17, 48:21, 49:3
caught [1] - 50:4
causes [1] - 30:5
cell [8] - 20:16, 25:19, 62:11, 67:8, 68:11, 68:17, 68:20, 73:11
cells [1] - 28:12
Center [1] - 5:22
certain [6] - 13:3, 24:1, 25:15, 77:23, 79:7
certainly [1] - 25:21
certainty [1] - 43:19
Certificate [1] - 3:6

Certification [1] - 3:7
certify [1] - 86:6
chain [3] - 35:9, 35:15, 35:17
chair [45] - 22:5, 23:9, 23:10, 23:11, 23:24, 24:3, 24:23, 25:1, 25:4, 26:18, 26:25, 27:10, 28:6, 30:13, 43:3, 49:23, 57:9, 57:25, 59:3, 59:5, 59:12, 59:17, 59:20, 59:22, 60:3, 60:23, 62:6, 62:10, 63:16, 66:14, 66:19, 67:2, 72:6, 72:12, 73:21, 73:23, 74:4, 75:23, 79:8, 83:11, 83:19, 84:1, 84:6
Chair [27] - 24:16, 24:25, 25:3, 25:7, 25:15, 26:23, 27:9, 27:20, 27:23, 28:1, 28:9, 28:16, 28:21, 28:24, 29:2, 29:9, 29:16, 30:3, 30:6, 41:20, 41:23, 64:9, 64:14, 66:9, 67:14, 74:20, 76:22
chance [1] - 69:3
change [3] - 19:24, 31:6
CHANGE [2] - 87:6
CHANGES [1] - 87:2
characterize [1] - 32:25
Charlotte [1] - 2:4
chart [3] - 73:6, 73:11, 73:14
charted [2] - 64:16, 81:20
charting [10] - 8:10, 8:11, 18:13, 22:18, 22:20, 50:17, 64:15, 64:22, 74:16
charts [1] - 17:23
check [14] - 23:11, 53:20, 55:13, 56:2, 58:18, 68:6, 72:11, 72:16, 77:23, 80:5, 81:6, 84:1, 84:4, 84:18
Check [1] - 51:22
checked [10] - 50:18, 51:23, 75:5, 77:14, 77:23, 81:12, 82:7, 82:10, 82:13, 82:16
checking [7] - 42:19, 49:25, 58:13, 72:5, 83:6, 83:12, 84:8

Established Reporting Solutions, LLC

**Checks** [3] - 3:16, 64:25, 74:9
**checks** [6] - 51:1, 52:3, 52:8, 53:19, 81:16, 81:19
**choice** [1] - 75:23
**circulation** [2] - 23:4, 80:24
**clarification** [1] - 68:25
**clarify** [2] - 30:21, 83:24
**class** [1] - 9:1
**classes** [1] - 8:23
**clear** [2] - 48:1, 75:15
**clearest** [1] - 47:17
**clerical** [1] - 5:22
**Clerk** [1] - 88:13
**clinical** [2] - 66:17, 66:18
**clothing** [1] - 77:19
**code** [1] - 55:17
**coffee** [2] - 41:1, 70:18
**cold** [1] - 80:24
**collared** [1] - 49:17
**college** [1] - 9:9
**color** [1] - 45:17
**combative** [2] - 28:16, 28:21
**coming** [2] - 13:10, 19:16
**command** [3] - 35:9, 35:15, 35:17
**commands** [5] - 71:10, 71:19, 71:22, 71:24, 72:3
**commencing** [1] - 1:12
**Comments** [1] - 54:25
**common** [1] - 11:21
**communicate** [1] - 26:24
**communication** [1] - 38:9
**Community** [1] - 6:25
**COMMUNITY** [1] - 2:20
**company** [1] - 8:3
**Compassus** [1] - 6:18
**complain** [1] - 57:18
**complaint** [2] - 57:12, 57:22
**complete** [1] - 64:13
**completed** [4] - 19:13, 37:7, 38:23, 88:9
**compliant** [1] - 67:14
**computer** [1] - 73:12
**concern** [3] - 20:20, 65:13, 65:17

**concerns** [1] - 64:5
**concluding** [1] - 1:12
**conclusion** [3] - 32:13, 41:13, 52:21
**condensed** [1] - 85:10
**conduct** [4] - 19:16, 20:9, 21:5, 21:7
**Conduct** [3] - 3:13, 17:3, 17:9
**confer** [1] - 22:11
**confirm** [2] - 43:12, 82:20
**confused** [1] - 65:10
**confusing** [1] - 8:20
**confusion** [1] - 7:25
**considered** [1] - 31:23
**considering** [1] - 21:1
**consist** [2] - 10:17, 55:11
**consisted** [1] - 20:4
**constitutional** [1] - 41:5
**contact** [1] - 88:11
**contained** [1] - 86:9
**continuing** [2] - 9:23, 10:15
**contract** [3] - 8:3, 8:6, 11:15
**controlled** [1] - 38:1
**cooperate** [3] - 70:17, 71:2, 71:22
**cooperating** [1] - 70:20
**cooperative** [3] - 69:6, 69:19, 70:19
**cooperativeness** [1] - 69:16
**cops** [1] - 14:22
**copy** [1] - 85:11
**corporal** [4] - 47:8, 47:13, 49:4, 49:8
**correct** [82] - 7:18, 9:9, 13:16, 16:2, 16:6, 16:18, 17:3, 17:15, 22:23, 23:14, 23:18, 24:9, 24:16, 25:6, 25:14, 30:16, 30:19, 31:19, 31:20, 33:8, 33:9, 33:22, 34:11, 34:12, 34:14, 36:10, 38:2, 44:14, 45:19, 46:20, 48:15, 48:22, 48:23, 49:1, 49:5, 49:19, 50:20, 53:3, 53:13, 53:22, 54:4, 54:18, 54:19, 54:21, 54:22, 54:23, 54:24, 55:3, 55:4, 55:5, 55:6, 55:9, 55:10, 55:18, 55:23,

58:5, 63:11, 63:12, 64:17, 67:22, 68:18, 68:21, 69:7, 70:23, 70:25, 72:6, 74:1, 75:5, 76:10, 76:11, 76:13, 76:14, 77:1, 77:10, 77:15, 80:20, 81:3, 82:2, 82:20, 83:13, 85:3, 86:7
**Correctional** [1] - 6:23
**correctional** [9] - 16:3, 22:9, 26:16, 26:19, 28:13, 40:19, 64:4, 75:12, 75:18
**corrections** [2] - 64:4, 88:8
**correctly** [1] - 22:6
**cough** [1] - 14:25
**counsel** [2] - 5:5, 5:6
**COUNTY** [2] - 2:13, 86:2
**county** [1] - 78:13
**County** [28] - 5:6, 6:1, 6:10, 6:14, 8:6, 9:16, 10:17, 11:3, 13:15, 15:16, 17:19, 23:20, 23:23, 27:18, 31:12, 32:20, 33:2, 34:18, 35:1, 35:21, 38:5, 42:13, 45:6, 45:19, 46:1, 65:16, 85:3, 85:4
**couple** [2] - 78:9, 84:16
**COURT** [1] - 1:1
**court** [2] - 4:22, 88:13
**courthouse** [1] - 45:8
**COVID** [13] - 13:16, 14:5, 14:7, 14:11, 14:15, 15:1, 19:21, 20:1, 20:4, 20:22, 21:11, 22:1, 41:2
**COVID-type** [1] - 14:7
**create** [1] - 52:2
**criminal** [2] - 4:20, 61:13
**criteria** [5] - 24:12, 28:5, 70:1, 70:2, 78:17
**Crivello** [1] - 2:9
**CROSS** [1] - 78:10
**Cross** [1] - 3:4
**crossed** [1] - 31:4
**crouched** [2] - 48:18, 48:21
**custody** [2] - 29:5, 81:11
**CV** [3] - 1:6, 87:3, 88:4
**CY** [1] - 2:3
**cyber** [1] - 38:7

### D

**dark** [1] - 46:17
**Date** [1] - 87:24
**date** [11] - 11:10, 43:16, 45:13, 49:14, 50:11, 56:23, 60:13, 60:19, 64:20, 65:14, 77:15
**Dated** [1] - 86:13
**DAVID** [2] - 1:7, 2:13
**David** [1] - 87:3
**days** [2] - 19:12, 20:25
**dealing** [3] - 6:15, 64:8, 76:4
**dealt** [4] - 12:9, 30:19, 69:23, 70:5
**decides** [1] - 66:13
**decision** [1] - 75:13
**declare** [1] - 87:22
**deemed** [1] - 33:1
**deems** [1] - 33:3
**defendants** [1] - 78:13
**Defendants** [3] - 1:8, 2:13, 2:19
**definitely** [1] - 18:11
**degree** [1] - 6:8
**demeanor** [4] - 52:5, 52:7, 52:12, 52:16
**Denise** [1] - 15:21
**dental** [1] - 11:23
**depended** [1] - 26:2
**depicted** [1] - 43:22
**deposed** [1] - 4:9
**DEPOSITION** [1] - 1:9
**Deposition** [1] - 88:5
**deposition** [5] - 4:21, 42:23, 78:16, 86:10, 88:7
**Dereemeyun** [5] - 47:9, 48:9, 48:10, 48:11, 48:14
**describe** [2] - 43:6, 49:14
**description** [3] - 16:5, 16:18, 55:1
**Description** [1] - 3:12
**destined** [1] - 25:17
**destructive** [1] - 54:18
**Detailed** [1] - 3:12
**detailed** [2] - 16:5, 16:17
**detention** [1] - 76:13
**determine** [1] - 26:14
**determined** [1] - 26:20
**detox** [2] - 12:18, 17:21
**diabetes** [2] - 13:3, 22:2

