UNITED STATES DISTRICT COURT

for the

EASTERN DISTRICT OF WISCONSIN

JUSTIN BLAKE,

                    Plaintiff,

            vs.                          Case No. 22 CV 970

DAVID BETH,  et al.,

                    Defendants.

---

DEPOSITION OF:

    DAVID BETH, taken at the instance of the Plaintiff, on April 16, 2024, commencing at 1:00 p.m. and concluding at 4:00 p.m., at 710 North Plankinton Avenue, Suite 500, Milwaukee, Wisconsin, before Nancy Ann Bellino, Stenographer and Notary Public.

APPEARANCES:

KIMBERLEY CY. MOTLEY, ESQ.
Motley Legal Services
P.O. Box 1433
Charlotte, NC  28106
704-763-5413
kmotley@motleylegal.com

appeared on behalf of the Plaintiff,
JUSTIN BLAKE;

BRIANNA MEYER, ESQ.
Crivello & Carlson
710 North Plankinton Avenue
Suite 500
Milwaukee, WI  53202
414-271-7722
BMeyer@CrivelloLaw.com

appeared on behalf of the Defendants,
DAVID BETH, COUNTY OF KENOSHA, et al.;

BRIAN BAIRD, ESQ.
Borgelt, Powell, Peterson & Frauen, S.C.
1243 North 10th Street
Suite 300
Milwaukee, WI  53205
414-287-9184
bwbaird@borgelt.com

appeared on behalf of the Defendants,
JESSICA BERGMANN, VISITING NURSE COMMUNITY CARE,
INC., and KENOSHA VISITING NURSE ASSOCIATION.

INDEX

Testimony taken of DAVID BETH

Direct Examination by Ms. Motley                    4

Reporter's Certificate                            105
Errata Sheet                                      106
Certification Letter                              107

EXHIBITS

| Number | | Page |
|---|---|---|
| 8 | Deposition Notice | 24 |
| 9 | Protective Holding Cells PTF | 28 |
| 10 | Medical Screening | 68 |
| 11 | Use of Force Polity | 83 |
| 12 | Use of Emergency Restraint Chair | 88 |

(Witness duly sworn.)

DAVID BETH,

called as a witness on behalf of the Plaintiff, having been first duly sworn on oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MOTLEY:

Q    Good afternoon, Mr. Beth.

A    Good afternoon.

Q    How would you like for me to address you?  Mr. Beth?  Sheriff Beth?

A    If those are the two choices, Mr. Beth is fine.

Q    Okay.  Great.  Thank you.  Well, Mr. Beth, thank you for coming here today.

Have you ever been deposed before?

A    Yes.

Q    Okay.  So even though you've been deposed, I am going to start with a few reminders.

A    Okay.

Q    Number One, everything that you are saying is being taken down by our wonderful court reporter.

A    Yes.

Q    And so with that being said, one person needs to talk at one time so she can take down everything that's being said.  Do you understand that?

A    I do.

Q    And I will also have to remind myself of that, too.

A    Okay.

Q    And you do understand that because everything is being taken down by our court reporter, if you could please answer all questions verbally as opposed to nonverbal?  Do you understand that?

A    I do understand.

Q    Thank you.  Do you have any questions?

A    No.

Q    Thank you.  Could you please talk to us about your employment history?

A    Do you want to go back to when I started in the Sheriff's Department in 1982, or before?

Q    Let's just start in 1982.

A    Okay.  July 5, 1982, it was my first day as a deputy sheriff with the Kenosha Sheriff's Department.  I was a deputy sheriff until -- let's see, I think December of 2022 -- no, 2002, where I was sworn in as the sheriff for Kenosha.  I then was the sheriff until January 6th of 2023.

Q    Congratulations on your retirement.

A    Thank you.

Q    So, just to be clear, you were the sheriff for the County of Kenosha?

A    Correct.

Q    And you became sworn in as the sheriff in 2002 until

January 6th of 2023?

A     My last day -- Actually, my term as sheriff ended -- I think it was January 1st.  But I did not retire officially until January 6th.

Q     Okay.  Great.  Thank you.

And as part of your position as a sheriff, what were some of your responsibilities?

A     Oh, let's see.  I would attend a lot of meetings, whether it be with county officials, municipal, town, city officials.  I would be in communication with agents from the state of Wisconsin, from the federal government.

I was ultimately in charge, I guess, of the jail, of the patrol divisions, the detective bureau.  There were a lot of units underneath the office of sheriff.  And -- Let me see.  I had to sign lots of papers, review lots of different things, go through emails that were sent to me, respond to citizens or people that would call in.

I get asked that question a lot and it covers a lot of different things.

Q     Big job.

A     It's an interesting job, that's for sure.

Q     Okay.  Great.  So let's focus on your job as a sheriff as it relates to detention centers and jails for Kenosha County; okay?

A     Yes.

Q    So with regards to the detention centers -- Well, just explain to us what detention centers, jails, holding facilities that you were responsible for in Kenosha County.

A    The Kenosha Sheriff's Department is in charge of two different facilities:  One is the Kenosha County Jail, or we call it the Pretrial Facility; and one is the Detention Center. They're located in two different locations about four miles apart.

Q    Okay.  So with regards to the Kenosha County Jail, do you recall in 2021 how many people were working at the Kenosha County Jail that you were responsible for?

MS. MEYER:  I'm just going to object to vague.  The entire 2021?  Or do you want to be more specific?

MS. MOTLEY:  Sorry.

BY MS. MOTLEY:

Q    On April 25th of 2021, do you recall how many people you were in charge of at the Kenosha County Jail?

A    Are you asking me for the number of correctional staff that were working at any one time or possibly that were scheduled during the entire week kind of thing?

Q    Well, let me ask a better question.

A    Okay.

Q    So could you please talk to us about the different categories of people whom you were responsible for?

A    Sure.  There's correctional officers and detention

officers. Correctional officers are from the jail facility. Detention officers are from the Detention Center. And, of course, there are supervisors that are above them. There's corporals and sergeants.

If we're just going non-sworn, there's plenty of clerical staff who are not in charge of facilities. Mostly clerical staff, but not sworn. Then you move into the sworn ranks. And you'd have deputy sheriffs, detectives, sergeants, lieutenants, captains, a chief deputy. And then it goes up to the rank of sheriff.

Q    Okay. And so with regards to the people whom you were responsible for from an employment standpoint, the sworn officers, we're talking about correctional officers; right?

A    No. Sworn are not correctional officers.

Q    Oh, they're not.

A    They can't arrest.

Q    Okay. Thank you for that distinction. So correctional officers are not sworn.

Are detention officers sworn?

A    No. They're the equivalent, just a different facility than correctional officers.

Q    Okay.

A    So detentions are out at the Detention Center; correctional officers are at the jail.

Q    Okay. So detention officers, they don't have the

right -- What's the difference between a sworn officer versus a non-sworn officer?

A    A civilian is a non-sworn officer.  They have no arrest powers.  That's really one of the major distinctions.  They don't carry weapons.  Their primary focus of employment is inside either -- detention officers are inside the detention facility.  Correctional officers are exactly the same, but they're in the jail facility.  They have no arrest powers, they don't carry weapons.

Q    Okay.  And for those officers that are not sworn that work as detention officers, do they have the right to restrain people?

A    Yes.

Q    Do they have a right to -- Do they take people to court, to transport people?

A    They'll take inmates or detainees to kind of a holding area.  And then sworn personnel will take them -- deputies will take them to the jail or something like that.

Q    Okay.  So just so we're using the same terminology -- and I always have an issue with this -- when we're talking about people that are housed at the Kenosha County Detention Center, those that are detained there, what is their title?

A    Detention officers.

Q    Sorry.  I mean the people that are arrested and brought there.

A    Well, there's a mix.  There's inmates and there's also detainees.  Detainees are people that we would hold through ICE or immigration.  And I'm pretty sure by -- I'm trying to think when they left.

When COVID started, ICE wanted -- With the COVID situation, we weren't going to take anymore detainees.  If you're being held through ICE, you're not actually under arrest, you're being detained.  So when COVID hit, ICE basically pulled the detainees out of our facility.  And I can't tell you the exact time when that happened, but it was about -- well, it must be about March of '20 because that's when COVID started.

Q    Okay.  So in March of 2020, that's when detainees were all -- around that time when they were all taken out of the Kenosha County Detention Center?

A    Correct.

Q    Okay.  So then from around March, '20 when all the detainees were taken out until April 25th of 2021, was the Kenosha County Detention Center exclusively just housing inmates?

A    I'm pretty sure.

Q    Okay.  So for purposes of, say, Justin Blake, you would agree he was an inmate when he was arrested on April 25th of 2021?

A    If they were arrested and brought into our facility, they would have been an inmate.

Q    Okay.  Thank you.

And then with regards to whom you supervised, you talked about you also supervised clerical staff; correct?

A    They fall under the umbrella of the Sheriff's Department.

Q    Do nurses and medical workers also fall under the umbrella of the Sheriff's Department?

A    They're a subcontractor hired by the Sheriff's Department through the County.

Q    Are you responsible for them as well?

MS. MEYER:  I'm just going to object to the extent that it calls for a legal conclusion.  But you can answer.

THE WITNESS:  If we had questions or they had questions, we would certainly communicate.

BY MS. MOTLEY:

Q    Would you be responsible for them as a supervisor?

MS. MEYER:  Same objection.

THE WITNESS:  No.

BY MS. MOTLEY:

Q    Would there be any instances where you would be responsible for them?

MS. MEYER:  Same objection.

THE WITNESS:  If a judge were to -- If I were to hear that a judge was complaining that someone wasn't being taken care of inside our facility, I would ask the nursing staff, you

know, what's going on and what's happened. And I usually do that through asking one of my captains who is in charge of the jail to look into it.

BY MS. MOTLEY:

Q Okay. So if a medical professional was involved in supervising someone being restrained, would they follow under your umbrella as being someone whom you were supervising at that point in time?

MS. MEYER: I'd object to the form. Again, it calls for a legal conclusion.

MS. MOTLEY: I have a better question.

BY MS. MOTLEY:

Q Were there some instances based on the tasks that the health providers were giving to inmates where you would say you were supervising them?

MS. MEYER: I'll do the same objections.

THE WITNESS: Say that one more time.

BY MS. MOTLEY:

Q Okay. Was your supervisory role of health professionals -- was that task-orientated?

MS. MEYER: I'm just going to object to the extent that he hasn't testified that he was supervising them. But answer, if you can.

THE WITNESS: I've never -- I couldn't tell you if I was actually supervising the medical staff at some point. There

was never a discussion. It was a collaborative effort to achieve things to keep our inmates safe and our staff safe, if that came down to that. And going by who it was at that time, I really couldn't say. I know we didn't pay them, so -- I shouldn't say that. Anyway, I kind of covered it.

BY MS. MOTLEY:

Q From what you testified earlier, as far as you know, health professionals were subcontracted through the Kenosha County?

A Yes.

Q Okay. And with regards to the Kenosha County Detention Center, do you know how many people were under your supervision on April 25th of 2021? Just how many were employed?

A How many were employed?

Q Yes.

A If I remember correctly, I think we had about a hundred and eighty FTEs -- full-time employees -- for both facilities.

Q Sorry. Just to clarify, for both facilities, you're talking about the Kenosha County Jail and the Kenosha Detention Center?

A Yes.

Q Okay. Do you recall how many were working at the Kenosha Detention Center at that time?

A A number that comes to mind for the jail is sixty-five-ish. So I would say about a hundred at the Detention

Center.

Q   And these are full-time staff?

A   Yes.

Q   Do you know how many part-time staff were working under you?

A   I don't.

Q   But there were also part-time staff?

A   Yes.

Q   Did you have any sort of short-term contracted staff also working under you?

A   No.

Q   Other than full-time and part-time staff, was there any other category of staff that were working at the Kenosha County Jail and Detention Center that you were responsible for?

A   No.  As long as you're including the supervisory staff of the correctional officers, too, right?

Q   So the supervisory staff, are they under the umbrella of full-time staff?

A   They're full-time staff, yes.

Q   Okay.  So you didn't have any supervisor that was part-time.

A   No.

Q   Okay.  And as part of being the sheriff in charge, did you create any policies?

A   Do I create policies?

Q     Did you create policies?

A     Not normally, no.

Q     Who was responsible for creating policies when you were working as the sheriff for Kenosha County?

A     That could go to several people.  Usually, it was in a supervisory role.  You had people -- And just before that, just about this time, we actually -- I'm trying to think of the name of the policy, company, whatever you want to call it.  But we had undergone a policy change from some of the older policies that were in existence.  And we updated all of them.

And the guy who created the company was actually a California State Highway patrolman.  And I'm trying to think of the name of the policies.  But we had a team that was dedicated to updating our policies and ran it through a representative from -- it will come to me.  And then other supervisors were part of reviewing and updating and making them current with what we do.

Q     And when you say around this time, are you talking about in the year 2021?

A     I can't tell you when they completed the entire policy process.  It took years.  It took a few years to get all of it done.  And I don't remember when the last one was completed.

Q     Okay.  Did you have the final approval of all policies while you were the sheriff?

A     Yes.

Q    So you were the chief policy-maker while you were sheriff?

A    My interpretation --

MS. MEYER:  I'm just going to object to form real quickly.  But go ahead.

THE WITNESS:  My interpretation of when you say maker is I created the policies.  I did not create them.  I would sign off on them.

BY MS. MOTLEY:

Q    So none of the policies would go into effect until they had your signature?

A    Correct.

Q    And that was from 2002 until 2023 when you retired --

A    Yes.

Q    And could you please share with us your educational background?

A    Sure.  I graduated from Westosha Central High School that's in Paddock Lake, Wisconsin.  And I have no degree, but I've attended University of Wisconsin Parkside, Gateway Technical College and I had a degree -- not a degree, I do have for accident reconstruction from Northwestern University.

Q    And while you've been a sheriff have you ever had to discipline anyone?

A    Yes.

MS. MEYER:  Object to form.

BY MS. MOTLEY:

Q    Have you ever had to discipline any of your employees while you've been the sheriff?

MS. MEYER:  Object to form.

THE WITNESS:  Yes.

BY MS. MOTLEY:

Q    And what are the different ways in which you've had to discipline employees while you've been sheriff?

A    Where I directly disciplined, those numbers were very, very limited.  I was aware of -- I'm going to guess I was probably aware of most all the disciplines that went through the department.  But actually my -- the ones that I actually had to create documentation for were for just probably captain and above, which would be four people.

Q    And how would you discipline people?

A    It could be in a written verbal, more of a training type of thing.  It could be a written discipline.  It could be in a suspension.  Or it could be termination.  I think those were my levels.

Q    So a written discipline, what is that?

A    A verbal one is basically I would --

Q    Sorry.  A written one.

A    A written verbal?  The first one -- The lowest one would be a written verbal.

Q    Oh, a written verbal.  Okay.  Sorry.

A That's okay. We struggled with it at first, too.

The written verbal would be I would talk to them about whatever the situation was and I would basically just document it down and put it in their file. That would be a written verbal.

Q Okay. Is that considered like a counseling session?

A That would be a very good way to describe it, yes.

Q So then that's the written verbal.

And then is there a separate verbal?

A There's a verbal, which would be the next step up.

Q And what does that entail?

A It's just a written discipline.

Q Okay. So a written verbal first is you talk to and then you document.

A Yes.

Q Second step is verbal.

A And it would be a more detailed documentation.

Q Okay. And then the third one is a training discipline?

A No.

Q Sorry. What's the third one?

A Probably maybe a suspension of a day or two or whatever.

Q And then you would decide whether that's with or without pay; correct?

A I'd probably talk to corporate. I never gave any of my

supervisors days off, so I don't know. I truthfully don't know if they would have been paid or not.

Q Okay. So the third most serious discipline that you've dealt with is suspension.

Then what's the fourth?

A It would be termination. And I've never terminated one of my top four staff.

Q Okay. And so for other employees under you who imposed discipline on employees, were there any other types of disciplines that could be imposed on people?

A I think those are the levels. I can't remember any others.

Q Okay. Can I suggest some?

A Sure.

Q Were employees ever fined?

A No.

Q Was there ever a discipline where they were required to go through some sort of training?

A Yes.

Q And where would that fall under the spectrum?

A That could be at almost any of the levels.

Q Okay. Could a person be placed on probation?

A We could extend someone's probation.

Q And when you say extend, are you talking about extending perhaps a new hire's probation?

A   Or if they were promoted and they weren't off the one-year probation, we could extend their probation.

Q   Okay.  So just to understand, when there's a new -- Would you say that the sworn and non-sworn officers that were under you -- would you term them all as law enforcement officers?

A   No.

Q   Okay.  So for purposes of this next question, for the sworn and unsworn officers I'm going to refer to them as officers, okay?

For those officers, when they're first hired are they all under a one-year probation?

A   The sworn ones are.  And I believe the correctional officers are as well.  I believe everyone is under a one-year probation.

Q   Okay.  And then when someone is promoted are they then -- sworn officers.

When sworn officers are promoted up, are they then put on another probation?

A   Yes.

Q   For how long?

A   One year.

Q   Okay.  And then for unsworn officers, if they are also promoted up are they also put on a probation?

A   Yes.

Q    So in terms of discipline, if you had a newly-hired sworn or unsworn officer that had done something to warrant a discipline, one of the options would be you could increase their probation time beyond the one year?

A    Yes.

Q    And also for those who are promoted to an upper-level position?

A    Yes.

Q    Okay.  So for those officers that aren't new, that aren't promoted to a new position and they're being disciplined, could they be put on probation?

A    No.

Q    Okay.  I'm just trying to understand all the disciplines available.

A    That's okay.  As you're going through it, I'm trying to remember, too.

Q    Okay.  And when a person is put on probation, what does that mean?

A    If you're under probation, our ability to -- If you're not meeting the requirements that we've set for that position, we can terminate you, we can let you go in a much easier process than once you pass probation.

Q    I see.  And then once you pass probation do you sign something to say you successfully completed probation?

A    I think we did.

Q   Okay.  And what is your definition of discipline?  Let me take that back.

Could a person be disciplined in terms of just you see them do something wrong and then you just talk to them right then and there?  Is that a form of discipline, to you?

A   And I would say that happens often in the course of a day for the Sheriff's Department with so many people, that you just see somebody not doing something as you think they should and you could just tell them -- and I don't have an example, but something extremely minor of keeping your desk neat or something.

Q   Okay.

A   So something like that wouldn't be written down, but it's something that I think everyone kind of does on the Sheriff's Department.

Q   Would you consider that a sort of discipline?

A   I think that's more of a training or educational.

Q   So like educational advice?

A   Yes.

Q   Okay.  And you said that happens often?

A   I would think that happens several times in a day at the Sheriff's Department.

Q   Okay.  And for those that you just sort of told us about, you need to clean your desk, you don't necessarily need to write that down and say, you know, on this date I told you to

clean your desk. You just tell them and that's it, generally?

A    I would say, generally, something as simple as that, yes.

Q    Okay. And how would you define discipline as it relates to how you and your employees conducted themselves within the Sheriff's Department?

MS. MEYER:  Object to form and foundation. You can answer.

THE WITNESS:  Could you redo that one for me, please?

BY MS. MOTLEY:

Q    Sure.  Other than the four -- the written verbal, the verbal, the suspension, the termination and also the training recommendations that could happen with all those things -- are there any other sort of disciplinary measures that could have been taken against any officers who worked with the Kenosha County Sheriff's Department?

A    I can't think of any.

Q    Okay. Did you bring any documents with you today for this deposition?

A    No.

Q    Okay. Did you bring any photographs, pictures or anything for us today?

A    No.

Q    Do you recall receiving my deposition notice?

A    I tried to find one, but I had one for a different

Established Reporting Solutions, LLC
Case 2:22-cv-00970-PP    Filed 01/20/25    Page 23 of 120    Document 74-17

hearing. So I don't know.

Q Would it help to refresh your memory if I showed you my deposition notice?

A Yes.

MS. MOTLEY: This is going to ultimately be marked as Exhibit 8.

(Exhibit 8 marked for I.D.)

BY MS. MOTLEY:

Q Do you recall receiving this document?

A No.

Q Do you recall -- and I don't want to know what was said in the conversation -- do you recall being notified of this deposition today?

A I was asked -- I was given some time --

MS. MEYER: She doesn't want to know the substance.

THE WITNESS: I apologize. One more time.

BY MS. MOTLEY:

Q Do you recall being notified about today's deposition?

A Yes.

Q And if you look under Production, I'm just going to go over these.

Do you have any communications such as emails, text messages, memos, letters, et cetera, with regards to Justin Blake?

A No.

Q    Do you have any documents that you brought today or in your possession or have knowledge of regarding Mr. Blake's involvement in protesting Kenosha from August 23, 2020 until present?

A    No.

Q    Do you have any documents related to Mr. Blake's detention and arrest that occurred at the Kenosha Secure Detention Center and/or the Kenosha County Pretrial Facility from April 25, 2021 to present?

A    No.

Q    Could you please talk to me about all the documents that you reviewed or read to prepare for today's deposition?

A    None.

Q    Focusing on your work with the Kenosha Secure Detention Facility versus the Kenosha County Jail, are there various types of restraints that were used against inmates?

A    The first part of what you said, you came up with a brand new term that we've not discussed today.  There's a detention facility and the pretrial or jail facility.  You said something completely different.  And, truthfully, I'm not sure what you said.

Q    Okay.  So maybe this is my fault, definitely.

So with regards to the Kenosha County Jail, for the purposes of today's hearing I'll just say jail.

A    Okay.

Q    With regards to the Kenosha County Detention Center, for the purposes of today's hearing I'll just refer to that as Detention Center; okay?

A    Yes.

Q    Sorry.  That's my mistake.

MS. MEYER:  A lot of terms.  Don't worry.

BY MS. MOTLEY:

Q    So with regards to the jail and the Detention Center, were there different types of restraints that could be used on inmates?

A    I believe both facilities are probably set up the same.

Q    Okay.  So with regards to the policies that we talked about earlier that you sign-off on, those policies, do they apply equally to the jail and the Detention Center?

MS. MEYER:  I'll just object if it's seeking a legal conclusion.  But you can answer, if you know.

THE WITNESS:  There are some.  Most of them are identical.  And there are a few because of the design of the facilities that would name one facility different than the other.

BY MS. MOTLEY:

Q    Okay.  But generally for a lot of the policies, they are the same for the jail and the Detention Center?

A    Yes.

Q    And so with regards to restraints that are used on

inmates at the Detention Center, what are the types of restraints that could be used?

MS. MEYER: Object to foundation. You can answer.

THE WITNESS: I don't know all the types of restraints. I never really worked in the jail.

BY MS. MOTLEY:

Q What about the Detention Center?

MS. MEYER: Same objection.

THE WITNESS: Other than three days that I pretended I was a new correctional officer, I really didn't work in the jail.

BY MS. MOTLEY:

Q Do you know any of the restraints that could be used?

A Handcuffs, shackles. There is a -- I don't know what you would call the padded room. And then the Emergency Restraint Chair.

Q The Emergency Restraint Chair?

A Whatever you call -- I don't remember what it's called. It's a chair.

Q Do you recall that Emergency Restraint Chair being referred to as the ERC?

A Yes.

Q So these restraints -- the handcuffs, the shackles, the padded room, the Emergency Restraint Chair -- these were all restraints that were available to be used at the jail?

A    Yes.

Q    And were all these restraints also available to use at the Detention Center?

A    I believe so.

Q    And when you talk about the padded room, what is that?

A    There's a room near the booking area that has foam padding on the walls and on the floor.  So if the right situation arose that they would put someone in there, that it would be more difficult to harm themselves.

Q    Is that known as a protective cell?

A    Could be.  I don't know the term that would be in policy, but --

Q    Okay.  Would it refresh your memory if you saw a policy regarding the protective holding cell?

A    Yes.

Q    I'd like to present this document.

MS. MOTLEY:  If you could mark that as Exhibit 9.

(Exhibit 9 marked for I.D.)

BY MS. MOTLEY:

Q    So let me interrupt for a minute.

Is this document that I placed in front of you -- Are you familiar with this document?

A    I'm going to believe at one point when this was submitted, I'm sure I reviewed it.

Q    I just want clarification.

When you talk about the padded room, is that also the protective holding cell?

A    Yes.

Q    Okay.  Thank you.

And is there -- So those are one in the same that are used at the jail and the Detention Center?

A    I can't picture one at the Detention Center.  I can't picture one there.

Q    But there might be one there?

A    There might be, yes.

Q    Okay.  And other than -- Are there any other types of restraints that are used against inmates at the jail and the Detention Center in 2021?

A    If there is, I'm not off the top of my head familiar what they are.

Q    Is a spit guard a sort of restraint?

A    I don't know if you'd call that a restraint.  It's a protective device.

Q    Okay.

A    But it's something that they could use.  I've never seen it used.

Q    And with regards to shackles, what are we talking about there?

A    Shackles are mostly used in transportation to court or to another facility.  It would be -- It could either be a large

set of handcuffs that go around your ankles and they also could go from a chain from those to a set of handcuffs, too.

Q    And I've seen shackles where they're also around somebody's waist.

Is that something that was available to Kenosha County officers to use against an inmate?

A    I don't have that answer.  I don't know.

Q    And then with regards to handcuffs, you're talking about the hand handcuffs; correct?

A    Yes.

Q    Okay.  And can you think of -- I know I keep asking this.

Can you think of any other restraints that were used at the Detention Center or the jail?

A    Again, most of the things other than handcuffs and shackles, I've never used any.  But those are the ones that come to my mind, that I can remember.

Q    Okay.  What about just a jail cell.  Is that used against inmates?

MS. MEYER:  Object to form.

THE WITNESS:  I don't know if it's used against them. That's what our jail is, it's a place where we put inmates or detainees at a time for their protection and ours, too.

BY MS. MOTLEY:

Q    Okay.  And those cells at the jail and Detention

Center, were there available single-use cells for inmates?

A    There are.  There are a few of them at both facilities, yes.  Whether they're available at a certain time or not, I can't tell you.

Q    But they're available to be used for staff?

A    Yes.  For inmates.

Q    For inmates, sorry.

And there's also cells that you held multiple inmates in at the jail and the Detention Center; correct?

A    Yes.

Q    Okay.  Do you recall how many people could be housed in a cell at the Detention Center in 2021 at one time?

MS. MEYER:  I'm going to object to form.  He just testified that there's multiple types of cells.

