IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

JUSTIN BLAKE,

    Plaintiff,

    v.                           Case No. 22-CV-970

DAVID BETH in his individual capacity and official
capacity,
COUNTY OF KENOSHA a municipal corporation,
KYLE BISSONNETTE in his official capacity,
JACOB DiCELLO in his official capacity,
GLORIA GALVAN in her official capacity,
DEREEMEYUN HAYNES in his official capacity
JEREMY MAY in his official capacity,
JESSICA BERGMANN in her individual and official capacity,
VISITING NURSE CARE, INC.,
KENOSHA VISITING NURSE ASSOCIATION,
JOHN DOE OFFICERS in the Kenosha County
Sheriff's Department 1-10,
JANE DOE MEDICAL PROFESSIONALS in their
individual and official capacities
WISCONSIN MUNICIPAL MUTUAL INSURANCE
COMPANY,
ABC INSURANCE COMPANY, and
XYZ INSURANCE COMPANY,

    Defendants.

---

## DEFENDANTS DAVID BETH, COUNTY OF KENOSHA, KYLE BISSONNETTE, JACOB DICELLO, GLORIA GALVAN, DEREEMEYUN HAYNES, JEREMY MAY, AND WISCONSIN MUNICIPAL MUTUAL INSURANCE COMPANY'S FINDINGS OF FACT IN SUPPORT OF SUMMARY JUDGMENT

Defendants David Beth, County of Kenosha, Kyle Bissonnette, Jacob DiCello, Gloria

Galvan, Dereemeyun Haynes, Jeremy May, and Wisconsin Municipal Mutual Insurance Company

("County Defendants"), by their attorneys Crivello Nichols & Hall, S.C., respectfully submits the

following Proposed Findings of Fact in support of their Motion for Summary Judgment.

## Parties

1.    Plaintiff, Justin Blake ("Blake"), is a citizen of Illinois who resides in Cook County. (Dkt. 59, ¶ 8).

2.    Kenosha County is a municipal entity within the State of Wisconsin. (Dkt. 59, ¶ 10).

3.    At all times relevant to this matter, Sheriff David Beth was the Kenosha County Sheriff. (McGaver Decl., ¶ 4, Ex. A, 5:22-6:4; Dkt. 59, ¶ 9).

4.    Sheriff Beth retired from his position as Kenosha County Sherif on January 6, 2023. (McGaver Decl., ¶ 4, Ex. A, 5:15-21).

5.    At all times relevant to this matter, Deputy Kyle Bissonnette was a member of the Kenosha County Sheriff's Department ("KSD"). (Bissonnette Decl., ¶ 1).

6.    At all times relevant to this matter, Officers Jacob DiCello, Gloria Galvan, and Dereemeyun Haynes were corrections officers with KSD. (DiCello Decl., ¶ 1; Galvan Decl., ¶ 1; Haynes Decl., ¶¶ 1-2).

7.    At all times relevant to this matter, Sergeant Jeremy May was a corrections sergeant with KSD. (May Decl., ¶ 1).

8.    At all times relevant to this matter, Jessica Bergmann was a registered nurse working for Visiting Nurse Community Care, Inc. ("VNCC"). (McGaver Decl., ¶ 5, Ex. B, 7:16-18, 15:24-16:1).

9.    At all times relevant to this matter, Kenosha County contracted with VNCC to provide medical care to persons in custody with KSD. (Dkt. 59 ¶ 18; Dkt. 60, ¶ 18).

10.    At all times relevant to this matter, the Wisconsin Municipal Mutual Insurance Company issued a policy of liability insurance to Kenosha County. (Dkt. 64, ¶ 26).

*Policies, Procedures, and Training*

11.     As part of intake at the Kenosha County Jail ("KCJ"), medical staff conducts an assessment that includes asking medical questions to determine whether an inmate needs to be seen by a nurse. (McGaver Decl., ¶ 5, Ex. B, 10:25-11:1, 13:1-5).

12.     Kenosha County Sheriff's Department Custody Policy Manual, Policy 712: Medical Screening states, in part,

> It is the policy of this department that a medical screening be performed on all inmates upon arrival at the intake area to ensure that existing, emergent, and urgent health care, dental or mental health needs are identified, risks are assessed and inmates with contagious and communicable diseases are properly classified and housed for their health and the health of the general population (Wis. Admin. Code DOC § 350.13(1)).

(Meyer Decl., ¶ 19, Ex. P, p. 1).

13.     Policy 712 further dictates that "[a]ll inmates **shall** complete a medical screening as part of the booking process." (Meyer Decl., ¶ 19, Ex. P, p. 1) (emphasis added).

14.     Kenosha County Sheriff's Department Custody Policy Manual, Policy 714: Mental Health Screening and Evaluation states, in part,

> It is the policy of this department that all individuals booked into the facility shall receive an initial mental health screening by a qualified mental health professional, qualified mental health staff or health-trained custody staff. A more comprehensive medical appraisal shall be conducted within the first 14 days of incarceration to confirm the initial findings and to ensure that, if needed, an appropriate treatment plan that meets the individual needs of the inmate is in place (Wis. Admin. Code DOC § 350.13).

(Meyer Decl., ¶ 20, Ex. Q, p. 1).

15.     Kenosha County Sheriff's Department Custody Procedural Manual, Procedure 413: Suicide Watch Procedure requires the booking and intake process to include "completing and processing the Transporting Officer Observation Summary, Medical/Mental Health Screening Visual Observation Report, and a Medical/Mental Screening Questionnaire." (Meyer Decl., ¶ 21, Ex. R, p. 1).

