**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

JUSTIN BLAKE,

        Plaintiff,

  v.

DAVID BETH, et al.,

        Defendants.

Case No: 22-cv-0970

**PLAINTIFF'S BRIEF IN OPPOSITION TO THE COUNTY DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT (ECF No. 81)**

NOW COMES Plaintiff, Justin Blake ("Blake"), by his attorneys, and for his brief in opposition to Defendants David Beth County of Kenosha, Kyle Bissonnette, Jacob DiCello, Gloria Galvan, Dereemeyun Haynes, Jeremy May, and Wisconsin Municipal Mutual Insurance Company, (collectively, the "County Defendants", unless otherwise noted) Motion for Summary Judgment (ECF No. 81). For the reasons stated herein, and because genuine issues of material fact are prevalent, this Court should deny the motion in its entirety.

## STATEMENT OF FACTS

Plaintiffs have filed a response to the County Defendants' proposed findings of fact ("CDPF"), ECF 83, as well as his own proposed findings of fact ("PFOF").

This case highlights how polarizing viewpoints can lead officers to conduct their jobs in a haphazard and unconstitutional way. One's exercise of their First Amendment rights – especially considering that our constitutional rights are as sacred as ever in our

current political climate – should never be infringed upon simply because of another's disagreement. This case is a vehicle to uphold those rights.

Mr. Blake is the uncle of Jacob Blake. On Sunday, April 25, 2021, Mr. Blake, religious leader Jonathan Barker, community member Joseph Cardinelli, and other public members, were peacefully protesting the decision by Kenosha County to not impose any consequences related to the shooting of Mr. Blake's nephew, Jacob Blake, outside the Kenosha Public Safety Building (hereinafter "KPSB") nephew. PFOF ¶ 1.

Sometime after 10:00 p.m. on April 25, Mr. Blake, Barker, and Cardinali, were arrested by Kenosha Sheriff's Department ("KSD") deputies. PFOF ¶ 2; ECF 83, CDPF ¶ 41. These deputies include Defendant Kyle Bissonnette and Sgt. Michael Pittsley, ("Officers"). CDPF ¶ 41, 44.

Despite all three men being involved in the same protest and exhibiting the same behavior, Mr. Barker and Mr. Cardinelli, who are both white, were arrested for disorderly conduct under the false pretense that they prevented "at least one citizen from entering the Public Safety Building." ECF 82 at 14. Mr. Blake, who is black, was arrested for the disorderly conduct allegation and also an additional obstruction allegation. ECF 82, at 14. There was no probable cause to arrest Mr. Blake for disorderly conduct and obstruction. PFOF ¶¶ 10-11. After Mr. Blake was arrested by Defendant Bissonnette the Officers became aware that Mr. Blake continued his silent protest while in custody. PFOF ¶ 2. Mr. Blake invoked his First Amendment rights by remaining silent. *Id.* The Officers were aware that Mr. Blake continued his silent protest upon arresting him; Officers added the obstruction charge purportedly because Mr. Blake did not have identification on him and chose to continue his silent protest. PFOF ¶ 4. Mr. Cardinali and Mr. Barker were released

around 2:00 a.m. but before being released were required to post $150 bond. PFOF ¶ 24, 36. Conversely, Mr. Blake was required to pay a $450 bond. *Id.*

Although Mr. Blake remained silent, there were numerous emails and reports throughout the day where the Officers and other defendants had clearly identified Justin Blake as one of the peaceful protestors arrested the evening before. PFOF ¶¶ 2,3,36-42. This is likely because the press had been reporting on the District Attorney's decision not to charge or discipline Jacob Blake's shooter. Officers claimed that when they arrested Mr. Blake, they did not know who he was, but the evidence in the record quite clearly suggests otherwise. PFOF ¶¶ 34-39.

Despite Mr. Blake exercising his right to remain silent, and his First Amendment right to protest, he was punished, retaliated against, and forced into an Emergency Restraint Chair ("ERC") by Officers Jeremy May, Kyle Bissonnette, Jacob DiCello, Gloria Galvan, Dereemeyun Haynes collectively referred to as "Defendant Officers," some of whom either put him in the ERC while others – like Defendant Jessica Bergmann[1] - stood idly by, watching Mr. Blake become tightly strapped to the ERC by his chest, arms, and legs for almost seven total hours. PFOF ¶ 3, 118. At no time was Mr. Blake aggressive, combative, or violent before, during, or after being placed in the ERC and there was no emergency, legal or medical reasons to justify his placement into the ERC. PFOF ¶¶ 47, 55-61.

After nearly seven total hours in the ERC, Mr. Blake abandoned his silent protest out of pain and agony and was released from the ERC once he identified himself to a deputy. PFOF ¶ 97. The consequence of being strapped to an ERC for hours had a

---

[1] Jessica Bergmann is also a named defendant in this matter. Plaintiff also filed a Motion in Opposition to their Motion for Summary Judgment. ECF 70.

devastating physical and emotional impact on Mr. Blake and was in violation of his constitutional rights. PFOF ¶ 116.

## ARGUMENT

Summary judgment is required *only* where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)(emphasis added). When considering a motion for summary judgment, the Court is to take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 255, 106 S. CT. 2505 (1986); *Schuetta v. Aurora Nat'l Life Assurance Co.*, 27 F.Supp.3d 949, 955-56 (E.D. Wis. 2014), citing Fed.R.Civ.P. 56(a). Importantly, a court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party when determining whether a genuine issue of material fact exists. *See, e.g., Simpson v. Merchants Recovery Bureau, Inc.*, 171 F.3d 546, 551 (7th Cir. 1999). This requires the Court to "construe all inferences in favor of the party against whom the motion under consideration is made." *Rupcich v. United Food & Commercial Workers Int'l Union*, 833 F.3d 847, 853 (7th Cir. 2016)(citations omitted); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)(Credibility determinations and weighing of the evidence ". . . are jobs for a factfinder.").

Here, Blake asserts five counts against the County Defendants, Defendant Officers, and Insurance Company. Mr. Blake alleges (1) First Amendment Retaliation (Count 2, ECF. 59, at ¶¶ 91-106); (2) excessive force under the Fourteenth and Fourth Amendments (Count 5, ¶¶ 132-149); (3) failure to intervene (Count 7, ¶¶ 150-163); (4)

negligent hiring, training, and supervision against Kenosha County (Count 12, ¶¶ 192-198); and (5) failure to render aid (Count 15, ¶¶ 220 – 225).[2]

Plaintiff further acknowledges that Kenosha County is responsible for the acts of all Defendants to this matter and that the 11th Claim for Relief of Indemnification is not a "claim" in and of itself, as well as the 16th Direct Action Claim against the Defendant Insurance Company. The County Defendants' motion should be denied for the reasons stated below.

## I. Blake's First Amendment Retaliation Claim Against Defendant Officers, Bissonnette, DiCello, Galvan, Haynes, and May Should Survive Summary Judgment. (Claim 2)

Plaintiff maintains that his First Amendment claim against Defendant Officers Kyle Bissonnette, DiCello, Galvan, Haynes, and May should not be dismissed because genuine issues of material fact prevent summary judgment from being appropriate.

To prevail on his First Amendment retaliation claim, Mr. Blake must show that (1) he engaged in a protected First Amendment activity; (2) that he "suffered a deprivation that would likely deter First Amendment activity in the future"; and (3) causation—specifically, "the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action against Plaintiff." *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020), quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). The activity in question relates to Blake protesting police brutality and in support of police accountability as it relates to the shooting of his nephew. Because Plaintiff can

---

[2] Plaintiff voluntarily dismisses Counts 1 (First Amendment claim), 3 (Deliberate Indifference claim), 4 (First Amendment Excessive Force and Arrest claim), 6 (Cruel and Unusual Punishment claim), 8 (Excessive Detention claim), 14 (Monell), 17 (Equal Protection), and Defendant Beth from this action.

satisfy each element for First Amendment Retaliation, this claim must survive and be presented to a jury.

### A. Engagement in activity protected by the First Amendment.

A plaintiff asserting First Amendment retaliation must first demonstrate that the activity in question was protected by the First Amendment. Protected speech is that which deals with matters of "public concern;" the inquiry is a question of law. *Connick v. Myers*, 461 U.S. 138, 145, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). It is well established that the right to criticize public officials is at the heart of the First Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 269–70, 84 S.Ct. 710, 11 L. Ed. 2d 686 (1964). "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270, 62 S.Ct. 190, 86 L.Ed. 192 (1941). "[D]ebate on public issues should be uninhibited, robust, and wide-open, and ... it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.*, 376 U.S. at 270, 84 S. Ct. 710.