**DiCello** [5] - 47:9, 48:3, 48:4, 48:19, 48:20
**dictate** [1] - 69:18
**different** [6] - 9:9, 20:24, 24:18, 25:17, 40:1, 78:17
**DIRECT** [1] - 4:5
**Direct** [1] - 3:3
**directed** [1] - 41:19
**directly** [2] - 14:11, 76:3
**disagree** [1] - 82:24
**discharged** [1] - 73:20
**disease** [1] - 22:2
**distribution** [1] - 88:9
**DISTRICT** [2] - 1:1, 1:3
**DO** [1] - 87:2
**doctor** [3] - 11:24, 18:16, 18:20
**doctors** [1] - 18:14
**document** [23] - 16:14, 16:24, 17:10, 17:14, 22:16, 22:17, 51:10, 51:19, 51:21, 51:25, 52:2, 52:3, 52:4, 53:3, 53:13, 53:21, 54:2, 55:1, 64:13, 64:24, 65:2, 76:9, 87:22
**documentation** [3] - 64:16, 64:18, 74:5
**documented** [5] - 33:8, 33:10, 51:13, 58:4, 81:11
**documents** [4] - 8:18, 39:20, 42:24, 42:25
**done** [6] - 10:24, 37:16, 37:22, 42:19, 51:22, 59:14
**door** [1] - 55:25
**down** [19] - 4:23, 5:3, 15:2, 19:16, 19:19, 22:3, 22:5, 22:7, 22:11, 22:12, 22:13, 37:20, 48:18, 48:21, 50:5, 60:22, 63:2, 67:25, 71:6
**Dr** [2] - 1:13, 18:22
**draw** [1] - 47:16
**Drive** [1] - 1:13
**driven** [2] - 20:14, 20:15
**duly** [2] - 4:1, 4:4
**during** [19] - 12:17, 12:22, 13:13, 13:15, 13:19, 15:6, 18:6, 19:21, 20:22, 21:7, 21:16, 22:1, 27:22, 27:25, 28:18, 31:11,

32:19, 34:13, 34:14

# E

**e-mail** [1] - 88:15
**early** [2] - 11:12, 66:9
**easier** [1] - 63:5
**easiest** [1] - 47:18
**EASTERN** [1] - 1:3
**education** [1] - 9:24
**effect** [1] - 83:20
**efforts** [3] - 60:12, 60:18, 60:25
**either** [4] - 5:5, 18:16, 18:22, 44:14
**electronic** [4] - 8:11, 22:18, 64:15, 74:16
**emergencies** [2] - 10:24, 17:22
**Emergency** [27] - 24:16, 24:25, 25:3, 25:7, 25:15, 26:23, 27:9, 27:19, 27:23, 28:1, 28:9, 28:15, 28:20, 28:24, 29:1, 29:8, 29:16, 30:2, 30:6, 41:20, 41:23, 64:9, 64:14, 66:9, 67:14, 74:19, 76:22
**emergency** [2] - 12:10, 34:3
**emphasized** [1] - 29:22
**employed** [1] - 14:4
**employee** [7] - 36:10, 36:17, 37:14, 37:15, 41:4, 41:8, 64:8
**enacted** [1] - 78:6
**encountered** [2] - 35:18, 57:15
**end** [1] - 85:13
**ended** [4] - 11:15, 34:10, 35:13, 51:1
**engaged** [1] - 38:25
**engaging** [1] - 35:7
**ensure** [4] - 22:5, 49:25, 80:17, 84:2
**ensuring** [3] - 23:3, 51:6, 57:4
**entail** [2] - 11:20, 12:25
**entailed** [1] - 15:13
**ENTER** [1] - 87:2
**entirety** [1] - 67:5
**entitled** [1] - 86:8
**entries** [1] - 73:4
**entry** [3] - 54:9, 54:12, 54:15
**ERC** [15] - 24:23, 25:1, 25:3, 25:5, 25:13,

30:16, 74:6, 78:18, 78:23, 79:2, 79:5, 79:10, 79:14, 79:21, 83:19
**Errata** [3] - 3:6, 88:8, 88:9
**ERRATA** [1] - 87:1
**ESQ** [3] - 2:3, 2:9, 2:15
**Esq** [1] - 88:1
**Established** [1] - 88:11
**et** [4] - 1:7, 2:13, 87:3, 88:4
**eventually** [3] - 13:8, 13:22, 14:12
**exact** [1] - 68:14
**exactly** [7] - 13:23, 18:12, 45:3, 68:5, 79:11, 81:25, 85:1
**Examination** [3] - 3:3, 3:4, 3:4
**EXAMINATION** [3] - 4:5, 78:10, 80:9
**examinations** [1] - 19:4
**examined** [1] - 4:4
**example** [1] - 22:4
**exchanging** [1] - 50:19
**Exhibit** [18] - 16:9, 16:11, 16:13, 17:5, 17:6, 17:8, 44:16, 44:17, 46:4, 46:6, 46:8, 50:6, 51:16, 51:17, 63:4, 63:10, 64:12
**exhibit** [3] - 44:15, 46:10, 63:8
**exhibited** [2] - 53:12, 54:20
**EXHIBITS** [1] - 3:10
**experience** [1] - 9:10
**experienced** [1] - 41:3
**explain** [12] - 5:16, 8:23, 10:19, 12:11, 14:20, 19:5, 20:13, 20:14, 50:15, 51:4, 55:20, 83:18
**explored** [1] - 35:19
**exposed** [1] - 15:1
**extent** [9] - 33:4, 34:20, 40:11, 41:3, 41:12, 57:22, 69:16, 71:13, 72:24
**extra** [7] - 14:5, 21:1, 21:4, 21:6, 21:16, 64:4
**extremities** [1] - 80:24

# F

**face** [1] - 41:2
**facilities** [2] - 78:5, 78:6
**facility** [1] - 20:15
**fact** [1] - 26:16
**facts** [1] - 87:22
**fair** [3] - 27:6, 32:18, 53:24
**far** [7] - 5:18, 7:16, 62:2, 66:17, 69:6, 73:10, 73:13
**fell** [1] - 13:4
**few** [1] - 4:11
**field** [1] - 5:20
**fifth** [1] - 76:25
**filed** [1] - 88:13
**fill** [1] - 65:2
**fine** [4] - 47:21, 48:6, 69:1, 84:5
**finger** [1] - 80:22
**first** [19] - 4:4, 4:12, 5:21, 6:1, 13:1, 27:11, 49:21, 52:8, 54:3, 57:8, 58:16, 58:18, 63:7, 72:8, 72:10, 72:11, 74:9, 83:7
**fit** [5] - 50:1, 51:7, 55:14, 80:18, 84:3
**fitting** [1] - 22:6
**five** [2] - 37:11, 78:14
**floor** [1] - 73:15
**fluids** [2] - 55:17, 55:22
**focus** [1] - 9:12
**focused** [1] - 13:7
**focusing** [1] - 27:17
**follow** [4] - 35:10, 64:8, 80:6, 84:16
**follow-up** [1] - 80:6
**follow-ups** [1] - 84:16
**following** [2] - 71:9, 71:19
**follows** [1] - 4:4
**FOR** [1] - 87:6
**force** [8] - 41:7, 41:10, 41:11, 41:16, 60:12, 60:18, 61:1, 61:6
**foregoing** [2] - 86:7, 87:22
**form** [28] - 29:3, 29:10, 30:8, 33:3, 34:20, 36:5, 39:2, 39:9, 40:11, 43:14, 52:23, 57:21, 58:10, 59:23, 60:14, 61:7, 61:15, 61:21, 65:22, 66:11, 67:3, 67:16, 69:8,

69:15, 69:25, 72:23, 74:22, 76:17
**formally** [1] - 78:12
**forward** [1] - 79:12
**foundation** [27] - 26:6, 28:2, 29:3, 29:10, 30:8, 31:7, 31:24, 32:6, 33:13, 34:21, 39:2, 39:9, 43:14, 45:1, 58:10, 61:7, 61:16, 61:21, 65:8, 66:11, 66:20, 67:9, 69:13, 69:25, 71:11, 74:22, 76:17
**four** [8] - 53:22, 53:25, 77:18, 78:2, 78:6, 81:11, 81:12
**fourth** [1] - 82:17
**frankly** [1] - 82:25
**Frauen** [2] - 2:16, 88:2
**frequency** [1] - 19:24
**frequent** [1] - 10:1
**Froedtert** [1] - 11:8
**front** [2] - 26:1, 51:19
**fully** [1] - 35:19
**fundamentals** [1] - 8:25