BY MS. MOTLEY:

Q    Okay.  So for the cells where multiple people could be in a cell, could you please give us the minimum amount of people that could be in a cell versus the maximum amount of people that could be in a cell at the Detention Center in 2021?

A    The cellblocks -- The larger cellblocks were a maximum -- I don't remember if it's sixty-two or -- it's between sixty-two and sixty-five that could be in the dorm settings.

Q    In one room?

A    Yes.

Q    So it could be as low as two, is that correct, to as

many as sixty-five?

A    The dorm settings are for -- Let's see.  It could be up to sixty-two, sixty-five.  It's a large room and there's bunk beds in an open setting.

Q    For multiple-use rooms, what's the least amount of inmates that can be in a multiple-use room?

A    At the Detention Center, most of the holdings out there were in the dorm setting.  We did have D Block.  And each one could have an individual cell, but the entire block maybe had a dozen.  There's room for that.

Q    Okay.  And this is at the Detention Center?

A    Yeah.

Q    Okay.  And with regards to the Detention Center, how important is inmate safety --

MS. MEYER:  Object to form.

BY MS. MOTLEY:

Q    (continuing) -- at the Detention Center?

MS. MEYER:  Same objection.

THE WITNESS:  Inmate safety is very important to us.

BY MS. MOTLEY:

Q    Why?

A    The health and safety of anyone that is put into the sheriff's custody is very important.

Q    How important is the safety of employees that work at the Detention Center?

A    It's very important, too.

Q    So with regards to -- What safety measures would officers -- excuse me, employees take, meaning sworn and non-sworn officers, to protect inmates in 2021?

MS. MEYER:  Object to form and foundation.

THE WITNESS:  Oh, my gosh.  That would be -- You'd have to go through so many different parts of -- Are they in transportation?  Are they in court?  Are they being transported to another facility?

BY MS. MOTLEY:

Q    Just those at the Detention Center.

MS. MEYER:  Same objections.

THE WITNESS:  It's endless of the list of things that you try to do to keep them safe.

BY MS. MOTLEY:

Q    Okay.  Let's talk about some of that.

Would access to food and water -- is that important for inmate safety?

A    Yes.

Q    I'm going to focus on 2021.

A    Okay.

Q    Access to healthcare, was that important to inmate safety in 2021?

MS. MEYER:  I'm just going to do a standing objection to this line of questioning as to foundation and form.

THE WITNESS:  Yes.

BY MS. MOTLEY:

Q    In 2021 -- You mentioned COVID measures started around March of 2020.

A    Yes.

Q    Do you recall, did those measures continue on through 2021?

MS. MEYER:  Object to form.  What is those measures?

THE WITNESS:  There were different things that we did because of COVID.  And I can't tell you how long all the measures lasted.

BY MS. MOTLEY:

Q    Okay.  So with regards to the healthcare measures that were taken at the Detention Center when COVID started up in March of 2020, could you please talk to us about what were some of the measures taken by the Detention Center to protect inmates because of COVID?

A    Truthfully, I'd have to go through the memos and things that we did and put into place, to be accurate.  I don't want to just haphazardly give you different things that we did.

Masks were a part.  I think we offered vaccinations when they came out.  And I don't remember when they came out.  I think there was separation when someone was sick.  When new inmates came in, there was a -- I don't remember how many days it was, but where you keep them separate from the population to

make sure that they didn't have COVID when they came in.

Q    And we're talking about the masks, the vaccinations, the separation.

Were these measures taking place in March of 2020 until about May 1st of 2021?

A    I can't give you the dates.  I don't remember that.

Q    Okay.  As part of some of the additional measures that were taken for inmates from March of 2020 until, we'll say, May 1st of 2021, did you have a smaller amount of inmates in each cell because of COVID?

A    No.  That's where the -- I forget the terminology, but that's where we freed up some cells.  And as people came in in certain time periods -- again, my memory is fourteen days -- once they passed that period that they could come up positive for COVID, then we'd move them into the larger dorms and things like that.

Q    Okay.  And with regards to masks during that time period -- March, 2020 until May 1st of 2021 -- when you say masks, were inmates required to wear masks during that time?

A    I don't remember if they were made to do it or they were offered it.

Q    Were employees required to wear masks during that time?

A    I can't tell you if it was during that time.  I remember when it first started we had supplied thousands of masks to all of our employees.  And I think they had to.

Q    Were employees supposed to wear gloves during that time?

MS. MEYER:  I'm just going to generally object to this line of questioning.  I don't think any of this is relevant to the Third Amended Complaint.  But you can answer.

THE WITNESS:  I don't remember whether they did or didn't have to wear gloves.

BY MS. MOTLEY:

Q    Okay.  And when you say there were vaccinations, what are you talking about with that?

A    COVID.  But I don't remember when they became available.  I couldn't tell you if it was during this time frame that you're talking about.

Q    Okay.  And were you talking about like -- You just said vaccinations.  I'm just trying to get a better understanding of what that means.

Were inmates required to be vaccinated?  Were employees required to be vaccinated?  What are we talking about?

A    I think they were available.  I don't think we mandated vaccinations for anyone.

Q    Okay.  If a person was arrested, was there additional medical screening that occurred for inmates?

MS. MEYER:  Object to form.

THE WITNESS:  There is medical screening for every inmate that comes in.

BY MS. MOTLEY:

Q    And what does that consist of?

A    I don't know that.

Q    Who would know that?

A    Someone who would work directly in the jail and work in booking.

Q    And the medical screens were required of every inmate that came into the jail and the Detention Center; right?

A    Varying levels of screening, yes.

Q    Varying levels of medical screening?

A    Yeah.  If you came in with nothing, you weren't sick, you didn't have a bad tooth, you didn't have anything, but if you came in and said, I have a pacemaker, I have, you know, something that would have to be looked at further, then there would be a varying level of screening.

Q    Okay.  So was every inmate that came in during that time period sort of like medically screened on some level?

A    Yes.

Q    And on the low end of that, say a person didn't have anything, what did that consist of?

A    I can't tell you.  I don't know.

Q    Let's talk about the arrest procedures.

In April of 2021, when a person was arrested could you please explain to us the process that generally happens that an employee would take from arrest to them being physically in the

Detention Center?

MS. MEYER: Object to form.

THE WITNESS: I can only give you a general description. Because like every situation, each arrest is probably a little bit different, too.

If you're talking about a basic arrest, you would -- first of all, you would place them under arrest. You'd do your best to probably tell them why they're being arrested. And at that point you ask them who they are, ask them if they have any form of identification.

You'd handcuff them. You would do a -- I forget. Not a Terry search, but you'd do a search of the person, make sure they don't have any weapons, you're not bringing them into the jail facility for weapons.

You'd have to transport them to the pretrial facility where you would bring them in, put them -- at some point, you'd take them to the booking clerks. They would have to do the documentation of what the arrest was for. Again, your identification, who you are, do you have any medical issues.

You'd have to see if maybe there's an issue with seeing somebody else that you're in the same case with or the same situation so you can't be in their jail cell with them because you'd communicate. Or maybe, if it was me, I was put in a jail cell with someone I was going to intimidate, you can't put them in -- there would be a no contact with another inmate.

So the booking process is pretty lengthy. And I can't tell you. I've never actually gone through it, myself. But it's pretty lengthy as far as determining all the different pieces of why you're there, who you are and how we can safely handle the best we can of what we've been informed of the person that's now entering the facility.

BY MS. MOTLEY:

Q    Okay. And when a person is placed under arrest by an officer with the Kenosha County Sheriff's Department, does that mean putting the handcuffs on them?

MS. MEYER: I'm just going to object because you used officer to encompass everyone before.

MS. MOTLEY: That's right, yes. So let me just clarify.

BY MS. MOTLEY:

Q    So when I used it before, that was for that one question. So now I'm talking about sworn officers, those that are on the street that are arresting people.

You said with arrest -- The first thing you said is when a person is placed under arrest. What does that mean?

MS. MEYER: Object to the extent it calls for a legal conclusion.

THE WITNESS: Placed under arrest is, at that point in my mind as a police officer, that I have a strong belief that you've committed or the person I'm going to arrest has committed

some sort of crime and taking them into custody and at some point they'll be transported into the jail facility.

BY MS. MOTLEY:

Q   So if a person is placed under arrest, they will have committed a crime?

A   Correct.

MS. MEYER:  Objection.  That's not what he testified to.

MS. MOTLEY:  No.  I'm trying to get clarification.

BY MS. MOTLEY:

Q   Because you did just say that, that a person when they're placed under arrest, they may have committed some sort of a crime.  Is that accurate?

MS. MEYER:  I'm going to object again.  His answer was that there was a strong belief that a crime had been committed.

BY MS. MOTLEY:

Q   So may have committed, strong belief, same thing.

So when a person is placed under arrest, right, it's because they may have or they've had a strong belief that they committed a crime; correct?

MS. MEYER:  I'm going to object to the form, to the foundation.  It is not the same thing.

MS. MOTLEY:  Objection to your speaking objection. Just give the reason --

MS. MEYER:  I'm objecting to form and foundation.

MS. MOTLEY: Stop coaching him, please.

MS. MEYER: Objecting to form and foundation is not coaching.

MS. MOTLEY: Okay. Then that's it. That's it.

MS. MEYER: I'm also going to say --

MS. MOTLEY: You don't have to yell at me.

MS. MEYER: I'm not yelling at you, Kim. I'm also telling you that you are misquoting his testimony yet again.

MS. MOTLEY: Okay.

BY MS. MOTLEY:

Q   So, again, when a person is placed under arrest and there is a strong belief that they have committed a crime, what happens when they're placed under arrest? You said that they are handcuffed; correct?

A   That's one possibility.

Q   Sometimes they are not handcuffed?

A   It depends. Every situation is completely different.

Q   Okay. And are only people that committed a crime or there's a strong belief that they committed a crime -- are those the only people that were, in 2020, placed under arrest by a sworn officer with the Kenosha County Sheriff's Department?

MS. MEYER: Object to form and foundation.

THE WITNESS: You can -- I know I've handcuffed people before and placed them in my squad car in the situation until things can be sorted out of what happened.

So for their protection and my protection and everyone at the scene, I know I have placed people in handcuffs, put them in my squad car, let's say, and then figured out the situation more clearly.

BY MS. MOTLEY:

Q    Could a person be placed under arrest in 2021 for a non-criminal reason?

MS. MEYER:  Object to form.

THE WITNESS:  Are you asking me can they be placed in handcuffs?  Or are you asking me can you arrest a person for --

BY MS. MOTLEY:

Q    Let me ask you a better question.

Could a person be placed under arrest in 2021 for, for instance, a non-criminal disorderly conduct ticket?

A    Yes.

Q    Okay.  Could a person be placed under arrest in 2021 for a speeding ticket?

A    Yes.

Q    Okay.  And could a person be placed under arrest just for investigative purposes in 2021?

A    I think I kind of answered that already.

Are you talking about handcuffing or are you talking about taking them and putting them in jail?

Q    That's what I'm trying to understand.  When you say placed under arrest, I'm trying to understand what that means.

Does that mean that they're handcuffed? Does that mean that they're detained and they cannot leave? When you use the words, a person is placed under arrest, what does that mean?

MS. MEYER: Only object to the extent it calls for a legal conclusion. But you can answer.

THE WITNESS: Again, I guess I go back to if I were to place someone under arrest, I'm also thinking of I placed them in handcuffs. And that does not necessarily mean in any situation that I've completed the investigation or I'm going to be taking you to jail.

So I have this feeling that we're trying to -- I know you're trying to say at what point if I take you into custody am I saying you're under arrest. If I put you in handcuffs, is it exactly the same thing? Me putting you in handcuffs is not necessarily I placed you under arrest.

At the point I've made a determination that I'm going to take you in and take you to the jail facility, at that point, if you're looking for when did I determine you're under arrest, it's at that point.

BY MS. MOTLEY:

Q Okay. So when you say placed under arrest, you mean that there is a determination -- a person may or may not be in handcuffs, but there has been a determination made by that officer to put them in a facility.

That's what you mean by the term, place them under

arrest?

A    Yes.

Q    Okay.  So when a person is placed under arrest before they get to the facility but they're going to go to the facility, is everyone handcuffed?

A    Not necessarily.

Q    Okay.  So, for those, whether or not they're handcuffed or not, when they're placed under arrest, before they make it to the facility is everyone given their Miranda rights?

A    No.

Q    Is anyone given their Miranda rights?

A    It depends on the officer's discretion at the time of what the questioning would be.

Q    Okay.  So is there any policy as to when a person is Mirandized who is placed under arrest and is going to a facility in 2021?

A    Is there a policy?  I don't remember a policy.  I remember when I was taught and going to the twenty-four-hour inservices.  But is there an actual policy?  I don't have that answer for you.

Q    Okay.  When would you have expected a person who was placed under arrest and they're going to a facility -- when would you have expected that person to be Mirandized once they're placed under arrest and they're going to the facility -- to the Detention Center in Kenosha in 2021?

MS. MEYER:  I'm going to object to form.  But go ahead.

THE WITNESS:  If the officer was not asking them questions outside of name and basic information, they didn't have to.

BY MS. MOTLEY:

Q    Okay.  And when would they have to?

A    When they would come and start asking questions -- I don't know how to describe that.  I haven't had to Mirandize somebody in a very long time.

I just picture like when a detective would come and do an investigation.  Before they would start asking outside questions from the basic information, they would Mirandize them.

Q    Were your officers required to know when they were supposed to Mirandize inmates who were placed under arrest?

A    Officers, you're talking about sworn officers, not the correctional staff?

Q    Right, yes.

A    Because the correctional staff does not.

Q    Correct.  Sworn officers.

A    I'm going to believe that they would have a good knowledge of when they should Mirandize, yes.

Q    Okay.  And would you have expected in 2021 that your sworn officers would have been trained to know when to Mirandize an inmate that was placed under arrest?

A    Yes.

Q    Would you have expected your non-sworn correctional officers working inside the Detention Center to have known when an inmate was Mirandized?

A    No.

Q    What would you have expected the non-sworn officers to know in relation to protecting the constitutional rights of inmates in 2021?

MS. MEYER:  Object to form.

MS. MOTLEY:  I'll withdraw it.  That was bad.

MS. MEYER:  No.  You're good.

BY MS. MOTLEY:

Q    Were your officers trained -- When I say officers, I mean your sworn officers.

In 2021 would you have expected your sworn officers to be trained on understanding the constitutional rights that inmates had?

MS. MEYER:  I'm just a little confused on the question.

MS. MOTLEY:  Yeah, sorry.  No problem.  Nothing personal.

BY MS. MOTLEY:

Q    Were your officers expected to -- sworn and non-sworn officers -- were your officers in 2021 expected to also protect the constitutional rights to inmates?

MS. MEYER:  I'll object only to the extent it might be seeking a legal conclusion.  Otherwise, you can answer.

THE WITNESS:  They should have knowledge of what the First Amendment is.

BY MS. MOTLEY:

Q    What about the other amendments?

A    I can't tell you what all the other amendments are.

Q    Would they be expected to have knowledge about the Fourth and Fifteenth Amendment, cruel and unusual punishment?

MS. MEYER:  Same objection.

THE WITNESS:  If you were to ask me to answer what the Fourth and Fifteenth are, I couldn't tell you what it is.

BY MS. MOTLEY:

Q    But were your officers required to know -- to have had training on the various constitutional rights that inmates were entitled to in 2021?

MS. MEYER:  Can I have a standing objection, so I don't have to interrupt you?

MS. MOTLEY:  No problem.

THE WITNESS:  I think they should have a basic understanding of what we do in the Sheriff's Department and the jail.  And that's protecting people, whether they're an inmate that's coming in or an officer that's there.

I would hope that our policies are written in a way that mirrors what the Constitution says we should do.  And without actually pulling out the policies and the Constitution and comparing notes, I guess I'd go back to my statement of I

hope that our policies mirror what we should be doing.

BY MS. MOTLEY:

Q    Okay.  Now, getting back to what you brought up with regards to -- Let's talk about the First Amendment, the right to protest.

Do you believe that there's a line between a person's First Amendment right to protest and disorderly conduct?

MS. MEYER:  I'm only, again, objecting if it's a legal conclusion.

THE WITNESS:  Do I believe there's a line?  I think as long as you're peacefully protesting, you're able to do that without crossing the line.

BY MS. MOTLEY:

Q    And how do you define peacefully protesting?

MS. MEYER:  Same standing objection.

THE WITNESS:  You're not -- Violent covers so many different things.  You're not throwing Molotov cocktails at people or bricks or striking things, you're not hindering or causing a disturbance, you're complying with basic safety wherever you are.

That's such a broad statement.  And you're not -- I can think of things where you're not blocking the roadway to get into a facility or people that are doing legal things, driving a car.  Or, in this situation, I believe what you're going toward is getting into the Safety Building.

So as long as you're not inhibiting everybody else's legal rights, protesting is, I think, supported by -- it's definitely supported by me. I can't speak for everybody else.

BY MS. MOTLEY:

Q So with regards to -- I think you said -- and I apologize if I'm mischaracterizing -- if you're not hindering or causing a disturbance, that you consider to be part of peacefully protesting if you are not hindering or causing a disturbance. Did I hear that correctly?

A I remember saying something along that line, yes.

Q So if a person is, you know, protesting in front of -- in Kenosha County and they're speaking with a megaphone and saying, you know, justice for Jacob Blake, is that conduct protected by the First Amendment --

MS. MEYER: I'm going to object to form.

BY MS. MOTLEY:

Q (continuing) -- based on your policies in 2021?

MS. MEYER: Sorry. I didn't mean to cut you off. Form, legal conclusion. You can answer.

THE WITNESS: I would say yes. We had days of that. And that was all -- We had no issue with that.

BY MS. MOTLEY:

Q If a person was, you know, picketing in front of the Kenosha Detention Center in 2021, just picketing with signs, would you have expected your officers to know that that was

their First Amendment right to do it versus -- How would you categorize that?

MS. MEYER: The same objections.

THE WITNESS: So basically if I'm understanding your question right, people are walking around, carrying a sign in support or not in support of something and they weren't standing in the middle of the road, they weren't blocking exits or doing things that would inhibit the safety of people coming to our building, we have no problem with that. We had that happen several times. I actually brought crumb cakes to people that were doing it.

BY MS. MOTLEY:

Q    Did you make those, yourself?

A    No.  Hostess did.

Q    Do you know who Jacob Blake is?

A    Do I know who he is?  I know who he is.

Q    Okay.  Do you know who Justin Blake is?

A    I believe he's a relative.  And if I remember right, he's an uncle or cousin -- uncle, I think.

Q    Okay.  So Justin Blake as the uncle of Jacob Blake, have you ever interacted with him?

A    Not to my knowledge.

Q    Do you know -- Well, we'll get to that.

Are your officers trained on what to consider as it relates to disorderly conduct?

A    In inservice and also when we had basic training, we get updates on laws and ordinances and things like that, yeah.

Q    Okay.  And have your officers ever gotten it wrong in terms of -- Well, let me just take that back.

In 2020 and 2021 -- Well, on April 25th of 2020, are you aware that Jacob Blake was shot in Kenosha County?

A    In April?

Q    August 25th of 2020, sorry.

A    Okay.  I remember it was August of 2020.

Q    And are you aware that after Jacob Blake was shot in August of 2020 there was protests that occurred in Kenosha County?

A    Yes.

Q    And are you aware that Justin Blake, who is the plaintiff in this matter, participated in protests regarding his nephew in Kenosha County after August 25th of 2020?

A    I'm not aware -- Other than the situation I think this discussion is about where I was informed that he sat in front of the doors of the Safety Building, I don't know if he did or not. I don't know if he was there during the riot situation.

Q    Okay. I'm just trying to like talk about that wide period of protesting, just to make it easier for all of us to understand.

A    Uh-huh.

Q    So when I talk about protesting now, until I change the

definition of it, I'm going to be referring to when Jacob Blake was shot. I believe it was actually August 23rd of 2020 until April 26th of 2021.

A    Okay.

Q    So I'm talking about that time period.

So during that time period was there a lot of protesting happening in Kenosha County?

A    We had some for, I want to say, ten days to two weeks when it first happened in August. It took us into September of 2020.

I think we had a few other things. Rittenhouse was there. We had protesting. When the trial was taking place, we had protesting. And I think we had a few other small, little things. But I don't know if I'm getting confused with a few other things or not. There's a possibility there were a few other situations.

Q    Okay. So from that time period.

And just to be clear so that you understand why I'm stopping it on April 26th of 2021, are you aware that Justin Blake was arrested in Kenosha County on April 25th of 2021?

A    I'm aware currently that he was, yes.

Q    Are you aware that he was released from custody on April 26th of 2021?

A    Is that the next day, what you just said? Yes.

Q    Okay. So that's why the book ends are August 23rd of

2020 to April 26th of 2021.

A    Okay.

Q    Okay.  So during that time period there was protesting regarding Jacob Blake; correct?

A    I believe there was, yes.

Q    Okay.  During that time period there was protesting regarding Kyle Rittenhouse; correct?

A    Yes.

Q    During that time period was there protesting regarding COVID restrictions?

A    You mean other than just employees?  You're talking about general public?

Q    General public and also employees.

A    I don't remember any for COVID.  I don't remember any. There may have been, but I don't remember any.

Q    Okay.  Do you recall any protesting regarding the presidential election that year?

A    In Kenosha?

Q    Yes.

A    No.

Q    Do you recall any protesting for or against Donald Trump during that time period?

A    I don't remember any.

Q    Do you recall any protesting for or against Biden during that time period?

A     If you're talking about -- Okay.  If I can go back to the riot time, the president did come to Kenosha.  And he met -- I actually had a chance to meet him on 60th Street at one of the buildings that were burnt out.  So there were probably protesters during that time.  Biden came a few days later, a week later, maybe, and there was probably some protesting at that time.

Q     Okay.  I don't want to put words in your mouth, but I'm going to ask you this.

During that time period is it fair to say that there was more than usual protest activity in Kenosha County than any other time while you've been the sheriff?

A     Yes.

Q     Would you say that was a heightened period of protesting?

A     Yes.

Q     Okay.  So what did you do to prepare your officers for this heightened period of protesting?

A     Starting at the night of the riot?

Q     Just whenever.

A     Well, that's the window you gave me.

Q     Oh, that is.  Sorry.  Yeah.

A     As you bring up Rittenhouse, was Rittenhouse after the April 26th date that you gave me, the trial?

Q     So let me refresh your memory with what I believe is

the dates.  So August 23, 2020 Jacob Blake was shot in Kenosha County.  Do you recall that?

A    Yes.

Q    I believe it was August 25th of 2020 that Kyle Rittenhouse --

A    That was the Wednesday.

Q    It was a Wednesday.

A    It started on a Sunday.  Rittenhouse was on a Wednesday.

Q    Maybe the 26th.  So August 25th or 26th of 2020 is when Kyle Rittenhouse shot and killed two people and injured a third.

A    Right.

Q    Okay.

A    My question on Rittenhouse is not his shooting.  Mine was the -- And there was protests when he had his trial.  I don't remember when the trial was.

Q    So just to refresh your memory, are you aware that the Rittenhouse trial, I believe, took place December --

A    It was cold.

Q    (continuing) -- of 2022 or 2021, which would have been after?

A    Okay.  One more time with your question so I understand.  I apologize.

MS. MEYER:  And just so we're all clear, when you're talking about Rittenhouse, you mean the actual act, not the

trial?

MS. MOTLEY: Yes, yes. Sorry.

MS. MEYER: Does that help?

MS. MOTLEY: Yes. Thank you.

THE WITNESS: Correct.

MS. MOTLEY: And just off the record.

(Discussion held off the record.)

BY MS. MOTLEY:

Q So during that time period in this heightened level of protesting, what did you do to prepare your officers?

A After the initial night that Sunday night, we had staff meetings. And we started to call in assistance from the State. And we also were looking for -- we would bring our staff in for training. And I don't know what they exactly covered, but we would deal with situations that could occur, whether they did or didn't. And our staff was -- Everyone, all vacations were cancelled. Everyone one was basically on board to assist.

Q And what time period are you talking about that all vacations were cancelled and everyone was called in to assist?

A The day after the initial shooting.

Q The day after the Rittenhouse shooting?

A No. The day after Jacob Blake. So Monday morning.

Q Right. So August 24th of 2020.

A Yes.

Q That's when you called in for assistance. And that's

when you had -- from that day, you had regular staff meetings?

A   Yes.

Q   And how long did the assistance come in to help and did you have regular staff meetings?  August 24, 2020 until when?

A   The staff meetings went -- I should say it was about a two-week situation.  And I don't know exactly, but it was ballpark, two weeks.  And we had staff meetings every day with the key players:  County executive, chief of police, the mayor, county executive -- I think I said that -- the head of the National Guard.  We had contacts with the federal government and U.S. Marshals, the FBI and the Attorney General's office.

So we had several meetings.  And we were updating our staff the best we could every single day of different situations.

Q   Okay.  And you said when we had staff meetings.

When you say we had staff meetings, who is the we you're referring to having staff meetings?

A   I was involved in several of them at the higher levels of who I was communicating with.  But our command staff had meetings with their staff every day, too.

Q   So you mean the sworn officers command staff with the Kenosha County Sheriff's Department had regular staff meetings?

A   We had updates.  We did the best we could while the entire situation was going on.

Q   Okay.

A    And were they every day with our deputies?  Probably not.

Q    You also mentioned that staff was in for training for various reasons.

With regards to the sworn staff members, during that time period of August 23rd of 2020 until April 26th of 2021 what were some of the trainings that sworn officers were required to participate in?

A    I can't tell you what trainings they had.  It differs every year.  The twenty-four-hour inservice.

Q    Was there any additional training that was out of the normal training that they were required to participate in?

A    They tried to gear the inservices toward what's relevant at the time.  So I can't tell you what they determined was relevant at the time.

Q    Do you recall if there was any trainings on disorderly conduct versus First Amendment rights training?

A    I don't remember.

Q    Are you aware if there was any training on use of force during that time period?

A    I truthfully can't tell you what each class was that they had to go over.

Q    Your answer may be the same, but I have to go over these.

A    I got it.

Q    Do you recall if there was any training as it relates to the Emergency Restraint Chair?

A    I don't know that.

Q    Do you recall if there was any training as it relates to medical health screening and evaluations training?

A    I don't know that.  But just going back to your last question, the restraint chair would not have been for the sworn personnel.

Q    Do you recall if there was any training for the non-sworn officers on the Emergency Restraint Chair during that time period?