3

16. Kenosha County Sheriff's Department Custody Policy Manual 511: Response to Resistance and Aggression states, in part:

> Officers are authorized to use physical force to accomplish legitimate correctional objectives including ensuring safety and security and maintaining order and control. Examples of legitimate objectives for the response to resistance and aggression are – but not limited to:
>
> 1. To gain control over a resistive or combative inmate;
> . . .
> 6. To prevent an inmate from harming him/herself.

(Meyer Decl., ¶ 22 Ex. S, p. 1).

17. Kenosha County Sheriff's Department Custody Procedural Manual, Procedure 407: Use of Emergency/Safety Restraint Chair strictly prohibits the use of an ERC as a means of punishment. (Meyer Decl., ¶ 23, Ex. T, p. 1).

18. Rather, "[t]he purpose of the restraint chair is to temporarily restrain inmates and/or transport inmates for medical, emergency, or safety reasons." (Meyer Decl., ¶ 23, Ex. T, p. 1).

19. Inmates may be placed into the ERC for a variety of reasons, including if they were a risk to themselves or others or if the inmate had items on their person that could cause harm. (McGaver Decl., ¶ 5, Ex. B; 28:9-14).

20. Once an inmate is placed in the ERC, medical staff conducts a physical assessment. (McGaver Decl., ¶ 5, Ex. B, 23:7-9).

21. Medical staff conducts an assessment every two hours thereafter an inmate remains in an ERC. (McGaver Decl., ¶ 5, Ex. B, 23:9-10).

22. Each time an inmate is removed from, and then placed back into an ERC, medical staff checks to ensure the restraints are properly fitted. (McGaver Decl., ¶ 5, Ex. B, 23:10-12).

23. Absent the presence of "overwhelming safety/security concerns," the maximum time an inmate is allowed in the ERC is eight hours. (Meyer Decl., ¶ 23, Ex. T, p. 1).

4

24.     Procedure 407 requires KSD staff to create both a supplemental report and a mental health log when an inmate is placed into the ERC. (Meyer Decl., ¶ 23, Ex. T, p. 1).

25.     KSD staff must check on the inmate in the ERC every fifteen minutes and track their observations on the mental health log. (Meyer Decl., ¶ 23, Ex. T, p. 2).

26.     Procedure 407 requires that, if necessary, every two hours KSD staff must perform evaluations on inmates in the ERC and offer the inmates water. (Meyer Decl., ¶ 23, Ex. T, p. 2).

27.     KSD staff must track the inmate's acceptance or refusal of water in a food/water intake log. (Meyer Decl., ¶ 23, Ex. T, p. 2).

### *April 25, 2021*

28.     On April 25, 2021, at approximately 8:00 p.m., KSD deputies were dispatched to the Kenosha Public Safety Building ("PSB"), located at 1000 55th Street, regarding a protest occurring on the property. (Meyer Decl., ¶ 24, Ex. U, 000006).

29.     When KSD arrived on scene, several individuals were laying against the main doors, blocking the entrance, and prohibiting citizens from entering the PSB to make police reports or record requests. (Meyer Decl., ¶ 24, Ex. U, 000006; McGaver Decl., ¶ 6, Ex. C, 32:7-14).

30.     Multiple individuals were either deterred from entering the PSB or denied access to the PSB by the protestors. (Meyer Decl., ¶ 25, Ex. V, 000014).

31.     One such citizen, Judith Devine, was unable to enter the PSB to obtain a copy of a police report because the protestors refused to move away from the doors. (Meyer Decl., ¶ 24, Ex. U 000006).

32.     Ms. Devine reported her inability to enter the PSB to KSD. (Meyer Decl., ¶ 24, Ex. U, 000006).

33.     At approximately 10:00 p.m., Deputy Bissonnette went to the PSB and joined the other officers already at the scene. (McGaver Decl., ¶ 6, Ex. C, 28:24-29:16).

5

34.     Upon arrival, Deputy Bissonnette saw several individuals sitting in front of the PSB blocking the front entrance and many others filming the sitters. (McGaver Decl., ¶ 6, Ex. C, 32:5-10).

35.     The individuals blocking the entrance were sitting shoulder to shoulder, blocking any ingress or egress from the PSB. (McGaver Decl., ¶ 6, Ex. C, 32:22-24).

36.     KSD attempted to compromise with the protestors for approximately fifteen minutes, offering to the protestors that if they simply shifted to the side and allowed citizens to enter the government building, there would be no need for arrests. (Meyer Decl., ¶ 24, Ex. U, 000006).

37.     The protestors refused and stated they would not stop blocking the entrance until they were allowed to speak with Kenosha Police Department Administration. (Meyer Decl., ¶ 24, Ex. U, 000006).

38.     Sergeant Pittsley explained to the protestors that if they failed to unblock the entrance, they would be arrested. (Meyer Decl., ¶ 24, Ex. U, 000006; McGaver Decl., ¶ 6, Ex. C, 40:21-23).

39.     At this point, the lone female protestor stood up and stepped away from the door. (Meyer Decl., ¶ 25, Ex. V, 000015).

40.     The three remaining protestors continued to refuse to move. (Meyer Decl., ¶ 24, Ex. U, 000006-000007).

41.     Sergeant Pittsley instructed his deputies to arrest the three remaining protestors. (Meyer Decl., ¶ 25, Ex. V, 000015).