County Defendants offer no argument, and therefore concede that, Mr. Blake had a First Amendment right after he was arrested and while inside the Kenosha Secure Detention Facility, (hereinafter "KSDF") and before he was placed and kept in the ERC. Mr. Blake was arrested by Defendant Bissonnette and officers were aware that he continued with his silent protest while in their custody on April 25-26, 2021. PFOF ¶ 2-3. Bissonette testified that no one, including him, gave Mr. Blake his Miranda warnings. PFOF ¶ 6. Defendant Bissonnette further stated that he first asked Mr. Blake for his name after he was transported to the KSDF. PFOF ¶ 7. Mr. Blake continued to protest with his

silence. PFOF ¶¶ 2,4. Mr. Blake's silence was the motivating factor in Defendant Officers' retaliation against him and prompted them restraining Blake to the ERC for nearly seven total hours. PFOF ¶ 22. The Kenosha County Corporate Representative, Douglas Simpson, agreed that Mr. Blake was placed in the restraint chair **_because "the only thing he did not do was give his name and talk"_**. PFOF ¶ 8.

It is worth acknowledging that the Fifth Amendment also protects Mr. Blake's right to remain silent. Mr. Blake has a right to remain silent and routine booking information may be asked by police during the booking process. See *State of Wisconsin v. Bryant*, 2001 WI App 41 (collecting cases) (defining the "routine booking question exception" to *Miranda v. Arizona*, 384 U.S. 436 (1966)). However, regardless of whether the Fifth Amendment's protections were offered, Mr. Blake was clearly exercising his First Amendment right to remain silent. PFOF ¶ 1, 2, 4. This protected speech began prior to his arrest. *Id.*

Summary judgment is inappropriate because the parties have differing stories; yet, the record is clear that 1) Mr. Blake was inside the KSDF protesting with his silence in accordance with his First Amendment rights and was never combative, violent, or resisting; 2) Mr. Blake was placed and kept fully restrained in the ERC for nearly seven hours because "the only thing he did not do was give his name and talk", and 3) Defendant Officers are trained that the "ERC is intended to help control combative, self-destructive, or potentially violent detainees," but abandoned their training and put Mr. Blake in the ERC. PFOF ¶¶ 2, 4, 8, 22, 46, 47,.

### A. Mr. Blake's protest outside the Kenosha Public Safety Building is protected activity under the First Amendment

Defendant Officers argue that Mr. Blake's form of protest outside the KPSB was

not protected by the First Amendment because Blake purportedly blocked the entrance to the building. ECF 82, at 17. This statement is not only misleading, but it is patently false. Deputy Bissonnette deceptively claimed that "Blake and his fellow protestors prevented at least one citizen (Judith Devine) from entering the KPSB and that the protestors were refusing to leave the doorway until their demands to meet with certain officials were met." ECF 82 at 14; ECF 83, CDPF at ¶¶31-32. Defendants further state that, "Judith Devine, was unable to enter the PSB to obtain a copy of a police report because the protestors refused to move away from the doors." *Id.*

In direct contradiction to Defendant Officers' "smoking gun" argument, on March 10, 2025, Blake was found *not guilty* of the civil violation of disorderly conduct by a jury. *See* Declaration of Kimberley Cy. Motley, hereinafter "Motley Decl." at Exhibit 1; PFOF ¶ 11. Judith Devine, the citizen whom Defendants repeatedly claim was "prevented…from entering the Public Safety Building" testified at Mr. Blake's jury trial. ECF 82 at 14, PFOF ¶ 12. When asked if anyone prevented her from entering the Public Safety Building on April 25, 2021, Ms. Devine testified that "Oh, no. Absolutely not. Actually they (a men protesting) opened the door for me." PFOF ¶ 12. She further testified that no one prevented her from exiting the building either and that "[t]hey (the people protesting) asked if I wanted coffee when I was leaving." PFOF ¶ 13. Ms. Devine also testified that it would be "absolutely not" true if "there was a police report that said that (she) told the police that (she) was prevented from entering the building." PFOF ¶ 29.

The chasm between Defendant Officers' claim that Mr. Blake and the others were acting as an improper barrier for public access is categorically false. ECF 82 at 14. Not only that, but it serves as a significant dispute of material fact. One the one hand,

Defendant Officers assert they were justified in arresting Mr. Blake for his protest for impeding citizens like Ms. Devine, but on the other, that same witness has debunked their entire theory. Id., PFOF ¶¶ 12-14. Any way it is spun, Mr. Blake's constitutional right to protest peacefully was interfered with.

Furthermore, Kenosha Detective Allison George testified at the jury trial that Mr. Blake was arrested for disorderly conduct because "protestors," not Mr. Blake specifically, were preventing citizens Bonnie Cunningham and Judith Devine from entering or exiting the building. PFOF ¶ 15. But neither citizen was prevented from entering or exiting the building by Mr. Blake. Id., ¶ ¶17-18. George testified under oath that, "she wrote a report" and that she spoke with Ms. Cunningham who was "trying to submit a report (and that she) was prevented from entering the building by Mr. Blake." PFOF ¶ 16. At trial, Detective George was shown video footage of Bonnie Cunningham outside the KPSB and identified Mr. Blake as the person standing up the entire time wearing a red, black, and green mask away from the entrance. PFOF ¶ 17. For the entire video, Justin Blake and Bonnie Cunningham never once interact. Id. After watching this video in court, Detective George then completely changed her testimony stating that she "could not say for certain that Mr. Blake prevented anyone from entering the building." Id.

Similarly, contrary to his authored report, Deputy Bissonnette never witnessed Blake preventing anyone from entering or exiting the building and he never told Blake to move from the public sidewalk in front of the building. PFOF ¶ 19. Therefore, this Court should take judicial notice of the fact that he did not prevent anyone from entering or exiting the public building as a jury found Blake not guilty of that same conduct. PFOF ¶ 1.

Mr. Blake was peacefully protesting for police accountability–in the very city where his nephew was shot seven times—and did not block the entrance to the public building. PFOF ¶ 1. It is well-settled that police brutality and misconduct are matters of public concern. *Delgado v. Jones,* 282 F.3d 511, 519 (7th Cir. 2002); *Gonzalez v. City of Chicago,* 239 F. 3d 939, 941 (7th Cir. 2001). *See also Irizarry v. Yehia*, 38 F. 4th 1282, 1285, 1294 (10th Cir. 2022) (stating "the First, Third, Fifth, Seventh, Ninth, and Eleventh Circuits have all concluded that it is clearly established law that a journalist has the right to film the police performing their duties in public as late as 2019."). Therefore, Mr. Blake protesting outside the KPSB and then later inside KSDF is protected activity, and the first element has been satisfied.

### B. Suffering of a Deprivation Likely to Deter Future First Amendment Activity.

Next, Plaintiff must declare that "the alleged adverse action ... must be sufficient to deter an ordinary person from engaging in that First Amendment activity in the future." *Santana v. Cook Cnty. Bd. Of Rev.*, 679 F.3d 614, 622 (7th Cir 2012); *see also Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir 2011) ("We apply an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity.").

Defendants similarly do not argue that Mr. Blake did not suffer a deprivation likely to chill First Amendment activity likely because community members have a constitutional right to engage in protests. Being arrested and subjected to any level of force for peacefully protesting not only violates one's constitutional rights but also serves as a powerful deterrent to the exercise of First Amendment freedoms. *See Black Lives Matter Seattle-King Cnty. V. City of Seattle, Seattle Police Dep't*, 466 F. Supp.

3d 1206, 1213 (W.D. Wash. 2020) (finding police department's "use of less-lethal, crowd control weapons" on protestors "ha[d] surely chilled speech").

The actions of Defendant Officers against Mr. Blake who continued to silently protest inside the KSDF of (1) restraining Blake in the ERC for nearly seven hours because he did not "talk" (PFOF ¶ 2, 4, 8, 22); (2) arresting Blake for an obstruction allegation to which he was never charged (PFOF ¶ 10, 24); (3) giving Blake a larger bond of $450 when Barker and Cardinelli who also were protesting and arrested were only required to pay $150 bond (PFOF ¶24); all of these actions by Defendant Officers certainly sends a chilling message that Blake, in exercising his freedom of speech, right against self-incrimination, and right to remain silent could result in physical harm, effectively undermining his right to protest police accountability. PFOF ¶ 116. The adverse action (force) need not silence all community members, but it is sufficient if it would deter a reasonable person from protesting against the government under similar circumstances.

This element is not in contention and is therefore satisfied.

### C.    Causation.

The final element requires Plaintiff to demonstrate causation, which may be proven through direct or circumstantial evidence. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). Plaintiff need not show but-for causation, but only that the protected activity is **a motivating factor** in the defendants' conduct. *Massey*, 457 F.3d at 717 (emphasis added). Yet, the protected activity and adverse action cannot be completely unrelated. *Kidwell*, 679 F.3d at 966. To establish causation through circumstantial evidence, a plaintiff may present evidence of "suspicious timing, ambiguous oral or written

statements, or behavior towards or comments directed at other [persons] in the protected group." *Id.*, quoting *Long v. Tchrs.' Ret. Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009).