# G

**G.G** [1] - 48:1
**Galaney** [1] - 15:22
**Galvan** [6] - 47:8, 47:22, 47:25, 48:25, 49:4, 80:14
**gearing** [1] - 54:9
**general** [2] - 19:6, 52:23
**generally** [1] - 26:21
**gentlemen** [1] - 49:10
**geriatrics** [1] - 9:1
**given** [4] - 16:5, 16:18, 71:24, 72:2
**glasses** [1] - 63:22
**Gloria** [4] - 47:8, 47:22, 48:25, 49:4
**graduate** [1] - 6:4
**graduated** [2] - 5:25, 6:2
**Great** [1] - 85:11
**great** [6] - 5:9, 17:1, 17:13, 17:17, 33:23, 46:25
**ground** [2] - 4:11, 4:21
**grounds** [1] - 31:7
**Group** [1] - 3:15
**Guadalupe** [1] - 10:7
**guard** [2] - 26:5, 26:20
**guards** [2] - 24:6, 24:8
**guess** [7] - 7:12,

24:14, 37:12, 41:15, 41:17, 70:11
**guidelines** [1] - 64:7

# H

**Haifman** [1] - 18:23
**hair** [1] - 43:21
**hairs** [1] - 46:21
**half** [1] - 37:12
**hallway** [1] - 12:19
**handbooks** [1] - 64:7
**handcuffed** [1] - 24:15
**handcuffs** [6] - 24:1, 24:2, 24:11, 24:15, 24:19, 25:25
**handful** [1] - 74:15
**handwriting** [2] - 16:15, 17:12
**hard** [3] - 20:24, 43:17, 74:16
**harm** [3] - 12:21, 78:22, 79:1
**harming** [2] - 12:21, 28:10
**Haynes** [5] - 47:9, 48:9, 48:10, 48:11, 48:14
**headache** [1] - 11:22
**heading** [1] - 8:19
**Health** [3] - 19:17, 19:19, 64:10
**health** [10] - 9:1, 12:20, 16:3, 17:25, 18:4, 39:23, 56:12, 56:14, 56:16, 56:20
**healthcare** [8] - 5:19, 5:21, 6:15, 8:6, 34:25, 35:16, 37:24, 39:12
**heard** [2] - 71:12, 75:15
**heart** [1] - 22:2
**heightened** [1] - 20:22
**help** [4] - 22:8, 39:18, 56:10, 56:12
**helpful** [1] - 71:6
**HERE** [1] - 87:2
**hereby** [2] - 86:6, 88:20
**hi** [4] - 4:8, 4:9, 55:13, 68:7
**himself** [1] - 67:8
**HIPAA** [3] - 30:19, 32:11, 32:15
**hiring** [2] - 15:12, 15:13
**his/her** [1] - 88:14
**holding** [1] - 28:12
**Home** [1] - 6:18

**home** [1] - 34:2
**honestly** [3] - 15:21, 43:23, 83:7
**Hospital** [1] - 11:8
**hospital** [2] - 14:11, 14:13
**hour** [1] - 37:12
**hours** [11] - 10:11, 18:12, 23:9, 42:5, 66:9, 83:11, 83:12, 83:20, 84:2, 84:5, 84:18
**house** [2] - 67:10, 67:11
**housed** [1] - 20:18
**housing** [1] - 19:14
**HR** [1] - 7:11
**hundred** [3] - 14:17, 43:19, 83:8

**I**

**I.D** [5] - 16:11, 17:6, 44:17, 46:6, 51:17
**idea** [4] - 43:15, 59:21, 61:9, 67:10
**identify** [2] - 43:18, 44:4
**identifying** [1] - 38:10
**Illinois** [1] - 6:7
**immediately** [2] - 14:8, 15:9
**impede** [1] - 23:4
**important** [1] - 5:1
**impossible** [1] - 69:3
**IN** [1] - 87:3
**inadequate** [1] - 80:23
**inappropriately** [1] - 40:18
**INC** [1] - 2:20
**incarcerated** [1] - 19:8
**incarceration** [1] - 19:12
**Incident** [1] - 43:2
**incidents** [1] - 83:8
**incorrect** [1] - 81:21
**INDEX** [1] - 3:1
**Indicating)** [1] - 48:13
**individual** [1] - 79:20
**individuals** [2] - 24:1, 47:11
**inform** [2] - 26:21, 75:18
**information** [2] - 36:23, 73:11
**informed** [1] - 27:3
**initial** [1] - 14:15
**initials** [1] - 46:15
**injurious** [2] - 53:12, 53:14

**inmate** [26] - 19:9, 20:13, 26:4, 26:5, 26:15, 29:18, 30:15, 30:18, 30:23, 31:4, 34:17, 40:16, 40:17, 40:22, 40:24, 41:22, 57:19, 69:24, 70:6, 70:18, 75:16, 78:21, 78:25, 79:5, 79:13, 83:19
**inmates** [29] - 6:15, 12:1, 12:4, 12:7, 14:22, 15:6, 18:2, 19:18, 19:22, 21:7, 21:21, 22:14, 22:22, 23:6, 23:23, 25:19, 26:12, 27:8, 27:19, 27:23, 28:8, 32:4, 32:10, 33:8, 33:11, 42:17, 67:11, 78:18
**inside** [2] - 68:17, 68:20
**instance** [4] - 1:11, 25:20, 26:5, 41:10
**intake** [7] - 10:25, 12:24, 13:1, 13:9, 14:3, 17:21, 20:11
**interact** [3] - 21:20, 22:14, 50:10
**interacted** [14] - 30:23, 31:21, 31:22, 42:18, 42:20, 50:18, 53:22, 53:24, 54:3, 58:16, 65:13, 65:17, 67:20, 67:21
**interacting** [6] - 42:16, 44:19, 44:22, 45:12, 49:18, 50:24
**interaction** [4] - 55:11, 55:17, 55:21, 68:11
**interactions** [14] - 22:15, 33:8, 33:10, 40:19, 49:21, 50:16, 51:3, 51:4, 51:9, 51:10, 51:25, 55:8, 58:21, 58:24
**interchangeable** [2] - 12:8, 25:2
**interested** [1] - 19:16
**interrupt** [1] - 70:8
**intervene** [1] - 40:20
**interview** [1] - 15:15
**interviewed** [2] - 15:14, 15:19
**interviewing** [1] - 15:17
**interviews** [1] - 7:24
**introduce** [1] - 49:24
**investigate** [1] - 65:6
**involved** [2] - 20:19,

36:16
**involving** [1] - 38:8
**issues** [1] - 20:23
**items** [5] - 28:11, 78:6, 78:25, 81:2, 81:5

**J**

**J.B** [2] - 46:16, 46:18
**J.B.** [1] - 46:15
**J.D** [1] - 48:5
**Jacob** [6] - 47:8, 48:3, 48:4, 48:19, 48:20, 48:21
**Jail** [18] - 6:1, 6:11, 6:14, 9:17, 10:17, 11:3, 17:19, 23:23, 27:18, 31:12, 32:20, 33:2, 34:18, 35:1, 35:21, 45:6, 45:19, 46:1
**jail** [4] - 15:4, 20:16, 25:16, 25:19
**January** [1] - 27:17
**Jessica** [1] - 46:14
**JESSICA** [8] - 1:11, 2:20, 3:2, 4:2, 87:4, 87:24, 88:3, 88:21
**jewelry** [1] - 63:20
**Job** [1] - 3:12
**job** [15] - 5:1, 5:21, 6:1, 9:20, 10:3, 10:16, 15:24, 16:5, 16:17, 17:18, 23:3, 23:13, 23:16, 23:19, 41:9
**join** [31] - 26:7, 27:14, 28:3, 29:4, 29:11, 30:10, 34:22, 35:4, 39:4, 40:13, 45:2, 52:22, 58:11, 59:24, 60:21, 61:8, 65:9, 66:5, 66:12, 66:21, 68:3, 70:9, 71:7, 71:13, 72:24, 74:23, 76:18, 82:4, 82:23, 83:15, 83:22
**Jonathan** [1] - 44:22
**Joseph** [1] - 44:19
**Julie** [1] - 18:23
**jump** [2] - 15:12, 79:12
**jumping** [1] - 11:18
**June** [3] - 11:6, 11:12, 11:13
**justification** [2] - 66:18
**JUSTIN** [2] - 1:4, 2:7
**Justin** [13] - 43:12, 43:13, 43:21, 44:9,

47:1, 48:22, 48:24, 55:2, 58:17, 58:21, 58:24, 59:11, 87:3

**K**

**KENOSHA** [2] - 2:13, 2:20
**Kenosha** [27] - 6:1, 6:10, 6:14, 8:6, 9:16, 10:17, 11:3, 13:15, 15:16, 17:19, 23:20, 23:23, 27:18, 31:12, 32:19, 33:1, 34:17, 35:1, 35:21, 38:5, 42:13, 45:6, 45:19, 46:1, 65:16, 85:3, 85:4
**kept** [1] - 39:20
**Kevin** [1] - 18:22
**KIMBERLEY** [1] - 2:3
**kind** [10] - 10:6, 10:18, 12:19, 14:10, 38:11, 49:22, 55:12, 75:17, 78:4, 80:25
**King** [1] - 1:13
**kmotley@ motleylegal.com** [1] - 2:5
**knowledge** [6] - 7:20, 9:13, 30:6, 56:19, 71:14, 71:18
**Kremms** [1] - 18:22
**KVNA** [4] - 7:3, 7:6, 7:19, 7:24
**KVNC** [1] - 7:2