A    I don't.

Q    Do you recall during that time period, because there was this heightened amount of protesting, was there also an increase of those who were arrested for protesting during that time period?

A    Considering the fact before August 23rd of 2020 we didn't have anyone arrested for protests.

Q    Ever?

A    Not during my time.

MS. MEYER:  Object to form.

BY MS. MOTLEY:

Q    Sorry.  Not during your time.

So August 23rd of 2020 -- or probably August 24th of 2020 until April 26th of 2021, about how many people were

arrested for protesting during that time period?

A    I don't know.

Q    Can you estimate?

A    I really don't know.

Q    Would it be fair to say that there were over a hundred people who were arrested after August 25th of 2020 until August 28th of 2020 in Kenosha County for protesting?

A    I don't know that.  One of the biggest reasons is we weren't the only law enforcement agency that would arrest people.  We had the city police department, you've got federal agents, you've got state agents.  So I don't have a clue.

Q    Are you aware that there were a lot of people that were housed at the Kenosha Detention Center for protesting -- or arrested for protesting the week of August 23rd of 2020?

MS. MEYER:  Object to form.  You can answer.

THE WITNESS:  I don't know.

BY MS. MOTLEY:

Q    Okay.  Are you aware that there was a lawsuit that was filed in the Wisconsin Eastern District Court where you were named as a defendant for some of those people who were arrested for protesting in Kenosha and taken to the Detention Center that week?

MS. MEYER:  I'm going to just object to form.

THE WITNESS:  I believe that to be true.

BY MS. MOTLEY:

Q     And during that week were you the one that approved the curfew?

A     Did I approve a curfew?  I was one of the ones that declared a curfew.  The mayor of Kenosha did a curfew, too.

Q     Correct.  Okay.  And as a result of -- Let's go back to the staff in for training.

So you said you don't recall if there was training for use of force during that time period?

A     I don't know.

Q     And did I hear correctly that you don't recall if there was training on disorderly conduct for officers during that time period?

A     I don't know.

Q     Do you recall if there was training to officers on differentiating between disorderly conduct and a person invoking their First Amendment rights?

A     I don't know.

Q     Do you recall if there was training to officers -- I mean sworn and non-sworn officers for all these questions -- as it relates to restraints to be used on persons?

A     No.

Q     Do you recall if there was any training on the improper use of force during that time period?

A     No.

Q   Do you recall if there was any training on investigating misconduct of officers during that time period?

A   No.

Q   Do you recall if there was any training on investigating healthcare workers' misconduct during that time period?

A   No.

Q   Do you recall, to your knowledge, did you approve any new policies during that time period?

A   I don't recall.

Q   Do you recall approving or signing off on any policies during that time period?

A   I don't remember them.

Q   Okay.  And as it relates to persons being arrested for protesting during that time period, what do you remember?

A   I was not part of any single person that was arrested incident.  My basic knowledge is of the overall event and the contacts and everything we had to do.  But I was not part of a single arrest.

Q   Okay.  So what do you remember?

A   Of arresting someone?

Q   Of what you were a part of or what do you remember during that time period?  I know you're saying you weren't a part of it, but what do you remember?

A   Of the events?

Q    Yes.  Of the events during that time period of August 23rd of 2020 through April 26th of 2021 with regards to --

A    I truthfully would go on for days, but I'd be happy to start.

I guess in the Reader's Digest version, I remember the incident of that night.  I was there after the police called for assistance and going down to the Sheriff's Department.  And the group came.  I had to call for assistance from other agencies asking them to send whatever officers they could to assist.

This is truly Reader's Digest, but the next day I had a phone call from a company about a protective security fence being put around the facilities and meeting with the mayor, county executive, chief of police, discussing the events of Sunday night.  And then every day we basically prepared for whatever was going to get rolled out to us.

Q    Okay.  And during that time period did you require -- again, talking about the months of August 23rd of 2020 to April 26th of 2021 -- did you require any of your officers, whether sworn or non-sworn officers, to demonstrate their proficiency as it relates to protecting a person's First Amendment constitutional rights?

A    Was I ever part of the training for that?  Or did I ever witness the training for that?

Q    No.  Did you ever require officers to demonstrate their

proficiency?

A    I never asked that.

Q    Okay.  Do you recall if any of your employees asked that of their officers?

A    I don't know.

Q    Do you know what the training as it relates to -- Well, has there ever been any training, to your knowledge, of sworn officers in Kenosha County for protecting a person's First Amendment rights?

A    I remember in trainings that I've been in -- but I can't tell you which ones -- that it has been discussed, yes.

Q    Do you know what the name of that training is?

A    No.

Q    Do you know when you took that training?

A    No.

Q    Do you know is that training a training you require your officers to take?

A    I can't tell you.  I just remember in forty years that I've gone in, that has been part of the discussion.

Q    Okay.  For that training do you know if you require your employees, the employees that worked under you, to take that training?

A    I really wasn't a part of assigning any of the trainings.

Q    During the time period of August 23rd of 2020 until

April 26th of 2021 did any of your officers make any mistakes in terms of arresting persons for disorderly conduct that should not have been arrested who were protesting?

MS. MEYER: Object to form, foundation, calls for a legal conclusion.

THE WITNESS: I don't remember any of those.

BY MS. MOTLEY:

Q You don't remember any of those arrests or any --

A Right.

Q Okay. Do you remember any arrests regarding disorderly conduct during that time period?

A Am I familiar with the situations for it? No.

Q No. Do you remember any arrests during that time period in Kenosha County for disorderly conduct?

A I know that we had them, but I don't remember the names of people. Our Sheriff's Department deals with a few hundred calls a day. And I don't remember the situations.

Q Okay. Was there a lot more calls that the Sheriff's Department was dealing with during that time period as it relates to protesting?

A For the entire event? Yes.

Q Okay. And so I guess I'm trying to understand, was there more work that was put on the Sheriff's Department during that time period as it relates to protesting?

A Yes.

Q    Like what?

A    Different calls would come in of strange or unusual cars or people in the area.  Some people were worried they'd see on social media that protesters were blackening their license plates out.  And they were at schools.  There were fifty cars in schools and different locations they would be at.

So social media was very good at drumming up situations that law enforcement would have to do a chase on to see if it was factual or not.

Q    Did you notice during that time period the work increasing for persons working in the Detention Centers as it relates to protesting?

A    Well, a lot of what we did involved other agencies putting people in custody the best they could in the situation. And just because it was difficult to get to the Sheriff's Department, the detention and the pretrial, as I'm thinking about it now, we did open it up.

At the Detention Center they'd come and book people there.  So we were able to coordinate.  It wasn't so much the amount of people as it was the difficulty getting to the jail facility rather than the detention facility.  Did I explain that?  The detention facility really didn't have protesters there.

So we could open up a makeshift booking area there rather than coming downtown which had a fence around it and had

the roads blocked and things like that. So it was easier for me to open up the makeshift booking area at the Detention Center rather than at the jail downtown.

Q    Okay. So is the Detention Center -- What's the address of the Detention Center?

A    It's 88th Avenue. I don't remember the exact location. It's near Kenosha Airport. It's on H. It's between 158 and 142.

Q    And the jail, the Kenosha jail --

A    1055th Street.

Q    And that's in downtown Kenosha?

A    Yes.

Q    Okay. And they're about a mile apart?

A    About four miles apart.

Q    About four miles, okay.

And so do you recall -- You said there were no protests that were happening at the Detention Center.

A    I don't remember any out there.

Q    But were there protests happening in downtown Kenosha during that time period?

A    Yes.

Q    Okay. And getting back to sort of the arrest procedures, so once a person comes in to the Detention Center in Kenosha, there's a medical screening at some point that occurs; correct?

A    Correct.

Q    Okay.  And there's a medical screening policy that Kenosha County had at that point in time; correct?

A    I believe so, yes.

Q    Okay.  Do you know what that policy entailed?

A    No.

Q    Would it refresh your memory if I showed you the policy?

A    Yes.

Q    Okay.

MS. MOTLEY:  Could you please mark that as 10.

(Exhibit 10 marked for I.D.)

BY MS. MOTLEY:

Q    Mr. Beth, are you familiar with this document?

A    I've read the first page of it again.

Q    Are you familiar with the first page?

A    I am now.

Q    You don't have to read all of it, but if you could just page through the document to see if you're familiar with it.

Now, was this document, Policy 712 -- was this a policy as it relates to medical screening for the Kenosha County Sheriff's Department on April 25, 2021?

A    I don't know.

Q    On the bottom of this document it says:  Copyright Lexipol, April 27th of 2022.  Do you see that?

A    Yes.  Lexipol is the company that I couldn't remember the name of.

Q    So how would we be able to find out if this was the policy as it relates to medical screening for Kenosha County on April 25th of 2021?

A    I don't know who you'd talk to.  I'd have to ask one of the captains to do the research on that.

Q    But it's possible that this was?

A    It's possible it was, yes.

Q    Thank you.  Now, after the medical screening -- we're not going to use it anymore -- After the medical screening when someone is booked in at the Detention Center, then what happens?

A    I don't know that.

Q    Is a person who is booked in as an inmate at the Detention Center in Kenosha -- Now we're just talking about that same time period, we'll just stick with that same time period --

MS. MEYER:  Just the months --

MS. MOTLEY:  Yes.  August 23, 2020 to April 26, 2021.

BY MS. MOTLEY:

Q    (continuing) -- then is a person fingerprinted at some point?

A    At some point they are fingerprinted, yes.

Q    Is there a booking photo taken of that person at some point?

A    Yes.

Q    Okay.  And is that person asked questions about their name, date of birth, things like that, at some point?

A    Yes.

Q    And this is all at the Detention Center?

A    No.  Jail.

Q    At the jail, okay.

A    You probably said that.  And I -- It's at the jail. Our booking location is at the jail downtown.

Q    Okay.  Is anyone who was arrested during that time period -- if they're placed under arrest and determined to go to a facility, is anyone ever directly sent to the Detention Center or does everyone have to come to the jail first?

A    The jail first.

Q    Okay.  And why is that?

A    That's where our booking is set up, our intake people.

Q    And so is it possible that a person will stay at the jail?  Or does everyone just get booked at the jail and then is taken to the Detention Center?

A    It could be either way.  It would depend on what -- So at that time, we had no ICE detainees.  So it would depend on the level that they were classified as.

There are a lot of different things that could govern this.  If they have to appear in court in seventy-two hours, they'd probably stay downtown.  Rarely are people ever -- You're never booked into the jail and then immediately taken out there.

I can't think of a time that it's ever happened.

Q    Okay.  So if a person is to go to court -- Well, Justin Blake.  Are you familiar with his arrest that occurred on April 21st of 2021?

A    I know that it happened.  But where he was, I think he was downtown.  He was at the jail.

Q    He was at the jail.  And was Justin Blake ever moved to the Detention Center?

A    Not that I can remember.

Q    Okay.  So when a person is booked and arrested at the jail, at some point they're asked for their name; correct?

A    Yes.

Q    Are they asked for their address?

A    Yes.

Q    And does the officer -- Well, who is the one that sort of asks those questions?

A    The officer would fill out an Arrest Sheet.  So they would be asking the questions, too.  And then they would go in and then booking would also ask the questions, too.

Q    So they would get asked those questions twice?

A    They could.

Q    Okay.  Do you know if Justin Blake was asked those questions twice?

A    I don't know.

Q    Okay.  And has there ever been a time when someone lies

about their name or their address to an officer after they're placed under arrest?

MS. MEYER:  Object to form.  But answer, if you can.

MS. MOTLEY:  Let me ask a better question.

BY MS. MOTLEY:

Q    How do you verify that a person is giving their correct name?

A    To the best of my knowledge -- I'm not a booking clerk -- they would come in, they'd give the information, you'd have dispatch or somebody run the information given, see if it matches, see if the physical matches.  And then they have fingerprints.  And see if they match the fingerprints, too.

Q    Okay.  So dispatch would take the -- Sorry.  Go ahead.

A    Records, not dispatch.  Records.

Q    Okay.  So a person -- I'm just trying to really understand this.

So a person verbally gives their name, verbally gives their address to an officer at the jail during booking.  And then that information can be checked by the records to verify if it's accurate?

A    They would check the information given to see does it actually come back to a person?  Did they give a birthday that doesn't match?  So now -- And then records might say, we do have a David Beth, but he wasn't born in August, he was born in July of 2005 and he's dead now.

Q Okay. And do they also check for like warrants and things like that on a person?

A Yes.

Q Okay. And how long does that process normally take?

A I can't answer that. It depends how busy it is.

Q Okay. Are you aware if there's ever been a time when a person has given their information to an officer at booking and it's been false?

A Yes.

Q Okay. So you mentioned that you can do fingerprint checks. Is that accurate?

A Everyone that comes in does get fingerprinted at some time.

Q Okay. So for those that do get fingerprinted and if they're giving false information, is there a way to check to verify it through records, too?

A I'm sure that there is, but I don't know the time delay. I don't know how long that takes.

Q Okay. Is there any other way that a person -- that your employees investigate, I'll use the word investigate -- the accuracy of a person's information that's under arrest?

A I don't know.

Q Okay. So when a person leaves the booking area and is put into a cell, right, they leave the booking area, is that booking process considered complete?

A     No.

Q     Okay.  When is the booking process considered complete?
What things need to happen?

A     Everything we've been discussing:  The information,
identification, fingerprinting.  Probably when they have -- I
probably shouldn't answer, but I think they have to have a
uniform, they can't be in their regular clothes.  And there may
be a few other pieces that go along with it, too.  But, no, just
because they're not at the booking area does not mean it's
complete.

Q     Okay.  So when a person is taken from booking and then
taken to a cell, are they supposed to be -- is there a policy in
terms of how they're supposed to be transported from the booking
area to the inside of a cell?

A     The booking area has cells around it.  So as you're
looking out from the booking clerk's area, there are cells all
the way around it.

        MS. MEYER:  Answer her question.  I think that was
different.

        MS. MOTLEY:  Yes.  Thank you.

BY MS. MOTLEY:

Q     So I'm just envisioning -- this is just me because I've
never been arrested in Kenosha -- so I'm envisioning the booking
area to be sort of a desk.  Is that accurate?

A     It has a counter, a standing counter.  And it's got

bulletproof glass around it kind of like if you were going into a bank.

Q   So the cells that are even near the booking area, those cells are not considered the booking area; correct?

A   I consider them the booking area.

Q   Okay.  So when a person leaves the glass area where they're questioned in the booking area and they go to the cells in the booking area, how are they transported from the glass area to the cells in the booking area?

A   I would say the most common way is they walk.

Q   But are they allowed to just walk, themselves?

A   No.  They are escorted.

Q   Okay.  How many officers escort them?

A   Whatever is available.  I don't know.

Q   Is there any policy that those inmates have to be handcuffed to go from the glass area of the booking area to the cells in the booking area?

A   I don't know the policy.

Q   Okay.  Do you believe there might be a policy?

A   I don't know.

Q   Okay.  And are you aware that on -- What do you know about Justin Blake's arrest that occurred on August 25th of 2021?

A   I believe it happened in the evening sometime.  And I think there was a pastor from a church that was there that I got

married the first time at. And I think there were a few other people. I can't even tell you how many people were there. And I think they obstructed the entrance to the safety building.

Q    Who told you that?

A    The next morning I would have been briefed by probably the captain of detentions.

Q    Okay. Do you recall working on August 25th of 2021?

A    August 25th of 2021?

Q    Sorry. April 25th of 2021, were you working that day?

A    Is that the day after his --

Q    That was the day of his arrest.

A    I don't remember if I was working or not.

Q    Okay.

A    I don't know what day of the week -- I don't know if I was working that day.

Q    Okay. Do you know if you were working on August 26th of 2021, the day he was released?

A    April?

Q    April 26th of 2021. Thank you.

A    I had to. I remember talking -- Someone briefed me on what happened.

Q    Do you recall what your normal working hours would have been on April 26th of 2021?

A    I didn't have normal working hours.

Q    Okay. You were on call twenty-four --

A    Some days, I showed up at 5:30 in the morning; and other days, I showed up at 10:00 in the morning.  So I couldn't tell you what time I showed up.

Q    Okay.  Do you remember seeing Justin Blake on April 25th or April 26th of 2021?

A    No.

Q    So do you recall who briefed you about Justin Blake's arrest?

A    I don't.

Q    Do you recall talking to anybody regarding Justin Blake's arrest on those dates?

A    They gave me a brief of what happened.

Q    And you don't remember who gave you a brief of what happened?

A    Un-ungh.

MS. MEYER:  Is that a no?

THE WITNESS:  No.

BY MS. MOTLEY:

Q    Do you recall talking to anyone after at any time, other than your lawyer, about Justin Blake's arrest that occurred on April 25th of 2021?

A    I don't remember talking about it, no.

Q    Do you remember if anyone talked to you about it, such as DA Gravely, regarding Justin Blake's arrest?

A    I don't remember that being part of our conversation.

Q    Do you recall getting any text messages or emails regarding Justin Blake's arrest?

A    I don't recall any.

Q    Is it possible that you received some?

A    It's always possible, yes.

Q    Do you recall talking with then DA Angelina Gabrielle regarding Justin Blake's arrest?

A    I don't remember that discussion.

Q    Do you recall communicating with Angelina Gabrielle or any other DAs regarding Justin Blake's arrest?

A    I don't recall a conversation.

Q    Okay.  Do you recall communicating in any way with any DAs regarding Justin Blake, Justin Blake's detention or Justin Blake's arrest?

A    I don't remember talking to anyone.

Q    Okay.  Do you remember communicating, not just talking.

A    Oh, communicating.  I don't remember communicating with them.

Q    Do you remember anyone communicating with you regarding Justin Blake's detention or arrest?

A    I do not remember communicating with anyone else.

Q    Do you recall any of your officers, sworn, or any correctional personnel communicating with you regarding Justin Blake's arrest?

A    I don't recall any.

Q    I recall you saying earlier a few minutes ago that someone briefed you on Justin Blake's arrest.

You don't recall who that person was?

A    No.  I'm trying to think who the chief deputy was at that time.  There was probably a few of us that were getting briefed.  And it could have been the chief deputy.  And I'm not sure who the captain was.  I'm going to guess the captain was probably there.

I can picture one of my sergeants, Pittsley, Michael Pittsley.  I can remember him, I'm going to guess, that next day communicating with him or him kind of telling me this had happened.

Q    So you said Pittley?

A    Pittsley.  His face is coming to my -- like he may have talked to me about it.

Q    Could you please spell that name for the record?

A    I'll try.  Michael, P-i-t-t-s-l-e-y.

Q    Do you recall -- if you don't remember his name, that's fine -- but do you recall what you were told about Justin Blake and his arrest, detention or actions on April 25th or April 26th of 2021?

A    That a group of people that included Mr. Blake and this pastor from the church, they sat blocking the front doors of the Safety Building.  And they told me they tried for a lengthy period of time, but I don't know what that time was off the top

of my head, and they wouldn't leave.

They had to reroute people through the side door to do business at the Safety Building.  And Mr. Blake wouldn't -- Everyone else identified themselves, but Mr. Blake wouldn't talk to anybody.  He wouldn't communicate.  I don't think there was a physical like altercation or anything, but he wouldn't communicate with anyone, wouldn't identify himself.

Q    Do you recall who they said was rerouting people to the side door of the Safety Building?

A    No.  And it was late.  So it wouldn't have been locked, but -- And the problem with that is it's in an unsecured area. And you basically walk right into the open area of the Sheriff's Department where they had to get at least one person in.

Q    And do you recall did they say that Justin Blake was violent?

A    I didn't hear that anyone was violent.

Q    Did you hear if anyone was abusive?

A    That, I don't remember.

Q    Did you hear if anyone was resisting arrest?

A    Do you mean in terms of being violent?

Q    Physically.  Like --

A    Struggling?

Q    Struggling.

A    I don't remember a struggle being mentioned.

Q    Do you recall anyone mentioning anyone being combative?

A    No.

Q    Do you recall how many people were arrested on April 25th of 2021?

A    I don't remember the number, no.

Q    Okay.  Do you recall what this officer told you why he was arrested?

A    No.  Exactly what he was charged with, no.

Q    Do you recall if there was a Joseph Gardinelli who was arrested, if they told you that?

A    Cardinelli?

Q    Cardinelli.

A    That is -- As you say that name, I'm going to say yes.

Q    Do you recall if they told you that a Jonathan Baker was also arrested?

A    I don't know that name.

Q    And do you recall at what time they said this happened?

A    Evening is the best I can recall.

Q    And do you recall them talking about these other two individuals, when they were released from custody?

A    They probably did at the time, but I don't recall it.

Q    What else do you recall about that conversation that was told to you?

A    We covered most of it that I can think of.

Q    Did that person talk to you about Justin Blake being restrained?

A    Yeah.  I think he was placed in the chair, the restraint chair.

Q    What did they say about that?

A    About being in the chair?  I don't remember exactly about that.  I think he wasn't cooperating and he wasn't talking at all, from what I remember.

Q    Did they tell you what time he was placed in the chair?

A    I don't remember that at all.

Q    Did they tell you why he was placed in the chair?

A    I guess he wasn't cooperating with the booking process.

Q    Do you know how they said he wasn't cooperating with the booking process?

A    At this point, I don't.

Q    But at no time did they tell you -- Did they tell you he was violent?

A    I don't recall any violence.

Q    Do you recall any assaultive behavior?

A    I don't recall any assaultive behavior.

Q    Do you recall any combative behavior?

A    No.

Q    Do you recall if he was potentially violent, like threatening to be violent?

MS. MEYER:  Just object to form, but go ahead.

THE WITNESS:  I don't know that at all.

BY MS. MOTLEY:

Q    At the time that Mr. Blake was arrested did the Kenosha County Sheriff's Department have a Use of Force Policy?

A    Yes.

Q    Do you know what that policy entailed as it relates to dealing with inmates?

A    No.

Q    Would it refresh your memory if I showed you the Use of Force Policy?

A    Yes.

MS. MOTLEY:  Could you please mark that as Exhibit 11.

(Exhibit 11 marked for I.D.)

BY MS. MOTLEY:

Q    Mr. Beth, does looking at this document refresh your memory?

A    Yes.

Q    Was this the Kenosha County Sheriff's Department Use of Force Policy as it existed on April 25th of 2021?

A    I don't know that for sure.

Q    If you'd look at the bottom of this document, it says Lexipol, September 28th of 2021.  Do you see that?

A    I do see that.

Q    Do you believe this was the Use of Force Policy as it existed on April 25th of 2021, after having seen that date?

A    I don't know what that date stands for, but that date

does exist on the document.

Q    Okay.  But it's possible that this was the Use of Force Policy?

A    Yes.

MS. MOTLEY:  We're going to take a break.  Let's go off the record.

(Short recess taken.)

BY MS. MOTLEY:

Q    So just to refresh our memory, the Use of Force Policy marked as Exhibit 11, you can't say for certain that that was the policy that existed on April 25th of 2021?

A    Correct.

Q    But does it look like it could be the policy that existed on April 25th of 2021?

A    Yes.

Q    Okay.  Now, during this heightened period of August 23rd of 2020 through April 26th of 2021, as far as you know, the Use of Force Policy for the Kenosha County Sheriff's Department was not changed during that time period?

A    I'm not aware of it being changed.  But this is also -- You said for the Kenosha Sheriff's Department.  From me looking at this, this appears to be for our sworn deputies, not for the correctional staff.

Q    Okay.  So would the sworn deputies -- Were the unsworn deputies, correctional staff, would they have a different Use of

Force Policy?

A    I don't know what they have.

Q    Okay.  But you testified earlier that for some of the policies they would be the same for the sworn officers and also the unsworn correctional officers; correct?

A    No.  I testified that they're the same -- Most of the policies are the same for the detention staff and the jail staff.  The only differences would be one facility is just configured differently.

Q    Okay.  So for the jail staff did they have a Use of Force Policy on April 25th of 2021?

A    They had to have a policy in place and what they were supposed to follow when booking somebody.

Q    And would they have a Use of Force Policy for the jail staff on April 25, 2021?

A    I don't know exactly what it's called.  Use of force is what I'm accustomed to.  But if theirs isn't called that, it could be something different.

Q    Okay.  But as far as you know, were the jail staff -- The jail staff policies that was under all their policies, you approved; correct?

A    Correct.

Q    All right.  So if they did have a Use of Force Policy, the jail staff, then that would have been a policy that you would have approved?

A     Yes.

Q     All right.  Were the jail staff, to your knowledge, required to have some type of use of force training?

A     Yes.

Q     Do you know what that training consisted of?

A     No.

Q     Do you know if there's any extra training that the jail staff was required to participate in from August 23rd of 2020 to April 26th of 2021?

A     I'm not aware.

Q     Do you know how you would test their proficiency in the use of force training of the jail staff on April 25th of 2021?

A     I've never been a trainer in the use of force, so I don't know how they would go through the proficiency.

Q     Are you aware that Joseph Cardinelli was not put in the Emergency Restraint Chair on April 25, 2021?

A     I don't believe that he was.

Q     Are you aware that Jonathan Baker also was not put in the restraint chair on April 25th of 2021?

MS. MEYER:  And I'll object to foundation.  You can answer, if you know.

THE WITNESS:  I guess if I answer the way that I feel comfortable about, the only one I'm aware of being placed in the restraint chair is Mr. Blake.

BY MS. MOTLEY:

Q    And why was he placed in the restraint chair?

MS. MEYER:  Object to foundation.

THE WITNESS:  The only thing I know is he wasn't identifying himself.  I'm sure there was more to it, but that's what stood out to me.

BY MS. MOTLEY:

Q    Okay.  And this was a conversation that you had with your officer --

A    Some of my command staff.

Q    Do you recall them saying -- giving you any other reasons why Mr. Blake was put in the Emergency Restraint Chair?

A    I don't remember in detail the conversation.  So at this point I'd have to say I don't know what else.

Q    Okay.  And did you require during that time period for your jail staff to read the Emergency Restraint Chair Manual?

MS. MEYER:  I'd just object to foundation.  But answer, if you can.

THE WITNESS:  I would believe that my jail staff would be -- at least who made the placement of Mr. Blake would have an understanding of the use of that.  Would every single correctional officer know how to use it?  Probably not.

BY MS. MOTLEY:

Q    And why would you believe that they would know or have knowledge of how to use the Emergency Restraint Chair, your jail

staff?

A    Just the different tools at their disposal, whether it be pepper spray or handcuffs.  They get training before they implement them, they use them.