42.     KSD took the protestors into custody for disorderly conduct. (Meyer Decl., ¶ 24, Ex. U, 000006-000007).

43.     Deputy Bissonnette approached Plaintiff, took hold of him by his arm, assisted him to his feet, and secured him in handcuffs. (McGaver Decl., ¶ 6, Ex. C, 35:9-11).

6

44. Deputy Bissonnette arrested Plaintiff for disorderly conduct: "[h]e was refusing to leave the building and he was causing a disturbance outside." (McGaver Decl., ¶ 6, Ex. C, 110:23-111:2).

45. Particularly, "[h]e was blocking employees from coming and going through the building and there was a crowd forming because of their actions." (McGaver Decl., ¶ 6, Ex. C, 111:5-8).

46. Plaintiff's counsel confirmed that refusing to leave the area, along with refusing to identify himself constituted disorderly conduct. (McGaver Decl., ¶ 6, Ex. C, 112:13-15).

47. Deputy Bissonnette then searched Plaintiff and walked him to an inmate transport van. (McGaver Decl., ¶ 6, Ex. C, 35:11-12).

48. Deputy Bissonnette did not question Plaintiff during their interaction. (McGaver Decl., ¶ 6, Ex. C, 35:14-17).

49. Deputy Bissonnette did not interact with any of the other arrested individuals that day. (McGaver Decl., ¶ 6, Ex. C, 45:22-23).

50. All three protestors were transported via inmate transport van to the Kenosha County Jail ("KCJ"). (Bissonnette Decl., ¶ 5, Ex. C, 000011).

51. At 10:03 p.m., the inmate transport van pulled into the Sally Port of the KCJ. (Meyer Decl., ¶ 4 Ex. A, 00:04).

52. At 10:04 p.m., KSD removed Plaintiff from the inmate transport van, walked him towards the side wall of the Sally Port, and searched his person. (Meyer Decl., ¶ 4, Ex. A, 00:53-02:16).

53. At the same time, KSD removed Plaintiff's fellow protestors, walked them towards the same side wall of the Sally Port, and searched their persons. (Meyer Decl., ¶ 4, Ex. A, 00:53-02:16).

54. At 10:06 p.m., KSD had all three protestors sit along the same wall within the Sally Port. (Meyer Decl., ¶ 4, Ex. A, 02:16-02:28).

55. At 10:07 p.m., multiple jail staff entered the Sally Port. (Meyer Decl., ¶ 4, Ex. A, 02:28-04:04).

56. At 10:09 p.m., jail staff escort one of Plaintiff's two fellow protestors into KCJ, while Plaintiff and his other fellow protestor remain seated along the side wall of the Sally Port. (Meyer Decl., ¶ 4, Ex. A, 04:05-04:17).

57. The first protestor brought into KCJ was identified as Joseph Cardinali, who was cooperative with staff and completed the intake process without any issue. (McGaver Decl., ¶ 13, Ex. J, p. 1).

58. At 10:23 p.m., jail staff escort the second of Plaintiff's fellow protestors to sit along the opposite wall of the Sally Port, while Plaintiff remains seated in his original position. (Meyer Decl., ¶ 4, Ex. A, 08:09-08:17).

59. At 10:37 p.m., jail staff escort the second of Plaintiff's fellow protestors into KCJ, while Plaintiff remains seated along the side wall of the Sally Port. (Meyer Decl., ¶ 4, Ex. A, 11:39-11:45).

60. The second protestor brought into KCJ was identified as Jonathan Barker, who was cooperative with staff and completed the intake process without any issue. (McGaver Decl., ¶ 13, Ex. J, p. 1).

61. At 10:47 p.m., jail staff escort Plaintiff to the opposite side wall of the Sally Port, near the door into KCJ. (Meyer Decl., ¶ 4, Ex. A, 13:28-13:42).

62. During his interactions with Plaintiff, Deputy Bissonnette asked Plaintiff for his name and explained the need for identification, but Plaintiff did not respond. (McGaver Decl., ¶ 6, Ex. C, 60:16-23).

8

63. Deputy Bissonnette did not know that Plaintiff was Justin Blake at the time. (McGaver Decl., ¶ 6, Ex. C, 60:24-25).

64. Blake was not assaulted or injured by officers during his arrest. (McGaver Decl., ¶ 10, Ex. G, 22:1-6).

65. At 11:07 p.m., jail staff and Deputy Bissonnette escort Plaintiff into KCJ, walks him to the front desk, and Officer DiCello performs another search of Plaintiff's person. (Meyer Decl., ¶ 4, Ex. A, 19:49-19:58; Meyer Decl., ¶ 5, Ex. B, 00:00-01:35; Meyer Decl., ¶ 6, Ex. C, 00:00-01:57).

66. Officer DiCello spoke to Plaintiff before the search, but Plaintiff did not react. (Meyer Decl., ¶ 6, Ex. C, 00:20-00:26).

67. When brought into KCJ, Plaintiff wore sunglasses, a mask, and a hooded sweatshirt that had a string in the hood. (Meyer Decl., ¶ 6, Ex. C, 00:17).

68. At 11:09 p.m., Officer DiCello removed Plaintiff's hood from his head, removed Plaintiff's sunglasses from his face, and completed the search. (Meyer Decl., ¶ 5, Ex. B, 01:35-01:51; Meyer Decl., ¶ 6, Ex. C, 01:49-).

69. Prior to removing Plaintiff's sunglasses, Officer DiCello can be seen speaking to Plaintiff, and Plaintiff nods affirmatively in response. (Meyer Decl., ¶ 6, Ex. C, 02:00-02:04).