Defendants mislead this Court to believe that Mr. Blake was criminally charged with a misdemeanor disorderly conduct and obstruction offense. ECF. 82 at 11. Specifically, Defendants cite to Wis. Stat. 946.41(1), the criminal statute for obstruction, and argue that,

> "there is no question that Blake was obstructing officers by refusing to comply with their commands, refusing to answer safety questions, and refusing to allow jail staff to complete the booking process." ECF 82, at 14

This is purposefully false as Mr. Blake was *never* criminally charged with any misdemeanor crimes. PFOF ¶ 10, 23. Instead, Blake was ticketed for a Kenosha County municipal ordinance violation, Disorderly Conduct 9.947.01, of which he was found not guilty. PFOF ¶ 10, 11. Defendant Bissonnette, the arresting officer, did not have the legal authority to book and arrest Mr. Blake on these meritless allegations because of the lack of probable cause. PFOF ¶ 23, 25. Bissonnette offered conflicting testimony about the arrest and stated that on the one hand after handcuffing, but before asking Blake for his name, "he was told to arrest [Blake] for" obstruction and disorderly conduct. PFOF ¶ 26. Later, Defendant Bissonnette changed his testimony, contradicting himself and testified that the basis for the obstructing charge was "because he refused to identify himself" after he was arrested. *Id.,* ¶ 27. Ultimately, Mr. Blake was never charged with obstructing as the arrest was baseless. PFOF ¶10, 23.

Defendant Officers' argument that they arrested Mr. Blake for disorderly conduct because "Blake and his fellow protestors prevented at least one citizen (Judith Devine) from entering the KPSB and that the protestors were refusing to leave the doorway until

their demands to meet with certain officials were met" is untrue. ECF 82 at 14.   To recap, on March 10, 2025, at a trial on the municipal violation, where Blake was found *not guilty*, Judith Devine, testified that:

1.   No one prevented her from entering the building and in fact, a male protestor, "actually they opened the door for me." PFOF ¶12-13

2.   She did "actually enter that door" and was "able to get (her) report. PFOF ¶ 28.

3.   And it was "absolutely not" true "if there was a police report that said that (she) told police that (she) was prevented from entering the building," and that she "didn't see any police" either outside or inside the building that day.  PFOF ¶ 29.

Once Mr. Blake was arrested, he continued his silent peaceful protest, was neither combative nor resistive and was put in the ERC for hours. PFOF ¶ 4, 5, 47.

When Defendant Haynes, who assisted in placing and keeping Blake restrained in the ERC, was questioned about Rusten Shensky, the officer who shot Mr. Blake's nephew seven times, Haynes testified that he "felt bad" and that it was "very rough for (Shensky) and he would not want to walk a mile in his shoes." PFOF ¶ 30. Conversely, when asked if Defendant Haynes also "felt bad" for Jacob Blake, for being shot seven times and nearly killed in front of his three children, he testified,

"I don't know the answer to that because, again, there isn't a clear thing on what was the follow up to the event. News and media only blasted the fact that he was shot as he was, you know, trying to take care of his kids. So, you know, without knowing the total circumstance I can't answer that wholly."

PFOF ¶ 31.
Haynes further expressed his resentment as to how **he** was negatively impacted by what he termed as the "Jacob Blake" shooting and said:

"as detention personnel we had to walk through this (protesting) every day. It got to the point where we had to bussed in instead of driving to work like

a normal day. We had to be bussed in. We parked our cars out at KCDC.
So, the whole ordeal just -- it turned into a nightmare for Kenosha County."

PFOF ¶ 32.

Defendant DiCello testified how "annoyed" he was after the riots in Kenosha as he had to "arrive at KCDC normally at least an hour to an hour-and-a-half before shift started," and they had to be "bussed into the pretrial facility" because "they couldn't guarantee safety (for) our vehicles or us." PFOF ¶ 33.

The important takeaways from Haynes and DiCello's testimony is that the Defendant Officers were resentful of Mr. Blake's peacefully protesting the failure to hold the officer accountable for nearly killing his nephew and as a result they used the opportunity to punish him from the "nightmare" that Kenosha County was put through. PFOF ¶ 32. As a result, Mr. Blake was arrested for non-criminal disorderly conduct and obstruction, was punished for not saying his name, despite officers May, Bissonnette, and Haynes knowing who he was, and then he was placed and kept restrained in the ERC for hours. PFOF ¶ 5, 8, 22. The actions of Defendant Officers of arresting, and then subsequently restraining Mr. Blake in the ERC for nearly seven hours for silently protesting, forcing him to pay a bond of $450, could cause a reasonable person to question whether their constitutional right to protest is worthwhile. PFOF ¶¶ 5, 8, 24. Such a result is exactly what the First Amendment retaliation claim seeks to prevent.

The First Amendment protects the "right of the people peaceably to assemble." U.S. Const. Amend. I. "The amount of access to which the government must give the public for First Amendment activities, and the standards by which a court will evaluate limitations on those rights, depends on the nature of the forum at issue." *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021). In a

traditional public forum, such as a street or park, restrictions on the time, place, and manner of First Amendment activity may be imposed so long as they are content-neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication of the information. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Interestingly, but not all that surprising is the fact that the Defendant officers knew who Mr. Blake at least forty minutes before he was brought to Zone 1. Sgt. Ken Krentz at 10:20p.m. on April 25, 2021, sent an email to Defendant Officers informing them that "3 subjects were taken into custody, including Justin Blake, Joe Cardinali, and Jonathan Barker. All 3 were taken without incident." PFOF ¶ 36; ECF. 73-10.

In an email regarding Mr. Blake's arrest at 12:49 a.m., Defendant May emailed that the person arrested "is believed to be Justin Blake; a community activist and uncle of Jacob Blake." PFOF ¶ 38. Defendant May doubled down on his identification of Blake and put the same description of Blake on his incident report at 12:50 a.m. PFOF ¶ 39.

Shortly after arresting Blake, Defendant Bissonnette, who saw numerous media reports, called the jail and let them know that "I might have arrested Justin Blake and was told by staff that they would "make a note of it." PFOF ¶ 40.

At 3:20 a.m., while Mr. Blake was in his fourth hour of silent protest and still in the ERC, Sgt. Ryan Murkowski sent an email to Defendant Officers, positively identifying Justin Blake as the person that was still in custody and "refus(ing) to talk." PFOF ¶ 41.

Four minutes later, at 3:24 a.m. Defendant May forwarded his email to Murkowski where May described , "Justin Blake; (as) a community activist and uncle of Jacob Blake." PFOF ¶ 42.

How can Defendant Officers claim that they "did not know Blake" and that placing him in the ERC from approximately 11:00 p.m. to 5:45 a.m. was somehow for their "safety" due to the lack of identification when it is clear that they did know Mr. Blake's identity? ECF 82 at 10. This not only suggests a serious dispute of material fact but highlights how desperate Defendant Officers are to sway this Court improperly.

Equally as damaging for County Defendants is Defendant Bissonnette's arrest sheet. Bissonette arrested Mr. Blake at 11:08 p.m., writing on the arrest sheet that night that he had arrested Justin Blake, and mentioning his name no less than twenty times. PFOF ¶ 37. ECF 79-3 at 1-2.

The truth is that Defendant Officers knew who Mr. Blake was before he was placed into the ERC and forced him to remain in the ERC using "safety" as a pretext despite their knowledge. Defendant Officers were also equally aware that Mr. Blake continued his silent protest after his arrest and retaliated against him by placing him in the ERC for not "giv(ing) his name and talk(ing)." PFOF ¶¶ 2, 4, 5, 8, 34, 41. Defendant Haynes testified that at one point he briefly took Mr. Blake out of the ERC and "pleaded with (Blake)" that he "did not want to be a part of whatever this turns into." PFOF ¶ 149.

The fact that the record contains a volume of evidence proving that the Defendant Officers knew who Mr. Blake was dispels any argument that the ERC's use was reasonable or even necessary. Instead, the ERC was used as punishment and in retaliation for Mr. Blake's protest against police brutality. Defendant Officers argue that they could not have possibly retaliated against Mr. Blake because they were "concerned for his safety." ECF 82 at 10. As evident in the record, there exists as least four email communications and police reports during the relevant time period where Defendant

Officers identified Mr. Blake as one of the peaceful protestors who was arrested. PFOF ¶¶ 36-39, 41-42. Additionally, Defendant Haynes testified that he knew who Justin Blake was when he was arrested on the night of April 25th. PFOF ¶ 43. Defendant Officers incredulously want to insult the intelligence of this Court to believe that they had no idea who Mr. Blake was and therefore they were left with no other choice but to violate their own policies and the law and put Mr. Blake in the ERC for "safety reasons". ECF 82, at 10. The officers repeatedly violated Mr. Blake's constitutional rights and used his silence during the protest as a pretext to arrest him for a meritless obstruction civil infraction and further retaliated against him by placing and keeping him restrained in the ERC for hours; all because they were "burdened" by Kenosha's "nightmare" over the Jacob Blake shooting. PFOF ¶ 22, 32, 118.