**L**

**last** [4] - 10:8, 54:2, 72:14, 72:16
**late** [3] - 18:13, 54:9, 73:4
**lawyer** [2] - 42:22, 65:5
**lawyers** [1] - 5:8
**layman's** [1] - 70:15
**least** [3] - 7:22, 61:5, 80:22
**left** [5] - 48:21, 74:1, 74:3, 76:10
**leg** [9] - 24:2, 24:22, 25:11, 25:12, 25:14, 27:2, 27:3, 76:10
**Legal** [1] - 2:3
**legal** [3] - 32:13, 41:13, 52:20
**length** [1] - 37:11
**less** [2] - 74:20, 75:14
**Less** [1] - 75:2

**letter** [1] - 88:15
**Letter** [1] - 3:7
**life** [1] - 58:19
**lifting** [1] - 13:22
**lightened** [1] - 14:12
**likely** [1] - 16:7
**limit** [3] - 60:12, 60:18, 60:25
**line** [3] - 31:3, 70:8, 78:19
**LINE** [1] - 87:6
**lines** [1] - 68:8
**list** [3] - 14:23, 14:24, 19:15
**listed** [2] - 77:18, 88:15
**Literally** [1] - 44:6
**location** [1] - 25:17
**locations** [1] - 73:12
**Log** [2] - 3:16, 51:22
**log** [1] - 37:8
**look** [5] - 39:18, 51:12, 63:5, 63:13, 75:2
**looked** [3] - 43:7, 43:16, 82:24
**looking** [4] - 44:9, 63:1, 63:10, 80:23
**looks** [8] - 16:17, 17:14, 49:16, 52:8, 53:21, 55:24, 63:4, 63:10
**loosen** [8] - 57:9, 57:11, 57:24, 57:25, 75:24, 79:25, 80:11, 83:6
**loosened** [3] - 79:15, 79:23, 80:15
**lost** [1] - 71:15
**Luther** [1] - 1:13

**M**

**machine** [1] - 86:9
**mail** [1] - 88:15
**major** [1] - 19:6
**male** [1] - 43:9
**man** [5] - 48:15, 48:17, 48:21, 49:3, 49:7
**manual** [1] - 41:19
**mark** [8] - 17:5, 44:15, 46:4, 47:3, 47:15, 47:24, 48:4, 48:11
**Mark** [1] - 46:15
**marked** [16] - 16:9, 16:11, 16:13, 17:6, 17:8, 44:2, 44:5, 44:14, 44:17, 46:6, 46:10, 46:18, 51:17, 63:5, 63:7, 64:12
**Martin** [1] - 1:13

**Martini** [5] - 47:8, 47:13, 47:19, 49:5, 49:8
**mask** [4] - 13:19, 14:1, 46:20, 49:4
**masks** [1] - 13:21
**master** [1] - 79:10
**matter** [3] - 4:21, 26:16, 86:8
**mean** [7] - 4:16, 28:13, 41:11, 46:21, 70:16, 70:20, 73:21
**means** [9] - 33:4, 36:6, 57:22, 69:16, 70:14, 71:6, 74:20, 75:14, 83:11
**Means** [1] - 75:3
**meant** [2] - 41:16, 83:18
**mechanism** [2] - 34:18, 57:12
**med** [3] - 9:1, 12:22, 42:19
**med-surg** [1] - 9:1
**medical** [26] - 10:22, 11:21, 12:9, 13:2, 13:13, 14:3, 14:15, 19:25, 20:20, 20:23, 21:7, 22:8, 23:16, 29:19, 29:25, 31:22, 32:10, 33:18, 34:13, 35:21, 36:3, 57:2, 64:3, 66:18, 66:23, 75:13
**medication** [7] - 10:24, 12:10, 12:12, 12:14, 17:20, 42:21, 54:23
**medications** [4] - 12:13, 12:14, 12:16, 55:5
**meetings** [1] - 9:25
**member** [2] - 26:20, 26:24
**members** [1] - 12:2
**memory** [3] - 39:19, 51:12, 72:9
**mental** [8] - 9:1, 12:20, 17:25, 18:4, 56:12, 56:14, 56:16, 56:20
**mentioned** [3] - 19:3, 23:13, 47:22
**met** [1] - 78:12
**methods** [1] - 60:7
**MEYER** [70] - 2:9, 26:6, 27:14, 28:2, 29:3, 29:10, 30:7, 30:10, 32:12, 32:21, 34:20, 35:3, 39:2,

39:8, 39:24, 40:6, 40:13, 41:12, 41:24, 42:9, 43:14, 45:1, 46:10, 52:20, 53:4, 56:18, 57:14, 57:20, 58:10, 59:6, 59:23, 60:14, 60:20, 61:2, 61:7, 61:15, 61:21, 62:22, 63:5, 65:8, 65:22, 66:4, 66:11, 66:20, 67:3, 67:9, 67:16, 67:25, 68:22, 69:1, 69:8, 69:13, 69:25, 70:7, 71:7, 71:11, 72:23, 74:22, 76:17, 78:9, 78:11, 79:9, 79:18, 80:2, 82:4, 82:23, 83:15, 83:22, 84:14, 85:10
**Meyer** [2] - 3:4, 78:12
**might** [6] - 7:1, 25:2, 63:5, 71:6, 73:9, 79:22
**Milwaukee** [3] - 1:14, 2:11, 2:17
**mind** [2] - 71:15, 76:6
**mini** [1] - 85:9
**minimum** [3] - 37:17, 84:2, 84:4
**minute** [2] - 4:12, 53:20
**minutes** [3] - 37:11, 53:25, 78:14
**mischaracterizes** [1] - 68:22
**misconduct** [18] - 34:25, 35:8, 35:15, 35:21, 36:3, 36:13, 37:24, 39:1, 39:7, 39:13, 39:22, 40:4, 40:5, 40:9, 40:16, 40:17, 40:21, 57:13
**misstates** [7] - 56:18, 75:20, 79:16, 82:3, 82:21, 83:14, 83:21
**module** [1] - 36:18
**modules** [9] - 9:24, 37:10, 37:13, 37:14, 37:16, 37:18, 37:21, 37:23, 38:1
**moment** [1] - 77:16
**morning** [2] - 4:7, 66:9
**most** [1] - 16:7
**MOTLEY** [116] - 2:3, 4:6, 7:4, 7:5, 16:12, 17:5, 17:7, 26:10, 27:15, 27:16, 28:7, 29:7, 29:14, 30:12, 31:1, 31:2, 31:9, 31:10, 31:18, 32:3,

32:9, 32:17, 32:24, 33:7, 33:17, 34:24, 35:6, 36:7, 36:8, 39:6, 39:11, 39:17, 40:3, 40:8, 40:15, 41:18, 42:1, 42:12, 43:20, 44:3, 44:6, 44:8, 44:15, 44:18, 45:4, 46:4, 46:7, 46:12, 47:20, 50:8, 50:9, 51:16, 51:18, 52:14, 52:25, 53:1, 53:5, 53:7, 56:21, 57:17, 58:1, 58:15, 59:7, 59:10, 60:1, 60:16, 60:24, 61:4, 61:10, 61:19, 62:1, 62:8, 63:3, 63:9, 65:11, 66:1, 66:7, 66:16, 66:24, 67:6, 67:12, 67:18, 68:2, 68:9, 68:24, 69:5, 69:10, 69:21, 70:2, 70:4, 70:13, 71:8, 71:17, 73:3, 75:1, 75:9, 76:1, 76:6, 76:7, 76:20, 78:8, 79:6, 79:16, 80:7, 80:10, 82:6, 82:24, 83:2, 83:16, 83:17, 83:23, 84:13, 84:16, 84:17, 85:5, 85:9
**Motley** [4] - 2:3, 3:3, 3:4, 78:17
**mouth** [1] - 24:5
**moved** [3] - 9:22, 62:11, 62:14
**moving** [1] - 62:16
**MR** [65] - 7:3, 26:7, 27:11, 28:3, 29:4, 29:11, 30:8, 30:25, 31:7, 31:14, 31:24, 32:6, 32:13, 33:3, 33:13, 34:22, 35:4, 36:5, 39:4, 39:14, 39:25, 40:11, 44:5, 44:12, 45:2, 47:17, 50:3, 52:10, 52:22, 57:21, 58:11, 59:24, 60:21, 61:8, 61:16, 61:22, 62:23, 63:7, 65:9, 65:23, 66:5, 66:12, 66:21, 68:3, 69:15, 70:9, 71:5, 71:13, 72:24, 74:23, 75:7, 75:20, 76:5, 76:18, 80:4, 80:8, 82:3, 82:5, 82:21, 83:14, 83:21, 84:11, 84:15, 85:7, 85:11