Q    And these are all the correctional officer staff that work at the jail were trained on pepper spray and the restraint chair?

A    I don't know if all of them were trained on the restraint chair.

Q    Okay.  Are you familiar with the Emergency Restraint Chair Policies at the Kenosha County Sheriff's Department that were implemented -- that were available on April 25th of 2021?

A    No.

Q    Would looking at the Procedure 407 perhaps refresh your memory?

A    Yes.

MS. MOTLEY:  Would you mark this as 12.

(Exhibit 12 marked for I.D.)

THE WITNESS:  I read the first page.  Would you like me to continue?

BY MS. MOTLEY:

Q    No.  Does this procedure -- Does this document look familiar to you?

A    Yes.

Q    Okay.  And is this Procedure 407 the policy as it

relates to the use of the Emergency Restraint Chair?

A    Yes.

Q    Do you recall who was involved in putting Mr. Blake in the Emergency Restraint Chair?

A    No.

Q    If I showed you a picture of some of the officers that were involved in putting Mr. Blake in the Emergency Restraint Chair to refresh your memory, do you think that might help?

A    Yes.

Q    Do you recognize anyone in this picture?

A    I don't have my reading glasses with me.

Q    Just yes or no.

A    Not conclusively, no.

Q    Do you recognize one single person in this document, yes or no?

A    Not with the masks on.  With not having my glasses and the quality of this picture, I don't.

Q    Do you recognize where this picture setting is?

A    Yes.  It's in the booking area at the Kenosha Sheriff's Department.

Q    Is this in the booking area of the jail?

A    Yes.

Q    Okay.  Thank you.

MS. MOTLEY:  You don't have to mark it.

STENOGRAPHER:  Okay.

BY MS. MOTLEY:

Q    Did any of the officers who you talked to, did they talk to you about who Mr. Blake disturbed on April 25th of 2021?

MS. MEYER:  Object to foundation and to the extent that it seeks a legal conclusion.

THE WITNESS:  Who he disturbed?

MS. MOTLEY:  Sorry.  Let me withdraw that.

BY MS. MOTLEY:

Q    Do you know what charges Mr. Blake was arrested for on April 25th of 2021?

A    Not positively, no.

Q    Do you think you might know?

A    It's possibly disorderly conduct, but I don't know that for sure.

Q    Did they talk to you about how long Mr. Blake was in the Emergency Restraint Chair?

MS. MEYER:  Object to form.

THE WITNESS:  No.

BY MS. MOTLEY:

Q    Did you conduct any investigations with regards to Mr. Blake being placed in the Emergency Restraint Chair after he was released from his arrest?

A    No.

Q    Why not?

A    I wasn't aware of any policy violations or law

violations. And I wasn't aware that there was any problem with it. So I would have had no reason to start an investigation.

Q Okay. Did the filing of this lawsuit with regards to Mr. Blake being placed in the Emergency Restraint Chair -- did that prompt any investigations for you?

A I think I was retired by that time.

Q Did you recommend to the current sheriff of Kenosha County to conduct any investigation as it relates to the arrest to Mr. Blake being put in the Emergency Restraint Chair?

A No.

Q Are you aware of any officers who were disciplined for putting Mr. Blake in the Emergency Restraint Chair?

A I am not aware.

Q Are aware if anyone was counselled with records to Mr. Blake being put in the Emergency Restraint Chair?

A No.

Q Do you know if anyone was talked to, given educational advice, with regards to Mr. Blake being put in the Emergency Restraint Chair?

A No.

Q Do you know what other sort of -- if this was the least restrictive restraint that could have been used on Mr. Blake on April 25th and April 26th of 2021?

MS. MEYER: I'll only object to the extent that it calls for a legal conclusion. But you can answer.

THE WITNESS:  If I'm looking at this picture, right, he's still in his clothing, street clothing.  And, to the best of my knowledge, he's never identified himself.  And his street clothing, that's something that they do worry about, someone hurting themselves with their own clothing.  So looking at this and from the knowledge that I have of it, this would appear to be the least restrictive.

BY MS. MOTLEY:

Q    Do you know if Mr. Blake was put into the padded room on April 25th or 26th of 2021?

A    I don't know where he was placed.

Q    But do you know if he was ever placed in the padded room?

A    In this situation, was he ever placed there?  I don't know where he was placed.  I knew that he was in this chair, but I don't know where he was placed.

Q    Do you recall ever asking anyone if this was the least restrictive means of restraint that could have been imposed on Mr. Blake?

A    I never asked that question.

Q    Do you recall anyone telling you that this was the least restrictive means of restraint for Mr. Blake on this date?

A    No.

Q    Did you look at any videos of his arrest?

A    It seems like I did see something.  And I don't

remember the actual arrest part as much as I remember people in front of the doors. But I don't remember the actual taking-into-custody part. I don't remember. But I remember people there. And I don't remember if it was a video or a photo or what it was.

Q    Did anyone talk to you about any medical treatment that was offered to Mr. Blake at the time he was arrested?

A    No.

Q    Did anyone talk to you about any mental healthcare treatment that was offered or given to Mr. Blake during his arrest and detention?

A    No.

Q    Were you concerned -- Would you have been -- If Mr. Blake was only put in the restraint chair as a means of punishment, would that have been proper use of the restraint chair?

A    No.

Q    Why not?

A    Our job in the jail is not to punish. That is for the courts to decide. Ours is to protect, keep them safe. And other parts, like in this situation, it would be to identify who is in our custody. Our job is not to punish them.

Q    So was Mr. Blake put in the restraint chair for his own safety?

A    Yes.

Q How? How so?

A How was he put in the chair or the reasoning behind it?

Q The reasoning.

A Oh, one of the things that we're concerned about is we have people hang themselves. We have people that with their own clothing -- the clothing that they have inside the jail is designed to, the best they can, not let you harm yourself, even though there are occasions that it does happen.

So the fact he's still in his regular street clothes -- and I don't know if they patted him down yet or not either; I don't know, I'm going to assume that they did -- but he has not identified himself. And the reason for safety, the clothes he's in.

Q Okay. And you said you've had instances where inmates have hung themselves with their own clothes?

A Not their own clothes, but they used a sheet. One used a plastic bag that they got commissary in and suffocated themself. So no one has ever been allowed into the jail facility as an inmate in their own clothes.

Q Okay. And Mr. Blake was arrested with two other individuals.

A I don't know how many, but okay.

Q Why weren't they all housed together?

MS. MEYER: Object to foundation.

BY MS. MOTLEY:

Q    Are you aware if Mr. Blake was put in the same cell as the other two individuals?

A    I don't know where the other two were placed.

Q    Okay.  Should Mr. Blake have been put in the same cell with the two other individuals that he was arrested with?

A    Being strapped in the restraint chair, no.

Q    If he wasn't strapped in the restraint chair should he have been placed with the other two individuals that he was arrested with?

A    That would depend on exactly how many people are in each of these cells.  Some of them are smaller and some are a little bit bigger, but they only hold a few different people.

So even if he cooperated and was in regular clothing, if that's what the situation was, he could have been.  But he didn't have to be.

Q    Okay.  Maybe I misheard this.  But I understood from your testimony earlier that if people are arrested for the same incident at the same time, that you guys try to segregate them.

Is that an incorrect understanding that I have?

A    Maybe I didn't say it quite right.  If I had sexually assaulted somebody, another guy -- because I wouldn't be placed in the women's cellblock -- I would not be allowed to -- the court would issue a separation order and I would not be allowed to be in the same cellblock as the person that I had sexually

assaulted. So in this situation, the three of them were together. So that would be a -- Unless there was an order to keep them separate.

Q Okay. If Mr. Blake was put in a single cell alone while he was in the Emergency Restraint Chair, would it have been against policy to have covered the windows?

MS. MEYER: Object to form. But you can answer, if you can.

THE WITNESS: Would it have been against policy to cover the windows? I don't know why they would cover the windows. I haven't read the entire policy on being in there, but I can see them covering a window if someone actually can see each other in different ones and they start hollering and screaming at each other. I could see it in a situation like that.

BY MS. MOTLEY:

Q Okay. So you can see him being in the Emergency Restraint Chair in a cell and them covering the windows?

A I don't know a situation that would cause that for him unless it was to sleep. I don't know why. You'd have to ask the people if there was a reason for it. I don't know what the reason would be.

Q Okay. If someone was put in the Emergency Restraint Chair, what are the protocols that are taken to make sure that that person is not injured for being in the chair?

A     From the part that I read here in the policy, the medical staff has to check on them at different periods.  And I think the detention staff also has to check on him in a fairly regular time frame.

Q     Did you require the medical staff to read the instruction manual for the Emergency Restraint Chair?

A     I don't know if they did or not.

Q     Did you require it?

A     I didn't require it.

Q     Did you require your correctional staff non-sworn officers to read the instruction manual for the Emergency Restraint Chair, if they used it?

A     I'm sure the ones that implemented its use were aware of it.  And I'm sure they probably read it or they were very familiar and had been trained in it even if they didn't read the manual.

Q     What makes you sure that they read it?

A     Well, I would hope that they would.

Q     How would you know if they did?

A     They'd have to tell me.

Q     Did anyone tell you that they read the Emergency Restraint Chair manual?

A     No.

Q     Ever in your career?

A     No.

Q    Are you informed of everyone that was put in the Emergency Restraint Chair?

A    No.

Q    Why not?

A    I depend on other people in my staff to take care of things like that.  And if it's a situation that rises to the level I should know about it, then they would pass the information along to me.

Q    Other than the Emergency Restraint Chair, is there a more restrictive way to restrain somebody at the jail?

A    Well, as you can see in the picture, there are handcuffs that are attached to the wall.  And I don't know if you consider that more restrictive.  But being held in a cellblock is very restrictive.  So those are other restrictive ways of being held.

Q    Do you think the Emergency Restraint Chair that Mr. Blake was put in and being put in a cellblock -- Sorry.

You're aware that Mr. Blake was put in the Emergency Restraint Chair on April 25th and 26th of 2021; correct?

A    Correct.

Q    Are you also aware that Mr. Blake was placed in the Emergency Restraint Chair and that restraint chair was put in a cell by himself?  Are you aware of that also occurring?

A    He was placed in there, yes, by himself, yes.

Q    So is there a more restrictive means of restraining

somebody compared to what happened to Mr. Blake?

A    I can't picture one.

Q    So that's the most -- The ultimate way to restrain somebody in the jail during August 23, 2021 to April 26, 2021, that was the most restrictive way to restrain someone in the Kenosha County Jail, correct, during that time period?

A    Yes.

Q    Did the officers who interacted with Mr. Blake on April 25th and 26th of 2021 -- did they do everything according to policy?

        MS. MEYER:  Object to form, foundation.

        MS. MOTLEY:  Let me withdraw.  Sorry.

BY MS. MOTLEY:

Q    Were there any policy violations that the correctional staff violated while interacting with Mr. Blake on the dates he was arrested?

A    I'm not aware of any.

Q    Would it trouble you if any of those policies were not adhered to in Mr. Blake's arrest?

        MS. MEYER:  Object to form.  But you can answer.

        THE WITNESS:  I guess I would have to hear exactly what happened and what the violation is.  If it's something that jeopardized anyone's safety, then I would be.

BY MS. MOTLEY:

Q    Would it trouble you if Mr. Blake was injured because

he was put in the Emergency Restraint Chair?

MS. MEYER:  Same objection.

THE WITNESS:  If he was injured by something the officers did, I would be concerned.

BY MS. MOTLEY:

Q    Why?

A    'Cuz our job is to protect people and make sure they don't get hurt by themselves or other people.

Q    And if he was injured for being in the Emergency Restraint Chair, would you agree that that is -- the officer should be liable for that?

MS. MEYER:  Object to form, foundation.  And it calls for a legal conclusion.

THE WITNESS:  If Mr. Blake -- Say that one more time.

BY MS. MOTLEY:

Q    If Mr. Blake was injured while he was in the Emergency Restraint Chair, do you believe it would be appropriate for the officers to be liable for those injuries?

MS. MEYER:  Same objection.

THE WITNESS:  I guess at that point I'd have to see exactly what occurred.  But if it's something that Mr. Blake did, himself, no.

BY MS. MOTLEY:

Q    What if it's something that Mr. Blake didn't do himself?

MS. MEYER: Same objection.

THE WITNESS: I have not heard that that happened.

BY MS. MOTLEY:

Q    Sorry.  You have not heard what happened?

A    I have not heard that -- Truthfully, I didn't hear Mr. Blake was injured or a correctional staff hurt him.  So you're trying to give me a hypothetical.  I'd have to look into the situation and see exactly what happened.

Q    Okay.  Do you know if anyone ever requested a psychiatrist, dentist or doctor to tend to Mr. Blake while he was at the jail?

A    I don't know if they did or not.

Q    Do you think they should have?

MS. MEYER: Object to form.

THE WITNESS: At the point that he isn't cooperating, no one would have been able to see him.

BY MS. MOTLEY:

Q    And do you believe Mr. Blake was not cooperating?

A    Yes.

Q    How so?

A    He wasn't identifying who he was.

Q    While Mr. Blake was under arrest, he had a constitutional right to remain silent; correct?

MS. MEYER: Object to the extent that it calls for a legal conclusion.

THE WITNESS: Yes.

BY MS. MOTLEY:

Q If someone invokes their constitutional right while they're detained at the jail, do you consider that person not being cooperative?

MS. MEYER: Same objection.

THE WITNESS: I believe my understanding is you have a right to not talk or answer questions. But I believe that you have to be able to give your name or help identify or have some source of identification. And he wasn't cooperating with that.

BY MS. MOTLEY:

Q So where is the line between a person -- Are officers aware of this as well -- Sorry.

Would you expect officers to know that an inmate has a right to remain silent if they're jailed at the Kenosha jail during that time period?

MS. MEYER: Object to foundation and that it calls for a legal conclusion. But you can answer, if you can.

THE WITNESS: I believe at some point the person has to identify themselves. Whether they answer other questions, where they were, even where they live, I don't think that they have to answer that until they have representation, if that's what they wish.

BY MS. MOTLEY:

Q Would you expect your officers to know during that time

period of August 23, 2020 to April 26th of 2021 that inmates have a right -- have constitutional rights to remain silent?

MS. MEYER: Same objection.

THE WITNESS: They have constitutional rights to remain silent.

BY MS. MOTLEY:

Q    Do you recall any trainings that officers received with regards to understanding an inmate's right to remain silent?

A    The trainings that we have is when we arrest people and kind of go by the deputy sheriffs. And so the identification in a situation when you take someone into custody, asking their name is something that people commonly ask.

Q    Okay. And what about if a person was brought to the correctional -- or to the jail. Did they receive the same training?

A    I don't know what training the correctional staff go through, but I do know that part of the job of the jail facility is we have to identify the people that are there in one fashion or another, whether it's through an I.D., verbal communication, something. But we have to be able to identify who comes in through those doors.

Q    Have you ever disciplined an officer for violating a person's constitutional rights?

A    I never have.

Q    Have you ever disciplined a correctional staff member

for violating an inmate's rights?

A    I never have.

Q    Do you know if any correctional staff has ever been disciplined for violating an inmate's constitutional rights by someone else that was under you?

MS. MEYER:  Object to form.

THE WITNESS:  I'm not aware of any.

MS. MOTLEY:  All right.  Thank you.  I have nothing further.

MR. BAIRD:  None for me.

MS. MEYER:  Nothing from me.  You're done.

STENOGRAPHER:  Signature?

MS. MEYER:  We'll reserve.

STENOGRAPHER:  And are you ordering this?

MS. MOTLEY:  Yes, please.  Can I get the condensed?

MR. BAIRD:  I'll do both regular and condensed.  So full package.

MS. MEYER:  I will do condensed.  Thank you.

(Proceedings end at 4:00 p.m.)

STATE OF WISCONSIN    )
                      )  SS.
WALWORTH COUNTY       )


        I, NANCY ANN BELLINO, Stenographer in and for the State

of Wisconsin, do hereby certify that the foregoing is a true and

correct transcript of all the proceedings had in the

above-entitled matter and the same are contained in my original

machine shorthand notes on the said deposition.


Dated at Walworth, Wisconsin on April 24, 2024.


_____

                    NANCY ANN BELLINO


ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

IN RE:  Justin Blake v. David Beth, et al.
CASE NO. 22 CV 970

WITNESS:  DAVID BETH
TAKEN:  APRIL 16, 2024

PAGE      LINE          CHANGE              REASON FOR CHANGE
_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true.

_____        _____
Date                    DAVID BETH
April 22, 2024
Brianna Meyer, Esq.
c/o Crivello & Carlson
BMeyer@CrivelloLaw.com

WITNESS: DAVID BETH
RE: Blake vs. Beth, et al.
Case No: 22 CV 970
Type of Proceedings: Deposition on April 16, 2024

The transcript of the above proceeding is now available and requires signature by the witness.

Please have the witness read his deposition and note any corrections on the Errata Sheet above.

Once completed, please print, sign and return the Errata Sheet to our office for distribution to all parties.

If you are in need of assistance, please contact Established Reporting Solutions at 414-460-3363.
.
If the witness does not read and sign the transcript within a reasonable amount of time, the original transcript may be filed with the Clerk of the court.

If the witness wishes to waive his/her signature now, please have the witness sign in the blank at the bottom of this letter and return to the e-mail address listed below.

Very truly yours,


_____
NANCY ANN BELLINO
nbellinocsr1@gmail.com

I do hereby waive my signature

_____
     DAVID BETH

1

**'**

**'20** [2] - 10:11, 10:16
**'cuz** [1] - 100:7

**1**

**10** [3] - 3:13, 68:11, 68:12
**105** [1] - 3:5
**1055th** [1] - 67:10
**106** [1] - 3:5
**107** [1] - 3:6
**10:00** [1] - 77:2
**10th** [1] - 2:16
**11** [4] - 3:14, 83:11, 83:12, 84:10
**12** [3] - 3:15, 88:17, 88:18
**1243** [1] - 2:16
**142** [1] - 67:8
**1433** [1] - 2:4
**158** [1] - 67:7
**16** [3] - 1:12, 106:5, 107:5
**1982** [3] - 5:13, 5:14, 5:15
**1:00** [1] - 1:12
**1st** [4] - 6:3, 35:5, 35:9, 35:18

**2**

**2002** [3] - 5:18, 5:25, 16:13
**2005** [1] - 72:25
**2020** [36] - 10:12, 25:3, 34:4, 34:15, 35:4, 35:8, 35:18, 41:20, 51:5, 51:8, 51:9, 51:11, 51:16, 52:2, 52:10, 53:1, 55:1, 55:4, 55:10, 56:23, 57:4, 58:6, 59:17, 59:24, 59:25, 60:6, 60:7, 60:14, 63:2, 63:18, 64:25, 69:18, 84:17, 86:8, 103:1
**2021** [82] - 7:10, 7:13, 7:16, 10:17, 10:23, 13:13, 15:19, 25:9, 29:13, 31:12, 31:19, 33:4, 33:20, 33:23, 34:3, 34:7, 35:5, 35:9, 35:18, 37:23, 42:6, 42:13, 42:16, 42:20, 44:16, 44:25, 45:22, 46:7, 46:14, 46:22, 47:14, 49:17, 49:24, 51:5, 52:3,

52:19, 52:20, 52:23, 53:1, 55:20, 58:6, 59:25, 63:2, 63:19, 65:1, 68:22, 69:5, 69:18, 71:4, 75:23, 76:7, 76:8, 76:9, 76:17, 76:19, 76:23, 77:5, 77:21, 79:21, 81:3, 83:18, 83:21, 83:24, 84:11, 84:14, 84:17, 85:11, 85:15, 86:9, 86:12, 86:16, 86:19, 88:12, 90:3, 90:10, 91:23, 92:10, 98:19, 99:4, 99:9, 103:1
**2022** [3] - 5:17, 55:20, 68:25
**2023** [3] - 5:19, 6:1, 16:13
**2024** [5] - 1:12, 105:13, 106:5, 107:1, 107:5
**21st** [1] - 71:4
**22** [4] - 1:6, 106:3, 107:1, 107:4
**23** [5] - 25:3, 55:1, 69:18, 99:4, 103:1
**23rd** [11] - 52:2, 52:25, 58:6, 59:17, 59:24, 60:14, 63:2, 63:18, 64:25, 84:17, 86:8
**24** [3] - 3:11, 57:4, 105:13
**24th** [2] - 56:23, 59:24
**25** [4] - 25:9, 68:22, 85:15, 86:16
**25th** [34] - 7:16, 10:17, 10:22, 13:13, 51:5, 51:8, 51:16, 52:20, 55:4, 55:10, 60:6, 69:5, 75:22, 76:7, 76:8, 76:9, 77:5, 77:21, 79:20, 81:3, 83:18, 83:24, 84:11, 84:14, 85:11, 86:12, 86:19, 88:12, 90:3, 90:10, 91:23, 92:10, 98:19, 99:9
**26** [2] - 69:18, 99:4
**26th** [24] - 52:3, 52:19, 52:23, 53:1, 54:24, 55:10, 58:6, 59:25, 63:2, 63:19, 65:1, 76:16, 76:19, 76:23, 77:5, 79:20, 84:17, 86:9, 91:23, 92:10, 98:19, 99:9, 103:1
**27th** [1] - 68:25
**28** [1] - 3:12

**28106** [1] - 2:4
**28th** [2] - 60:7, 83:21

**3**

**300** [1] - 2:17

**4**

**4** [1] - 3:3
**407** [2] - 88:14, 88:25
**414-271-7722** [1] - 2:11
**414-287-9184** [1] - 2:18
**414-460-3363** [1] - 107:11
**4:00** [2] - 1:13, 104:20

**5**

**5** [1] - 5:15
**500** [2] - 1:13, 2:10
**53202** [1] - 2:11
**53205** [1] - 2:17
**5:30** [1] - 77:1

**6**

**60th** [1] - 54:3
**68** [1] - 3:13
**6th** [3] - 5:19, 6:1, 6:4

**7**

**704-763-5413** [1] - 2:5
**710** [2] - 1:13, 2:10
**712** [1] - 68:20

**8**

**8** [3] - 3:11, 24:6, 24:7
**83** [1] - 3:14
**88** [1] - 3:15
**88th** [1] - 67:6

**9**

**9** [3] - 3:12, 28:17, 28:18
**970** [3] - 1:6, 106:3, 107:4

**A**

**ability** [1] - 21:19
**able** [6] - 48:11, 66:19, 69:3, 101:16, 102:9, 103:20
**above-entitled** [1] - 105:8

**abusive** [1] - 80:17
**access** [2] - 33:17, 33:22
**accident** [1] - 16:21
**according** [1] - 99:9
**accuracy** [1] - 73:21
**accurate** [5] - 34:19, 40:13, 72:20, 73:11, 74:24
**accustomed** [1] - 85:17
**achieve** [1] - 13:2
**act** [1] - 55:25
**actions** [1] - 79:20
**activity** [1] - 54:11
**actual** [4] - 44:19, 55:25, 93:1, 93:2
**additional** [3] - 35:7, 36:21, 58:11
**address** [6] - 4:9, 67:4, 71:13, 72:1, 72:18, 107:15
**adhered** [1] - 99:19
**advice** [2] - 22:18, 91:18
**afternoon** [2] - 4:7, 4:8
**agencies** [2] - 63:9, 66:13
**agency** [1] - 60:9
**agents** [3] - 6:10, 60:11
**ago** [1] - 79:1
**agree** [2] - 10:22, 100:10
**ahead** [4] - 16:5, 45:1, 72:13, 82:23
**Airport** [1] - 67:7
**al** [4] - 1:7, 2:13, 106:3, 107:4
**allowed** [4] - 75:11, 94:18, 95:23, 95:24
**almost** [1] - 19:21
**alone** [1] - 96:4
**altercation** [1] - 80:6
**Amended** [1] - 36:5
**Amendment** [10] - 47:2, 47:7, 48:4, 48:7, 49:14, 50:1, 58:17, 61:17, 63:22, 64:9
**amendments** [2] - 47:4, 47:5
**amount** [7] - 31:17, 31:18, 32:5, 35:9, 59:14, 66:20, 107:13
**Angelina** [2] - 78:6, 78:9
**ankles** [1] - 30:1
**Ann** [1] - 1:14

**ANN** [3] - 105:5, 105:18, 107:18
**answer** [30] - 5:4, 11:12, 12:22, 23:8, 26:16, 27:3, 30:7, 36:5, 40:14, 43:5, 44:20, 46:25, 47:9, 49:19, 58:23, 60:15, 72:3, 73:5, 74:6, 74:18, 86:21, 86:22, 87:17, 91:25, 96:7, 99:20, 102:8, 102:18, 102:20, 102:22
**answered** [1] - 42:21
**anyway** [1] - 13:5
**apart** [3] - 7:8, 67:13, 67:14
**apologize** [3] - 24:16, 49:6, 55:23
**appear** [2] - 70:23, 92:6
**appeared** [3] - 2:6, 2:13, 2:19
**apply** [1] - 26:14
**appropriate** [1] - 100:17
**approval** [1] - 15:23
**approve** [2] - 61:4, 62:8
**approved** [3] - 61:2, 85:21, 85:25
**approving** [1] - 62:11
**APRIL** [1] - 106:5
**April** [59] - 1:12, 7:16, 10:17, 10:22, 13:13, 25:9, 37:23, 51:5, 51:7, 52:3, 52:19, 52:20, 52:23, 53:1, 54:24, 58:6, 59:25, 63:2, 63:19, 65:1, 68:22, 68:25, 69:5, 69:18, 71:4, 76:9, 76:18, 76:19, 76:23, 77:5, 77:21, 79:20, 81:3, 83:18, 83:24, 84:11, 84:14, 84:17, 85:11, 85:15, 86:9, 86:12, 86:16, 86:19, 88:12, 90:3, 90:10, 91:23, 92:10, 98:19, 99:4, 99:9, 103:1, 105:13, 107:1, 107:5
**area** [27] - 9:17, 28:6, 66:3, 66:24, 67:2, 73:23, 73:24, 74:9, 74:14, 74:15, 74:16, 74:24, 75:3, 75:4, 75:5, 75:6, 75:7, 75:8, 75:9, 75:16,