70. At 11:10 p.m., jail staff retried the ERC while Sergeant May spoke to Plaintiff. (Meyer Decl., ¶ 5, Ex. B, 02:00-02:54).

71. Generally, when a person refuses to identify themselves, KSD will run a "FastID" to try to identify them. (McGaver Decl., ¶ 6, Ex. C, 60:1-2).

72. "FastID" is a mechanism that allows law enforcement to identify individuals whose fingerprints are already contained in a database (*i.e.*, those who have been convicted or fingerprinted in the State of Wisconsin before). (McGaver Decl., ¶ 11, Ex. H, 23:6-12, 25:24-26:7).

9

73. Jail staff attempted to FastID Plaintiff but was not able to get any information back. (Bissonnette Decl., ¶ 5, Ex. C, 000011).

74. Plaintiff refused to cooperate with Correctional Officers in the booking area of the KCJ by refusing to speak to or acknowledge the officers. (Meyer Decl., ¶ 26, Ex. W).

75. While officers attempted to book Plaintiff, it was thought that he might be Justin Blake, but his identification was not confirmed. (Meyer Decl., ¶ 26, Ex. W; see also McGaver Decl., ¶ 11, Ex. H, 90:17-24).

76. Sergeant May asked Plaintiff's fellow protestors to identify Plaintiff, but they refused to answer who it was, despite answering other questions asked of them. (McGaver Decl., ¶ 11, Ex. H, 101:21-102:4).

77. Because there was no way to confirm Plaintiff's identity, he was booked as John Doe. (McGaver Decl., ¶ 11, Ex. H, 27:6-11).

78. Prior to an inmate going on the body scanner, they must answer certain health-related questions. (McGaver Decl., ¶ 7, Ex. D, 47:10-48:4).

79. The questions are part of a safety and security protocol. (McGaver Decl., ¶ 7, Ex. D, 55:17-22).

80. Officer DiCello asked Plaintiff to go on the body scanner. (McGaver Decl., ¶ 8, Ex. E, 40:23-41:1).

81. Corporal Martini asked Plaintiff to go on the body scanner. (McGaver Decl., ¶ 8, Ex. E, 40:23-41:1).

82. Plaintiff refused to answer if he would go on to the body scanner. (McGaver Decl., ¶ 8, Ex. E, 69:8).

83. At the time of his arrest, Plaintiff was wearing, among other items, shoes, a belt, and a hooded sweatshirt. (McGaver Decl., ¶ 8, Ex. E, 67:9-11).

84. Plaintiff refused to remove his non-allowable items of clothing at KCJ. (McGaver Decl., ¶ 7, Ex. D, 74:18-23, 76:11-16; McGaver Decl., ¶ 11, Ex. H, 50:15-21).

85. KSD did not remove Plaintiff's clothing items without consent because, as Deputy Bissonnette explained, "we're not about to hold an uncooperative person down and strip them of their personal possessions." (McGaver Decl., ¶ 8, Ex. E, 67:9-12).

86. Stripping away personal possession, or "involuntary removals," carries the risk of injury both to the arrestee and to the jail staff conducting the removal. (McGaver Decl., ¶ 11, Ex. H, 58:4-9).

87. Sergeant May explained to Plaintiff why KSD needed him to remove the non-allowable items:

> [W]e explained to him we need these items; the reason why we needed the items; and that if we weren't able to get them, we would have to put him in a restraint chair for his safety since he's not willing to answer questions as to if he's feeling – harming himself or others.

(McGaver Decl., ¶ 11, Ex. H, 71:8-17).

88. Sergeant May also informed Plaintiff that his refusal to answer questions was delaying the booking process and Plaintiff's possible release. (McGaver Decl., ¶ 11, Ex. H, 72:25-73:6).

89. Plaintiff refused to answer whether he was suicidal, refused to speak with jail staff, refused to go on the body scanner, and refused to relinquish items of clothing he could use to kill himself. (McGaver Decl., ¶ 8, Ex. E, 70:19-23).

90. Sergeant May made the determination to place Plaintiff into the ERC:

> This is a fresh intake that's coming in. Are you suicidal? Do you have any medical problems? Things of a nature that we need to be aware of. Are you going to harm staff if we try to remove your items from you? With the unknowns of all of that, I made the decision to place him in the restraint chair.

(McGaver Decl., ¶ 12, Ex. I, 55:3-9; see also, McGaver Decl., ¶ 9, Ex. F, 61:4-7; McGaver Decl., ¶ 7, Ex. D, 48:17-20).

91.     The ERC was the least amount of force that jail staff could use with regard to Plaintiff. (McGaver Decl., ¶ 11, Ex. H., 80:19-23).

92.     Plaintiff was placed in the ERC for his own safety, the safety of the facility, and the safety of the officers. (McGaver Decl., ¶ 4, Ex. A, 93:23-25; McGaver Decl., ¶ 11, Ex. H, 50:8-12).

93.     Plaintiff was placed in the ERC because he refused to answer any questions, including those relating to his potentially suicidal state, and he refused to go through the body scanner:

> [B]ecause we don't know if he's suicidal we have to act in his best interests and assume he is suicidal, so the ERC is to protect him from himself while he refused to answer us.

(McGaver Decl., ¶ 8, Ex. E, 37:21-38:3; see also McGaver Decl., ¶ 11, Ex. H, 62:20-25).