Mr. Blake, whom every single officer acknowledged was not combative and never physically resisted, was punished and forced into the ERC. PFOF ¶ 47.

Because a properly instructed jury can reasonably infer that the Defendant Officers had underlying intentions to stifle Mr. Blake's First Amendment right to protest and remain silent, and because that same jury can reasonably infer that Blake's activities were a substantial or motivating factor in their arresting and/or placing and keeping him in the ERC, the First Amendment retaliation claim must proceed to trial.

## II. Defendants Bissonnette, DiCello, Galvan, Haynes, and May Violated Blake's Fourth and Fourteenth Amendment Rights Against Excessive Force and Arrest. (Claim 5).

Because Mr. Blake was a pre-trial detainee at the time of the incident, his excessive force claim falls under the Fourteenth Amendment's Due Process Clause rather than the Eight Amendment's Cruel and Unusual Punishment clause. *Lewis v.*

*Downey*, 581 F.3d 467, 473 (7th Cir. 2009).[3] In the Seventh Circuit, summary judgment is to be used sparingly in excessive force cases where, as here, the parties' versions of the facts differ sharply. *See Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (holding that "since the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'")(citations omitted). Courts in this Circuit consistently adhere to this rule. *See, e.g., Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 n. 4 (7th Cir. 2012) ("We certainly agree that summary judgment is frequently inappropriate in excessive force cases.").

The Fourteenth Amendment's Due Process Clause "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473, 192 L. Ed. 2d 416 (2015). To determine whether the force was objectively unreasonable, courts must take into account the particulars of each case, considering "the perspective of a reasonable officer ... including what the officer knew at the time." *Id.* Courts also must consider the government's "need to manage the facility" and defer to the "policies and practices [that] ... are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 540, 547, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979); *Kingsley*, 135 S. Ct. at 2473. A claim that police officers used excessive force while making an arrest, investigatory stop, or other seizure is analyzed under the Fourth Amendment's "objective reasonableness"

---

[3] Plaintiff concedes that its Sixth Claim of Cruel and Unusual Punishment may be dismissed.

standard. *Graham v. Connor*, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989). The ultimate question in analyzing a particular use of force is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

In order to make such a determination as to the amount of force used, "[t]he law requires an assessment of the totality of the facts and circumstances, which includes consideration of 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Estate of Smith v. City of Milwaukee*, 410 F. Supp. 3d at 1071, quoting *Strand v. Minchuk*, 910 F.3d 909, 914-15 (7th Cir. 2018), *cert. denied,* 139 S. Ct. 1629, 203 L.Ed.2d 900 (2019); *Muhammed v. City of Chicago*, 316 F. 680, 683 (7th Cir. 2002)("Deadly force may be used if the officer has probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape.") quoting *Tennessee v. Garner*, 471 U.S. 1, 11-12, 105. S. Ct. 1694, 85 L.Ed.2d (1985). Thus, as applied to the present case, this means that Justin Blake has a constitutional right to not be forced into the ERC if he did not put anyone else in imminent danger or attempt to resist arrest for a serious crime. *Weinmann v. McClone*, 787 F.3d at 447. The discussion of each of the three potential factors for the Court to consider as to amount of force used demonstrates that the Defendant Officers did not have a proper justification to use the ERC and thus, the force applied was objectively unreasonable and excessive.

**A. Mr. Blake was not combative, violent, or resistive and the force used was objectively unreasonable.**

Pursuant to the training manual for the ERC, "The Emergency Restraint Chair (E.R.C.) is intended to help control combative, self-destructive, or potentially violent detainees." PFOF ¶ 46. Every Defendant Officer, Jessica Bergmann, and the Kenosha County Representative agrees that Mr. Blake was never combative, self-destructive, or potentially violent before, during, or after he was placed in the ERC. PFOF ¶ 47. Additionally, according to the KSD Response to Resistance and Aggression Policy 511, Defendant Officers are trained to, "only use the minimum amount of force reasonably necessary to achieve the objective for which force is used. PFOF ¶ 148.

The use of a restraint chair is excessive where the person being restrained has not "refused orders to cooperate [and] stand up." *See Hokamp v. Miller*, No. 21-CV-1125-JPS, 2023 WL 129793, at *13 (E.D. Wis. Jan. 9, 2023), quoting *Cibulka v. City of Madison*, 448 F. Supp. 3d 1002, 1024 (W.D. Wis. 2020), aff'd, 992 F.3d 633 (7th Cir. 2021). Not a single Defendant Officer alleges that Mr. Blake was combative, violent, or that there was a medical reason to place him in the ERC for nearly seven total hours. Furthermore, the County Defendants' motion is devoid of any rationale excuses as to why a "quiet and calm" Blake, who was detained for noncriminal disorderly conduct and obstruction allegations, was restrained in the ERC for nearly seven hours. PFOF ¶ 3, 22, 61. The only reason identified by Defendant Officers is that Mr. Blake somehow posed a safety risk to himself or others. ECF 82 at 10. And this statement is not backed up by policy. Mr. Blake was no safety threat, because, if he truly were as Defendants allege, he would never have been allowed to keep on his sweatshirt, shoes, socks, pants, watch, and belt – which are all items that a person is prohibited to wear if they are placed into the ERC. PFOF ¶ 78, 102. Defendant May testified that Mr. Blake was put in the ERC with the restricted items

because he was "a high-profile inmate", despite also claiming to not know who Mr. Blake.
PFOF ¶ 120. May testified that,

> "The fact that he may have been Justin Blake, a high-profile, potentially high-profile inmate, like I said before, if we're physically removing items, it causes the issue of harm to staff, you know, injuries to staff, injuries to the subject and would not. So, the best option was to put him in the chair. Everything was on camera." *Id.*

The nonsensical argument that Mr. Blake was a safety concern is mitigated entirely by how accessible ligatures were to Mr. Blake. Ironically, pursuant to Kenosha's Inmate Reception policy on dealing with high-profile persons, it states that "high-profile offenders should not be treated differently than other inmates". PFOF ¶ 108.

According to Kenosha Sheriff's Department Operational Policy 407 on the use of an Emergency/Safety Restraint Chair it states that :

> "The restraint chair will be used to temporarily restrain and/or transport combative inmates for safety reasons." PFOF ¶ 52.

The only excuse Defendants provide for placing Mr. Blake in the ERC was "for safety reasons" but every single Defendant acknowledges that he was never combative. ECF 82 at 10. And the cases Defendants cite are not on point. For instance, Defendants cite to *Cibulka* to try to argue that the use of the chair was appropriate. ECF 82 at 22. In *Cibulka*, the plaintiff was told to "stand up and come to segregation", but he refused and began to actively resist. *Cibulka v. City of Madison*, 448 F.Supp.3d at 1014-1015, 1024. There, the jail officials told plaintiff that they would use the ERC if he did not get up but he continued to resist. *Id.* Because the *Cibulka* continued to resist, the officers used the ERC to transport him from the booking area to a segregation cell. *Id.* Importantly, the jail's nurse came to check on the plaintiff and confirmed that he was safely and properly secured in the ERC, for no more than two hours. *Id.*, at 1015.

Additionally, *Hokamp* likewise is no help to Defendants. ECF 82, at 23. In *Hokamp*, upon arrival to the jail, the plaintiff refused to exit the squad car, was agitated, aggressive, and was yelling "rape." *Hokamp v. Miller*, No. 21-CV-1125-JPS, 2023 WL 129793, at *13 (E.D. Wis. Jan. 9, 2023). *Id.* When plaintiff was placed in the ERC, she continued to yell, curse, and physically resist. *Id.* Moreover, the court found that five hours in the chair was not excessive because the plaintiff was continuously monitored by the jail's medical staff, refused to exit the squad car, was agitated, aggressive, yelling, and screaming "rape," the court found that the use of the ERC was not excessive. *Id.*, at *13-14.

This case is nothing like *Cibulka* or *Hokamp* - where the use of the ERC was appropriate for a physically violent, combative, resisting detainee when the detainee was monitored by the jail's medical staff. Here, even the Kenosha County Corporate Representative, Douglas Simpson, agreed that Mr. Blake was placed in the restraint chair **_because "the only thing he did not do was give his name and talk"_**. PFOF ¶ 8. Mr. Blake never resisted, was not combative, was not violent, was not screaming, did not claim to be suicidal, was not monitored by the jail's medical staff, and was placed in the chair without incident. PFOF ¶ 47.