**MS** [183] - 4:6, 7:4, 7:5, 16:12, 17:5, 17:7, 26:6, 26:10, 27:14, 27:15, 27:16, 28:2, 28:7, 29:3, 29:7, 29:10, 29:14, 30:7, 30:10, 30:12, 31:1, 31:2, 31:9, 31:10, 31:18, 32:3, 32:9, 32:12, 32:17, 32:21, 32:24, 33:7, 33:17, 34:20, 34:24, 35:3, 35:6, 36:7, 36:8, 39:2, 39:6, 39:8, 39:11, 39:17, 39:24, 40:3, 40:6, 40:8, 40:13, 40:15, 41:12, 41:18, 41:24, 42:1, 42:9, 42:12, 43:14, 43:20, 44:3, 44:6, 44:8, 44:15, 44:18, 45:1, 45:4, 46:4, 46:7, 46:10, 46:12, 47:20, 50:8, 50:9, 51:16, 51:18, 52:14, 52:20, 52:25, 53:1, 53:4, 53:5, 53:7, 56:18, 56:21, 57:14, 57:17, 57:20, 58:1, 58:10, 58:15, 59:6, 59:7, 59:10, 59:23, 60:1, 60:14, 60:16, 60:20, 60:24, 61:2, 61:4, 61:7, 61:10, 61:15, 61:19, 61:21, 62:1, 62:8, 62:22, 63:3, 63:5, 63:9, 65:8, 65:11, 65:22, 66:1, 66:4, 66:7, 66:11, 66:16, 66:20, 66:24, 67:3, 67:6, 67:9, 67:12, 67:16, 67:18, 67:25, 68:2, 68:9, 68:22, 68:24, 69:1, 69:5, 69:8, 69:10, 69:13, 69:21, 69:25, 70:2, 70:4, 70:7, 70:13, 71:7, 71:8, 71:11, 71:17, 72:23, 73:3, 74:22, 75:1, 75:9, 76:1, 76:6, 76:7, 76:17, 76:20, 78:8, 78:9, 78:11, 79:6, 79:9, 79:16, 79:18, 80:2, 80:7, 80:10, 82:4, 82:6, 82:23, 82:24, 83:2, 83:15, 83:16, 83:17, 83:22, 83:23, 84:13, 84:14, 84:16, 84:17, 85:5, 85:10

**multiple** [1] - 62:22
**must** [2] - 17:12, 81:20

## N

**name** [5] - 10:8, 16:10, 46:8, 46:11, 46:13
**names** [1] - 37:9
**NANCY** [3] - 86:5, 86:18, 88:18
**Nancy** [1] - 1:14
**NaphCare** [11] - 8:2, 8:3, 8:5, 8:9, 8:13, 8:15, 8:18, 11:16, 13:10, 22:20
**NaphCare's** [1] - 8:12
**nasal** [1] - 20:6
**nasals** [1] - 20:7
**nature** [1] - 68:14
**nbellinocsr1@gmail. com** [1] - 88:19
**NC** [1] - 2:4
**near** [1] - 47:15
**necessarily** [5] - 15:8, 24:16, 26:22, 27:1, 82:2
**necessary** [5] - 22:16, 40:20, 76:16, 77:10, 77:14
**need** [11] - 13:4, 15:9, 20:1, 20:23, 20:25, 33:25, 34:5, 56:3, 79:15, 79:22, 88:11
**needed** [6] - 12:14, 12:23, 24:7, 26:20, 42:21, 84:6
**never** [20] - 9:9, 21:18, 25:14, 27:5, 30:1, 31:21, 35:18, 40:21, 41:10, 41:15, 41:25, 54:23, 55:5, 57:15, 57:18, 59:25, 62:20, 76:6, 82:25
**new** [1] - 37:16
**next** [2] - 35:11, 67:21
**night** [11] - 9:21, 9:22, 9:23, 10:9, 10:13, 18:7, 33:24, 37:22, 42:20, 43:2, 73:8
**NO** [1] - 87:3
**non** [1] - 61:13
**non-criminal** [1] - 61:13
**none** [1] - 77:19
**normal** [1] - 56:7
**normally** [1] - 62:19
**North** [3] - 1:13, 2:10, 2:16
**Nos** [1] - 55:18

**NOT** [1] - 87:2
**Notary** [1] - 1:15
**note** [5] - 52:7, 52:11, 53:10, 54:2, 88:7
**noted** [6] - 53:3, 53:13, 55:7, 55:18, 76:12, 78:1
**notes** [3] - 67:21, 80:5, 86:10
**nothing** [7] - 15:10, 61:23, 71:22, 78:8, 84:13, 84:15, 85:5
**notice** [1] - 8:18
**Number** [2] - 3:11, 4:22
**nurse** [22] - 6:1, 7:9, 9:21, 10:4, 10:18, 10:23, 11:18, 13:5, 13:15, 15:2, 15:3, 15:11, 16:1, 16:3, 18:16, 18:23, 23:7, 49:24, 55:13, 60:15, 68:7, 73:8
**NURSE** [2] - 2:20, 2:20
**Nurse** [2] - 6:23, 6:25
**nurses** [3] - 10:5, 14:21, 20:25
**nursing** [11] - 5:25, 6:2, 8:22, 8:25, 9:1, 9:3, 9:6, 9:11, 28:14, 29:23
**Nursing** [1] - 6:9

## O

**oath** [1] - 4:4
**object** [39] - 5:6, 26:6, 27:11, 28:2, 29:3, 29:10, 31:7, 34:20, 39:2, 41:12, 43:14, 45:1, 52:20, 56:18, 58:10, 59:3, 59:5, 59:11, 59:17, 59:23, 60:14, 61:7, 61:15, 61:21, 65:8, 65:22, 65:23, 66:11, 66:20, 67:3, 67:9, 67:16, 69:8, 69:15, 69:25, 71:11, 72:23, 76:17
**objected** [1] - 59:19
**objection** [35] - 30:7, 30:8, 30:25, 31:14, 31:24, 32:6, 32:12, 32:21, 33:3, 33:13, 35:3, 36:5, 39:8, 39:25, 40:11, 52:23, 57:20, 57:21, 60:20, 61:2, 62:23, 66:4, 69:13, 70:7, 70:8,

71:5, 74:22, 75:20, 76:5, 79:6, 79:16, 82:3, 82:21, 83:14, 83:21
**objections** [1] - 5:8
**observe** [3] - 56:22, 57:5, 66:25
**observed** [2] - 55:2, 66:25
**obviously** [1] - 42:9
**OF** [4] - 1:3, 1:9, 2:13, 86:1
**offered** [2] - 19:12, 55:17
**office** [1] - 88:9
**officer** [18] - 15:2, 26:4, 34:16, 38:25, 39:7, 40:5, 40:20, 56:4, 57:9, 57:11, 57:18, 57:24, 69:4, 75:19, 80:11, 80:14, 83:6
**officers** [15] - 14:23, 21:5, 21:7, 21:13, 21:14, 21:24, 22:4, 22:9, 45:22, 66:14, 67:10, 71:4, 71:25, 79:22, 79:25
**officers'** [3] - 71:10, 71:19, 72:2
**offsite** [1] - 56:10
**often** [1] - 21:2
**ON** [1] - 87:2
**on-the-job** [7] - 9:20, 10:3, 10:16, 23:3, 23:13, 23:16, 23:19
**once** [1] - 14:5
**Once** [2] - 22:18, 88:9
**one** [25] - 4:22, 5:2, 15:14, 18:24, 21:5, 22:2, 26:14, 35:7, 37:18, 44:3, 44:5, 48:8, 57:10, 57:11, 59:1, 64:6, 66:13, 70:24, 73:15, 77:5, 79:22, 80:22, 83:5, 83:6
**One** [4] - 20:12, 21:16, 21:21, 22:8
**ones** [1] - 37:12
**onsite** [5] - 33:24, 34:1, 34:10, 42:8, 56:10
**opposed** [1] - 9:11
**option** [2] - 74:17, 78:3
**order** [1] - 31:5
**original** [2] - 86:9, 88:13
**Ortega** [1] - 10:10

**outside** [2] - 25:16, 45:8
**over-the-shoulder** [1] - 76:23
**overall** [1] - 55:13
**own** [2] - 25:19, 50:13

## P

**p.m** [11] - 1:12, 1:13, 18:7, 31:19, 33:21, 42:6, 45:18, 55:8, 67:20, 68:10, 85:13
**P.O** [1] - 2:4
**page** [6] - 54:2, 74:9, 74:14, 74:18, 77:10
**PAGE** [1] - 87:6
**Page** [3] - 3:11, 16:20, 75:2
**pain** [3] - 11:22, 11:23, 80:24
**paper** [3] - 8:10, 21:18, 74:16
**paperwork** [1] - 17:23
**parameters** [2] - 11:1, 13:4
**part** [6] - 5:1, 15:16, 20:18, 36:17, 62:16, 62:18
**participate** [4] - 36:12, 37:14, 38:4, 41:22
**participated** [2] - 36:10, 38:16
**particular** [2] - 69:16, 83:5
**particularly** [1] - 73:18
**parties** [1] - 88:10
**pass** [5] - 10:25, 12:12, 12:22, 17:20, 42:20
**passes** [1] - 12:10
**patient** [8] - 5:23, 30:24, 31:5, 31:23, 32:20, 33:1, 33:11, 80:22
**patients** [9] - 11:25, 12:4, 12:6, 17:21, 17:24, 31:13, 32:5, 67:11, 72:22
**patients'** [1] - 41:5
**Patrick** [1] - 35:12
**penalties** [1] - 87:22
**people** [23] - 7:11, 8:13, 8:15, 9:16, 11:21, 12:12, 12:18, 12:19, 13:1, 13:3, 13:12, 14:6, 14:8, 15:19, 24:11, 24:23, 25:11, 25:13, 25:17, 29:12, 47:5, 49:23,