75:17, 80:11, 80:12, 89:19, 89:21
**arose** [1] - 28:8
**arrest** [72] - 8:16, 9:3, 9:8, 10:7, 25:7, 37:22, 37:25, 38:4, 38:6, 38:7, 38:18, 39:8, 39:19, 39:20, 39:23, 39:25, 40:4, 40:12, 40:18, 41:11, 41:13, 41:20, 42:6, 42:10, 42:13, 42:16, 42:19, 42:25, 43:3, 43:7, 43:13, 43:15, 43:18, 43:21, 44:1, 44:3, 44:8, 44:15, 44:22, 44:24, 45:14, 45:24, 60:9, 62:19, 67:22, 70:10, 71:3, 72:2, 73:21, 75:22, 76:11, 77:8, 77:11, 77:20, 77:24, 78:2, 78:7, 78:10, 78:14, 78:20, 78:24, 79:2, 79:20, 80:19, 90:22, 91:8, 92:24, 93:1, 93:11, 99:19, 101:22, 103:9
**Arrest** [1] - 71:17
**arrested** [31] - 9:24, 10:22, 10:24, 36:21, 37:23, 38:8, 52:20, 59:15, 59:18, 60:1, 60:6, 60:14, 60:20, 62:14, 62:16, 65:3, 70:9, 71:10, 74:23, 81:2, 81:6, 81:9, 81:14, 83:2, 90:9, 93:7, 94:20, 95:6, 95:10, 95:18, 99:16
**arresting** [3] - 39:18, 62:21, 65:2
**arrests** [3] - 65:8, 65:10, 65:13
**assaulted** [2] - 95:22, 96:1
**assaultive** [2] - 82:17, 82:18
**assigning** [1] - 64:23
**assist** [3] - 56:17, 56:19, 63:10
**assistance** [6] - 56:12, 56:25, 57:3, 63:8, 63:9, 107:11
**ASSOCIATION** [1] - 2:20
**assume** [1] - 94:11
**attached** [1] - 98:12
**attend** [1] - 6:8
**attended** [1] - 16:19

**Attorney** [1] - 57:11
**August** [33] - 25:3, 51:8, 51:9, 51:11, 51:16, 52:2, 52:9, 52:25, 55:1, 55:4, 55:10, 56:23, 57:4, 58:6, 59:17, 59:24, 60:6, 60:7, 60:14, 63:2, 63:18, 64:25, 69:18, 72:24, 75:22, 76:7, 76:8, 76:16, 84:17, 86:8, 99:4, 103:1
**available** [12] - 21:14, 27:25, 28:2, 30:5, 31:1, 31:3, 31:5, 36:12, 36:19, 75:14, 88:12, 107:6
**Avenue** [3] - 1:13, 2:10, 67:6
**aware** [33] - 17:10, 17:11, 51:6, 51:10, 51:14, 51:17, 52:19, 52:21, 52:22, 55:17, 58:19, 60:12, 60:18, 73:6, 75:21, 84:20, 86:10, 86:15, 86:18, 86:23, 90:25, 91:1, 91:11, 91:13, 91:14, 95:2, 97:13, 98:18, 98:21, 98:23, 99:17, 102:13, 104:7

---

**B**

---

**background** [1] - 16:16
**bad** [2] - 37:12, 46:9
**bag** [1] - 94:17
**BAIRD** [3] - 2:15, 104:10, 104:16
**Baker** [2] - 81:13, 86:18
**ballpark** [1] - 57:7
**bank** [1] - 75:2
**based** [2] - 12:13, 49:17
**basic** [7] - 38:6, 45:3, 45:12, 47:18, 48:19, 51:1, 62:17
**became** [2] - 5:25, 36:11
**beds** [1] - 32:4
**behalf** [4] - 2:6, 2:13, 2:19, 4:3
**behavior** [3] - 82:17, 82:18, 82:19
**behind** [1] - 94:2
**belief** [6] - 39:24, 40:15, 40:17, 40:19,

41:12, 41:19
**Bellino** [1] - 1:14
**BELLINO** [3] - 105:5, 105:18, 107:18
**below** [1] - 107:16
**BERGMANN** [1] - 2:20
**best** [9] - 38:8, 39:5, 57:13, 57:23, 66:14, 72:8, 81:17, 92:2, 94:7
**BETH** [9] - 1:7, 1:11, 2:13, 3:2, 4:2, 106:4, 106:24, 107:3, 107:21
**Beth** [10] - 4:7, 4:9, 4:10, 4:11, 4:12, 68:14, 72:24, 83:14, 106:3, 107:4
**better** [5] - 7:21, 12:11, 36:15, 42:12, 72:4
**between** [6] - 9:1, 31:21, 48:6, 61:16, 67:7, 102:12
**beyond** [1] - 21:4
**Biden** [2] - 53:24, 54:5
**big** [1] - 6:20
**bigger** [1] - 95:13
**biggest** [1] - 60:8
**birth** [1] - 70:2
**birthday** [1] - 72:22
**bit** [2] - 38:5, 95:13
**blackening** [1] - 66:4
**Blake** [70] - 10:21, 24:24, 49:13, 50:15, 50:17, 50:20, 51:6, 51:10, 51:14, 52:1, 52:20, 53:4, 55:1, 56:22, 71:3, 71:7, 71:22, 77:4, 78:13, 79:19, 79:22, 80:3, 80:4, 80:14, 81:24, 83:2, 86:24, 87:12, 87:20, 89:3, 89:7, 90:3, 90:9, 90:15, 90:21, 91:4, 91:9, 91:12, 91:15, 91:18, 91:22, 92:9, 92:19, 92:22, 93:7, 93:10, 93:14, 93:23, 94:20, 95:2, 95:5, 96:4, 98:17, 98:18, 98:21, 99:1, 99:8, 99:15, 99:25, 100:14, 100:16, 100:21, 100:24, 101:6, 101:10, 101:18, 101:22, 106:3, 107:4
**BLAKE** [2] - 1:4, 2:7
**Blake's** [16] - 25:2,

25:6, 75:22, 77:7, 77:11, 77:20, 77:24, 78:2, 78:7, 78:10, 78:13, 78:14, 78:20, 78:24, 79:2, 99:19
**blank** [1] - 107:15
**Block** [1] - 32:8
**block** [1] - 32:9
**blocked** [1] - 67:1
**blocking** [3] - 48:22, 50:7, 79:23
**BMeyer@ CrivelloLaw.com** [2] - 2:12, 107:2
**board** [1] - 56:17
**book** [2] - 52:25, 66:18
**booked** [5] - 69:12, 69:14, 70:17, 70:25, 71:10
**booking** [36] - 28:6, 37:6, 38:17, 39:1, 66:24, 67:2, 69:23, 70:8, 70:15, 71:19, 72:8, 72:18, 73:7, 73:23, 73:24, 73:25, 74:2, 74:9, 74:11, 74:13, 74:15, 74:16, 74:23, 75:3, 75:4, 75:5, 75:7, 75:8, 75:9, 75:16, 75:17, 82:10, 82:12, 85:13, 89:19, 89:21
**Borgelt** [1] - 2:16
**born** [2] - 72:24
**bottom** [3] - 68:24, 83:20, 107:15
**Box** [1] - 2:4
**brand** [1] - 25:18
**break** [1] - 84:5
**BRIAN** [1] - 2:15
**Brianna** [1] - 107:1
**BRIANNA** [1] - 2:9
**bricks** [1] - 48:18
**brief** [2] - 77:12, 77:13
**briefed** [5] - 76:5, 76:20, 77:7, 79:2, 79:6
**bring** [5] - 23:18, 23:21, 38:16, 54:23, 56:13
**bringing** [1] - 38:13
**broad** [1] - 48:21
**brought** [6] - 9:24, 10:24, 25:1, 48:3, 50:10, 103:13
**building** [2] - 50:9, 76:3
**Building** [5] - 48:25, 51:19, 79:24, 80:3,

80:9
**buildings** [1] - 54:4
**bulletproof** [1] - 75:1
**bunk** [1] - 32:3
**bureau** [1] - 6:13
**burnt** [1] - 54:4
**business** [1] - 80:3
**busy** [1] - 73:5
**bwbaird@borgelt. com** [1] - 2:18
**BY** [83] - 4:6, 7:15, 11:15, 11:19, 12:4, 12:12, 12:18, 13:6, 16:9, 17:1, 17:6, 23:10, 24:8, 24:17, 26:7, 26:21, 27:6, 27:12, 28:19, 30:24, 31:15, 32:16, 32:20, 33:10, 33:15, 34:2, 34:12, 36:8, 37:1, 39:7, 39:15, 40:3, 40:10, 40:16, 41:10, 42:5, 42:11, 43:20, 45:5, 46:11, 46:20, 47:3, 47:11, 48:2, 48:13, 49:4, 49:16, 49:22, 50:12, 56:8, 59:22, 60:17, 61:1, 65:7, 68:13, 69:19, 72:5, 74:21, 77:18, 83:1, 83:13, 84:8, 87:1, 87:7, 87:23, 88:21, 90:1, 90:8, 90:19, 92:8, 95:1, 96:16, 99:13, 99:24, 100:5, 100:15, 100:23, 101:3, 101:17, 102:2, 102:11, 102:24, 103:6

---

**C**

---

**c/o** [1] - 107:2
**cakes** [1] - 50:10
**California** [1] - 15:12
**cancelled** [2] - 56:17, 56:19
**cannot** [1] - 43:2
**captain** [4] - 17:13, 76:6, 79:7
**captains** [3] - 8:9, 12:2, 69:7
**car** [3] - 41:24, 42:3, 48:24
**Cardinelli** [3] - 81:10, 81:11, 86:15
**care** [2] - 11:25, 98:5
**CARE** [1] - 2:20
**career** [1] - 97:24

Carlson [2] - 2:9, 107:2
carry [2] - 9:5, 9:9
carrying [1] - 50:5
cars [2] - 66:3, 66:5
case [1] - 38:21
Case [2] - 1:6, 107:4
CASE [1] - 106:3
categories [1] - 7:24
categorize [1] - 50:2
category [1] - 14:13
causing [3] - 48:19, 49:7, 49:8
cell [20] - 28:10, 28:14, 29:2, 30:18, 31:12, 31:17, 31:18, 31:19, 32:9, 35:10, 38:22, 38:24, 73:24, 74:12, 74:14, 95:2, 95:5, 96:4, 96:18, 98:23
cellblock [4] - 95:23, 95:25, 98:14, 98:17
cellblocks [2] - 31:20
Cells [1] - 3:12
cells [14] - 30:25, 31:1, 31:8, 31:14, 31:16, 35:12, 74:15, 74:16, 75:3, 75:4, 75:7, 75:9, 75:17, 95:12
Center [55] - 7:6, 8:2, 8:23, 9:21, 10:14, 10:18, 13:12, 13:20, 13:23, 14:1, 14:14, 25:8, 26:1, 26:3, 26:8, 26:14, 26:23, 27:1, 27:7, 28:3, 29:6, 29:7, 29:13, 30:14, 31:1, 31:9, 31:12, 31:19, 32:7, 32:11, 32:13, 32:17, 32:25, 33:11, 34:14, 34:16, 37:8, 38:1, 44:25, 46:2, 49:24, 60:13, 60:21, 66:18, 67:2, 67:4, 67:5, 67:17, 67:23, 69:12, 69:15, 70:4, 70:11, 70:18, 71:8
centers [3] - 6:23, 7:1, 7:2
Centers [1] - 66:11
Central [1] - 16:17
certain [3] - 31:3, 35:13, 84:10
certainly [1] - 11:14
Certificate [1] - 3:5
Certification [1] - 3:6
certify [1] - 105:6
cetera [1] - 24:23
chain [1] - 30:2

Chair [36] - 3:15, 27:16, 27:17, 27:20, 27:24, 59:2, 59:10, 86:16, 87:12, 87:16, 87:25, 88:11, 89:1, 89:4, 89:8, 90:16, 90:21, 91:4, 91:9, 91:12, 91:15, 91:19, 96:5, 96:18, 96:24, 97:6, 97:12, 97:22, 98:2, 98:9, 98:16, 98:19, 98:22, 100:1, 100:10, 100:17
chair [21] - 27:19, 59:7, 82:1, 82:2, 82:4, 82:7, 82:9, 86:19, 86:24, 87:2, 88:7, 88:9, 92:15, 93:14, 93:16, 93:23, 94:2, 95:7, 95:8, 96:25, 98:22
chance [1] - 54:3
CHANGE [2] - 106:6
change [2] - 15:9, 51:25
changed [2] - 84:19, 84:20
CHANGES [1] - 106:2
charge [6] - 6:12, 7:4, 7:17, 8:6, 12:2, 14:23
charged [1] - 81:7
charges [1] - 90:9
Charlotte [1] - 2:4
chase [1] - 66:8
check [5] - 72:21, 73:1, 73:15, 97:2, 97:3
checked [1] - 72:19
checks [1] - 73:11
chief [6] - 8:9, 16:1, 57:8, 63:14, 79:4, 79:6
choices [1] - 4:11
church [2] - 75:25, 79:23
citizens [1] - 6:16
city [2] - 6:9, 60:10
civilian [1] - 9:3
clarification [2] - 28:25, 40:9
clarify [2] - 13:18, 39:14
class [1] - 58:21
classified [1] - 70:21
clean [2] - 22:24, 23:1
clear [3] - 5:22, 52:18, 55:24
clearly [1] - 42:4
clerical [3] - 8:6, 8:7,

11:3
Clerk [1] - 107:13
clerk [1] - 72:9
clerk's [1] - 74:16
clerks [1] - 38:17
clothes [6] - 74:7, 94:9, 94:12, 94:15, 94:16, 94:19
clothing [7] - 92:2, 92:4, 92:5, 94:6, 95:14
clue [1] - 60:11
coaching [2] - 41:1, 41:3
cocktails [1] - 48:17
cold [1] - 55:19
collaborative [1] - 13:1
College [1] - 16:20
combative [2] - 80:25, 82:19
comfortable [1] - 86:23
coming [5] - 4:13, 47:21, 50:8, 66:25, 79:14
command [3] - 57:19, 57:21, 87:10
commencing [1] - 1:12
commissary [1] - 94:17
committed [10] - 39:25, 40:5, 40:12, 40:15, 40:17, 40:20, 41:12, 41:18, 41:19
common [1] - 75:10
commonly [1] - 103:12
communicate [4] - 11:14, 38:23, 80:5, 80:7
communicating [10] - 57:19, 78:9, 78:12, 78:16, 78:17, 78:19, 78:21, 78:23, 79:11
communication [2] - 6:10, 103:19
communications [1] - 24:22
COMMUNITY [1] - 2:20
company [4] - 15:8, 15:11, 63:12, 69:1
compared [1] - 99:1
comparing [1] - 47:25
complaining [1] - 11:24
Complaint [1] - 36:5
complete [3] - 73:25,

74:2, 74:10
completed [5] - 15:20, 15:22, 21:24, 43:9, 107:9
completely [2] - 25:20, 41:17
complying [1] - 48:19
concerned [3] - 93:13, 94:4, 100:4
concluding [1] - 1:12
conclusion [14] - 11:12, 12:10, 26:16, 39:22, 43:5, 46:25, 48:9, 49:19, 65:5, 90:5, 91:25, 100:13, 101:25, 102:18
conclusively [1] - 89:13
condensed [3] - 104:15, 104:16, 104:18
conduct [13] - 42:14, 48:7, 49:13, 50:25, 58:17, 61:12, 61:16, 65:2, 65:11, 65:14, 90:13, 90:20, 91:8
conducted [1] - 23:5
configured [1] - 85:9
confused [2] - 46:17, 52:14
congratulations [1] - 5:20
consider [6] - 22:16, 49:7, 50:24, 75:5, 98:13, 102:4
considered [4] - 18:6, 73:25, 74:2, 75:4
considering [1] - 59:17
consist [2] - 37:2, 37:20
consisted [1] - 86:5
Constitution [2] - 47:23, 47:24
constitutional [11] - 46:6, 46:15, 46:23, 47:13, 63:22, 101:23, 102:3, 103:2, 103:4, 103:23, 104:4
contact [2] - 38:25, 107:11
contacts [2] - 57:10, 62:18
contained [1] - 105:9
continue [2] - 34:6, 88:20
continuing [4] - 32:17, 49:17, 55:20, 69:20
contracted [1] - 14:9

conversation [6] - 24:12, 77:25, 78:11, 81:21, 87:8, 87:13
cooperated [1] - 95:14
cooperating [6] - 82:5, 82:10, 82:11, 101:15, 101:18, 102:10
cooperative [1] - 102:5
coordinate [1] - 66:19
copyright [1] - 68:24
corporals [1] - 8:4
corporate [1] - 18:25
correct [31] - 5:24, 10:15, 11:3, 16:12, 18:24, 30:9, 31:9, 31:25, 40:6, 40:20, 41:14, 45:19, 53:4, 53:7, 56:5, 61:6, 67:25, 68:1, 68:3, 71:11, 72:6, 75:4, 84:12, 85:5, 85:21, 85:22, 98:19, 98:20, 99:6, 101:23, 105:7
correctional [28] - 7:18, 7:25, 8:1, 8:13, 8:14, 8:17, 8:21, 8:24, 9:7, 14:16, 20:13, 27:10, 45:16, 45:18, 46:1, 78:23, 84:23, 84:25, 85:5, 87:22, 88:5, 97:10, 99:14, 101:6, 103:14, 103:16, 103:25, 104:3
corrections [1] - 107:8
correctly [3] - 13:16, 49:9, 61:11
counseling [1] - 18:6
counselled [1] - 91:14
counter [2] - 74:25
County [45] - 5:23, 6:23, 7:3, 7:5, 7:9, 7:11, 7:17, 9:21, 10:14, 10:18, 11:9, 13:9, 13:11, 13:19, 14:13, 15:4, 23:16, 25:8, 25:15, 25:23, 26:1, 30:5, 39:9, 41:21, 49:12, 51:6, 51:12, 51:16, 52:7, 52:20, 54:11, 55:2, 57:22, 60:7, 64:8, 65:14, 68:3, 68:21, 69:4, 83:3, 83:17, 84:18, 88:11, 91:8, 99:6
COUNTY [2] - 2:13, 105:2

**county** [4] - 6:9, 57:8, 57:9, 63:14
**course** [2] - 8:3, 22:6
**COURT** [1] - 1:1
**Court** [1] - 60:19
**court** [9] - 4:20, 5:4, 9:15, 29:24, 33:8, 70:23, 71:2, 95:24, 107:13
**courts** [1] - 93:20
**cousin** [1] - 50:19
**cover** [2] - 96:10
**covered** [4] - 13:5, 56:14, 81:23, 96:6
**covering** [2] - 96:12, 96:18
**covers** [2] - 6:18, 48:16
**COVID** [14] - 10:5, 10:8, 10:11, 34:3, 34:10, 34:14, 34:17, 35:1, 35:10, 35:15, 36:11, 53:10, 53:14
**create** [5] - 14:24, 14:25, 15:1, 16:7, 17:13
**created** [2] - 15:11, 16:7
**creating** [1] - 15:3
**crime** [8] - 40:1, 40:5, 40:13, 40:15, 40:20, 41:12, 41:18, 41:19
**criminal** [2] - 42:7, 42:14
**Crivello** [2] - 2:9, 107:2
**crossing** [1] - 48:12
**cruel** [1] - 47:7
**crumb** [1] - 50:10
**curfew** [4] - 61:3, 61:4, 61:5
**current** [2] - 15:16, 91:7
**custody** [9] - 32:23, 40:1, 43:12, 52:22, 66:14, 81:19, 93:3, 93:22, 103:11
**cut** [1] - 49:18
**CV** [3] - 1:6, 106:3, 107:4
**CY** [1] - 2:3

## D

**DA** [2] - 77:24, 78:6
**DAs** [2] - 78:10, 78:13
**Date** [1] - 106:24
**date** [7] - 22:25, 54:24, 70:2, 83:24, 83:25, 92:22

**Dated** [1] - 105:13
**dates** [4] - 35:6, 55:1, 77:11, 99:15
**David** [2] - 72:24, 106:3
**DAVID** [9] - 1:7, 1:11, 2:13, 3:2, 4:2, 106:4, 106:24, 107:3, 107:21
**days** [10] - 19:1, 27:9, 34:24, 35:13, 49:20, 52:8, 54:5, 63:4, 77:1, 77:2
**dead** [1] - 72:25
**deal** [1] - 56:15
**dealing** [2] - 65:19, 83:6
**deals** [1] - 65:16
**dealt** [1] - 19:4
**December** [2] - 5:17, 55:18
**decide** [2] - 18:23, 93:20
**declare** [1] - 106:22
**declared** [1] - 61:5
**dedicated** [1] - 15:13
**defendant** [1] - 60:20
**Defendants** [3] - 1:8, 2:13, 2:19
**define** [2] - 23:4, 48:14
**definitely** [2] - 25:22, 49:3
**definition** [2] - 22:1, 52:1
**degree** [3] - 16:18, 16:20
**delay** [1] - 73:18
**demonstrate** [2] - 63:20, 63:25
**dentist** [1] - 101:10
**Department** [28] - 5:13, 5:16, 7:4, 11:5, 11:7, 11:9, 22:7, 22:15, 22:22, 23:6, 23:16, 39:9, 41:21, 47:19, 57:22, 63:8, 65:16, 65:19, 65:23, 66:16, 68:22, 80:13, 83:3, 83:17, 84:19, 84:21, 88:11, 89:20
**department** [2] - 17:12, 60:10
**deposed** [2] - 4:14, 4:16
**deposition** [8] - 23:19, 23:24, 24:3, 24:13, 24:18, 25:12, 105:10, 107:7
**DEPOSITION** [1] - 1:9

**Deposition** [2] - 3:11, 107:5
**deputies** [5] - 9:17, 58:1, 84:22, 84:24, 84:25
**deputy** [7] - 5:15, 5:16, 8:8, 8:9, 79:4, 79:6, 103:10
**describe** [2] - 18:7, 45:8
**description** [1] - 38:4
**design** [1] - 26:18
**designed** [1] - 94:7
**desk** [4] - 22:10, 22:24, 23:1, 74:24
**detail** [1] - 87:13
**detailed** [1] - 18:17
**detained** [4] - 9:22, 10:8, 43:2, 102:4
**detainees** [9] - 9:16, 10:2, 10:6, 10:9, 10:12, 10:17, 30:23, 70:20
**detective** [2] - 6:13, 45:10
**detectives** [1] - 8:8
**detention** [22] - 6:23, 7:1, 7:2, 7:25, 8:2, 8:19, 8:25, 9:6, 9:11, 9:23, 25:7, 25:19, 66:16, 66:21, 66:22, 78:13, 78:20, 79:20, 85:7, 93:11, 97:3
**Detention** [57] - 7:6, 8:2, 8:23, 9:21, 10:14, 10:18, 13:11, 13:19, 13:23, 13:25, 14:14, 25:8, 25:14, 26:1, 26:3, 26:8, 26:14, 26:23, 27:1, 27:7, 28:3, 29:6, 29:7, 29:13, 30:14, 30:25, 31:9, 31:12, 31:19, 32:7, 32:11, 32:13, 32:17, 32:25, 33:11, 34:14, 34:16, 37:8, 38:1, 44:25, 46:2, 49:24, 60:13, 60:21, 66:11, 66:18, 67:2, 67:4, 67:5, 67:17, 67:23, 69:12, 69:15, 70:4, 70:11, 70:18, 71:8
**detentions** [2] - 8:23, 76:6
**determination** [3] - 43:16, 43:22, 43:23
**determine** [1] - 43:18
**determined** [2] - 58:14, 70:10

**determining** [1] - 39:3
**device** [1] - 29:18
**difference** [1] - 9:1
**differences** [1] - 85:8
**different** [29] - 6:15, 6:19, 7:5, 7:7, 7:23, 8:20, 17:7, 23:25, 25:20, 26:9, 26:19, 33:7, 34:9, 34:20, 38:5, 39:3, 41:17, 48:17, 57:13, 66:2, 66:6, 70:22, 74:19, 84:25, 85:18, 88:2, 95:13, 96:13, 97:2
**differentiating** [1] - 61:16
**differently** [1] - 85:9
**differs** [1] - 58:9
**difficult** [2] - 28:9, 66:15
**difficulty** [1] - 66:20
**Digest** [2] - 63:6, 63:11
**DIRECT** [1] - 4:5
**Direct** [1] - 3:3
**directly** [3] - 17:9, 37:5, 70:11
**disciplinary** [1] - 23:14
**discipline** [17] - 16:23, 17:2, 17:8, 17:15, 17:17, 17:20, 18:12, 18:18, 19:3, 19:9, 19:17, 21:1, 21:3, 22:1, 22:5, 22:16, 23:4
**disciplined** [7] - 17:9, 21:10, 22:3, 91:11, 103:22, 103:25, 104:4
**disciplines** [3] - 17:11, 19:10, 21:14
**discretion** [1] - 44:12
**discussed** [2] - 25:18, 64:11
**discussing** [2] - 63:14, 74:4
**discussion** [4] - 13:1, 51:18, 64:19, 78:8
**Discussion** [1] - 56:7
**disorderly** [10] - 42:14, 48:7, 50:25, 58:16, 61:12, 61:16, 65:2, 65:10, 65:14, 90:13
**dispatch** [3] - 72:10, 72:13, 72:14
**disposal** [1] - 88:2
**distinction** [1] - 8:17
**distinctions** [1] - 9:4

**distribution** [1] - 107:9
**District** [1] - 60:19
**DISTRICT** [2] - 1:1, 1:3
**disturbance** [3] - 48:19, 49:7, 49:9
**disturbed** [2] - 90:3, 90:6
**divisions** [1] - 6:13
**DO** [1] - 106:2
**doctor** [1] - 101:10
**document** [16] - 18:3, 18:14, 24:9, 28:16, 28:21, 28:22, 68:14, 68:19, 68:20, 68:24, 83:14, 83:20, 84:1, 88:22, 89:14, 106:22
**documentation** [3] - 17:13, 18:17, 38:18
**documents** [4] - 23:18, 25:1, 25:6, 25:11
**Donald** [1] - 53:21
**done** [3] - 15:22, 21:2, 104:11
**door** [2] - 80:2, 80:9
**doors** [4] - 51:19, 79:23, 93:2, 103:21
**dorm** [3] - 31:22, 32:2, 32:8
**dorms** [1] - 35:15
**down** [9] - 4:20, 4:23, 5:4, 13:3, 18:4, 22:13, 22:25, 63:8, 94:10
**downtown** [7] - 66:25, 67:3, 67:11, 67:19, 70:8, 70:24, 71:6
**dozen** [1] - 32:10
**driving** [1] - 48:23
**drumming** [1] - 66:7
**duly** [2] - 4:1, 4:4
**during** [54] - 7:20, 35:17, 35:19, 35:22, 35:23, 36:1, 36:12, 37:16, 51:20, 52:6, 53:3, 53:6, 53:9, 53:22, 53:25, 54:5, 56:9, 58:5, 58:20, 59:10, 59:13, 59:15, 59:20, 59:23, 60:1, 61:2, 61:9, 61:12, 61:24, 62:2, 62:5, 62:9, 62:12, 62:15, 62:23, 63:1, 63:17, 64:25, 65:11, 65:13, 65:19, 65:23, 66:10, 67:20, 70:9, 72:18, 84:16, 84:19, 87:15, 93:10, 99:4, 99:6,