94.     Plaintiff's refusal to answer questions for the body scanner and refusal to remove articles of prohibited clothing caused a security concern. (McGaver Decl., ¶ 7, Ex. D, 74:14-17).

95.     Plaintiff was also placed in the ERC because he had non-allowable items on his person: his shoelaces, his belt, a string in his hooded sweatshirt. (McGaver Decl., ¶ 11, Ex. H, 50:15-21).

96.     Failing to employ the ERC and instead allowing Plaintiff in a holding cell with the non-allowable items could result in Plaintiff strangling himself. (McGaver Decl., ¶ 11, Ex. H 50:19-21).

97.     Plaintiff was not placed in the ERC for punishment. (McGaver Decl., ¶ 12, Ex. I, 51:1-10).

98.     Although Deputy Bissonnette was still present while Plaintiff was put in the chair, he did not assist in placing Plaintiff in the ERC. (McGaver Decl., ¶ 6, Ex. C, 81:21-82:9).

99. Deputy Bissonnette had no say whether Plaintiff was going to be placed in the ERC. (McGaver Decl., ¶ 6, Ex. C, 107:8-10).

100. Deputy Bissonnette did not have any concerns with Plaintiff being placed into the ERC. (McGaver Decl., ¶ 6, Ex. C, 86:12-16).

101. Officer DiCello did not have any concerns with Plaintiff being placed into the ERC. (McGaver Decl., ¶ 8, Ex. E, 65:11-14).

102. Officer Galvan did not have any concerns with Plaintiff being placed into the ERC. (McGaver Decl., ¶ 9, Ex. F, 63:11-13; 71:21-72:1).

103. Officer Haynes did not have any concerns with Plaintiff being placed into the ERC. (McGaver Decl., ¶ 7, Ex. D, 49:20-50:1).

104. At 11:11 p.m., Officers DiCello and Haynes assisted Plaintiff into a seated position in the ERC. (Meyer Decl., ¶ 5, Ex. B, 03:01-03:17).

105. Officer Haynes then secured Plaintiff's legs to the ERC, while Officer DiCello began securing the chest and lap straps with the assistance of Officers Galvan and Martini. (Meyer Decl., ¶ 5, Ex. B, 03:17-04:01).

106. Officer Galvan adjusted the leg straps. (Meyer Decl., ¶ 5, Ex. B, 04:01-04:14).

107. At 11:12 p.m., Officer DiCello removed Plaintiff's handcuffs, then he and Officer Haynes secured Plaintiff's left wrist and arm to the ERC while Officer Galvan does the same with Plaintiff's right wrist and arm. (Meyer Decl., ¶ 5, Ex. B, 04:15-06:01; McGaver Decl., ¶ 8, Ex. E, 37:19-20).

108. At 11:14 p.m., Nurse Bergmann checked the restraints. (Meyer Decl., ¶ 5, Ex. B, 06:02-06:39).

13

109.    Nurse Bergmann noted that right wrist restraint may need to be loosened and informed Officer Galvan of the same. (Meyer Decl., ¶ 5, Ex. B, 06:08-06:09; McGaver Decl., ¶ 5, Ex. B, 79:20-80:1, 80:11-14).

110.    Upon Nurse Bergmann's instruction, Officer Galvan loosened the restraint. (Meyer Decl., ¶ 5, Ex. B, 06:09-06:18; McGaver Decl., ¶ 5, Ex. B, 79:25-80:1, 80:15-18).

111.    At 11:15 p.m., Officer DiCello wheeled Plaintiff into a holding cell and spoke to Plaintiff, but Plaintiff did not react. (Meyer Decl., ¶ 5, Ex. B, 06:19-07:07; Meyer Decl., ¶ 7, Ex. D, 00:00-01:27).

112.    All arrestees are kept in a holding cell until they are processed. (McGaver Decl., ¶ 11, Ex. H, 41:18-23).

113.    At 11:17 p.m., Officer Galvan spoke to Plaintiff, but Plaintiff does not react. (Meyer Decl., ¶ 7, Ex. D, 01:49-02:00).

114.    After Officer Galvan spoke to Plaintiff, jail staff closed the door to the holding cell. (Meyer Decl., ¶ 7, Ex. D, 02:05-02:18).

115.    Once Plaintiff was placed in the ERC, the Defendant Officers began a Mental Health Log, tracking officers' observations of Plaintiff. (Meyer Decl., ¶ 27, Ex. X).

116.    The Defendant Officers also began a Water Intake/Flush Log, tracking officers' interactions with Plaintiff, offering him both water and use of the restroom while in the ERC. (Meyer Decl., ¶ 28 Ex. Y).

117.    After Plaintiff was placed in the ERC, Sergeant May began an email chain with two listservs – one each for sergeants and captains – describing in detail the arrest, Plaintiff's refusal to cooperate, and the placement of Plaintiff into the ERC. (Meyer Decl., ¶ 29, Ex. Z, 000507-000508).

118.    At some point while in the ERC, Plaintiff told Officer Haynes that "he had to do this for his cause." (McGaver Decl., ¶ 7, Ex. D, 89:22-23).

119.    Nurse Bergmann conducted four distinct restraint checks while Plaintiff was in the ERC: (1) 11:09 p.m.; (2) 12:18 a.m.; (3) 2:05 a.m.; and (4) 3:45 a.m. (McGaver Decl., ¶ 5 Ex. B, 53:19-54:10; see also McGaver Decl., ¶ 14, Ex. K).