Defendant May, who ordered that Mr. Blake be placed in the ERC, admitted that "the policy doesn't say that you can use (the ERC for) noncombative inmates." PFOF ¶54.

The following table shows the views of all Defendant witnesses noting Blake was not combative and his consistent cooperation before and while he was in the ERC:

| WITNESS | Jacob Blake not combative, violent, or resistive |
|---------|--------------------------------------------------|
| Jeremy May | Blake did not physically resist, (he) was not violent, was not combative, did not say he was suicidal, and was put in the chair without incident. PFOF ¶ 53. |

| | |
|---|---|
| Kyle Bissonnette | When placing Blake under arrest he was cooperative and was not violent, aggressive, resistive, or combative. PFOF ¶ 55. |
| Gloria Galvan | Did not recall Blake physically resisting, combative, or violent on April 25 or April 26, 2021. PFOF ¶ 56. |
| Deeremeyun Haynes | Did not witness Blake being violent, combative, aggressive, did not think he was under the influence of drugs, and did not think he was suicidal. PFOF ¶ 58. |
| Jacob DiCello | Did not recall Blake being combative, aggressive, violent, or physically resistive. PFOF ¶ 59. |
| Douglas Simpson – Kenosha County Representative | There is nothing in the reports that suggests that Mr. Blake was uncooperative, combative, physically resisting, suicidal, self-destructive, or on any type of drugs. PFOF ¶ 60. |

While Mr. Blake stood "quiet and calm," as described by Nurse Bergman,[4] supervising Defendant May directed his officers to, "Put (Blake's) ass in the damn chair!" PFOF ¶ 61, 62. The "chair" that Defendant May was referring to was the ERC, a mechanical chair made of metal, thick hard plastic, and nylon that secures a person's arms, shoulders, waist, and ankles with restraints that was purchased by Kenosha County in the late 1990s. PFOF ¶ 63. Mr. Blake's shoulders, arms, wrists, waist, and ankles were tightly strapped in the ERC for hours while being forced to sit upright. PFOF ¶ 64.

Placing Mr. Blake in the ERC was an excessive use of force. PFOF ¶ 66. And it was not an emergency situation, nor was he placed in the chair for any medical purpose. PFOF ¶ 67. Mr. Blake was finally released from the chair at around 5:38 a.m. *only* because he identified himself. PFOF ¶ 68. Bissonnette upon arresting and bringing in Mr. Blake had already filled out the medical screening form prior to his placement in the ERC and noted that he did not have Tuberculosis. *Id.* After Mr. Blake said his name, and

---

[4] Plaintiff dismissed Jessica Bergmann from this claim but she is a fact witness to the actions of the other Defendant Officers.

despite the supposed concerns for his safety, Simpson testified that the officers never took his belt, hoodie, or shoelaces. PFOF ¶ 70. Plain and simple, Mr. Blake was placed in the ERC as punishment.

A timeline of the events is important to assess the totality of the circumstances. Defendant Bissonnette arrests Mr. Blake at 9:40 p.m. for municipal ordinance violations and conducts a search of him. PFOF ¶ 3; ECF 83, CDPF ¶ 47. Bissonette leads Mr. Blake, who is handcuffed, into the KSDF at 11:07:19 p.m., with two other officers including Defendant DiCello who performs another search of Mr. Blake. PFOF 3, 71; ECF 83, CDPF ¶ 65.



PFOF ¶ 71.

At 11:07:46 p.m. Blake is seen standing with his hood on his head, sunglasses, and a facemask surrounded by several officers, handcuffed, wearing a "Justice for Jacob Blake" hoodie, with Defendant DiCello to his left and Bissonnette to his right.



ECF 83, CDPF ¶ 65; PFOF 72.

Next, at 11:09:27 p.m., Mr. Blake remains handcuffed and continues to stand calmly while Defendant DiCello removes his hood and his sunglasses without issue.[5] ECF 83, CDPF ¶ 68; PFOF ¶ 73.



Then at 11:10:23 p.m. upon the orders of Defendant May, the ERC is retrieved by Defendant Galvan. Mr. Blake is flanked by Defendants Haynes and DiCello, calmly

---

[5] Four other officers pictured including Defendant Bissonnette and Haynes, observe.

walks, while three officers including Bissonnette and May continue to observe. ECF 83, CDPF 70 ; PFOF 74.



The video continues at 11:11:22 p.m., less than 1 minute later, showing a still non-combative, cooperative Mr. Blake who continues to be handcuffed, at the orders of May, **being led to sit down in the ERC**, surrounded by eight officers including Defendants Haynes, DiCello, Bergman, Galvan, and Bissonnette. ECF 74-9 at 07:57 ; PFOF ¶ 73.



Despite all of Mr. Blake's cooperation, less than four minutes after having walked into the KSDF, at 11:11:26 p.m., Below is a picture, as identified by Gloria Galvan during

her deposition, of the Defendants DiCello, Galvan, and Haynes[6] participating in strapping Blake in the ERC because of his silence.  PFOF ¶ 48, 76.



And it is curious why there is such a large audience for an unknown man to be placed in an ERC.  There is no conceivable reason for Mr. Blake to have been strapped to an ERC, which according to the KSD ERC Policy 407 and the ERC Training Manual is supposed to be "used to temporary restrain and/or transport combative inmates," other than for direct punishment in exercising his constitutional rights. PFOF ¶¶ 46, 52.

And finally, at 11:15., Mr. Blake is strapped and fully restrained in the ERC, is wheeled away by Defendant DiCello and placed in a locked holding cell. PFOF ¶ 77.

---

[6] Defendant Kyle Bissonnette is also pictured with his back to Blake in the photograph but was not identified by Gloria Galvan during her deposition.



The record is overflowing with evidence for a reasonable jury to find that the force used against a non combative or resistive Mr. Blake who was restrained in the chair, for nearly seven hours, will wearing prohibited items was objectively unreasonable. PFOF ¶ 46, 47, 52, 78.

Defendants also falsely claim that their only reason for using the ERC was because they had "no reasonable alternative" to gain Blake's compliance with the booking process. ECF 82, at 25. This is a false and misleading statement that contradicts sound evidence. Plus, case law is clear that obtaining mere compliance is not enough to warrant the use of force of a restraint chair. *See Cibulka v. City of Madison*, 448 F.Supp.3d at 1014-1015, 1024 (concluding that the use of the restraint chair was a reasonable use of force because the detainee refused to walk himself to the segregation cell after being noncooperative in the booking process and become violent, aggressive, and began resisting). Because the use of force must be exercised in proportion to the threat posed, this court should deny defendants summary judgment on Blake's Fourteenth Amendment excessive force claims. See *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) ("Force is

reasonable only when exercised in proportion to the threat posed") (internal citations omitted).

Besides, in comparing the facts taken in the light most favorable to Mr. Blake, as well as the facts asserted by Defendant Officers, this Court should find it near impossible to claim that there exists no dispute of material fact. In addition to every Defendant Officer noting that Blake was never combative, the Court also has the benefit of the surveillance video which is the best evidence here; Mr. Blake is never seen resisting, is never observed as combative, violent, or dangerous. ECF 74-9, PFOF ¶ 47. For these reasons, a reasonable jury could conclude that use of the ERC was excessive force in violation of Mr. Blake's constitutional rights.

### B.    Mr. Blake was not placed in the ERC for medical or safety reasons.

Defendants argue that "Blake refused to answer critical medical and mental health questions that were necessary for booking, he refused to identify himself, and he refused to remove prohibited items necessary to hold him in a cell without use of the ERC." ECF 82, at 10. This is untrue. Defendants do not offer a single citation to testimony from any of the Defendants stating that Mr. Blake refused to answer any medical and mental health questions. PFOF ¶ 79. That is because it does not exist. Plus, Nurse Bergmann succinctly testified that, Blake "was not placed in the (chair) for medical reasons." PFOF ¶ 67.

Per Suicide Watch Procedure 413, Defendants are aware that if they really had any medical or mental health concerns regarding Blake that the officers would have been required to complete a "Medical/Mental Health Screening Visual Observation Report." – which would not have required any answers from Blake. PFOF ¶ 80. Per the policy, Defendant May and other supervisors would have been required to order that a Mental

Health Risk Assessment Form be completed. PFOF ¶ 81 at 2. Also, per the policy they would have been required to place Mr. Blake on suicide watch. *Id.* Furthermore, per the policy, officers would have been required to remove Mr. Blakes clothing and place him in a safety gown. *Id.* at 3. And finally, per policy, officers would have been required to refer Mr. Blake to a mental health professional as soon as practical. *Id.* Not a single action per the Suicide Watch policy happened because Blake's potential medical or mental health condition was of no moment to the Defendants. *Id.*, ¶ 80, 81.