84:25
**people's** [1] - 68:6
**per** [1] - 84:20
**percent** [3] - 14:17, 43:19, 83:8
**performing** [1] - 17:20
**period** [13] - 11:16, 14:10, 14:16, 15:6, 19:22, 19:23, 20:2, 27:22, 27:25, 28:17, 28:18, 76:3, 83:1
**perjury** [1] - 87:22
**permanently** [2] - 73:24, 74:4
**person** [20] - 5:2, 26:20, 28:1, 30:5, 30:13, 30:23, 31:4, 31:11, 31:21, 32:18, 33:11, 35:11, 42:20, 44:9, 47:15, 48:8, 63:24, 63:25, 64:20, 83:10
**personal** [2] - 71:14, 71:18
**perspective** [2] - 28:14, 70:12
**Peterson** [2] - 2:16, 88:2
**pharmacology** [1] - 8:25
**philosophical** [1] - 32:2
**phishing** [1] - 38:11
**photo** [3] - 49:16, 50:6, 63:4
**Photograph** [2] - 3:14, 3:15
**photos** [2] - 44:13, 63:1
**phrased** [1] - 52:11
**physical** [7] - 13:9, 15:9, 19:4, 19:11, 19:13, 19:15, 23:8
**physically** [2] - 41:16, 82:8
**physicals** [2] - 19:22, 19:25
**picture** [17] - 43:12, 43:15, 43:22, 44:1, 44:10, 45:21, 46:1, 46:2, 46:9, 46:19, 46:25, 47:3, 47:4, 47:5, 48:2, 48:12, 49:11
**pivot** [1] - 13:8
**pivoting** [1] - 13:23
**place** [10] - 14:4, 28:5, 32:16, 34:18, 59:13, 69:9, 75:14, 75:16, 75:18, 77:20

**placed** [11] - 23:11, 27:10, 49:23, 60:23, 62:5, 62:9, 64:21, 66:22, 79:5, 79:8, 84:1
**placing** [1] - 78:18
**Plaintiff** [4] - 1:5, 1:11, 2:6, 4:3
**Plankington** [1] - 2:10
**Pleasant** [1] - 11:8
**point** [2] - 49:18, 63:25
**policies** [2] - 29:25, 64:10
**policy** [7] - 19:11, 52:3, 56:6, 56:7, 84:20, 84:21, 84:22
**position** [1] - 75:17
**positive** [1] - 41:2
**possible** [2] - 54:14, 54:16
**Powell** [2] - 2:16, 88:2
**practice** [1] - 30:1
**practitioner** [2] - 18:16, 18:23
**Prairie** [1] - 11:9
**precautions** [3] - 77:9, 77:13, 77:25
**Precautions** [1] - 77:11
**prepare** [1] - 42:23
**prescribe** [1] - 11:24
**prescribed** [2] - 12:12, 12:15
**present** [1] - 71:21
**presented** [1] - 44:13
**president** [1] - 35:13
**pretty** [1] - 23:2
**previous** [5] - 75:20, 82:3, 82:21, 83:14, 83:21
**previously** [2] - 8:10, 21:3
**primarily** [1] - 24:1
**print** [1] - 88:9
**procedure** [1] - 13:13
**proceeding** [1] - 88:6
**Proceedings** [2] - 85:13, 88:5
**proceedings** [1] - 86:8
**process** [9] - 14:4, 15:12, 15:13, 15:17, 20:15, 20:19, 22:1, 62:16, 62:19
**proclaim** [1] - 79:10
**professional** [7] - 5:17, 34:14, 36:9, 38:8, 39:13, 39:23, 56:14
**professionals** [10] -

Established Reporting Solutions, LLC

18:4, 23:17, 31:22, 33:19, 35:1, 35:16, 35:22, 36:3, 37:24, 56:12
**programs** [1] - 6:14
**promise** [1] - 4:16
**prompted** [3] - 15:10, 21:2, 21:24
**proper** [3] - 49:25, 51:7, 80:18
**protection** [2] - 30:19, 32:11
**protections** [1] - 32:15
**protest** [2] - 61:24, 62:3
**protesting** [1] - 45:7
**protocols** [2] - 11:23, 12:18
**provide** [3] - 17:25, 51:8, 57:2
**provided** [1] - 32:10
**Public** [1] - 1:15
**publically** [1] - 43:11
**purposely** [1] - 56:1
**put** [45] - 5:8, 20:16, 22:5, 25:19, 26:4, 27:8, 27:19, 28:1, 28:8, 28:23, 29:1, 29:8, 29:15, 30:6, 30:16, 43:3, 46:15, 48:1, 48:7, 54:12, 54:14, 57:9, 59:3, 59:5, 59:12, 59:17, 59:20, 59:22, 60:2, 62:10, 64:9, 64:13, 64:19, 66:19, 67:2, 67:7, 73:4, 74:8, 74:14, 74:19, 78:23, 79:1, 79:14, 79:21
**putting** [2] - 41:22, 57:19

## Q

**Quadalupe** [1] - 85:1
**qualified** [1] - 11:1
**questioned** [1] - 13:13
**questioning** [2] - 50:4, 78:19
**questions** [18] - 5:5, 5:11, 9:12, 13:2, 14:6, 14:7, 14:16, 14:20, 14:22, 14:23, 21:7, 21:19, 36:24, 37:5, 56:25, 78:9, 78:17, 80:2
**quick** [1] - 80:5
**quiet** [3] - 52:8, 52:18, 54:21

**quiz** [1] - 37:3

## R

**Ramiro** [1] - 10:7
**RE** [2] - 87:3, 88:4
**read** [5] - 41:19, 71:14, 87:22, 88:7, 88:12
**real** [2] - 73:6, 80:5
**really** [30] - 5:23, 19:7, 20:17, 20:19, 20:20, 21:17, 23:3, 23:8, 24:4, 24:12, 28:5, 28:14, 31:16, 32:2, 32:7, 32:16, 33:6, 35:19, 36:19, 36:20, 41:3, 41:15, 43:10, 45:7, 51:7, 58:14, 63:14, 70:11, 82:25
**reason** [4] - 23:11, 41:17, 73:9, 79:1
**REASON** [1] - 87:6
**reasonable** [1] - 88:13
**reasons** [4] - 29:19, 66:23, 79:4, 79:7
**receive** [4] - 9:15, 23:5, 30:5, 64:21
**received** [4] - 10:16, 16:24, 23:1, 38:12
**recheck** [1] - 80:17
**recognize** [5] - 16:15, 47:4, 47:7, 47:8, 48:2
**recommend** [5] - 26:11, 29:15, 29:18, 65:20, 66:2
**record** [9] - 5:8, 25:9, 38:19, 38:22, 44:12, 46:18, 48:14, 48:20, 61:2
**Redirect** [1] - 3:4
**REDIRECT** [1] - 80:9
**redness** [1] - 80:25
**refer** [5] - 12:6, 18:2, 24:25, 32:4, 63:8
**referred** [2] - 21:10, 50:5
**referring** [2] - 44:12, 50:6
**refresh** [3] - 39:19, 51:12, 72:9
**regards** [20] - 6:13, 10:3, 11:2, 23:5, 23:14, 23:19, 23:24, 24:10, 24:22, 26:19, 36:2, 36:9, 38:10, 51:24, 54:25, 55:7, 62:3, 64:19, 69:23, 76:8

**registered** [1] - 16:1
**regular** [1] - 19:22
**relates** [7] - 36:5, 36:12, 37:24, 41:5, 41:7, 41:20, 65:6
**relationship** [2] - 7:14, 8:1
**released** [1] - 15:8
**relevant** [2] - 17:24, 22:16
**Relias** [3] - 9:25, 36:19, 36:21
**remember** [24] - 9:25, 11:10, 15:22, 20:8, 21:17, 39:15, 43:10, 45:17, 45:24, 50:19, 57:1, 57:7, 62:24, 63:1, 63:20, 68:4, 68:14, 74:17, 74:23, 78:19, 78:21, 78:25, 81:24, 82:5
**removed** [2] - 74:6, 77:19
**rephrase** [3] - 52:15, 64:23, 79:19
**report** [9] - 22:15, 34:18, 35:5, 35:20, 39:1, 39:7, 40:5, 51:12, 57:13
**Report** [1] - 43:2
**reported** [3] - 39:22, 40:4, 40:21
**reporter** [1] - 4:22
**Reporter's** [1] - 3:6
**reporting** [5] - 36:13, 37:24, 39:12, 40:9, 40:16
**Reporting** [1] - 88:11
**reports** [1] - 51:24
**represent** [1] - 78:13
**request** [2] - 10:22, 19:25
**requested** [1] - 10:22
**requests** [2] - 11:21, 12:10
**required** [4] - 13:19, 14:1, 15:5, 26:4
**requirements** [1] - 13:22
**requires** [1] - 88:6
**reserve** [1] - 85:7
**resisting** [1] - 29:2
**respect** [2] - 27:12
**respond** [1] - 10:24
**responded** [1] - 55:15
**responding** [1] - 17:22
**responsibilities** [1] - 17:19
**responsibility** [1] -