102:16, 102:25
**During** [1] - 54:10

### E

**e-mail** [1] - 107:15
**easier** [3] - 21:21, 51:22, 67:1
**Eastern** [1] - 60:19
**EASTERN** [1] - 1:3
**educational** [4] - 16:15, 22:17, 22:18, 91:17
**effect** [1] - 16:10
**effort** [1] - 13:1
**eighty** [1] - 13:17
**either** [4] - 9:6, 29:25, 70:19, 94:10
**election** [1] - 53:17
**emails** [3] - 6:16, 24:22, 78:1
**Emergency** [36] - 3:15, 27:15, 27:17, 27:20, 27:24, 59:2, 59:10, 86:16, 87:12, 87:16, 87:25, 88:10, 89:1, 89:4, 89:7, 90:16, 90:21, 91:4, 91:9, 91:12, 91:15, 91:18, 96:5, 96:17, 96:23, 97:6, 97:11, 97:21, 98:2, 98:9, 98:16, 98:18, 98:22, 100:1, 100:9, 100:16
**employed** [2] - 13:13, 13:14
**employee** [1] - 37:25
**employees** [19] - 13:17, 17:2, 17:8, 19:8, 19:9, 19:15, 23:5, 32:24, 33:3, 35:22, 35:25, 36:1, 36:17, 53:11, 53:13, 64:3, 64:21, 73:20
**employment** [3] - 5:11, 8:12, 9:5
**encompass** [1] - 39:12
**end** [2] - 37:19, 104:20
**ended** [1] - 6:2
**endless** [1] - 33:13
**ends** [1] - 52:25
**enforcement** [3] - 20:5, 60:9, 66:8
**entail** [1] - 18:11
**entailed** [2] - 68:5, 83:5
**ENTER** [1] - 106:2
**entering** [1] - 39:6
**entire** [7] - 7:13, 7:20,

15:20, 32:9, 57:24, 65:21, 96:11
**entitled** [2] - 47:14, 105:8
**entrance** [1] - 76:3
**envisioning** [2] - 74:22, 74:23
**equally** [1] - 26:14
**equivalent** [1] - 8:20
**ERC** [1] - 27:21
**Errata** [3] - 3:5, 107:8, 107:9
**ERRATA** [1] - 106:1
**escort** [1] - 75:13
**escorted** [1] - 75:12
**ESQ** [3] - 2:3, 2:9, 2:15
**Esq** [1] - 107:1
**Established** [1] - 107:11
**estimate** [1] - 60:3
**et** [5] - 1:7, 2:13, 24:23, 106:3, 107:4
**evaluations** [1] - 59:5
**evening** [2] - 75:24, 81:17
**event** [2] - 62:17, 65:21
**events** [3] - 62:25, 63:1, 63:14
**exact** [2] - 10:10, 67:6
**exactly** [11] - 9:7, 43:14, 56:14, 57:6, 81:7, 82:4, 85:16, 95:11, 99:21, 100:21, 101:8
**EXAMINATION** [1] - 4:5
**Examination** [1] - 3:3
**examined** [1] - 4:4
**example** [1] - 22:9
**exclusively** [1] - 10:18
**excuse** [1] - 33:3
**executive** [3] - 57:8, 57:9, 63:14
**Exhibit** [9] - 24:6, 24:7, 28:17, 28:18, 68:12, 83:11, 83:12, 84:10, 88:18
**EXHIBITS** [1] - 3:9
**exist** [1] - 84:1
**existed** [4] - 83:18, 83:24, 84:11, 84:14
**existence** [1] - 15:10
**exits** [1] - 50:7
**expect** [2] - 102:14, 102:25
**expected** [10] - 44:21, 44:23, 45:22, 46:1, 46:5, 46:14, 46:21,

46:22, 47:6, 49:25
**explain** [3] - 7:2, 37:24, 66:21
**extend** [3] - 19:23, 19:24, 20:2
**extending** [1] - 19:25
**extent** [8] - 11:11, 12:21, 39:21, 43:4, 46:24, 90:4, 91:24, 101:24
**extra** [1] - 86:7
**extremely** [1] - 22:10

### F

**face** [1] - 79:14
**facilities** [9] - 7:2, 7:5, 8:6, 13:17, 13:18, 26:11, 26:19, 31:2, 63:13
**facility** [32] - 8:1, 8:20, 9:7, 9:8, 10:9, 10:24, 11:25, 25:19, 26:19, 29:25, 33:9, 38:14, 38:15, 39:6, 40:2, 43:17, 43:24, 44:4, 44:5, 44:9, 44:15, 44:22, 44:24, 48:23, 66:21, 66:22, 70:11, 85:8, 94:19, 103:17
**Facility** [3] - 7:6, 25:8, 25:15
**fact** [2] - 59:17, 94:9
**facts** [1] - 106:22
**factual** [1] - 66:9
**fair** [2] - 54:10, 60:5
**fairly** [1] - 97:3
**fall** [3] - 11:4, 11:6, 19:20
**false** [2] - 73:8, 73:15
**familiar** [10] - 28:22, 29:14, 65:12, 68:14, 68:16, 68:19, 71:3, 88:10, 88:23, 97:15
**far** [4] - 13:7, 39:3, 84:17, 85:19
**fashion** [1] - 103:18
**fault** [1] - 25:22
**FBI** [1] - 57:11
**federal** [3] - 6:11, 57:10, 60:10
**fence** [2] - 63:12, 66:25
**few** [15] - 4:17, 15:21, 26:18, 31:2, 52:11, 52:13, 52:14, 52:15, 54:5, 65:16, 74:8, 76:1, 79:1, 79:5, 95:13
**Fifteenth** [2] - 47:7,

47:10
**fifty** [1] - 66:5
**figured** [1] - 42:3
**file** [1] - 18:4
**filed** [2] - 60:19, 107:13
**filing** [1] - 91:3
**fill** [1] - 71:17
**final** [1] - 15:23
**fine** [2] - 4:11, 79:19
**fined** [1] - 19:15
**fingerprint** [1] - 73:10
**fingerprinted** [4] - 69:20, 69:22, 73:12, 73:14
**fingerprinting** [1] - 74:5
**fingerprints** [2] - 72:12
**First** [9] - 47:2, 48:4, 48:7, 49:14, 50:1, 58:17, 61:17, 63:21, 64:8
**first** [17] - 4:4, 5:15, 17:23, 18:1, 18:13, 20:11, 25:17, 35:24, 38:7, 39:19, 52:9, 68:15, 68:16, 70:12, 70:13, 76:1, 88:19
**five** [4] - 13:25, 31:22, 32:1, 32:3
**floor** [1] - 28:7
**foam** [1] - 28:6
**focus** [3] - 6:22, 9:5, 33:20
**focusing** [1] - 25:14
**follow** [2] - 12:6, 85:13
**follows** [1] - 4:4
**food** [1] - 33:17
**FOR** [1] - 106:6
**force** [7] - 58:19, 61:9, 61:24, 85:16, 86:3, 86:12, 86:13
**Force** [12] - 3:14, 83:3, 83:9, 83:18, 83:23, 84:2, 84:9, 84:18, 85:1, 85:11, 85:14, 85:23
**foregoing** [2] - 105:7, 106:22
**forget** [2] - 35:11, 38:11
**form** [37] - 12:9, 16:4, 16:25, 17:4, 22:5, 23:7, 30:20, 31:13, 32:15, 33:5, 33:25, 34:8, 36:23, 38:2, 38:10, 40:21, 40:25, 41:2, 41:22, 42:8, 45:1, 46:8, 49:15,

47:10
**fifty** [1] - 66:5
**figured** [1] - 42:3
49:19, 59:21, 60:15, 60:23, 65:4, 72:3, 82:23, 90:17, 96:7, 99:11, 99:20, 100:12, 101:14, 104:6
**forty** [1] - 64:18
**foundation** [17] - 23:7, 27:3, 33:5, 33:25, 40:22, 40:25, 41:2, 41:22, 65:4, 86:20, 87:3, 87:17, 90:4, 94:24, 99:11, 100:12, 102:17
**four** [9] - 7:7, 17:14, 19:7, 23:11, 44:18, 58:10, 67:14, 67:15, 76:25
**fourteen** [1] - 35:13
**fourth** [1] - 19:5
**Fourth** [2] - 47:7, 47:10
**frame** [2] - 36:12, 97:4
**Frauen** [1] - 2:16
**freed** [1] - 35:12
**front** [6] - 28:21, 49:11, 49:23, 51:18, 79:23, 93:2
**FTEs** [1] - 13:17
**full** [6] - 13:17, 14:2, 14:12, 14:18, 14:19, 104:17
**full-time** [5] - 13:17, 14:2, 14:12, 14:18, 14:19

### G

**Gabrielle** [2] - 78:6, 78:9
**Gardinelli** [1] - 81:8
**Gateway** [1] - 16:19
**gear** [1] - 58:13
**general** [3] - 38:3, 53:12, 53:13
**General's** [1] - 57:11
**generally** [5] - 23:1, 23:2, 26:22, 36:3, 37:24
**given** [8] - 24:14, 44:9, 44:11, 72:10, 72:21, 73:7, 91:17, 93:10
**glass** [4] - 75:1, 75:6, 75:8, 75:16
**glasses** [2] - 89:11, 89:16
**gloves** [2] - 36:1, 36:7
**gosh** [1] - 33:6
**govern** [1] - 70:22
**government** [2] - 6:11,

57:10
**graduated** [1] - 16:17
**Gravely** [1] - 77:24
**great** [3] - 4:12, 6:5, 6:22
**group** [2] - 63:9, 79:22
**guard** [1] - 29:16
**Guard** [1] - 57:10
**guess** [12] - 6:12, 17:10, 43:6, 47:25, 63:6, 65:22, 79:7, 79:10, 82:10, 86:22, 99:21, 100:20
**guy** [2] - 15:11, 95:22
**guys** [1] - 95:19

## H

**hand** [1] - 30:9
**handcuff** [1] - 38:11
**handcuffed** [7] - 41:14, 41:16, 41:23, 43:1, 44:5, 44:7, 75:16
**handcuffing** [1] - 42:22
**handcuffs** [16] - 27:14, 27:23, 30:1, 30:2, 30:8, 30:9, 30:15, 39:10, 42:2, 42:10, 43:8, 43:13, 43:14, 43:23, 88:3, 98:12
**handle** [1] - 39:5
**hang** [1] - 94:5
**haphazardly** [1] - 34:20
**happy** [1] - 63:4
**harm** [2] - 28:9, 94:7
**head** [3] - 29:14, 57:9, 80:1
**health** [5] - 12:14, 12:19, 13:8, 32:22, 59:5
**healthcare** [4] - 33:22, 34:13, 62:5, 93:9
**hear** [8] - 11:23, 49:9, 61:11, 80:16, 80:17, 80:19, 99:21, 101:5
**heard** [3] - 101:2, 101:4, 101:5
**hearing** [3] - 24:1, 25:24, 26:2
**heightened** [5] - 54:14, 54:18, 56:9, 59:14, 84:16
**held** [5] - 10:7, 31:8, 56:7, 98:13, 98:15
**help** [5] - 24:2, 56:3, 57:3, 89:8, 102:9

**HERE** [1] - 106:2
**hereby** [2] - 105:6, 107:20
**High** [1] - 16:17
**higher** [1] - 57:18
**Highway** [1] - 15:12
**himself** [8] - 80:7, 87:5, 92:3, 94:12, 98:23, 98:24, 100:22, 100:25
**hindering** [3] - 48:18, 49:6, 49:8
**hire's** [1] - 19:25
**hired** [3] - 11:8, 20:11, 21:1
**his/her** [1] - 107:14
**history** [1] - 5:11
**hit** [1] - 10:8
**hold** [2] - 10:2, 95:13
**holding** [4] - 7:2, 9:16, 28:14, 29:2
**Holding** [1] - 3:12
**holdings** [1] - 32:7
**hollering** [1] - 96:13
**hope** [3] - 47:22, 48:1, 97:18
**hostess** [1] - 50:14
**hour** [2] - 44:18, 58:10
**hours** [3] - 70:23, 76:22, 76:24
**housed** [4] - 9:21, 31:11, 60:13, 94:23
**housing** [1] - 10:18
**hundred** [4] - 13:16, 13:25, 60:5, 65:16
**hung** [1] - 94:15
**hurt** [2] - 100:8, 101:6
**hurting** [1] - 92:5
**hypothetical** [1] - 101:7

## I

**I.D** [6] - 24:7, 28:18, 68:12, 83:12, 88:18, 103:19
**ICE** [5] - 10:2, 10:5, 10:7, 10:8, 70:20
**identical** [1] - 26:18
**identification** [5] - 38:10, 38:19, 74:5, 102:10, 103:10
**identified** [3] - 80:4, 92:3, 94:12
**identify** [6] - 80:7, 93:21, 102:9, 102:20, 103:18, 103:20
**identifying** [2] - 87:5, 101:21

**immediately** [1] - 70:25
**immigration** [1] - 10:3
**implement** [1] - 88:4
**implemented** [2] - 88:12, 97:13
**important** [7] - 32:14, 32:19, 32:23, 32:24, 33:1, 33:17, 33:22
**imposed** [3] - 19:8, 19:10, 92:18
**improper** [1] - 61:23
**IN** [1] - 106:3
**INC** [1] - 2:20
**incident** [3] - 62:17, 63:7, 95:19
**included** [1] - 79:22
**including** [1] - 14:15
**incorrect** [1] - 95:20
**increase** [2] - 21:3, 59:15
**increasing** [1] - 66:11
**INDEX** [1] - 3:1
**individual** [1] - 32:9
**individuals** [5] - 81:19, 94:21, 95:3, 95:6, 95:9
**information** [11] - 45:3, 45:12, 72:9, 72:10, 72:19, 72:21, 73:7, 73:15, 73:21, 74:4, 98:8
**informed** [3] - 39:5, 51:18, 98:1
**inhibit** [1] - 50:8
**inhibiting** [1] - 49:1
**initial** [2] - 56:11, 56:20
**injured** [7] - 55:11, 96:25, 99:25, 100:3, 100:9, 100:16, 101:6
**injuries** [1] - 100:18
**inmate** [17] - 10:22, 10:25, 30:6, 32:14, 32:19, 33:18, 33:22, 36:25, 37:7, 37:16, 38:25, 45:24, 46:3, 47:20, 69:14, 94:19, 102:14
**inmate's** [3] - 103:8, 104:1, 104:4
**inmates** [33] - 9:16, 10:1, 10:19, 12:14, 13:2, 25:16, 26:10, 27:1, 29:12, 30:19, 30:22, 31:1, 31:6, 31:7, 31:8, 32:6, 33:4, 34:16, 34:24, 35:8, 35:9, 35:19, 36:17, 36:22, 45:14,

46:7, 46:16, 46:23, 47:13, 75:15, 83:6, 94:14, 103:1
**inservice** [2] - 51:1, 58:10
**inservices** [2] - 44:19, 58:13
**inside** [6] - 9:6, 11:25, 46:2, 74:14, 94:6
**instance** [2] - 1:11, 42:14
**instances** [3] - 11:20, 12:13, 94:14
**instruction** [2] - 97:6, 97:11
**intake** [1] - 70:15
**interacted** [2] - 50:21, 99:8
**interacting** [1] - 99:15
**interesting** [1] - 6:21
**interpretation** [2] - 16:3, 16:6
**interrupt** [2] - 28:20, 47:16
**intimidate** [1] - 38:24
**investigate** [2] - 73:20
**investigating** [2] - 62:2, 62:5
**investigation** [4] - 43:9, 45:11, 91:2, 91:8
**investigations** [2] - 90:20, 91:5
**investigative** [1] - 42:20
**invokes** [1] - 102:3
**invoking** [1] - 61:16
**involved** [5] - 12:5, 57:18, 66:13, 89:3, 89:7
**involvement** [1] - 25:3
**ish** [1] - 13:25
**issue** [4] - 9:20, 38:20, 49:21, 95:24
**issues** [1] - 38:19

## J

**Jacob** [9] - 49:13, 50:15, 50:20, 51:6, 51:10, 52:1, 53:4, 55:1, 56:22
**jail** [73] - 6:12, 8:1, 8:24, 9:8, 9:18, 12:3, 13:24, 25:19, 25:24, 26:8, 26:14, 26:23, 27:5, 27:11, 27:25, 29:6, 29:12, 30:14, 30:18, 30:22, 30:25, 31:9, 37:5, 37:8,

38:14, 38:22, 38:23, 40:2, 42:23, 43:10, 43:17, 47:20, 66:20, 67:3, 67:9, 70:5, 70:6, 70:7, 70:8, 70:12, 70:13, 70:17, 70:25, 71:6, 71:7, 71:11, 72:18, 85:7, 85:10, 85:14, 85:19, 85:20, 85:24, 86:2, 86:7, 86:12, 87:16, 87:19, 87:25, 88:6, 89:21, 93:19, 94:6, 94:18, 98:10, 99:4, 101:11, 102:4, 102:15, 103:14, 103:17
**Jail** [9] - 7:5, 7:9, 7:11, 7:17, 13:19, 14:14, 25:15, 25:23, 99:6
**jailed** [1] - 102:15
**jails** [2] - 6:23, 7:2
**January** [4] - 5:19, 6:1, 6:3, 6:4
**jeopardized** [1] - 99:23
**JESSICA** [1] - 2:20
**job** [7] - 6:20, 6:21, 6:22, 93:19, 93:22, 100:7, 103:17
**Jonathan** [2] - 81:13, 86:18
**Joseph** [2] - 81:8, 86:15
**judge** [2] - 11:23, 11:24
**July** [2] - 5:15, 72:24
**justice** [1] - 49:13
**JUSTIN** [2] - 1:4, 2:7
**Justin** [28] - 10:21, 24:23, 50:17, 50:20, 51:14, 52:19, 71:2, 71:7, 71:22, 75:22, 77:4, 77:7, 77:10, 77:20, 77:24, 78:2, 78:7, 78:10, 78:13, 78:20, 78:23, 79:2, 79:19, 80:14, 81:24, 106:3

## K

**keep** [6] - 13:2, 30:11, 33:14, 34:25, 93:20, 96:3
**keeping** [1] - 22:10
**KENOSHA** [2] - 2:13, 2:20
**Kenosha** [69] - 5:16, 5:18, 5:23, 6:23, 7:3,

7:4, 7:5, 7:9, 7:10, 7:17, 9:21, 10:14, 10:18, 13:8, 13:11, 13:19, 13:23, 14:13, 15:4, 23:16, 25:3, 25:7, 25:8, 25:14, 25:15, 25:23, 26:1, 30:5, 39:9, 41:21, 44:25, 49:12, 49:24, 51:6, 51:11, 51:16, 52:7, 52:20, 53:18, 54:2, 54:11, 55:1, 57:22, 60:7, 60:13, 60:21, 61:5, 64:8, 65:14, 67:7, 67:9, 67:11, 67:19, 67:24, 68:3, 68:21, 69:4, 69:15, 74:23, 83:2, 83:17, 84:18, 84:21, 88:11, 89:19, 91:7, 99:6, 102:15

**key** [1] - 57:8
**killed** [1] - 55:11
**Kim** [1] - 41:7
**KIMBERLEY** [1] - 2:3
**kind** [8] - 7:20, 9:16, 13:5, 22:14, 42:21, 75:1, 79:11, 103:10
**kmotley@ motleylegal.com** [1] - 2:5
**knowledge** [13] - 25:2, 45:21, 47:1, 47:6, 50:22, 62:8, 62:17, 64:7, 72:8, 86:2, 87:25, 92:3, 92:6
**known** [2] - 28:10, 46:2
**Kyle** [3] - 53:7, 55:4, 55:11

## L

**Lake** [1] - 16:18
**large** [2] - 29:25, 32:3
**larger** [2] - 31:20, 35:15
**last** [3] - 6:2, 15:22, 59:6
**lasted** [1] - 34:11
**late** [1] - 80:10
**law** [4] - 20:5, 60:9, 66:8, 90:25
**laws** [1] - 51:2
**lawsuit** [2] - 60:18, 91:3
**lawyer** [1] - 77:20
**least** [7] - 32:5, 80:13, 87:20, 91:21, 92:7, 92:17, 92:22

**leave** [3] - 43:2, 73:24, 80:1
**leaves** [2] - 73:23, 75:6
**left** [1] - 10:4
**Legal** [1] - 2:3
**legal** [16] - 11:12, 12:10, 26:15, 39:21, 43:5, 46:25, 48:8, 48:23, 49:2, 49:19, 65:5, 90:5, 91:25, 100:13, 101:25, 102:18
**lengthy** [3] - 39:1, 39:3, 79:24
**letter** [1] - 107:15
**Letter** [1] - 3:6
**letters** [1] - 24:23
**level** [6] - 21:6, 37:15, 37:17, 56:9, 70:21, 98:7
**levels** [6] - 17:19, 19:11, 19:21, 37:9, 37:10, 57:18
**Lexipol** [3] - 68:25, 69:1, 83:21
**liable** [2] - 100:11, 100:18
**license** [1] - 66:4
**lies** [1] - 71:25
**lieutenants** [1] - 8:9
**limited** [1] - 17:10
**line** [7] - 33:25, 36:4, 48:6, 48:10, 48:12, 49:10, 102:12
**LINE** [1] - 106:6
**list** [1] - 33:13
**listed** [1] - 107:15
**live** [1] - 102:21
**located** [1] - 7:7
**location** [2] - 67:6, 70:8
**locations** [2] - 7:7, 66:6
**locked** [1] - 80:10
**look** [7] - 12:3, 24:20, 83:20, 84:13, 88:22, 92:24, 101:7
**looked** [1] - 37:14
**looking** [8] - 43:18, 56:13, 74:16, 83:14, 84:21, 88:14, 92:1, 92:5
**low** [2] - 31:25, 37:19
**lowest** [1] - 17:23

## M

**machine** [1] - 105:9
**mail** [1] - 107:15

**major** [1] - 9:4
**maker** [2] - 16:1, 16:6
**makeshift** [2] - 66:24, 67:2
**mandated** [1] - 36:19
**manual** [4] - 97:6, 97:11, 97:16, 97:22
**Manual** [1] - 87:16
**March** [8] - 10:11, 10:12, 10:16, 34:4, 34:15, 35:4, 35:8, 35:18
**mark** [5] - 28:17, 68:11, 83:11, 88:17, 89:24
**marked** [7] - 24:5, 24:7, 28:18, 68:12, 83:12, 84:10, 88:18
**married** [1] - 76:1
**Marshals** [1] - 57:11
**masks** [8] - 34:21, 35:2, 35:17, 35:19, 35:22, 35:25, 89:16
**match** [2] - 72:12, 72:23
**matches** [2] - 72:11
**matter** [2] - 51:15, 105:8
**maximum** [2] - 31:18, 31:21
**mayor** [3] - 57:8, 61:5, 63:13
**mean** [18] - 9:24, 21:18, 39:10, 39:20, 43:1, 43:3, 43:8, 43:21, 43:25, 46:13, 49:18, 53:11, 55:25, 57:21, 61:20, 74:9, 80:20
**meaning** [1] - 33:3
**means** [6] - 36:16, 42:25, 92:18, 92:22, 93:14, 98:25
**measures** [10] - 23:14, 33:2, 34:3, 34:6, 34:8, 34:11, 34:13, 34:16, 35:4, 35:7
**media** [2] - 66:4, 66:7
**medical** [18] - 11:6, 12:5, 12:25, 36:22, 36:24, 37:7, 37:10, 38:19, 59:5, 67:24, 68:2, 68:21, 69:4, 69:10, 69:11, 93:6, 97:2, 97:5
**Medical** [1] - 3:13
**medically** [1] - 37:17
**meet** [1] - 54:3
**meeting** [2] - 21:20, 63:13

**meetings** [12] - 6:8, 56:12, 57:1, 57:4, 57:5, 57:7, 57:12, 57:15, 57:16, 57:17, 57:20, 57:22
**megaphone** [1] - 49:12
**member** [1] - 103:25
**members** [1] - 58:5
**memory** [11] - 24:2, 28:13, 35:13, 54:25, 55:17, 68:7, 83:8, 83:15, 84:9, 88:15, 89:8
**memos** [2] - 24:23, 34:18
**mental** [1] - 93:9
**mentioned** [4] - 34:3, 58:3, 73:10, 80:24
**mentioning** [1] - 80:25
**messages** [2] - 24:23, 78:1
**met** [1] - 54:2
**MEYER** [86] - 2:9, 7:12, 11:11, 11:17, 11:22, 12:9, 12:16, 12:21, 16:4, 16:25, 17:4, 23:7, 24:15, 26:6, 26:15, 27:3, 27:8, 30:20, 31:13, 32:15, 32:18, 33:5, 33:12, 33:24, 34:8, 36:3, 36:23, 38:2, 39:11, 39:21, 40:7, 40:14, 40:21, 40:25, 41:2, 41:5, 41:7, 41:22, 42:8, 43:4, 45:1, 46:8, 46:10, 46:17, 46:24, 47:8, 47:15, 48:8, 48:15, 49:15, 49:18, 50:3, 55:24, 56:3, 59:21, 60:15, 60:23, 65:4, 69:17, 72:3, 74:18, 77:16, 82:23, 86:20, 87:3, 87:17, 90:4, 90:17, 91:24, 94:24, 96:7, 99:11, 99:20, 100:2, 100:12, 100:19, 101:1, 101:14, 101:24, 102:6, 102:17, 103:3, 104:6, 104:11, 104:13, 104:18
**Meyer** [1] - 107:1
**Michael** [2] - 79:9, 79:17
**middle** [1] - 50:7
**might** [7] - 29:9,