120.    Officer Haynes spoke to Plaintiff multiple times while he was in the ERC:

> Most of our conversations were to the nature of that, you know, I would prefer that he would come out of the chair, and, you know, let us get him to be scanned and that we can move along with this process.

(McGaver Decl., ¶ 7, Ex. D, 64:9-12).

### *April 26, 2021*

121.    At 12:00 a.m. on April 26, 2021, while monitoring Plaintiff, Officer Galvan opened the holding cell door and had a verbal conversation with him. (Meyer Decl., ¶ 8, Ex. E, 00:20-00:41).

122.    At 12:10 a.m., jail staff removed Plaintiff from the ERC and allowed him to stretch his legs. (Meyer Decl., ¶ 8, Ex. E, 02:24-04:10).

123.    At 12:15 a.m., jail staff returned Plaintiff to the ERC. (Meyer Decl., ¶ 8, Ex. E, 04:47-06:22).

124.    At one point while in the ERC, Plaintiff requested ice chips, which Officer Haynes retrieved and provided to him. (McGaver Dec., ¶ 7, Ex. D, 90:24-91:4).

125.    Immediately upon Plaintiff's return to the ERC, Nurse Bergmann conducted a restraint check. (Meyer Decl., ¶ 8, Ex. E, 06:22-06:45).

126.    At 12:44 a.m., jail staff spoke with Plaintiff and inspected the restraints. (Meyer Decl., ¶ 8, Ex. E, 15:46-16:41).

127.    At 1:19 a.m., Officer Galvan removed Plaintiff's left wrist restraint and provided him with two cups of water, which he drank. (Meyer Decl., ¶ 8, Ex. E, 30:18-32:58).

128.    At 1:20 a.m., Officer Galvan resecured Plaintiff's left wrist restraint. (Meyer Decl., ¶ 8, Ex. E, 32:58-33:27).

15

129.     At 1:34 a.m., jail staff removed Plaintiff from the ERC and allowed him to stretch his legs. (Meyer Decl., ¶ 9, Ex. F, 03:50-09:28).

130.     At 1:51 a.m., jail staff returned Plaintiff to the ERC. (Meyer Decl., ¶ 9, Ex. F, 09:28-11:54).

131.     At 2:01 a.m., Nurse Bergmann conducted a restraint check. (Meyer Decl., ¶ 9, Ex. F, 14:32-15:50).

132.     During the check, Nurse Bergmann noted a needed adjustment, which Officer Haynes carried out. (Meyer Decl., ¶ 9, Ex. F, 14:32-15:50).

133.     At 3:15 a.m., Officer Haynes spoke to Plaintiff, brought Plaintiff a cup of water, and removed Plaintiff's left wrist restraint which allowed Plaintiff to drink the water. (Meyer Decl., ¶ 15, Ex. L, 06:04-08:49).

134.     At 3:21 a.m., Officer Haynes resecured Plaintiff's left wrist. (Meyer Decl., ¶ 15, Ex. L, 08:49-09:00).

135.     At 3:45 a.m., Nurse Bergmann conducted another restraint check. (Meyer Decl., ¶ 15, Ex. L, 15:05-16:03).

136.     Hours after Deputy Bissonnette arrested Plaintiff and left the jail, one of Deputy Bissonnette's coworkers mentioned to him that, based off images from the news, Plaintiff could have been Justin Blake. (McGaver Decl. ¶ 6, Ex. C, 1:1-62:1).

137.     Deputy Bissonnette then contacted a booking clerk at the jail and shared the John Doe arrestee may be Justin Blake. (McGaver Decl. ¶ 6, 63:2-14).

138.     Deputy Bissonette explained:

```
16     A     He can't officially be booked into the jail unless he's
17           identified and he cannot get a bond unless he is
18           identified, so I was trying to just help.
. . .
24           They needed like a hard ID or a confirmation on him
```

16

25          before they could do anything.

(McGaver Decl. ¶ 6, Ex. C, **63:16-24**).

139.    As of 5:15 a.m., Plaintiff was still refusing to cooperate. (Meyer Decl., ¶ 29, Ex. Z, 000506).

140.    Sergeant May sent an update to the sergeants and captains explaining:

**Update**

As of 0515 hours, subject "John Doe" is still in the ERC. Subject has refused requests when released from the ERC multiple times to use the bathroom, to turn over property mentioned below that isn't permitted in the holding cells due to safety concerns. Subject has spoken a few words to some staff in Zone 1, but isn't willing to answer questions related to the intake or booking process. Subject has been informed multiple times of what is needed, as it relates to being booked and bonded out, and how continuing to refuse to cooperate is what is delaying that process. Consistent with time in the ERC, subject provided no sort of response to this information.

(Meyer Decl., ¶ 29, Ex. Z, 000506) (emphasis in original).

141.    At 5:35 a.m., Officer Haynes entered the holding cell, removed the restraints from the ERC, and assisted Plaintiff to a stand. (Meyer Decl., ¶ 16, Ex. M, 04:38-06:34).

142.    At 5:37 a.m., Officer Haynes walked Plaintiff out of the holding cell. (Meyer Decl., ¶ 16, Ex. M, 06:34-06:47).

143.    Eventually, Plaintiff told Officer Haynes he would comply, but only to the extent that he would come out of the ERC. (McGaver Decl., ¶ 7, Ex. D, 90:4-14).

144.    Lt. Neil Paulsen attempted to speak with Plaintiff at KCJ. (Meyer Decl., ¶ 26, Ex. W).

145.    Lt. Paulsen explained to Plaintiff that KSD would like to release him, but they could not do so until he was positively identified. (Meyer Decl., ¶ 26, Ex. W).