Additionally, Defendant Officers and Nurse Bergmann acknowledge that they never bothered to ask him any medical questions, nor did they see anyone attempting to ask Mr. Blake any medical questions. PFOF ¶¶ 67, 83-85. The only "evidence" produced is self-serving and inconsistent with prior testimony. Defendant Bissonnette, the arresting officer of Mr. Blake, curiously signed a declaration stating that "at no point did (Blake) answer health questions required for booking." ECF 79, at 2. Conversely, Bissonette testified that he did not witness any health questions being asked of Blake and that "he would assume" that Blake was asked such questions as part of the booking process but could not recall. PFOF ¶ 85 Nurse Bergmann could not recall conducting a medical assessment of Blake nor asking him one single question medical or otherwise, . PFOF ¶ 84.

For some inexplicable reason, Defendant's DiCello also signed a declaration that states "at no point did (Blake) indicate he was uncomfortable while sitting in the ERC," and "he did not indicate that he was in pain while sitting in the ERC ." ECF 76, at ¶¶ 8-9 However, DiCello also testified that he "does not recall" if he or anyone else, asked Blake

if he was in pain or discomfort while in the ERC, because his "comfort is not our priority." PFOF ¶ 86.

Douglas Simpson, agreed that Mr. Blake was placed and kept in the restraint chair **because "the only thing he did not do was give his name and talk"**. PFOF ¶ 8. While Mr. Blake may not have said his name, Defendant Officers clearly knew his name. PFOF ¶¶ 34-43. Defendant May testified that another purported reason for keeping Blake in the ERC was for "safety reasons" and that prior to being put in the ERC there was a FastID conducted that did not come back with any information. PFOF ¶ 94. This is also false. FastID is a data tool that requires a person's fingerprint to track particular data. PFOF ¶ 93. Despite the fact that Mr. Blake cooperated in providing his fingerprint, not one single Defendant Officer knows who supposedly conducted the FastID check of him. PFOF ¶ 95.

Mr. Blake was never told that if he "did not cooperate" and speak that he would be placed in the ERC. PFOF ¶ 96. Conveniently, not a single officer audio recorded conversations with Blake despite them having the means to do so. Furthermore, Blake testified that after being in overwhelming "extreme pain for a prolonged amount of time," he had no choice but to say his name. PFOF ¶ 97. At that point, he was released from the ERC. *Id.*

Continuing on the flawed theory that Mr. Blake was required to sit in the ERC for safety reasons, he was not asked to remove any "prohibited items" when he was released from the chair. ECF 82 at 10. The video of Mr. Blake walking into the detention facility to be booked and placed in the cell clearly shows that he is cooperative and was not combative throughout the entire process. ECF 74-9. Mr. Blake was wearing sunglasses,

a face mask, hooded sweatshirt with ties, shoes with laces, and pants with a belt. PFOF ¶ 98. The sunglasses were removed, face mask was taken off, and the hood of his sweatshirt was lowered all without incident. *Id.*

Considered in the light most favorable to Mr. Blake, a reasonable jury could conclude that he did not pose an immediate threat to anyone and that the use of the ERC was excessive force in violation of his constitutional rights.

### C. Mr. Blake being placed and kept in the ERC for nearly seven hours was objectively unreasonable and excessive.

An officer may not use excessive force "against a non resisting or passively resisting subject." *Coder v. Giese*, No. 21-CV-109-WMC, 2023 WL 4637129, at *5 (W.D. Wis. July 20, 2023), quoting *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018); *Abbot v. Sangamon Cnty., Ill.,* 705 F.3d 706, 727 (7th Cir. 2013). And "[f]orce is reasonable only when exercised in proportion to the threat posed," *See Cyrus*, 624 F.3d at 863 (internal citations omitted).

Kenosha County Representative, Douglas Simpson, testified that there were other less restrictive measures that could (and should) have been utilized but were not. PFOF ¶ 100. Simpson testified that Mr. Blake clearly walked in the jail with no resistance and there was no evidence that Blake stiffened, purposefully stopped walking or showed any sort of "dead weight." PFOF ¶ 101. Other less restrictive uses of force measures that officers could (and should) have taken include simply asking Blake to take off his shoe and sweatshirt to gain compliance; officers could have placed Mr. Blake in the padded observation room – as Bissonette acknowledged doing for other inmates; officers could have placed him in the change out room, as Defendant DiCello acknowledges doing for other combative inmates; officers could have sought counseling for Mr. Blake; officers

could have handcuffed him to the wall; pursuant to the KCSD Inmate Reception policy and Defendant May's declaration that Mr. Blake was a "high-profile detainee," he should have been placed in specialty housing; or officers could have simply released him from custody for the municipal tickets for which persons are routinely never arrested or even jailed. PFOF ¶¶ 100, 103-108.

Defendant May approved the use of the ERC, stating that, despite the policy clearly acknowledging that the ERC is a use of force, May testified that he did not know "that placing someone in the restraint chair is a use of force" and that he "didn't consider it as use of force." PFOF ¶ 110, 124.  May further testified that after working with the KSD for over fifteen (15) years, Mr. Blake was the first time that he *ever* "used the restraint chair for someone (who was not) speaking." PFOF ¶ 113.  It is clear from Defendant Officers that the ERC was rarely - if ever - used for an individual electing to remain silent:

| WITNESS | Mr. Blake was the first person who Defendant Officers ever put in the ERC for not speaking |
|---|---|
| Kyle Bissonnette | After working in KSD for over seven (7) years he could not remember ever putting someone in the ERC solely because they did not verbally respond to questions. PFOF ¶ 112. |
| Gloria Galvan | She didn't know why Blake was being put in the ERC and also did not bother to ask. PFOF ¶ 114. |
| Deeremeyun Haynes | After working for the KSD for over ten (10) years he does not know one single person who was put in the restraint chair for not speaking and/or for refusing to remove their belt, shoes, or hoodie. PFOF ¶ 115. |
| Jacob DiCello | He was not trained that everyone who does not verbally speak is to be put into the ERC. ECF 73-5, at 94:19-22. |

Mr. Blake being restrained in the ERC for nearly seven hours was an objectively unreasonable amount of force. It was clear, that while Mr. Blake was in the ERC that he was in pain. PFOF ¶ 116. The jail video captures the limited painful movements that Blake could make while restrained in the ERC that showed his legs shaking, flexing his hands, head moving up and down as well as side to side. ECF 74-11, 74-12, 74-13, 74-14. Also, according to the ERC training and as displayed on a brightly florescent WARNING sticker on the back of the ERC, a person is not to be "in this (ERC) chair for more than TWO hours." PFOF ¶ 117. The evidence is clear that Mr. Blake was kept in the ERC for nearly seven hours and at one stretch was not taken out of the chair for nearly four hours. PFOF ¶ 118-119. This constitutes excessive force.

Mr. Blake was not resisting, was not combative, and there were no safety or medical concerns that justified restraining Mr. Blake to the ERC. PFOF ¶ 47. Mr. Blake cooperatively walked into the KSDF and sat in the chair as instructed, all while silently protesting. PFOF ¶¶ 2, 4, 47, 54-60, . Because there are substantial issues of fact, a properly instructed jury can reasonably infer that the Defendants' use of force of placing Mr. Blake in an ERC for nearly seven hours was objectively unreasonable and constituted excessive force. For these reasons, the Court should deny summary judgment and allow this case to proceed to trial on the merits.

### III. Blake's Failure To Intervene Claim Survives Because Defendant Officers Knew The Use Of The ERC Violated Blake's First, Fourth And Fourteenth Amendment Rights. (Claim #7)

Defendant Officers failed to intervene when Blake was illegally and unconstitutionally placed in the ERC as retaliation for his right to remain silent. "[U]nder certain circumstances, a state actor's failure to intervene renders him or her culpable under § 1983." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). To succeed on a claim

for failure to intervene, a plaintiff must demonstrate that the defendants "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). A realistic opportunity to prevent it includes telling officers to stop their action. *Stewardson v. Biggs*, 43 F.4th 732, 736 (7th Cir. 2022) (quoting *Yang*, 37 F.3d at 285).