21:18
**responsive** [1] - 54:21
**restrained** [5] - 22:23, 29:19, 65:3, 65:20, 66:2
**restraining** [2] - 23:6, 23:7
**Restraint** [30] - 3:16, 24:16, 24:25, 25:3, 25:7, 25:15, 26:23, 27:9, 27:19, 27:23, 28:1, 28:9, 28:15, 28:21, 28:24, 29:2, 29:9, 29:16, 30:3, 30:6, 41:20, 41:23, 64:9, 64:14, 64:24, 66:9, 67:14, 74:9, 74:20, 76:22
**restraint** [25] - 22:5, 23:24, 23:25, 24:3, 24:19, 25:4, 25:12, 26:25, 28:6, 49:23, 51:1, 52:3, 57:25, 58:18, 66:19, 72:11, 72:16, 76:21, 76:24, 76:25, 77:3, 79:8, 79:25, 80:22, 81:16
**Restraints** [1] - 51:22
**restraints** [59] - 22:6, 23:3, 23:12, 23:14, 23:20, 23:22, 23:25, 24:5, 24:18, 25:18, 25:22, 26:11, 26:15, 29:13, 29:23, 42:19, 49:25, 50:18, 51:7, 51:23, 55:14, 57:4, 57:5, 57:10, 57:11, 57:19, 57:25, 58:13, 60:8, 64:19, 64:21, 67:2, 68:6, 68:7, 72:5, 75:17, 75:24, 76:2, 76:8, 76:9, 76:12, 76:15, 77:6, 79:15, 79:22, 80:12, 80:16, 81:7, 81:12, 82:7, 82:11, 82:14, 82:17, 83:6, 83:12, 84:3, 84:5, 84:8, 84:19
**restrictive** [3] - 61:5, 74:20, 75:14
**Restrictive** [1] - 75:2
**result** [1] - 45:9
**return** [2] - 88:9, 88:15
**review** [2] - 42:25, 52:6
**reviewed** [3] - 42:24, 82:20, 83:9
**reviewing** [2] - 29:24, 77:16

**Rick** [1] - 10:8
**rid** [1] - 28:13
**rights** [1] - 41:5
**risk** [2] - 28:10, 78:22
**road** [1] - 67:25
**Rockford** [4] - 6:5, 6:7, 8:21, 9:8
**role** [4] - 59:4, 65:25, 66:6, 67:17
**room** [2] - 20:11, 82:2
**rules** [2] - 4:11, 4:21

## S

**S.C** [2] - 2:16, 88:2
**safe** [3] - 15:3, 28:12, 85:7
**Safety** [1] - 77:11
**safety** [6] - 29:24, 30:11, 30:13, 77:9, 77:13, 77:25
**saw** [12] - 8:20, 24:23, 25:12, 27:6, 34:16, 38:25, 43:2, 53:15, 72:14, 75:16, 82:19, 83:5
**school** [4] - 5:25, 8:21, 9:3, 9:5
**Science** [1] - 6:9
**scope** [1] - 59:8
**screen** [1] - 45:25
**screening** [6] - 14:3, 15:10, 21:1, 21:4, 21:6, 21:16
**scrubs** [1] - 45:17
**searched** [1] - 56:22
**second** [3] - 6:24, 44:13, 68:11
**section** [1] - 54:25
**security** [5] - 28:4, 29:24, 30:11, 30:13, 38:7
**see** [46] - 7:13, 8:1, 8:5, 8:8, 10:20, 11:17, 12:15, 13:12, 14:14, 15:3, 15:5, 16:10, 19:3, 20:7, 21:2, 21:20, 23:22, 24:5, 25:12, 25:18, 25:19, 25:22, 26:3, 27:8, 27:19, 28:15, 28:23, 29:1, 29:25, 46:2, 46:25, 47:18, 52:6, 53:17, 54:8, 57:9, 58:7, 58:8, 63:1, 64:24, 72:10, 75:3, 77:11, 77:12, 78:3, 83:6
**seeing** [7] - 16:14, 17:10, 27:10, 27:22,

28:20, 72:17, 73:20
**seeks** [1] - 52:20
**seem** [2] - 8:20, 58:13
**self** [3] - 12:21, 53:12, 53:14
**self-harm** [1] - 12:21
**self-injurious** [2] - 53:12, 53:14
**send** [1] - 14:11
**sending** [1] - 14:13
**sense** [6] - 11:17, 21:15, 31:6, 40:17, 70:15, 78:5
**sent** [2] - 19:14, 43:1
**service** [1] - 12:2
**Services** [4] - 2:3, 19:17, 19:19, 64:11
**services** [3] - 17:25, 18:3, 56:16
**seven** [1] - 19:12
**shackles** [7] - 24:3, 24:23, 25:11, 25:12, 25:14, 27:2, 27:4
**shadowed** [1] - 10:18
**shadowing** [1] - 11:18
**share** [2] - 7:22, 17:18
**shared** [1] - 7:23
**SHEET** [1] - 87:1
**Sheet** [3] - 3:6, 88:8, 88:9
**shift** [21] - 9:21, 9:22, 9:23, 10:4, 10:8, 10:9, 10:11, 10:13, 18:5, 18:7, 18:11, 31:11, 32:19, 33:24, 34:9, 34:13, 34:14, 54:13, 74:7
**shirt** [2] - 50:5, 63:11
**shoes** [1] - 63:15
**short** [1] - 84:1
**shorthand** [1] - 86:9
**shot** [1] - 45:25
**shoulder** [1] - 76:23
**shoulders** [1] - 76:22
**show** [5] - 10:23, 16:8, 43:11, 45:21, 45:25
**showing** [2] - 16:13, 17:8
**shows** [1] - 16:20
**sick** [3] - 10:21, 11:19, 19:16
**side** [2] - 64:4, 64:6
**sign** [4] - 37:6, 88:9, 88:12, 88:15
**signature** [8] - 16:16, 16:23, 17:12, 37:7, 85:6, 88:6, 88:14, 88:20
**signed** [2] - 16:20, 17:14

**signs** [3] - 19:7, 69:20, 80:23
**similar** [1] - 51:2
**simple** [1] - 59:16
**single** [3] - 30:15, 32:18, 67:7
**sitting** [1] - 37:18
**situation** [2] - 57:16, 67:5
**six** [3] - 10:12, 10:14, 77:6
**sleeping** [1] - 54:21
**smell** [1] - 58:2
**smock** [1] - 77:18
**software** [5] - 8:14, 8:16, 8:17, 9:24, 22:18
**solely** [2] - 12:4, 23:16
**Solutions** [1] - 88:11
**someone** [16] - 18:2, 21:25, 22:4, 26:23, 27:3, 28:6, 28:20, 29:15, 35:14, 36:6, 41:1, 41:16, 64:8, 64:13, 65:3, 70:17
**sometimes** [5] - 12:22, 17:22, 18:13, 19:13, 78:22
**sorry** [11] - 4:14, 4:17, 7:1, 48:22, 53:5, 62:7, 73:22, 77:17, 79:19, 83:16, 84:16
**Sorry** [1] - 24:24
**sort** [21] - 5:16, 7:21, 9:15, 9:19, 10:16, 12:2, 13:15, 14:3, 14:15, 20:13, 20:22, 21:20, 22:7, 23:22, 35:16, 36:2, 38:8, 48:25, 52:4, 57:12, 65:6
**sound** [1] - 55:25
**sounds** [2] - 32:1, 54:1
**South** [1] - 11:8
**Specialty** [1] - 5:22
**specific** [1] - 79:21
**specifically** [2] - 49:22, 78:3
**spit** [6] - 24:6, 24:8, 26:5, 26:9, 26:20
**splitting** [1] - 46:21
**SS** [1] - 86:1
**stable** [1] - 19:8
**staff** [13] - 9:25, 12:2, 15:10, 26:16, 26:19, 26:24, 28:13, 29:23, 30:14, 64:3, 64:4, 75:12, 76:13
**stand** [2] - 6:22, 73:9

**standard** [1] - 36:20
**Standard** [3] - 3:13, 17:2, 17:9
**standing** [8] - 46:19, 47:11, 48:15, 48:25, 49:3, 49:7, 49:11, 70:8
**stands** [1] - 6:24
**start** [1] - 6:10
**started** [7] - 5:13, 11:7, 11:11, 13:10, 13:22, 13:23, 20:3
**starting** [1] - 55:8
**STATE** [1] - 86:1
**State** [1] - 86:6
**STATES** [1] - 1:1
**STENOGRAPHER** [4] - 44:2, 62:7, 85:6, 85:8
**Stenographer** [2] - 1:15, 86:5
**steps** [1] - 14:5
**still** [5] - 11:2, 31:7, 32:22, 33:15, 74:7
**stop** [2] - 5:7, 11:5
**Street** [1] - 2:16
**strictly** [1] - 29:24
**structure** [1] - 35:17
**struggle** [1] - 29:12
**stuff** [5] - 5:22, 7:24, 11:23, 13:2, 14:25
**subject** [1] - 36:23
**submit** [1] - 19:25
**suicide** [2] - 77:18, 77:19
**Suite** [3] - 1:13, 2:10, 2:17
**sunglasses** [1] - 43:17
**supervised** [2] - 33:23, 40:19
**supervises** [1] - 63:24
**supervising** [2] - 64:1, 64:6
**supervisor** [11] - 22:12, 33:24, 33:25, 34:1, 34:6, 34:10, 35:5, 35:7, 42:8, 42:13, 64:5
**supervisors** [1] - 56:10
**supported** [1] - 80:1
**suppose** [1] - 64:3
**supposed** [8] - 13:21, 30:3, 64:2, 64:7, 81:3, 83:11, 83:12, 83:19
**surg** [1] - 9:1
**Surgery** [1] - 5:22
**swab** [1] - 20:6

**swelling** [1] - 80:24
**sworn** [2] - 4:1, 4:4
**symptom** [1] - 14:11
**symptoms** [2] - 21:11, 22:1
**systems** [2] - 19:6, 78:4