29:10, 46:24, 72:23, 75:19, 89:8, 90:12
**mile** [1] - 67:13
**miles** [3] - 7:7, 67:14, 67:15
**Milwaukee** [3] - 1:14, 2:11, 2:17
**mind** [3] - 13:24, 30:17, 39:24
**mine** [1] - 55:14
**minimum** [1] - 31:17
**minor** [1] - 22:10
**minute** [1] - 28:20
**minutes** [1] - 79:1
**Miranda** [2] - 44:9, 44:11
**Mirandize** [5] - 45:8, 45:12, 45:14, 45:21, 45:23
**Mirandized** [3] - 44:15, 44:23, 46:3
**mirror** [1] - 48:1
**mirrors** [1] - 47:23
**mischaracterizing** [1] - 49:6
**misconduct** [2] - 62:2, 62:5
**misheard** [1] - 95:17
**misquoting** [1] - 41:8
**mistake** [1] - 26:5
**mistakes** [1] - 65:1
**mix** [1] - 10:1
**Molotov** [1] - 48:17
**Monday** [1] - 56:22
**months** [2] - 63:18, 69:17
**morning** [4] - 56:22, 76:5, 77:1, 77:2
**most** [9] - 17:11, 19:3, 26:17, 30:15, 32:7, 75:10, 81:23, 99:3, 99:5
**Most** [1] - 85:6
**mostly** [2] - 8:6, 29:24
**MOTLEY** [113] - 2:3, 4:6, 7:14, 7:15, 11:15, 11:19, 12:4, 12:11, 12:12, 12:18, 13:6, 16:9, 17:1, 17:6, 23:10, 24:5, 24:8, 24:17, 26:7, 26:21, 27:6, 27:12, 28:17, 28:19, 30:24, 31:15, 32:16, 32:20, 33:10, 33:15, 34:2, 34:12, 36:8, 37:1, 39:7, 39:13, 39:15, 40:3, 40:9, 40:10, 40:16, 40:23, 41:1, 41:4, 41:6, 41:9,

41:10, 42:5, 42:11, 43:20, 45:5, 46:9, 46:11, 46:18, 46:20, 47:3, 47:11, 47:17, 48:2, 48:13, 49:4, 49:16, 49:22, 50:12, 56:2, 56:4, 56:6, 56:8, 59:22, 60:17, 61:1, 65:7, 68:11, 68:13, 69:18, 69:19, 72:4, 72:5, 74:20, 74:21, 77:18, 83:1, 83:11, 83:13, 84:5, 84:8, 87:1, 87:7, 87:23, 88:17, 88:21, 89:24, 90:1, 90:7, 90:8, 90:19, 92:8, 95:1, 96:16, 99:12, 99:13, 99:24, 100:5, 100:15, 100:23, 101:3, 101:17, 102:2, 102:11, 102:24, 103:6, 104:8, 104:15

**Motley** [2] - 2:3, 3:3
**mouth** [1] - 54:8
**move** [2] - 8:7, 35:15
**moved** [1] - 71:7
**MR** [2] - 104:10, 104:16
**MS** [197] - 4:6, 7:12, 7:14, 7:15, 11:11, 11:15, 11:17, 11:19, 11:22, 12:4, 12:9, 12:11, 12:12, 12:16, 12:18, 12:21, 13:6, 16:4, 16:9, 16:25, 17:1, 17:4, 17:6, 23:7, 23:10, 24:5, 24:8, 24:15, 24:17, 26:6, 26:7, 26:15, 26:21, 27:3, 27:6, 27:8, 27:12, 28:17, 28:19, 30:20, 30:24, 31:13, 31:15, 32:15, 32:16, 32:18, 32:20, 33:5, 33:10, 33:12, 33:15, 33:24, 34:2, 34:8, 34:12, 36:3, 36:8, 36:23, 37:1, 38:2, 39:7, 39:11, 39:13, 39:15, 39:21, 40:3, 40:7, 40:9, 40:10, 40:14, 40:16, 40:21, 40:23, 40:25, 41:1, 41:2, 41:4, 41:5, 41:6, 41:7, 41:9, 41:10, 41:22, 42:5, 42:8, 42:11, 43:4, 43:20, 45:1,

45:5, 46:8, 46:9, 46:10, 46:11, 46:17, 46:18, 46:20, 46:24, 47:3, 47:8, 47:11, 47:15, 47:17, 48:2, 48:8, 48:13, 48:15, 49:4, 49:15, 49:16, 49:18, 49:22, 50:3, 50:12, 55:24, 56:2, 56:3, 56:4, 56:6, 56:8, 59:21, 59:22, 60:15, 60:17, 60:23, 61:1, 65:4, 65:7, 68:11, 68:13, 69:17, 69:18, 69:19, 72:3, 72:4, 72:5, 74:18, 74:20, 74:21, 77:16, 77:18, 82:23, 83:1, 83:11, 83:13, 84:5, 84:8, 86:20, 87:1, 87:3, 87:7, 87:17, 87:23, 88:17, 88:21, 89:24, 90:1, 90:4, 90:7, 90:8, 90:17, 90:19, 91:24, 92:8, 94:24, 95:1, 96:7, 96:16, 99:11, 99:12, 99:13, 99:20, 99:24, 100:2, 100:5, 100:12, 100:15, 100:19, 100:23, 101:1, 101:3, 101:14, 101:17, 101:24, 102:2, 102:6, 102:11, 102:17, 102:24, 103:3, 103:6, 104:6, 104:8, 104:11, 104:13, 104:15, 104:18

**multiple** [5] - 31:8, 31:14, 31:16, 32:5, 32:6
**multiple-use** [2] - 32:5, 32:6
**municipal** [1] - 6:9
**must** [1] - 10:10

## N

**name** [17] - 15:7, 15:13, 26:19, 45:3, 64:12, 69:2, 70:2, 71:11, 72:1, 72:7, 72:17, 79:16, 79:18, 81:12, 81:15, 102:9, 103:12
**named** [1] - 60:20
**names** [1] - 65:15
**Nancy** [1] - 1:14

**NANCY** [3] - 105:5, 105:18, 107:18
**National** [1] - 57:10
**nbellinocsr1@gmail. com** [1] - 107:19
**NC** [1] - 2:4
**near** [3] - 28:6, 67:7, 75:3
**neat** [1] - 22:10
**necessarily** [4] - 22:24, 43:8, 43:15, 44:6
**need** [4] - 22:24, 74:3, 107:11
**needs** [1] - 4:22
**nephew** [1] - 51:16
**never** [16] - 12:24, 13:1, 18:25, 19:6, 27:5, 29:20, 30:16, 39:2, 64:2, 70:25, 74:23, 86:13, 92:3, 92:20, 103:24, 104:2
**new** [8] - 19:25, 20:3, 21:9, 21:10, 25:18, 27:10, 34:23, 62:9
**newly** [1] - 21:1
**newly-hired** [1] - 21:1
**next** [6] - 18:10, 20:8, 52:24, 63:11, 76:5, 79:10
**night** [5] - 54:19, 56:11, 63:7, 63:15
**NO** [1] - 106:3
**non** [14] - 8:5, 9:2, 9:3, 20:4, 33:4, 42:7, 42:14, 46:1, 46:5, 46:21, 59:10, 61:20, 63:20, 97:10
**non-criminal** [2] - 42:7, 42:14
**non-sworn** [12] - 8:5, 9:2, 9:3, 20:4, 33:4, 46:1, 46:5, 46:21, 59:10, 61:20, 63:20, 97:10
**none** [3] - 16:10, 25:13, 104:10
**nonverbal** [1] - 5:5
**normal** [3] - 58:12, 76:22, 76:24
**normally** [2] - 15:2, 73:4
**North** [3] - 1:13, 2:10, 2:16
**Northwestern** [1] - 16:21
**NOT** [1] - 106:2
**Notary** [1] - 1:15
**note** [1] - 107:7
**notes** [2] - 47:25,

105:10
**nothing** [4] - 37:11, 46:18, 104:8, 104:11
**Notice** [1] - 3:11
**notice** [3] - 23:24, 24:3, 66:10
**notified** [2] - 24:12, 24:18
**number** [3] - 7:18, 13:24, 81:4
**Number** [2] - 3:10, 4:19
**numbers** [1] - 17:9
**NURSE** [2] - 2:20, 2:20
**nurses** [1] - 11:6
**nursing** [1] - 11:25

## O

**oath** [1] - 4:4
**object** [50] - 7:12, 11:11, 12:9, 12:21, 16:4, 16:25, 17:4, 23:7, 26:15, 27:3, 30:20, 31:13, 32:15, 33:5, 34:8, 36:3, 36:23, 38:2, 39:11, 39:21, 40:14, 40:21, 41:22, 42:8, 43:4, 45:1, 46:8, 46:24, 49:15, 59:21, 60:15, 60:23, 65:4, 72:3, 82:23, 86:20, 87:3, 87:17, 90:4, 90:17, 91:24, 94:24, 96:7, 99:11, 99:20, 100:12, 101:14, 101:24, 102:17, 104:6
**objecting** [3] - 40:25, 41:2, 48:8
**objection** [16] - 11:17, 11:22, 27:8, 32:18, 33:24, 40:7, 40:23, 47:8, 47:15, 48:15, 100:2, 100:19, 101:1, 102:6, 103:3
**objections** [3] - 12:16, 33:12, 50:3
**obstructed** [1] - 76:3
**occasions** [1] - 94:8
**occur** [1] - 56:15
**occurred** [7] - 25:7, 36:22, 51:11, 71:3, 75:22, 77:21, 100:21
**occurring** [1] - 98:23
**occurs** [1] - 67:24
**OF** [4] - 1:3, 1:9, 2:13, 105:1

**offered** [4] - 34:21, 35:21, 93:7, 93:10
**office** [3] - 6:14, 57:11, 107:9
**officer** [23] - 9:1, 9:2, 9:3, 21:2, 27:10, 39:9, 39:12, 39:24, 41:21, 43:24, 45:2, 47:21, 71:15, 71:17, 72:1, 72:18, 73:7, 81:5, 87:9, 87:22, 88:5, 100:10, 103:22
**officer's** [1] - 44:12
**officers** [84] - 7:25, 8:1, 8:2, 8:13, 8:14, 8:18, 8:19, 8:21, 8:24, 8:25, 9:6, 9:7, 9:10, 9:11, 9:23, 14:16, 20:4, 20:6, 20:9, 20:10, 20:11, 20:14, 20:17, 20:18, 20:23, 21:9, 23:15, 30:6, 33:3, 33:4, 39:17, 45:13, 45:15, 45:19, 45:23, 46:2, 46:5, 46:12, 46:13, 46:14, 46:21, 46:22, 47:12, 49:25, 50:24, 51:3, 54:17, 56:10, 57:21, 58:7, 59:10, 61:12, 61:15, 61:19, 61:20, 62:2, 63:10, 63:19, 63:20, 63:25, 64:4, 64:8, 64:17, 65:1, 75:13, 78:22, 85:4, 85:5, 89:6, 90:2, 91:11, 97:11, 99:8, 100:4, 100:18, 102:12, 102:14, 102:25, 103:7
**officially** [1] - 6:3
**officials** [2] - 6:9, 6:10
**often** [2] - 22:6, 22:20
**older** [1] - 15:9
**ON** [1] - 106:2
**once** [5] - 21:22, 21:23, 35:14, 44:23, 67:23
**Once** [1] - 107:9
**One** [1] - 4:19
**one** [57] - 4:22, 4:23, 7:5, 7:6, 7:19, 9:4, 12:2, 12:17, 15:22, 17:21, 17:22, 17:23, 18:18, 18:20, 19:6, 20:1, 20:12, 20:14, 20:22, 21:3, 21:4, 23:9, 23:25, 24:16, 26:19, 28:23, 29:5, 29:7, 29:8, 29:9,

31:12, 31:23, 32:8, 39:16, 41:15, 54:3, 55:22, 56:17, 60:8, 61:2, 61:4, 69:6, 71:15, 79:9, 80:13, 85:8, 86:23, 89:14, 94:4, 94:16, 94:18, 99:2, 100:14, 101:16, 103:18
**one-year** [2] - 20:12, 20:14
**ones** [7] - 17:12, 20:13, 30:16, 61:4, 64:11, 96:13, 97:13
**open** [5] - 32:4, 66:17, 66:24, 67:2, 80:12
**opposed** [1] - 5:5
**options** [1] - 21:3
**order** [2] - 95:24, 96:2
**ordering** [1] - 104:14
**ordinances** [1] - 51:2
**orientated** [1] - 12:20
**original** [2] - 105:9, 107:13
**otherwise** [1] - 46:25
**outside** [2] - 45:3, 45:11
**overall** [1] - 62:17
**own** [6] - 92:5, 93:23, 94:5, 94:15, 94:16, 94:19

## P

**P-i-t-t-s-l-e-y** [1] - 79:17
**p.m** [3] - 1:12, 1:13, 104:20
**P.O** [1] - 2:4
**pacemaker** [1] - 37:13
**package** [1] - 104:17
**padded** [6] - 27:15, 27:24, 28:5, 29:1, 92:9, 92:12
**padding** [1] - 28:7
**Paddock** [1] - 16:18
**Page** [1] - 3:10
**PAGE** [1] - 106:6
**page** [4] - 68:15, 68:16, 68:19, 88:19
**paid** [1] - 19:2
**papers** [1] - 6:15
**Parkside** [1] - 16:19
**part** [23] - 6:6, 14:4, 14:7, 14:12, 14:21, 14:23, 15:16, 25:17, 34:21, 35:7, 49:7, 62:16, 62:18, 62:22, 62:24, 63:23, 64:19, 64:23, 77:25, 93:1,

93:3, 97:1, 103:17
**part-time** [4] - 14:4, 14:7, 14:12, 14:21
**participate** [3] - 58:8, 58:12, 86:8
**participated** [1] - 51:15
**parties** [1] - 107:10
**parts** [2] - 33:7, 93:21
**pass** [3] - 21:22, 21:23, 98:7
**passed** [1] - 35:14
**pastor** [2] - 75:25, 79:23
**patrol** [1] - 6:13
**patrolman** [1] - 15:12
**patted** [1] - 94:10
**pay** [2] - 13:4, 18:24
**peacefully** [3] - 48:11, 48:14, 49:8
**penalties** [1] - 106:22
**people** [68] - 6:17, 7:10, 7:16, 7:24, 8:11, 9:12, 9:14, 9:15, 9:21, 9:24, 10:2, 13:12, 15:5, 15:6, 17:14, 17:15, 19:10, 22:7, 31:11, 31:16, 31:17, 31:18, 35:12, 39:18, 41:18, 41:20, 41:23, 42:2, 47:20, 48:18, 48:23, 50:5, 50:8, 50:10, 55:11, 59:25, 60:6, 60:10, 60:12, 60:20, 65:16, 66:3, 66:14, 66:18, 66:20, 70:15, 70:24, 76:2, 79:22, 80:2, 80:8, 81:2, 93:1, 93:4, 94:5, 95:11, 95:13, 95:18, 96:21, 98:5, 100:7, 100:8, 103:9, 103:12, 103:18
**pepper** [2] - 88:3, 88:6
**perhaps** [2] - 19:25, 88:14
**period** [51] - 35:14, 35:18, 37:17, 51:22, 52:5, 52:6, 52:17, 53:3, 53:6, 53:9, 53:22, 53:25, 54:10, 54:14, 54:18, 56:9, 56:18, 58:6, 58:20, 59:11, 59:13, 59:16, 60:1, 61:9, 61:13, 61:24, 62:2, 62:6, 62:9, 62:12, 62:15, 62:23, 63:1, 63:17, 64:25, 65:11, 65:14,

65:19, 65:24, 66:10, 67:20, 69:16, 70:10, 79:25, 84:16, 84:19, 87:15, 99:6, 102:16, 103:1
**periods** [2] - 35:13, 97:2
**perjury** [1] - 106:22
**person** [59] - 4:22, 19:22, 21:17, 22:3, 36:21, 37:19, 37:23, 38:12, 39:5, 39:8, 39:20, 39:25, 40:4, 40:11, 40:18, 41:11, 42:6, 42:10, 42:13, 42:16, 42:19, 43:3, 43:22, 44:3, 44:14, 44:21, 44:23, 49:11, 49:23, 61:16, 62:16, 67:23, 69:14, 69:20, 69:23, 70:1, 70:16, 71:2, 71:10, 72:6, 72:15, 72:17, 72:22, 73:2, 73:7, 73:19, 73:23, 74:11, 75:6, 79:3, 80:13, 81:24, 89:14, 95:25, 96:25, 102:4, 102:12, 102:19, 103:13
**person's** [5] - 48:6, 63:21, 64:8, 73:21, 103:23
**personal** [1] - 46:19
**personnel** [3] - 9:17, 59:8, 78:23
**persons** [4] - 61:21, 62:14, 65:2, 66:11
**Peterson** [1] - 2:16
**phone** [1] - 63:12
**photo** [2] - 69:23, 93:4
**photographs** [1] - 23:21
**physical** [2] - 72:11, 80:6
**physically** [2] - 37:25, 80:21
**picketing** [2] - 49:23, 49:24
**picture** [11] - 29:7, 29:8, 45:10, 79:9, 89:6, 89:10, 89:17, 89:18, 92:1, 98:11, 99:2
**pictures** [1] - 23:21
**pieces** [2] - 39:4, 74:8
**Pittley** [1] - 79:13
**Pittsley** [3] - 79:9, 79:10, 79:14
**place** [9] - 30:22, 34:19, 35:4, 38:7,

43:7, 43:25, 52:12, 55:18, 85:12
**placed** [49] - 19:22, 28:21, 39:8, 39:20, 39:23, 40:4, 40:12, 40:18, 41:11, 41:13, 41:20, 41:24, 42:2, 42:6, 42:9, 42:13, 42:16, 42:19, 42:25, 43:3, 43:7, 43:15, 43:21, 44:3, 44:8, 44:15, 44:22, 44:24, 45:14, 45:24, 70:10, 72:2, 82:1, 82:7, 82:9, 86:23, 87:2, 90:21, 91:4, 92:11, 92:12, 92:14, 92:15, 92:16, 95:4, 95:9, 95:22, 98:21, 98:24
**placement** [1] - 87:20
**Plaintiff** [4] - 1:5, 1:11, 2:6, 4:3
**plaintiff** [1] - 51:15
**Plankington** [2] - 1:13, 2:10
**plastic** [1] - 94:17
**plates** [1] - 66:5
**players** [1] - 57:8
**plenty** [1] - 8:5
**point** [23] - 12:8, 12:25, 28:23, 38:9, 38:16, 39:23, 40:2, 43:12, 43:16, 43:17, 43:19, 67:24, 68:3, 69:21, 69:22, 69:24, 70:2, 71:11, 82:13, 87:14, 100:20, 101:15, 102:19
**police** [5] - 39:24, 57:8, 60:10, 63:7, 63:14
**Policies** [1] - 88:11
**policies** [24] - 14:24, 14:25, 15:1, 15:3, 15:9, 15:13, 15:14, 15:23, 16:7, 16:10, 26:12, 26:13, 26:22, 47:22, 47:24, 48:1, 49:17, 62:9, 62:11, 85:4, 85:7, 85:20, 99:18
**Policy** [12] - 68:20, 83:3, 83:9, 83:18, 83:23, 84:3, 84:9, 84:18, 85:1, 85:11, 85:14, 85:23
**policy** [32] - 15:8, 15:9, 15:20, 16:1, 28:12, 28:13, 44:14, 44:17, 44:19, 68:2,

68:5, 68:8, 68:20, 69:4, 74:12, 75:15, 75:18, 75:19, 83:5, 84:11, 84:13, 85:12, 85:24, 88:25, 90:25, 96:6, 96:9, 96:11, 97:1, 99:10, 99:14
**policy-maker** [1] - 16:1
**Polity** [1] - 3:14
**population** [1] - 34:25
**position** [4] - 6:6, 21:7, 21:10, 21:20
**positive** [1] - 35:14
**positively** [1] - 90:11
**possession** [1] - 25:2
**possibility** [2] - 41:15, 52:15
**possible** [6] - 69:8, 69:9, 70:16, 78:4, 78:5, 84:2
**possibly** [2] - 7:19, 90:13
**potentially** [1] - 82:21
**Powell** [1] - 2:16
**powers** [2] - 9:4, 9:8
**prepare** [3] - 25:12, 54:17, 56:10
**prepared** [1] - 63:15
**present** [3] - 25:4, 25:9, 28:16
**president** [1] - 54:2
**presidential** [1] - 53:17
**pretended** [1] - 27:9
**Pretrial** [2] - 7:6, 25:8
**pretrial** [3] - 25:19, 38:15, 66:16
**pretty** [4] - 10:3, 10:20, 39:1, 39:3
**primary** [1] - 9:5
**print** [1] - 107:9
**probation** [16] - 19:22, 19:23, 19:25, 20:2, 20:12, 20:15, 20:19, 20:24, 21:4, 21:11, 21:17, 21:19, 21:22, 21:23, 21:24
**problem** [5] - 46:18, 47:17, 50:9, 80:11, 91:1
**Procedure** [2] - 88:14, 88:25
**procedure** [1] - 88:22
**procedures** [2] - 37:22, 67:23
**proceeding** [1] - 107:6
**Proceedings** [2] - 104:20, 107:5
**proceedings** [1] -

105:8
**process** [9] - 15:21, 21:21, 37:24, 39:1, 73:4, 73:25, 74:2, 82:10, 82:12
**Production** [1] - 24:20
**professional** [1] - 12:5
**professionals** [2] - 12:20, 13:8
**proficiency** [4] - 63:21, 64:1, 86:11, 86:14
**promoted** [6] - 20:1, 20:16, 20:18, 20:24, 21:6, 21:10
**prompt** [1] - 91:5
**proper** [1] - 93:15
**protect** [5] - 33:4, 34:16, 46:22, 93:20, 100:7
**protected** [1] - 49:14
**protecting** [4] - 46:6, 47:20, 63:21, 64:8
**protection** [3] - 30:23, 42:1
**Protective** [1] - 3:12
**protective** [5] - 28:10, 28:14, 29:2, 29:18, 63:12
**protest** [3] - 48:5, 48:7, 54:11
**protesters** [3] - 54:5, 66:4, 66:22
**protesting** [33] - 25:3, 48:11, 48:14, 49:2, 49:8, 49:11, 51:22, 51:25, 52:7, 52:12, 52:13, 53:3, 53:6, 53:9, 53:16, 53:21, 53:24, 54:6, 54:15, 54:18, 56:10, 59:14, 59:15, 60:1, 60:7, 60:13, 60:14, 60:21, 62:15, 65:3, 65:20, 65:24, 66:12
**protests** [6] - 51:11, 51:15, 55:15, 59:18, 67:16, 67:19
**protocols** [1] - 96:24
**providers** [1] - 12:14
**psychiatrist** [1] - 101:10
**PTF** [1] - 3:12
**Public** [1] - 1:15
**public** [2] - 53:12, 53:13
**pulled** [1] - 10:8
**pulling** [1] - 47:24
**punish** [2] - 93:19, 93:22

**punishment** [2] - 47:7, 93:15
**purposes** [5] - 10:21, 20:8, 25:24, 26:2, 42:20
**put** [39] - 18:4, 20:18, 20:24, 21:11, 21:17, 28:8, 30:22, 32:22, 34:19, 38:16, 38:23, 38:24, 42:2, 43:13, 43:24, 54:8, 63:13, 65:23, 73:24, 86:15, 86:18, 87:12, 91:9, 91:15, 91:18, 92:9, 93:14, 93:23, 94:2, 95:2, 95:5, 96:4, 96:23, 98:1, 98:17, 98:18, 98:22, 100:1
**putting** [7] - 39:10, 42:23, 43:14, 66:14, 89:3, 89:7, 91:12

**Q**

**quality** [1] - 89:17
**questioned** [1] - 75:7
**questioning** [3] - 33:25, 36:4, 44:13
**questions** [16] - 5:5, 5:8, 11:13, 11:14, 45:3, 45:7, 45:12, 61:20, 70:1, 71:16, 71:18, 71:19, 71:20, 71:23, 102:8, 102:20
**quickly** [1] - 16:5
**quite** [1] - 95:21

**R**

**ran** [1] - 15:14
**rank** [1] - 8:10
**ranks** [1] - 8:8
**rarely** [1] - 70:24
**rather** [3] - 66:21, 66:25, 67:3
**RE** [2] - 106:3, 107:4
**read** [16] - 25:12, 68:15, 68:18, 87:16, 88:19, 96:11, 97:1, 97:5, 97:11, 97:14, 97:15, 97:17, 97:21, 106:22, 107:7, 107:12
**Reader's** [2] - 63:6, 63:11
**reading** [1] - 89:11
**real** [1] - 16:4
**really** [8] - 9:4, 13:4, 27:5, 27:10, 60:4, 64:23, 66:22, 72:15

**reason** [6] - 40:24, 42:7, 91:2, 94:12, 96:21, 96:22
**REASON** [1] - 106:6
**reasonable** [1] - 107:13
**reasoning** [2] - 94:2, 94:3
**reasons** [3] - 58:4, 60:8, 87:12
**receive** [1] - 103:14
**received** [2] - 78:4, 103:7
**receiving** [2] - 23:24, 24:9
**recess** [1] - 84:7
**recognize** [3] - 89:10, 89:14, 89:18
**recommend** [1] - 91:7
**recommendations** [1] - 23:13
**reconstruction** [1] - 16:21
**record** [4] - 56:6, 56:7, 79:16, 84:6
**records** [6] - 72:14, 72:19, 72:23, 73:16, 91:14
**redo** [1] - 23:9
**refer** [2] - 20:9, 26:2
**referred** [1] - 27:21
**referring** [2] - 52:1, 57:17
**refresh** [10] - 24:2, 28:13, 54:25, 55:17, 68:7, 83:8, 83:14, 84:9, 88:14, 89:8
**regarding** [16] - 25:2, 28:14, 51:15, 53:4, 53:7, 53:9, 53:16, 65:10, 77:10, 77:24, 78:2, 78:7, 78:10, 78:13, 78:19, 78:23
**regards** [25] - 7:1, 7:9, 8:11, 11:2, 13:11, 24:23, 25:23, 26:1, 26:8, 26:12, 26:25, 29:22, 30:8, 32:13, 33:2, 34:13, 35:17, 48:4, 49:5, 58:5, 63:2, 90:20, 91:3, 91:18, 103:8
**regular** [8] - 57:1, 57:4, 57:22, 74:7, 94:9, 95:14, 97:4, 104:16
**related** [1] - 25:6
**relates** [17] - 6:23, 23:5, 50:25, 59:1, 59:4, 61:21, 62:14,