17

146.    At this point, Plaintiff verbally identified himself as Justin Blake. (Meyer Decl., ¶ 26, Ex. W).

147.    When Lt. Paulsen asked Plaintiff why he did not identify himself the previous day, Plaintiff stated it was an emotional day. (Meyer Decl., ¶26 Ex. W).

148.    Plaintiff confirmed he felt as though he was treated fairly while at KSD. (Meyer Decl., ¶ 26, Ex. W).

149.    At 5:38 a.m., Plaintiff was removed from the ERC. (McGaver Decl., ¶ 14, Ex. 5).

150.    While Plaintiff was in the ERC, jail staff offered him water and restroom breaks seven times. (Meyer Decl., ¶ 28, Ex. Y).

151.    Of those seven offers, Plaintiff only accepted water twice and agreed to use the restroom twice; Plaintiff refused every other offer. (Meyer Decl., ¶ 28, Ex. Y).

152.    While Plaintiff was in the ERC, jail staff logged thirty-four separate observations of Plaintiff. (Meyer Decl., ¶ 27, Ex. X).

153.    Plaintiff's body language was neutral while in the ERC, giving officers no reason to suspect he was in any pain. (McGaver Decl., ¶ 8, Ex. E, 95:20-96:1).

154.    While Plaintiff was in the ERC, he never told Nurse Bergmann the restraints were too tight. (McGaver Decl., ¶ 10, Ex. G, 185:19-22).

155.    While Plaintiff was in the ERC, he never told Nurse Bergmann he felt any tingling in his extremities. (McGaver Decl., ¶ 10, Ex. G, 185:23-25).

156.    While Plaintiff was in the ERC, he never requested medical attention. (McGaver Decl., ¶ 10, Ex. G, 187:15-18).

157.    At 10:11 a.m., jail staff escorted Plaintiff from the holding cell to the front desk. (Meyer Decl., ¶ 10, Ex. G, 07:43-07:59).

158. While at the desk, Plaintiff immediately removed his jacket, shook his head "no," and nodded his head "yes," conversed with jail staff, executed at least one document, and provided his fingerprint multiple times. (Meyer Decl., ¶ 10, Ex. G, 07:59-15:20).

159. At 10:19 a.m., Plaintiff successfully completed the body scanner process. (Meyer Decl., ¶ 10, Ex. G, 15:55-16:47).

160. At 10:22 a.m., jail staff escorted Plaintiff to the booking window. (Meyer Decl., ¶ 11, Ex. H, 00:00-00:19).

161. At 10:32 a.m., jail staff escorted Plaintiff from the booking window to have his booking photographs and fingerprints taken. (Meyer Decl., ¶ 11, Ex. H, 08:05-14:06).

162. At 10:40 a.m., jail staff escorted Plaintiff from the area where he had his photographs and fingerprints taken to the phone area where Plaintiff promptly makes a phone call. (Meyer Decl., ¶ 11, Ex. H, 14:07-14:46; Meyer Decl., ¶ 13, Ex. I, 07:11-08:53).

163. At 10:43 a.m., jail staff escorted Plaintiff from the phone area to another holding cell. (Meyer Decl., ¶ 11, Ex. H, 16:48-16:52; Meyer Decl., ¶ 13, Ex. I, 08:54-09:39).

164. At approximately 11:10 a.m., Tanya McLean posted Plaintiff's bond. (Meyer Decl., ¶ 30, Ex. AA).

165. At 11:18 a.m., jail staff escorted Plaintiff from the holding cell to the booking window. (Meyer Decl., ¶ 13, Ex. I, 22:33-23:38; Meyer Decl., ¶ 13, Ex. J, 00:00-02:07; Meyer Decl., ¶ 14, Ex. K, 01:53-08:28).

166. At 11:21 a.m., Sergeant Brian Doe responded to the ongoing email chain between sergeants and captains, explaining:

> The subject was removed from the ERC shortly before 0600 hours this morning. He is now cooperative and has been identified as Justin Blake. Mr. Blake has completed the booking process and is currently in the process of being released.

(Meyer Decl., ¶ 29, Ex. Z, 000506).

19

167.    At 11:26 a.m., jail staff escorted Plaintiff from the booking window to a hallway near the KCJ exit. (Meyer Decl., ¶ 13, Ex. J, 02:07; Meyer Decl., ¶ 14, Ex. K, 08:29-08:48).

168.    At 11:27 a.m., jail staff returned Plaintiff's property to him and allowed him to change back into his hooded sweatshirt. (Meyer Decl., ¶ 14, Ex. K, 08:49-10:38).

169.    At 11:30 a.m., Plaintiff is escorted out of KCJ and released from custody. (Meyer Decl., ¶ 14, Ex. K, 11:25-11:34).

170.    Plaintiff did not tell anyone at KSD, at any point, that he was in any pain. (McGaver Decl., ¶ 10, Ex., G 7:3-22, 123:17-23; McGaver Decl., ¶ 8, Ex. E, 95:7-9).

171.    But, Plaintiff assumed that both correctional and medical staff had to have known he was in "extreme pain," due to his "constant unsettling motion" and "the tone of [my][1] voice when [I was] singing." (McGaver Decl., ¶ 10, Ex. G, 179:21-181:25).

172.    At 11:32 a.m., Lieutenant Paulsen added Sheriff Beth and others to the above-described email chain, stating:

UPDATE

Justin Blake has been booked and his bond was posted. He just walked out the door.