### A. Defendant Officers knew that a constitutional violation was taking place against Mr. Blake.[7]

Defendant Officers knew the use of the ERC violated Blake's First, Fourth, and Fourteenth Amendment rights because all Defendants have failed to articulate a justifiable reason for its use in the first place. The use of the ERC cannot be used to obtain mere compliance with answering questions; there has to be more than a detainee who has decided to remain mute. PFOF ¶ 8; *Cf. Cibulka v. City of Madison*, 448 F.Supp.3d at 1014-1015, 1024, (concluding that the use of the restraint chair was a reasonable use of force because the detainee refused to walk himself to the segregation cell after being noncooperative in the booking process and becoming violent, aggressive, and resisting). Because the use of force must be exercised in proportion to the threat Mr. Blake posed— which was none, based on the available video evidence - Defendants Officers knew that a constitutional violation was being committed. PFOF ¶ 131, 132, 148.; *See Cyrus*, 624 F.3d at 863 ("Force is reasonable only when exercised in proportion to the threat posed") (internal citations omitted).

### B. Defendant Officers had a realistic opportunity to prevent use of the ERC on Mr. Blake for nearly seven total hours but did nothing.

---

[7] Defendant Jessica Bergmann is also a named party on this claim and Plaintiffs will fill a Motion in Opposition to her Summary Judgment. ECF 70.

Defendant Galvin, who retrieved the chair, testified that Defendant May issued the order to put Blake in the ERC but she could not remember why. PFOF ¶ 113. Defendant Officers all had a realistic opportunity to question the other officers' choice and rationale for putting Blake in the ERC but did nothing. PFOF ¶ 122.

Defendant May, as the supervising officer, approved use of the restraint chair, ordering his officers to "put his ass in the damn chair." PFOF ¶ 62. Defendants Haynes, DiCello, and Galvan dutifully followed May's unlawful orders, strapping Mr. Blake into the chair for nearly seven total hours and never voicing any concerns, never tried to intervene. PFOF ¶ 76, 77118, 122. It was only after a pained Blake, having been restrained in the chair for hours, said his name that he was let out of the ERC. PFOF ¶ 97, 116.

Kenosha County Use of Force Policy 300 provides:

"any officer who witnesses another officer or person using objectively unreasonable force has a duty to 1) intervene and 2) is required to report these observations to another supervisor." PFOF ¶ 123.

A reasonable juror could conclude that the Defendant Officers violated Mr. Blake's constitutional rights by using objectively unreasonable force against him and they had seven hours to intervene and never once did. PFOF ¶ 122. Therefore, the failure to intervene claim should not be dismissed.

## IV.    The Defendants Officers are not entitled to Qualified Immunity.

The County Defendants wrongly raise the argument that its officers are entitled to qualified immunity for injuring and violating Mr. Blake's constitutional rights. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.

Ct. 808, 172 L.d.2d 565 (2009)(emphasis added). Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Pekrun*, 172 F. Supp. 3d at 1048 (citations omitted).

Once the defense of qualified immunity is raised, a plaintiff "must show (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time so that it would have been clear to a reasonable officer that her conduct was unlawful in the situation." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (explaining that "qualified immunity shields from liability [defendants] who act in ways they reasonably believe to be lawful"); *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016); *Weinmann*, 787 F.3d at 447.

While the Supreme Court's case law "do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79, 137 S. Ct. 548, 196 L.Ed.2d 463 (2017) (internal citations omitted). "In other words, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L.Ed.2d 271 (1986).

### A. The Facts Show that Mr. Blake's Constitutional Right to be Free from Excessive Force were Violated.

Under the Supreme Court precedent, the first prong of inquiry for this Court is to determine whether the officers used excessive force, and thus violated Cole's Fourth Amendment constitutional rights, pursuant to *Tennessee v. Garner*, 471 U.S.1, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985), *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989), and their related progeny. *See Strand*, 910 F.3d at 914-15.

According to the ERC Policy 407, placing someone in the ERC is a use of force. PFOF ¶ 124. And in order for a person to be placed in the ERC there are several specific requirements that need to be meet. First, it requires the approval of a supervisor. *Id*. And the ERC is only to "be used to **temporarily** restrain and/or transport **combative** inmates for safety reasons." PFOF ¶ 52. While clearly Defendant May approved the use of the ERC , there is no evidence that Blake was combative at any time to justify restraining him for nearly seven hours in it. PFOF ¶ 47. Defendant Officers used excessive force when they placed and kept Blake in the ERC for hours and such force was not objectively reasonable. PFOF ¶ 22. Thus, Defendants violated Blake's constitutional right to be free from excessive force.

**B.      The right was "clearly established" at the time of the alleged violation.**

The question here is whether it was clearly established that an officer is not permitted to place someone in the ERC who is not violent, combative, resistive, or abusive. The answer is yes, it was clearly established.

Defendants, in moving for summary judgment, assert that they had a right to arrest and place a cooperative, non-combative, silently protesting Mr. Blake in the ERC because he did not talk. PFOF ¶ 8. However, every Defendant Officer testified that at no time was Blake combative, which is a prerequisite for placing anyone in the ERC. PFOF ¶ 47. Defendants claim that they placed Mr. Blake in the chair for "safety reasons," however other then not saying his name, which they knew, there is no evidence that Mr. Blake was an actual safety concern. PFOF ¶¶ 34-43. A passive Mr. Blake was handcuffed and placed under arrest; he walked into the van, he was fingerprinted; he then walked into the

KSDF; his sunglasses and hood were removed by officers; he walked to the ERC sitting down, and he did all of these things cooperatively and without incident. PFOF ¶¶ 71-78.

The use of a restraint chair is excessive where the person being restrained has not "refused orders to cooperate [and] stand up." *See Hokamp*, No. 21-CV-1125-JPS, 2023 WL 129793, at *13 (E.D. Wis. Jan. 9, 2023), quoting *Cibulka,* 448 F. Supp. 3d at1024 (W.D. Wis. 2020), aff'd, 992 F.3d 633 (7th Cir. 2021). Thus, whether Blake was a safety concern and whether Defendants could use excessive force by placing Blake in the ERC for silently protesting for nearly seven total hours was an unconstitutional use of force that was clearly established at the time. PFOF ¶¶ 2, 4, 22, 47. For these reasons, the Court should deny qualified immunity.

## V.      Mr. Blake's Negligent Hiring, Training, and Supervision Claim Against Kenosha County[8] Must Survive. (Claim 12)

There are genuine issues of material fact that precludes summary judgment on Mr. Blake's negligent hiring, training, and supervision claim against County Defendants. Defendants argue that Blake is unable to maintain this claim based on their conclusory statement that they are entitled to discretionary immunity, that Bergmann did not have a propensity to approve the actions of law enforcement even if they go against medical policies and the medical interests of Blake, and that this is in essence is a Monell Claim. ECF 82, at 39-40. Defendant's arguments fail on all fronts.

To prove his state claim for negligent hiring, training and supervision, Mr. Blake must prove the following elements:

(1) the existence of a duty of care on the part of the supervisor, (2) a breach of that duty of care, (3) a wrongful act of the supervisee that was

---

[8] VNCC is also a named defendant on this claim. Plaintiff also filed a Motion in Opposition to their Motion for Summary Judgment. ECF70.

a cause of injury to the plaintiff, and (4) an act or omission of the supervisor that was a cause of the supervisee's wrongful act.

*Kolbe & Kolbe Millwork, Co. v. Manson Ins. Agency, Inc.*, 983 F. Supp. 2d 1035, 1048 (W.D. Wis. 2013).

Negligent hiring, training, and supervision occur where an employer fails to train or inadequately trains an employee, and that employee then causes injury to another. Wisconsin first recognized this tort in *Miller v. Wal-Mart Stores, Inc.*, 219 Wis. 2d 250, 274, 580 N.W.2d 233 (1998). The court in *Miller* observed that the general elements of negligence apply to require proof of a duty of care, a breach of that duty, a causal connection between the conduct and the injury, and damages. *219 Wis. 2d* at 260.

As to cause, the issue is whether the employer's failure to exercise due care was a cause-in-fact of the wrongful act of the employee that in turn caused the plaintiff's injury. *Id.*, 219 Wis. 2d at 261. "In other words, there must be a nexus between the negligent hiring, training, or supervision and the act of the employee." *Id.* at 262. This nexus involves two questions. The first question is whether the employee's wrongful act caused the plaintiff's injury. *See Id.* The second is whether the employer's negligence was a cause of the employee's wrongful act. *Id.* "[T]he negligence of the employer must be connected to the act of the employee." Miller, 219 Wis. 2d. at 262-63.

First, Linda Scott, the corporate representative of VNCC, testified that Mr. Blake was a patient to Defendant Bergmann, and that as her patient it "is her domain" to check if the restraints were causing Mr. Blake harm and it also is her duty to make sure he is taken out of the chair every two hours. PFOF ¶¶ 128-129. Additionally, pursuant to the VNCC Contract, Ms. Bergmann was required to "comply with all rules and general regulations of the KPSD." PFOF ¶¶ 130-132. This would include the KSD Use of Force

Policy which requires employees to stop and report any objectively unreasonable force, such as placing Mr. Blake in the ERC. PFOF ¶ 131. . And she would be required to follow the ERC training manual, to make sure that Blake is out of the chair at least every two hours, which she also did not comply with. PFOF ¶ 133.