## T

**TAKEN** [1] - 87:5
**talks** [1] - 5:2
**TB** [2] - 12:22, 12:23
**team** [1] - 18:4
**TechCare** [2] - 8:12, 22:19
**technology** [1] - 8:12
**tedious** [1] - 14:19
**terminology** [1] - 30:22
**terms** [5] - 25:2, 25:18, 57:21, 58:8, 66:25
**test** [5] - 12:23, 20:4, 36:25, 80:19, 80:20
**testified** [5] - 4:4, 79:20, 81:1, 81:22, 82:1
**testifying** [2] - 78:21, 78:25
**Testimony** [1] - 3:2
**testimony** [10] - 56:18, 68:23, 75:20, 79:13, 79:16, 81:18, 82:3, 82:22, 83:14, 83:21
**tests** [4] - 12:22, 20:2, 20:9, 20:10
**THE** [65] - 26:8, 28:4, 29:5, 29:12, 30:11, 31:16, 32:1, 32:7, 32:15, 32:22, 33:6, 33:15, 34:23, 35:5, 39:5, 39:10, 39:16, 40:2, 40:7, 40:14, 41:15, 41:25, 42:11, 43:17, 45:3, 46:11, 47:19, 50:7, 52:13, 53:6, 56:19, 57:15, 57:24, 58:12, 59:8, 59:25, 60:15, 60:22, 61:3, 61:9, 61:18, 61:23, 62:25, 65:10, 65:25, 66:6, 66:13, 66:22, 67:4, 67:10, 67:17, 68:5, 69:2, 69:9, 69:18, 70:11, 71:16, 73:1, 74:24, 75:8, 75:22, 76:19, 79:7, 79:17, 84:12
**themselves** [2] -

28:11, 78:22
**third** [1] - 82:14
**thoughts** [1] - 12:21
**threatening** [1] - 26:9
**three** [3] - 40:6, 47:11, 52:8
**threw** [1] - 70:18
**throw** [1] - 52:22
**thrown** [1] - 41:1
**Tiffany** [2] - 10:10, 85:2
**tight** [7] - 23:4, 57:4, 57:6, 68:8, 75:17, 75:24, 76:3
**tightly** [1] - 57:19
**title** [2] - 15:24, 33:4
**titles** [1] - 31:6
**today** [2] - 4:23, 82:20
**today's** [1] - 42:23
**together** [2] - 6:18, 17:23
**took** [5] - 8:3, 8:5, 8:24, 11:16, 36:4
**top** [1] - 64:24
**Topp** [1] - 35:13
**touching** [1] - 41:16
**trained** [14] - 8:13, 8:15, 9:18, 9:20, 9:22, 10:7, 26:17, 30:2, 35:20, 36:23, 80:21, 84:23, 84:24, 84:25
**training** [28] - 6:14, 8:17, 9:11, 9:16, 9:19, 9:20, 10:1, 10:3, 10:16, 23:1, 23:3, 23:5, 23:14, 23:16, 23:19, 36:2, 36:22, 37:1, 37:4, 37:7, 38:5, 38:6, 38:7, 38:12, 38:17, 38:19, 38:22, 41:7
**trainings** [7] - 36:4, 36:10, 36:12, 36:15, 36:16, 39:19, 41:5
**TRANSCRIPT** [1] - 87:2
**transcript** [5] - 85:8, 86:7, 88:6, 88:12, 88:13
**transition** [3] - 8:11, 13:10, 74:16
**transportation** [1] - 25:16
**treated** [1] - 58:9
**treatment** [1] - 57:2
**triage** [1] - 20:11
**trick** [1] - 44:6
**tried** [1] - 46:17
**true** [3] - 55:1, 86:7,

87:23
**truly** [2] - 43:10, 88:17
**try** [1] - 78:13
**trying** [7] - 7:13, 29:9, 31:3, 44:4, 68:24, 77:22, 81:24
**two** [12] - 10:5, 23:9, 24:18, 44:13, 49:10, 73:12, 83:11, 83:12, 83:20, 84:2, 84:4, 84:18
**Type** [1] - 88:5
**type** [3] - 10:23, 14:7, 37:6
**types** [3] - 23:22, 25:18, 25:22
**typical** [1] - 64:13
**typically** [17] - 10:5, 11:25, 18:5, 18:6, 18:10, 18:25, 20:11, 22:7, 22:17, 25:25, 26:8, 26:14, 30:11, 36:15, 56:2, 68:5, 74:14
**typo** [1] - 54:6

## U

**umbrella** [1] - 49:22
**unclear** [1] - 33:3
**uncooperative** [10] - 67:1, 69:12, 69:19, 69:24, 70:6, 70:14, 70:19, 70:25, 71:3, 71:22
**under** [8] - 11:24, 36:6, 37:8, 74:9, 75:2, 81:7, 81:8, 81:10
**Under** [1] - 87:22
**underclothes** [1] - 77:19
**unique** [2] - 13:16, 19:23
**unit** [1] - 19:14
**Unit** [3] - 19:17, 19:19, 64:11
**UNITED** [1] - 1:1
**University** [3] - 6:5, 8:21, 9:8
**unlawful** [1] - 34:17
**unless** [1] - 76:3
**unusually** [1] - 73:18
**up** [9] - 12:14, 14:12, 19:15, 49:17, 50:22, 55:23, 55:24, 73:15, 80:6
**ups** [1] - 84:16
**upstairs** [1] - 73:14
**user** [1] - 37:9

## V

**vague** [3] - 27:12, 71:5, 79:6
**vaguely** [1] - 78:20
**varied** [1] - 37:11
**verbal** [4] - 55:7, 55:11, 55:17, 55:20
**verbally** [4] - 67:21, 81:19, 81:23, 82:1
**version** [1] - 63:6
**video** [8] - 57:8, 80:1, 80:13, 81:15, 81:17, 83:5, 83:9
**videos** [7] - 13:18, 43:2, 82:19, 82:25, 83:1, 83:5
**violation** [1] - 61:14
**violent** [4] - 28:24, 70:21, 70:22, 70:24
**violently** [1] - 40:24
**visiting** [2] - 6:23, 7:9
**VISITING** [2] - 2:20, 2:20
**Visiting** [1] - 6:25
**vital** [1] - 19:7
**VNCC** [22] - 6:21, 6:22, 7:17, 8:6, 11:13, 15:13, 16:18, 17:2, 23:17, 35:16, 36:4, 36:6, 36:10, 36:17, 37:15, 38:2, 38:19, 41:4, 41:8, 42:11, 64:8, 65:12
**VNCC's** [3] - 36:6, 64:6, 84:22
**vs** [2] - 1:6, 88:4

## W

**waist** [1] - 77:5
**waive** [2] - 88:14, 88:20
**waking** [1] - 56:1
**walk** [1] - 24:11
**walking** [1] - 20:15
**Walworth** [1] - 86:13
**WALWORTH** [1] - 86:2
**watch** [1] - 57:7
**watches** [1] - 12:20
**ways** [1] - 26:2
**wear** [3] - 13:19, 13:21, 14:1
**wearing** [12] - 43:24, 45:15, 46:19, 49:15, 49:17, 62:21, 63:2, 63:11, 63:15, 63:18, 63:20, 63:22
**white** [5] - 46:19, 49:4,

49:17, 50:5, 63:2
**white-collared** [1] - 49:17
**WI** [2] - 2:11, 2:17
**willing** [1] - 70:17
**WISCONSIN** [2] - 1:3, 86:1
**Wisconsin** [4] - 1:14, 5:21, 86:6, 86:13
**wishes** [1] - 88:14
**withdraw** [6] - 27:15, 31:1, 31:9, 36:7, 52:25, 76:6
**Witness** [1] - 4:1
**WITNESS** [67] - 26:8, 28:4, 29:5, 29:12, 30:11, 31:16, 32:1, 32:7, 32:15, 32:22, 33:6, 33:15, 34:23, 35:5, 39:5, 39:10, 39:16, 40:2, 40:7, 40:14, 41:15, 41:25, 42:11, 43:17, 45:3, 46:11, 47:19, 50:7, 52:13, 53:6, 56:19, 57:15, 57:24, 58:12, 59:8, 59:25, 60:15, 60:22, 61:3, 61:9, 61:18, 61:23, 62:25, 65:10, 65:25, 66:6, 66:13, 66:22, 67:4, 67:10, 67:17, 68:5, 69:2, 69:9, 69:18, 70:11, 71:16, 73:1, 74:24, 75:8, 75:22, 76:19, 79:7, 79:17, 84:12, 87:4, 88:3
**witness** [13] - 4:3, 44:13, 53:14, 53:15, 54:17, 69:11, 71:3, 71:18, 88:6, 88:7, 88:12, 88:14, 88:15
**witnessed** [1] - 69:7
**woke** [2] - 55:23, 55:24
**woman** [2] - 46:19, 48:24
**wonderful** [1] - 4:22
**wondering** [1] - 74:13
**word** [1] - 70:14
**words** [1] - 50:19
**worry** [1] - 44:3
**WRITE** [1] - 87:2
**write** [7] - 11:21, 22:15, 46:8, 46:11, 46:13, 47:25, 51:24
**writing** [1] - 47:18
**written** [1] - 16:10
**wrote** [2] - 10:22, 75:12

## Y

**year** [1] - 27:17
**yearly** [3] - 37:17, 37:19, 38:18
**yellow** [1] - 46:22
**yourself** [2] - 46:2, 56:3

## Z

**zone** [1] - 73:13
**Zone** [4] - 20:12, 21:16, 21:21, 22:8