63:21, 64:6, 65:20, 65:24, 66:12, 68:21, 69:4, 83:5, 89:1, 91:8
**relation** [1] - 46:6
**relative** [1] - 50:18
**released** [4] - 52:22, 76:17, 81:19, 90:22
**relevant** [3] - 36:4, 58:14, 58:15
**remain** [5] - 101:23, 102:15, 103:2, 103:4, 103:8
**remember** [71] - 13:16, 15:22, 19:11, 21:16, 27:18, 30:17, 31:21, 34:22, 34:24, 35:6, 35:20, 35:24, 36:6, 36:11, 44:17, 44:18, 49:10, 50:18, 51:9, 53:14, 53:15, 53:23, 55:16, 58:18, 62:13, 62:15, 62:20, 62:22, 62:24, 63:6, 64:10, 64:18, 65:6, 65:8, 65:10, 65:13, 65:15, 65:17, 67:6, 67:18, 69:1, 71:9, 76:12, 76:20, 77:4, 77:13, 77:22, 77:23, 77:25, 78:8, 78:15, 78:16, 78:17, 78:19, 78:21, 79:10, 79:18, 80:18, 80:24, 81:4, 82:4, 82:6, 82:8, 87:13, 93:1, 93:2, 93:3, 93:4
**remind** [1] - 5:1
**reminders** [1] - 4:17
**reporter** [2] - 4:20, 5:4
**Reporter's** [1] - 3:5
**Reporting** [1] - 107:11
**representation** [1] - 102:22
**representative** [1] - 15:14
**requested** [1] - 101:9
**require** [10] - 63:17, 63:19, 63:25, 64:16, 64:20, 87:15, 97:5, 97:8, 97:9, 97:10
**required** [12] - 19:17, 35:19, 35:22, 36:17, 36:18, 37:7, 45:13, 47:12, 58:7, 58:12, 86:3, 86:8
**requirements** [1] - 21:20
**requires** [1] - 107:6
**reroute** [1] - 80:2

**rerouting** [1] - 80:8
**research** [1] - 69:7
**reserve** [1] - 104:13
**resisting** [1] - 80:19
**respond** [1] - 6:16
**responsibilities** [1] - 6:7
**responsible** [9] - 7:3, 7:11, 7:24, 8:12, 11:10, 11:16, 11:21, 14:14, 15:3
**restrain** [4] - 9:11, 98:10, 99:3, 99:5
**restrained** [2] - 12:6, 81:25
**restraining** [1] - 98:25
**Restraint** [36] - 3:15, 27:16, 27:17, 27:20, 27:24, 59:2, 59:10, 86:16, 87:12, 87:16, 87:25, 88:10, 89:1, 89:4, 89:7, 90:16, 90:21, 91:4, 91:9, 91:12, 91:15, 91:19, 96:5, 96:18, 96:23, 97:6, 97:12, 97:22, 98:2, 98:9, 98:16, 98:19, 98:22, 100:1, 100:10, 100:17
**restraint** [18] - 29:16, 29:17, 59:7, 82:2, 86:19, 86:24, 87:2, 88:6, 88:9, 91:22, 92:18, 92:22, 93:14, 93:15, 93:23, 95:7, 95:8, 98:22
**restraints** [12] - 25:16, 26:9, 26:25, 27:2, 27:4, 27:13, 27:23, 27:25, 28:2, 29:12, 30:13, 61:21
**restrictions** [1] - 53:10
**restrictive** [10] - 91:22, 92:7, 92:18, 92:22, 98:10, 98:13, 98:14, 98:25, 99:5
**result** [1] - 61:6
**retire** [1] - 6:3
**retired** [2] - 16:13, 91:6
**retirement** [1] - 5:20
**return** [2] - 107:9, 107:15
**review** [1] - 6:15
**reviewed** [2] - 25:12, 28:24
**reviewing** [1] - 15:16
**rights** [16] - 44:9, 44:11, 46:6, 46:15, 46:23, 47:13, 49:2,

Established Reporting Solutions, LLC

58:17, 61:17, 63:22, 64:9, 103:2, 103:4, 103:23, 104:1, 104:4
**riot** [3] - 51:20, 54:2, 54:19
**rises** [1] - 98:6
**Rittenhouse** [11] - 52:11, 53:7, 54:23, 55:5, 55:8, 55:11, 55:14, 55:18, 55:25, 56:21
**road** [1] - 50:7
**roads** [1] - 67:1
**roadway** [1] - 48:22
**role** [2] - 12:19, 15:6
**rolled** [1] - 63:16
**room** [11] - 27:15, 27:24, 28:5, 28:6, 29:1, 31:23, 32:3, 32:6, 32:10, 92:9, 92:13
**rooms** [1] - 32:5
**run** [1] - 72:10

## S

**S.C** [1] - 2:16
**safe** [4] - 13:2, 33:14, 93:20
**safely** [1] - 39:4
**Safety** [5] - 48:25, 51:19, 79:24, 80:3, 80:9
**safety** [13] - 32:14, 32:19, 32:22, 32:24, 33:2, 33:18, 33:23, 48:19, 50:8, 76:3, 93:24, 94:12, 99:23
**sat** [2] - 51:18, 79:23
**saw** [1] - 28:13
**scene** [1] - 42:2
**scheduled** [1] - 7:20
**School** [1] - 16:17
**schools** [2] - 66:5, 66:6
**screaming** [1] - 96:14
**screened** [1] - 37:17
**Screening** [1] - 3:13
**screening** [12] - 36:22, 36:24, 37:9, 37:10, 37:15, 59:5, 67:24, 68:2, 68:21, 69:4, 69:10, 69:11
**screens** [1] - 37:7
**search** [2] - 38:12
**second** [1] - 18:16
**Secure** [2] - 25:7, 25:14
**security** [1] - 63:12
**see** [27] - 5:17, 6:8,

6:14, 21:23, 22:3, 22:8, 32:2, 38:20, 66:3, 66:8, 68:19, 68:25, 72:10, 72:11, 72:12, 72:21, 83:21, 83:22, 92:25, 96:12, 96:14, 96:17, 98:11, 100:20, 101:8, 101:16
**seeing** [2] - 38:20, 77:4
**seeking** [2] - 26:15, 46:25
**seeks** [1] - 90:5
**segregate** [1] - 95:19
**send** [1] - 63:10
**sent** [2] - 6:16, 70:11
**separate** [3] - 18:9, 34:25, 96:3
**separation** [3] - 34:23, 35:3, 95:24
**September** [2] - 52:9, 83:21
**sergeants** [3] - 8:4, 8:8, 79:9
**serious** [1] - 19:3
**Services** [1] - 2:3
**session** [1] - 18:6
**set** [5] - 21:20, 26:11, 30:1, 30:2, 70:15
**setting** [3] - 32:4, 32:8, 89:18
**settings** [2] - 31:22, 32:2
**seventy** [1] - 70:23
**seventy-two** [1] - 70:23
**several** [5] - 15:5, 22:21, 50:10, 57:12, 57:18
**sexually** [2] - 95:21, 95:25
**shackles** [6] - 27:14, 27:23, 29:22, 29:24, 30:3, 30:16
**share** [1] - 16:15
**Sheet** [4] - 3:5, 71:17, 107:8, 107:9
**SHEET** [1] - 106:1
**sheet** [1] - 94:16
**sheriff** [21] - 4:10, 5:16, 5:17, 5:18, 5:19, 5:22, 5:25, 6:2, 6:6, 6:14, 6:22, 8:10, 14:23, 15:4, 15:24, 16:2, 16:22, 17:3, 17:8, 54:12, 91:7
**sheriff's** [1] - 32:23
**Sheriff's** [28] - 5:13, 5:16, 7:4, 11:4, 11:7,

11:8, 22:7, 22:15, 22:22, 23:6, 23:16, 39:9, 41:21, 47:19, 57:22, 63:8, 65:16, 65:18, 65:23, 66:15, 68:22, 80:12, 83:3, 83:17, 84:18, 84:21, 88:11, 89:19
**sheriffs** [2] - 8:8, 103:10
**shooting** [3] - 55:14, 56:20, 56:21
**short** [2] - 14:9, 84:7
**short-term** [1] - 14:9
**shorthand** [1] - 105:9
**shot** [5] - 51:6, 51:10, 52:2, 55:1, 55:11
**showed** [7] - 24:2, 68:7, 77:1, 77:2, 77:3, 83:8, 89:6
**sick** [2] - 34:23, 37:11
**side** [2] - 80:2, 80:9
**sign** [8] - 6:15, 16:7, 21:23, 26:13, 50:5, 107:9, 107:12, 107:15
**sign-off** [1] - 26:13
**Signature** [1] - 104:12
**signature** [4] - 16:11, 107:6, 107:14, 107:20
**signing** [1] - 62:11
**signs** [1] - 49:24
**silent** [5] - 101:23, 102:15, 103:2, 103:5, 103:8
**simple** [1] - 23:2
**single** [7] - 31:1, 57:13, 62:16, 62:19, 87:21, 89:14, 96:4
**single-use** [1] - 31:1
**situation** [24] - 10:6, 18:3, 28:8, 38:4, 38:22, 41:17, 41:24, 42:3, 43:9, 48:24, 51:17, 51:20, 57:6, 57:24, 66:14, 92:14, 93:21, 95:15, 96:1, 96:14, 96:19, 98:6, 101:8, 103:11
**situations** [6] - 52:16, 56:15, 57:14, 65:12, 65:17, 66:7
**sixty** [7] - 13:25, 31:21, 31:22, 32:1, 32:3
**sixty-five** [3] - 31:22, 32:1, 32:3
**sixty-five-ish** [1] - 13:25

**sixty-two** [3] - 31:21, 31:22, 32:3
**sleep** [1] - 96:20
**small** [1] - 52:13
**smaller** [2] - 35:9, 95:12
**social** [2] - 66:4, 66:7
**Solutions** [1] - 107:11
**Someone** [1] - 76:20
**someone** [20] - 11:24, 12:6, 12:7, 20:16, 28:8, 34:23, 37:5, 38:24, 43:7, 62:21, 69:12, 71:25, 79:2, 92:4, 96:12, 96:23, 99:5, 102:3, 103:11, 104:5
**sometime** [1] - 75:24
**sometimes** [1] - 41:16
**Sorry** [5] - 7:14, 49:18, 72:13, 98:17, 102:13
**sorry** [16] - 9:24, 13:18, 17:22, 17:25, 18:20, 26:5, 31:7, 46:18, 51:8, 54:22, 56:2, 59:23, 76:9, 90:7, 99:12, 101:4
**sort** [13] - 14:9, 19:18, 22:16, 22:23, 23:14, 29:16, 37:17, 40:1, 40:12, 67:22, 71:15, 74:24, 91:21
**sorted** [1] - 41:25
**source** [1] - 102:10
**speaking** [2] - 40:23, 49:12
**specific** [1] - 7:13
**spectrum** [1] - 19:20
**speeding** [1] - 42:17
**spell** [1] - 79:16
**spit** [1] - 29:16
**spray** [2] - 88:3, 88:6
**squad** [2] - 41:24, 42:3
**SS** [1] - 105:1
**staff** [66] - 7:18, 8:6, 8:7, 11:3, 11:25, 12:25, 13:2, 14:2, 14:4, 14:7, 14:9, 14:12, 14:13, 14:15, 14:17, 14:18, 14:19, 19:7, 31:5, 45:16, 45:18, 56:11, 56:13, 56:16, 57:1, 57:4, 57:5, 57:7, 57:13, 57:15, 57:16, 57:17, 57:19, 57:20, 57:21, 57:22, 58:3, 58:5, 61:7, 84:23, 84:25, 85:7, 85:8, 85:10,

85:15, 85:19, 85:20, 85:24, 86:2, 86:8, 86:12, 87:10, 87:16, 87:19, 88:1, 88:5, 97:2, 97:3, 97:5, 97:10, 98:5, 99:15, 101:6, 103:16, 103:25, 104:3
**standing** [5] - 33:24, 47:15, 48:15, 50:6, 74:25
**standpoint** [1] - 8:12
**stands** [1] - 83:25
**start** [7] - 4:17, 5:14, 45:7, 45:11, 63:5, 91:2, 96:13
**started** [8] - 5:12, 10:5, 10:11, 34:3, 34:14, 35:24, 55:8, 56:12
**starting** [1] - 54:19
**State** [3] - 15:12, 56:12, 105:6
**STATE** [1] - 105:1
**state** [2] - 6:11, 60:11
**statement** [2] - 47:25, 48:21
**STATES** [1] - 1:1
**stay** [2] - 70:16, 70:24
**Stenographer** [2] - 1:14, 105:5
**STENOGRAPHER** [3] - 89:25, 104:12, 104:14
**step** [2] - 18:10, 18:16
**stick** [1] - 69:16
**still** [2] - 92:2, 94:9
**stood** [1] - 87:6
**Stop** [1] - 41:1
**stopping** [1] - 52:19
**strange** [1] - 66:2
**strapped** [2] - 95:7, 95:8
**street** [4] - 39:18, 92:2, 92:3, 94:9
**Street** [3] - 2:16, 54:3, 67:10
**striking** [1] - 48:18
**strong** [6] - 39:24, 40:15, 40:17, 40:19, 41:12, 41:19
**struggle** [1] - 80:24
**struggled** [1] - 18:1
**struggling** [2] - 80:22, 80:23
**subcontracted** [1] - 13:8
**subcontractor** [1] - 11:8
**submitted** [1] - 28:24

**substance** [1] - 24:15
**successfully** [1] - 21:24
**suffocated** [1] - 94:17
**suggest** [1] - 19:13
**Suite** [3] - 1:13, 2:10, 2:17
**Sunday** [3] - 55:8, 56:11, 63:15
**supervised** [2] - 11:2, 11:3
**supervising** [5] - 12:6, 12:7, 12:15, 12:22, 12:25
**supervision** [1] - 13:12
**supervisor** [2] - 11:16, 14:20
**supervisors** [3] - 8:3, 15:15, 19:1
**supervisory** [4] - 12:19, 14:15, 14:17, 15:6
**supplied** [1] - 35:24
**support** [2] - 50:6
**supported** [2] - 49:2, 49:3
**supposed** [5] - 36:1, 45:14, 74:12, 74:13, 85:13
**suspension** [4] - 17:18, 18:21, 19:4, 23:12
**sworn** [51] - 4:1, 4:4, 5:18, 5:25, 8:5, 8:7, 8:12, 8:14, 8:18, 8:19, 9:1, 9:2, 9:3, 9:10, 9:17, 20:4, 20:9, 20:13, 20:17, 20:18, 21:2, 33:3, 33:4, 39:17, 41:21, 45:15, 45:19, 45:23, 46:1, 46:5, 46:13, 46:14, 46:21, 57:21, 58:5, 58:7, 59:7, 59:10, 61:20, 63:20, 64:7, 78:22, 84:22, 84:24, 85:4, 97:10

### T

**TAKEN** [1] - 106:5
**taking-into-custody** [1] - 93:3
**task** [1] - 12:20
**task-orientated** [1] - 12:20
**tasks** [1] - 12:13
**taught** [1] - 44:18
**team** [1] - 15:13

**Technical** [1] - 16:20
**ten** [1] - 52:8
**tend** [1] - 101:10
**term** [6] - 6:2, 14:9, 20:5, 25:18, 28:11, 43:25
**terminate** [1] - 21:21
**terminated** [1] - 19:6
**termination** [3] - 17:18, 19:6, 23:12
**terminology** [2] - 9:19, 35:11
**terms** [7] - 21:1, 22:3, 26:6, 51:4, 65:2, 74:13, 80:20
**Terry** [1] - 38:12
**test** [1] - 86:11
**testified** [7] - 4:4, 12:22, 13:7, 31:14, 40:7, 85:3, 85:6
**Testimony** [1] - 3:2
**testimony** [2] - 41:8, 95:18
**text** [2] - 24:22, 78:1
**THE** [58] - 11:13, 11:18, 11:23, 12:17, 12:24, 16:6, 17:5, 23:9, 24:16, 26:17, 27:4, 27:9, 30:21, 32:19, 33:6, 33:13, 34:1, 34:9, 36:6, 36:24, 38:3, 39:23, 41:23, 42:9, 43:6, 45:2, 47:1, 47:9, 47:18, 48:10, 48:16, 49:20, 50:4, 56:5, 60:16, 60:24, 65:6, 77:17, 82:24, 86:22, 87:4, 87:19, 88:19, 90:6, 90:18, 92:1, 96:9, 99:21, 100:3, 100:14, 100:20, 101:2, 101:15, 102:1, 102:7, 102:19, 103:4, 104:7
**theirs** [1] - 85:17
**themself** [1] - 94:18
**themselves** [9] - 23:5, 28:9, 75:11, 80:4, 92:5, 94:5, 94:15, 100:8, 102:20
**they've** [1] - 40:19
**thinking** [2] - 43:7, 66:16
**Third** [1] - 36:5
**third** [4] - 18:18, 18:20, 19:3, 55:11
**thousands** [1] - 35:24
**threatening** [1] - 82:22

**three** [2] - 27:9, 96:1
**throwing** [1] - 48:17
**ticket** [2] - 42:14, 42:17
**title** [1] - 9:22
**today** [6] - 4:13, 23:18, 23:22, 24:13, 25:1, 25:18
**today's** [4] - 24:18, 25:12, 25:24, 26:2
**together** [2] - 94:23, 96:2
**took** [5] - 15:21, 52:9, 55:18, 64:14
**tools** [1] - 88:2
**tooth** [1] - 37:12
**top** [3] - 19:7, 29:14, 79:25
**toward** [2] - 48:24, 58:13
**town** [1] - 6:9
**trained** [7] - 45:23, 46:12, 46:15, 50:24, 88:6, 88:8, 97:15
**trainer** [1] - 86:13
**training** [42] - 17:16, 18:18, 19:18, 22:17, 23:13, 47:13, 51:1, 56:14, 58:3, 58:11, 58:12, 58:17, 58:19, 59:1, 59:4, 59:5, 59:9, 61:7, 61:8, 61:12, 61:15, 61:19, 61:23, 62:1, 62:4, 63:23, 63:24, 64:6, 64:7, 64:12, 64:14, 64:16, 64:20, 64:22, 86:3, 86:5, 86:7, 86:12, 88:3, 103:15, 103:16
**trainings** [7] - 58:7, 58:9, 58:16, 64:10, 64:24, 103:7, 103:9
**TRANSCRIPT** [1] - 106:2
**transcript** [4] - 105:7, 107:6, 107:12, 107:13
**transport** [2] - 9:15, 38:15
**transportation** [2] - 29:24, 33:8
**transported** [4] - 33:8, 40:2, 74:13, 75:8
**treatment** [2] - 93:6, 93:10
**trial** [6] - 52:12, 54:24, 55:15, 55:16, 55:18, 56:1
**tried** [3] - 23:25,

58:13, 79:24
**trouble** [2] - 99:18, 99:25
**true** [3] - 60:24, 105:7, 106:23
**truly** [2] - 63:11, 107:17
**Trump** [1] - 53:22
**truthfully** [5] - 19:1, 25:20, 34:18, 58:21, 63:4
**Truthfully** [1] - 101:5
**try** [3] - 33:14, 79:17, 95:19
**trying** [16] - 10:3, 15:7, 15:12, 21:13, 21:15, 36:15, 40:9, 42:24, 42:25, 43:11, 43:12, 51:21, 65:22, 72:15, 79:4, 101:7
**twenty** [3] - 44:18, 58:10, 76:25
**twenty-four** [1] - 76:25
**twenty-four-hour** [2] - 44:18, 58:10
**twice** [2] - 71:20, 71:23
**two** [19] - 4:11, 7:4, 7:7, 18:21, 31:21, 31:22, 31:25, 32:3, 52:8, 55:11, 57:6, 57:7, 70:23, 81:18, 94:20, 95:3, 95:4, 95:6, 95:9
**two-week** [1] - 57:6
**Type** [1] - 107:5
**type** [2] - 17:17, 86:3
**types** [7] - 19:9, 25:15, 26:9, 27:1, 27:4, 29:11, 31:14

### U

**U.S** [1] - 57:11
**ultimate** [1] - 99:3
**ultimately** [2] - 6:12, 24:5
**umbrella** [4] - 11:4, 11:7, 12:7, 14:17
**un-ungh** [1] - 77:15
**uncle** [3] - 50:19, 50:20
**under** [51] - 10:7, 11:4, 11:6, 12:6, 13:12, 14:4, 14:10, 14:17, 19:8, 19:20, 20:5, 20:12, 20:14, 21:19, 24:20, 38:7, 39:8, 39:20, 39:23, 40:4, 40:12, 40:18, 41:11,

41:13, 41:20, 42:6, 42:13, 42:16, 42:19, 42:25, 43:3, 43:7, 43:13, 43:15, 43:18, 43:21, 43:25, 44:3, 44:8, 44:15, 44:22, 44:24, 45:14, 45:24, 64:21, 70:10, 72:2, 73:21, 85:20, 101:22, 104:5
**Under** [1] - 106:22
**undergone** [1] - 15:9
**underneath** [1] - 6:14
**understood** [1] - 95:17
**ungh** [1] - 77:15
**uniform** [1] - 74:7
**UNITED** [1] - 1:1
**units** [1] - 6:14
**University** [2] - 16:19, 16:21
**Unless** [1] - 96:2
**unless** [1] - 96:20
**unsecured** [1] - 80:11
**unsworn** [5] - 20:9, 20:23, 21:2, 84:24, 85:5
**unusual** [2] - 47:7, 66:2
**up** [20] - 8:9, 18:10, 20:18, 20:24, 25:17, 26:11, 32:2, 34:14, 35:12, 35:14, 48:3, 54:23, 66:7, 66:17, 66:24, 67:2, 70:15, 77:1, 77:2, 77:3
**updated** [1] - 15:10
**updates** [2] - 51:2, 57:23
**updating** [3] - 15:14, 15:16, 57:12
**upper** [1] - 21:6
**upper-level** [1] - 21:6
**usual** [1] - 54:11

### V

**vacations** [2] - 56:16, 56:19
**vaccinated** [2] - 36:17, 36:18
**vaccinations** [5] - 34:21, 35:2, 36:9, 36:15, 36:20
**vague** [1] - 7:12
**various** [3] - 25:15, 47:13, 58:4
**varying** [3] - 37:9, 37:10, 37:15
**verbal** [15] - 17:16,

17:21, 17:23, 17:24, 17:25, 18:2, 18:5, 18:8, 18:9, 18:10, 18:13, 18:16, 23:11, 23:12, 103:19
**verbally** [3] - 5:5, 72:17
**verify** [3] - 72:6, 72:19, 73:16
**version** [1] - 63:6
**versus** [5] - 9:1, 25:15, 31:18, 50:1, 58:17
**video** [1] - 93:4
**videos** [1] - 92:24
**violated** [1] - 99:15
**violating** [3] - 103:22, 104:1, 104:4
**violation** [1] - 99:22
**violations** [3] - 90:25, 91:1, 99:14
**violence** [1] - 82:16
**Violent** [1] - 48:16
**violent** [6] - 80:15, 80:16, 80:20, 82:15, 82:21, 82:22
**VISITING** [2] - 2:20, 2:20
**vs** [2] - 1:6, 107:4

## W

**waist** [1] - 30:4
**waive** [2] - 107:14, 107:20
**walk** [3] - 75:10, 75:11, 80:12
**walking** [1] - 50:5
**wall** [1] - 98:12
**walls** [1] - 28:7
**Walworth** [1] - 105:13
**WALWORTH** [1] - 105:2
**warrant** [1] - 21:2
**warrants** [1] - 73:1
**water** [1] - 33:17
**ways** [2] - 17:7, 98:15
**weapons** [4] - 9:5, 9:9, 38:13, 38:14
**wear** [4] - 35:19, 35:22, 36:1, 36:7
**Wednesday** [3] - 55:6, 55:7, 55:9
**week** [7] - 7:20, 54:6, 57:6, 60:14, 60:22, 61:2, 76:14
**weeks** [2] - 52:8, 57:7
**Westosha** [1] - 16:17
**WI** [2] - 2:11, 2:17
**wide** [1] - 51:21
**window** [2] - 54:21,

96:12
**windows** [4] - 96:6, 96:10, 96:11, 96:18
**WISCONSIN** [2] - 1:3, 105:1
**Wisconsin** [7] - 1:14, 6:11, 16:18, 16:19, 60:19, 105:6, 105:13
**wish** [1] - 102:23
**wishes** [1] - 107:14
**withdraw** [3] - 46:9, 90:7, 99:12
**WITNESS** [60] - 11:13, 11:18, 11:23, 12:17, 12:24, 16:6, 17:5, 23:9, 24:16, 26:17, 27:4, 27:9, 30:21, 32:19, 33:6, 33:13, 34:1, 34:9, 36:6, 36:24, 38:3, 39:23, 41:23, 42:9, 43:6, 45:2, 47:1, 47:9, 47:18, 48:10, 48:16, 49:20, 50:4, 56:5, 60:16, 60:24, 65:6, 77:17, 82:24, 86:22, 87:4, 87:19, 88:19, 90:6, 90:18, 92:1, 96:9, 99:21, 100:3, 100:14, 100:20, 101:2, 101:15, 102:1, 102:7, 102:19, 103:4, 104:7, 106:4, 107:3
**Witness** [1] - 4:1
**witness** [7] - 4:3, 63:24, 107:6, 107:7, 107:12, 107:14, 107:15
**women's** [1] - 95:23
**wonderful** [1] - 4:20
**word** [1] - 73:20
**words** [2] - 43:3, 54:8
**workers** [1] - 11:6
**workers'** [1] - 62:5
**worried** [1] - 66:3
**worry** [2] - 26:6, 92:4
**write** [1] - 22:25
**WRITE** [1] - 106:2
**written** [15] - 17:16, 17:17, 17:20, 17:22, 17:23, 17:24, 17:25, 18:2, 18:4, 18:8, 18:12, 18:13, 22:13, 23:11, 47:22

## Y

**year** [8] - 15:19, 20:2, 20:12, 20:14, 20:22,

21:4, 53:17, 58:10
**years** [3] - 15:21, 64:18
**yell** [1] - 41:6
**yelling** [1] - 41:7
**yourself** [2] - 50:13, 94:7