225

(Meyer Decl., ¶ 29, Ex. Z, 000505).

173.    At some point on April 26, 2021, Sheriff Beth was briefed by his staff on Plaintiff's interaction with KSD. (McGaver Decl., ¶ 10, Ex. G, 76:7-21).

174.    At no point during Deputy Bissonnette, Officer Galvan, Officer Haynes, Officer DiCello, or Sergeant May's interactions with Plaintiff on April 25 and 26, 2021, did he identify

---

[1] Throughout Plaintiff's deposition testimony, he referred to himself in the plural form, using "we," "us," and "our," in place me "I," "me," and "mine." (See, *e.g.*, McGaver Decl., ¶ 10, Ex. G, 75:17-23). It was clarified with plaintiff multiple times that he was only referring to himself, despite using the plural form. (See, *e.g.*, McGaver Decl., ¶ 10, Ex. G, 77:6-9). For ease of understanding, the County Defendants will correct the form of noun when necessary.

20

himself by name. (Bissonnette Decl., ¶ 7; Galvan Decl., ¶ 5 Haynes Decl., ¶ 7; DiCello Decl., ¶ 5; May Decl., ¶ 6).

175. At no point during Deputy Bissonnette, Officer Galvan, Officer Haynes, Officer DiCello, or Sergeant May's interactions with Plaintiff on April 25 and 26, 2021, did he identify himself by government issued identification card. (Bissonnette Decl., ¶ 8; Galvan Decl., ¶ 6; Haynes Decl., ¶ 8; DiCello Decl., ¶ 6; May Decl., ¶ 7).

176. At no point during Deputy Bissonnette, Officer Galvan, Officer Haynes, Officer DiCello, or Sergeant May's interactions with Plaintiff on April 25 and 26, 2021, did Plaintiff answer health questions required for booking. (Bissonnette Decl., ¶ 9; Galvan Decl., ¶ 7; Haynes Decl., ¶ 9; DiCello Decl., ¶ 7; May Decl., ¶ 8).

177. At no point during Deputy Bissonnette, Officer Galvan, Officer Haynes, Officer DiCello, or Sergeant May's interactions with Plaintiff on April 25 and 26, 2021, did he indicate in any way that he was uncomfortable while sitting in the emergency restraint chair. (Bissonnette Decl., ¶ 10; Galvan Decl., ¶ 8; Haynes Decl., ¶ 10; DiCello Decl., ¶ 8; May Decl., ¶ 9).

178. At no point during Deputy Bissonnette, Officer Galvan, Officer Haynes, Officer DiCello, or Sergeant May's interactions with Plaintiff on April 25 and 26, 2021, did he indicate in any way that he was in any pain while sitting in the emergency restraint chair. (Bissonnette Decl., ¶ 11; Galvan Decl., ¶ 9; Haynes Decl., ¶ 11; DiCello Decl., ¶ 9; May Decl., ¶ 10).

179. KSD issued a Request for Criminal Complaint for Justin Blake, seeking charges of disorderly conduct and obstructing an officer. (Meyer Decl., ¶ 18, Ex. O).

180. On June 22, 2021, Kenosha County issued Plaintiff a citation for disorderly conduct based on his conduct at the KCJ in *Kenosha County v. Justin S. Blake*, Kenosha County Case Number 21-FO-463. (Meyer Decl., ¶ 17, Ex. N).

181.    On July 14, 2021, Plaintiff failed to appear, and the court entered default judgment against him. (Meyer Decl., ¶ 17, Ex. N, July 14, 2021, entries).

182.    On July 19, 2021, the court reopened the case at Plaintiff's request. (Meyer Decl., ¶ 17, Ex. N, July 16 and 19, 2021, entries).

183.    On November 17, 2023, Plaintiff failed to appear again, and the court entered a second order of default judgment against him. (Meyer Decl., ¶ 17, Ex. N, Nov. 17, 2023, entries).

184.    On February 16, 2024, the court again reopened the case at Plaintiff's request. (Meyer Decl., ¶ 17, Ex. N, Feb. 16, 2024, entries).

185.    Jury selection for Plaintiff's trial on his disorderly conduct citation is set to occur March 10, 2025. (Meyer Decl., ¶ 17, Ex. N, Oct. 4, 2024, entry).

186.    KSD issued a Request for Criminal Complaint for Jonthan Barker, seeking a charge of disorderly conduct.  (Meyer Decl. ¶ 31, Ex BB).

187.    KSD issued a Request for Criminal Complaint for Joseph Cardinali, seeking a charge of disorderly conduct. (Meyer Decl. ¶ 32, Ex. CC).

Dated this 20th day of January, 2024.

By:  /s Brianna J. Meyer
    SAMUEL C. HALL, JR.
    State Bar No. 1045476
    STEVEN C. MCGAVER
    State Bar No. 1051898
    BRIANNA J. MEYER
    State Bar No. 1098293
    Attorneys for Defendants, David G. Beth, County of Kenosha, Kyle Bissonnette, Jacob DiCello, Gloria Galvan, Dereemeyun Haynes, Jeremy May, and Wisconsin Municipal Mutual Insurance Company
    CRIVELLO, NICHOLS & HALL, S.C.
    710 N. Plankinton Avenue, Suite 500
    Milwaukee, WI  53203
    Phone: (414) 271-7722
    Fax: (414) 271-4438

22

E-mail: shall@crivellolaw.com
smcgaver@crivellolaw.com
bmeyer@crivellolaw.com