Mr. Blake's ultimate injuries were foreseeable and pursuant to the ERC Training Manual an inmate is not to be in the chair for more than two hours and the training notes misuse of the chair without reading and thoroughly understanding the instructions may result in injury or death. PFOF ¶¶ 116, 133

Ms. Scott could not say for certain that Defendant Bergmann had completed any training as it relates to use of the ERC, she had not seen any documents to that effect, and she did not know if she was even competent in her role in relation to use of the chair. PFOF ¶ 135.

Defendant Bergmann testified that this was her first job as a nurse, she "couldn't recall" being directed to read the ERC Manual as is a required part of the training, and that she had not received any training by Kenosha County regarding the use of restraints. PFOF ¶ 136. Ms. Scott testified that Defendant Bergmann should have been trained by Kenosha County on use of the ERC but never verified that she was. PFOF ¶ 137. Bergmann had a duty of care to her patient, Mr. Blake, and has an obligation to report any harm to him by making a simple phone call which she failed to do. PFOF 138.

There are two reasons why we know that the County Defendants and VNCC did not properly train or supervise Bergmann: (1) Neither the County nor VNCC ensured that Bergmann was formally trained on the use of restraints, use of force, and more importantly the use of the ERC as required, and (2) the lack of supervision over Bergmann, to which

she failed in her obligation to report the objectively unreasonable use of force that unnecessarily harmed Blake as would have been required of her had she been properly trained. PFOF ¶¶ 134-138.

It is clear that a lack of training on various policies directly led to the harms that Mr. Blake eventually faced. *Id.*, PFOF ¶ 116. It is also plausible for a jury to hold the County liable for its failure to ensure that Defendant Bergmann was properly trained on how to treat patients that were placed in the ERC and to make sure they were properly monitored.

The County's inaction in both training and supervision demonstrates unreasonableness making it liable for the consequences of its failures. A reasonably instructed jury could find that the County breached their duties to monitor Defendant Bergmann. That same jury could find Kenosha County was deficient in its training and supervision of her.

## VI. Defendants Bissonnette, Galvan, Haynes, and May Failed to Render Aid to Mr. Blake.

Because the plaintiff was a pretrial detainee, the court analyzes his claim that he was denied adequate medical care under the Fourteenth Amendment. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (*citing Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015)). To proceed on this claim, the plaintiff must show that 1) "the 'defendants acted purposefully, knowingly, or perhaps even recklessly'" and 2) "the defendants' actions were [not] 'objectively reasonable.'" *Pittman by & through Hamilton v. County of Madison, Ill.*, 970 F.3d 823, 827 (7th Cir. 2020)(*quoting Miranda*, 900 F.3d at 353-54). Neither negligence, gross negligence nor medical malpractice amount to deliberate indifference. *See Miranda*, 900 F.3d at 353. The plaintiff's allegations must show "'more than negligence but less than subjective intent—something

akin to reckless disregard'" to proceed on a Fourteenth Amendment claim. *Id.* at 353-54 (*quoting Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)).

In viewing the videos of Mr. Blake in the ERC, it is clear that he is in pain. ECF 74-11, 74-12, 74-13, and 74-14. Defendant Officers made no effort to provide any medical care to Mr. Blake who was subjected to the restraint chair for nearly seven total hours. PFOF ¶ 118. Defendants are aware that since Mr. Blake was in their custody that they had an obligation to address any medical or mental health concerns that they had regarding Blake. PFOF ¶ 139. Since Mr. Blake was not speaking, per the Suicide Watch Policy 413 the officers would have been required to complete a "Medical/Mental Health Screening Visual Observation Report", which would not have required any verbal answers from Blake. PFOF ¶ 143. Defendant May and other supervisors would also have been required to order that a Mental Health Risk Assessment Form be completed. Defendants did not do either of these things. PFOF ¶ 144.

Also, the ERC training manual it states, "detainees should not be left in the Emergency Restraint Chair for more than two hours." PFOF ¶ 117. Mr. Blake was subjected to the ERC for nearly seven total hours, of which from approximately 1:53 a.m. until 5:40 a.m., no one let him out of the chair. PFOF ¶¶ 145.

Defendant Officers should be liable for their failure to act to protect Mr. Blake's constitutional rights. *Acosta v. City of Chicago*, 2018 WL 3630011, *5 (N.D. Ill. July 31, 2018) ("Police officers have a constitutional duty to provide adequate medical care to people in their custody."), citing *Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013) (quoting *West v. Atkins*, 487 U.S. 42, 55–56 (1988)). The issue here is the seriousness of the need for medical attention. Clearly, as evidenced on the restraint chair

itself where it warns that it could cause injury or death that is serious. *Acosta*, 2018 WL 3630011, *5 (N.D. Ill. July 31, 2018) ("Under the Fourth Amendment, the inquiry into seriousness operates on a sliding scale."), citing *Ortiz v. City of Chicago,* 656 F.3d 523, 531 (7th Cir. 2011). And in cases of delayed medical access, "'the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.' *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (collecting cases analyzing delayed treatment under the Eighth Amendment).").

Defendant Officers failed to provide aid to Mr. Blake and such failure was objectively unreasonable. Despite acknowledging that Step 1 of the ERC manual warned against a person being placed in the chair for wearing nonallowable items such as a watch, hoodie, socks, shoes, belts – which Mr. Blake was wearing - for fear that they may cause injury or death, Defendant May testified that he could not recall being trained on Step 1 he did not recall if anyone asked Blake to remove these articles, and acknowledges that these items were not removed from Blake the entire time he was in the chair. PFOF ¶¶ 102,146.   Defendant Officer Haynes witnessed officers in dealing with combative detainees take nonallowable items.  PFOF ¶ 150. Specifically, Haynes testified that for combative detainees not wanting to remove such items that they would, escort them to,

> "Female Holding Cell 3 and they would be told to kneel on the ground.  And if they refused to kneel on the ground depending on their level of resistance they would, you know, be escorted to the ground and those items they are not allowed to have would be removed from them and then they would be secured inside the cell." *Id.*

There are serious questions of facts as to why Defendant Officers did not render aid to Mr. Blake or inquire as to the length of time Mr. Blake was subjected to the ERC. For these reasons, the failure to render aid claim must survive summary judgment.

**VII.    Mr. Blake's Indemnification and Direct-Action are Theories of Damages.**

Plaintiff acknowledge that indemnification pursuant to Wis. Stat § 895.46 is a theory of damages, not a private cause of action. Therefore, indemnification—only "as a claim"—may be "dismissed," provided, however, that Plaintiff are not waiving their right to proceed on indemnification for damages. As for the direct-action claim, Blake has shown above that the County Defendants negligently hired, trained, and supervised. Therefore, the direct-action claim should not be dismissed.

**VIII.    Punitive Damages Should Not Be Dismissed Because There Is A Disputed Issue Of Fact That Requires A Jury.**

Because there are genuine disputes of material fact, punitive damages should be left to the jury to decide. Defendants do not cite any case that says punitive damages can be decided at summary judgment. *See* ECF 82, 44, citing *Soderbeck v. Burnett County,* Wis., 752 F.2d 285, 288, 289-90 (7th Cir. 1985) (deciding defendant's motion for direct verdict regarding punitive damages *at the close of plaintiff's case in trial*). Seventh Circuit precedent holds that whether a defendant's conduct warrants punitive damages is for the jury to decide. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 815–16 (7th Cir. 2017) ("whether punitive damages can be awarded for a particular cause of action is a matter of law, but the question of whether a defendant's conduct was sufficiently willful and wanton to justify imposing punitive damages is generally for the jury to decide." (internal citations omitted)). There are genuine disputed issues of material facts that prevent summary judgment on the merits, so the issue of punitive damages should go to a jury.

## <u>CONCLUSION</u>

For the reasons stated herein, Plaintiff request that this Court **DENY** the County Defendants' motion for summary judgment and allow this matter to proceed to trial.

45

Dated this April 15, 2025.

**MOTLEY LEGAL SERVICES**

By: *s/Kimberley Cy. Motley*
    Kimberley Cy. Motley, SBN 1047193
    PO Box 1433
    Matthews, NC 28106
    (704) 763-5413 (phone)
    kmotley@motleylegal.com

**CADE LAW GROUP LLC**

    Nathaniel Cade, Jr. SBN: 1028115
    Annalisa Pusick SBN: 1116379
    P.O. Box 170887
    Milwaukee, WI 53217
    (414) 255-3802 (phone)
    (414) 255-3804 (fax)
    nate@cade-law.com
    annalisa@cade-law.com
    Attorneys for Plaintiff