STATE OF WISCONSIN: CIRCUIT COURT: KENOSHA COUNTY:

BRANCH 1

---

| | | |
|---|---|---|
| STATE OF WISCONSIN, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 21-FO-463 |
| | ) | |
| -vs- | ) | **EXCERPT OF JURY TRIAL** |
| | ) | |
| **JUSTIN S. BLAKE,** | ) | |
| | ) | |
| Defendant. | ) | |

---

THE HONORABLE GERAD T. DOUGVILLO
JUDGE PRESIDING

APPEARANCES

JAMES T. SEMPF, Assistant District Attorney, appeared on behalf of Kenosha County.

KIMBERLEY CY MOTLEY, Motley Legal Services, appeared on behalf of the defendant.

DATE OF PROCEEDINGS:
**March 10, 2025**

Tracy A. Czarnecki-Kozmer, RPR
Official Court Reporter, Branch 1

# W I T N E S S   I N D E X


| | PAGE |
|---|---|
| **COUNTY'S CASE-IN-CHIEF:** | |
| **DETECTIVE ALLISON GEORGE** | |
| Direct examination by Mr. Sempf | 4-15 |
| Cross-examination by Ms. Motley | 15-33 |
| Redirect examination by Mr. Sempf | 33-35 |
| **SERGEANT MICHAEL PITTSLEY** | |
| Direct examination by Mr. Sempf | 36-40 |
| Cross-examination by Ms. Motley | 40-46 |
| Redirect examination by Mr. Sempf | 46-47 |
| Recross-examination by Ms. Motley | 47-48 |
| **DEPUTY KYLE BISSONNETTE** | |
| Direct examination by Mr. Sempf | 49-55 |
| Cross-examination by Ms. Motley | 55-57 |
| **DEPUTY BRIAN KOSCHNITZKE** | |
| Direct examination by Mr. Sempf | 58-64 |
| Cross-examination by Ms. Motley | 64-68 |
| Redirect examination by Mr. Sempf | 68-69 |
| **COUNTY RESTS** | 69 |
| **DEFENSE'S CASE-IN-CHIEF:** | |
| **JUDITH DEVINE** | |
| Direct examination by Ms. Motley | 73-75 |
| Cross-examination by Mr. Sempf | 75-76 |
| Redirect examination by Ms. Motley | 77 |
| **DEFENSE RESTS** | 77 |

(Excerpt of proceedings)

THE COURT: All right. And then is the County ready then to continue on this afternoon?

MR. SEMPF: Yes.

THE COURT: Defense?

MS. MOTLEY: Yes.

THE COURT: All right.

(Jury enters courtroom)

THE COURT: All right. Thank you. Please be seated. Welcome back this afternoon, ladies and gentlemen of the jury. We are on the record in Kenosha County versus Justin Blake. All of the appearances are the same from this morning.

We've done the opening statements and what not, and now we're going to jump into the State's -- or County's, I'm sorry, case-in-chief. To that regard, for the County, Attorney Sempf, your first witness?

MR. SEMPF: I'll call Detective George.

THE COURT: All right. Detective George?

MR. SEMPF: Detective George.

(Detective George enters courtroom, takes witness stand)

THE COURT: Good afternoon. If you could raise your right hand and state and spell your name?

DETECTIVE GEORGE: Detective Allison George,

A-l-l-i-s-o-n, George, G-e-o-r-g-e.

DETECTIVE ALLISON GEORGE, being first duly sworn on oath to tell the truth, the whole truth, and nothing but the truth, testified as follows:

THE WITNESS: I do.

THE COURT: All right. Thank you. Please have a seat. You can adjust the chair and microphone as you need to. And to the County, as you're ready.

MR. SEMPF: Thank you.

**DIRECT EXAMINATION BY MR. SEMPF:**

Q. Good afternoon, ma'am.
A. Good afternoon.
Q. You are Detective George?
A. I am.
Q. Are you employed?
A. I'm employed with the Kenosha County Sheriff's Office.
Q. And in what capacity are you employed with the Kenosha County Sheriff's Office?
A. I'm a detective.
Q. How many years of law enforcement experience do you have?
A. I've been a law enforcement officer for over eight years.
Q. Do you know an individual by the name of Justin

Blake?

A. I do.

Q. How do you know that individual?

A. Through the course of my employment as an employee with the Kenosha Sheriff's Office.

Q. And the individual that I've identified as Justin Blake and you've indicated that you know through the course of your employment with the Kenosha County Sheriff's Office, do you see that individual anywhere in the courtroom?

A. Yes. Mr. Justin Blake is the defendant seated at the defense table.

Q. There's two. Is he -- is he wearing glasses or not?

A. It is the gentleman wearing glasses.

MR. SEMPF: All right. Your Honor, I'd ask that the record reflect that this witness has identified the defendant.

THE COURT: Any objection?

MS. MOTLEY: No.

THE COURT: So noted.

MR. SEMPF: Thank you.

BY MR. SEMPF:

Q. Detective, I want to direct your attention to April 25th of 2021 around 4:00 in the afternoon. What

were you doing on that date and approximate time?

A. On that date I was assigned to a patrol area. Essentially I was working patrol on the east side of the interstate in the county of Kenosha. Around that time I was called from the road to come provide extra security to the campus, this area, the Public Safety Building and the courthouse.

Q. Okay. What was the problem that you were directed to deal with?

A. I was advised to just come and be in the area for an extra law enforcement presence for the safety of the community and the safety of everyone involved. There was a small protest going on at that time.

Q. All right. Where was the protest?

A. At that specific time I don't recall exactly where. I know it was in the area of the courthouse and the Public Safety Building.

Q. At some point did the protest move over to the Public Safety Building?

A. That is correct.

Q. And just -- just to give the jury some idea of what -- what the building we're talking about, can we describe the Public Safety Building?

A. So the Public Safety Building is located, I might be disoriented by this building, but it's right over off

of 11th. It is the Public Safety Building located-- It kind of takes up the entire half of the block. The front entrance or the public entrance where the public can go into there is kind of right there in the middle of the block. There's a small parking lot and then a big long sidewalk and then the main doors for the public to be able to go into the building and access its services within.

Q. What entities are located within the Public Safety Building?

A. So the Public Safety Building, when you go in the front doors, if you go to your left there is the access to get to the Kenosha Police Department. So if you need to speak to an officer, speak to a supervisor, file a complaint, get a report you would go there.

Next to that is the Kenosha Joint Services Records Department. They do just about everything - records, pay parking tickets, ask questions, get accident reports.

There's a central hallway that leads to elevators which go up to the jail which is where the professional visitation area is. If anyone like clergy or attorneys want to visit an inmate, that's how they get there.

And then finally on the right is the door to

the Kenosha Sheriff's Department. Same thing as the police department - request services, get reports, ask questions.

Q. How many public entrances -- entrances are there to the Kenosha County Public Safety Building?

A. There is only one way for the public to get into the Public Safety Building and that is through what I call the front entrance that's located on the south side of the building right by the public parking lot.

Q. All right. Did anything unusual happen on the 25th?

A. Later on in the evening-- It was a very peaceful protest. Later on in the evening several of the protestors, I believe five, made their way to the front doors of the Public Safety Building and sat down in front of the two doors -- the double doors blocking the entrance.

Q. Was the defendant one of those people?

A. Yes, he was.

Q. Are you aware that anyone from the public was denied access to the Public Safety Building?

A. Yes, I am.

Q. How do you know that?

A. During my extra security patrol I was called to try and get people into the building who needed

services. For example, one lady was there. She needed to make a report regarding a battery but she could not get into the doors because the protestors were blocking it. So I walked to her, met with her and had to personally escort her all the way around to the other side of the building through a private secure law enforcement only area in order to get her safely to the department where she needed to go to make a report.

Q. All right. Did -- did you have access to that access point because of your status with the Kenosha County Sheriff's Office?

A. That's correct. It's an employee only entrance, not a public entrance.

Q. Okay. So an individual, if I were to come and I wanted to get in that way, I would not be able to do it.

A. Not at all, no.

Q. Was it just the one that you provided assistance or were there more individuals?

A. That I directly escorted to go into the building? I believe there was only the one, but I do recall kind of bouncing back and forth and hearing people dispatch to help people come in.

Q. All right. How do you know that the defendant was one of the people that was blocking the doors?

A. Because I observed him seated against the door.

Q. Okay. Was he -- was he seated in the -- in the -- in front of the public entrance?

A. Correct, in front of the south public entrance.

Q. All right. Was he there by himself?

A. No, he was not.

Q. Okay. And who-- How many other individuals were there with him?

A. Later in the evening, when I made contact with the defendant and the others, there were four people seated right next to each other with their arms interlocked not allowing access through the door as well as one individual who was not seated who was standing.

Q. All right. Were there attempts made to get these individuals to move?

A. Yes. We communicated with them. I know other deputies had communicated with them. I specifically communicated with them all. I said that we welcome your right to protest. The only thing is we cannot block this door. I suggested you're welcome to stand on the sidewalk, in the parking lot, to the sides of the door, anywhere that just doesn't block the door and prevent people from being able to come in.

Q. Did that cause anyone to move?

A. No.

Q. Okay. So you explained what the problem was and

the individuals in front of the door still didn't move.

A. That's correct.

Q. Including the defendant.

A. Including the defendant, yes.

Q. At some point was there -- did you and/or people that you were with at the time attempt to negotiate a solution to get those individuals to move away from blocking the door?

A. Yes. At that time I don't recall precisely how many law enforcement officers were but I know that myself and Sergeant Pittsley were speaking with the protestors again reiterating that we are not telling you you cannot protest. You are welcome to. We just cannot have this safety issue. We cannot have these doors blocked. We attempted to come to a peaceful resolution but were unable to.

Q. What-- You mentioned a safety issue. What would be the safety issue with -- that could happen with people blocking the door?

A. So because that's the only public entrance for the building, anyone -- any member of the public who's inside that public area, they don't have a key card to get out and they can only get out through that door. So if there was a bomb threat, if there was a fight or if an active shooter, anything like that, they would be

unable to escape the building because it was blocked from the outside. And at that time the doors were covered in plywood so people trying to get out wouldn't even be able to see that it was a person or anything blocking them. They would just be prevented from leaving the building.

Q. Okay. So were your attempts to reach a compromise with the defendant and the individuals that were with him successful?

MS. MOTLEY: Objection, your Honor. We're here specifically for Justin Blake, and she's talking generally about protestors and they and them. So I'd ask-- I object to the relevancy of that question to other people -- people other than Mr. Blake.

MR. SEMPF: Well, she's clearly testified that it wasn't just the individual, Mr. Blake blocking the door. The focus of my question, she testified that they had attempted to -- she had attempted to reach a compromise with Mr. Blake and the other individuals blocking the door.

MS. MOTLEY: Your Honor, I believe her testimony was she attempted to reach a compromise with them. She didn't say Mr. Blake. She said them, they, protestors and we're here specifically for Mr. Blake.

THE COURT: Did that answer include

Mr. Blake when you say them?

THE WITNESS: Yes, sir.

THE COURT: Okay. I'll allow that to stand. It gives context to the situation. And also as it's a citation for disorderly conduct, it has to do with the circumstances as they then existed. So the surrounding circumstances, I think that fits into that so that makes it relevant. So objection overruled.

BY MR. SEMPF:

Q. Was the attempt to reach a compromise with the protestors including Mr. Blake successful?

A. It was not.

Q. They still did not move.

A. No, they did not. No one did.

Q. At some point shortly before 10:00 did you make the dec -- an officer that was with you make the decision that the -- that the blocking of the building had to end?

A. A supervisor from the Kenosha Sheriff's Office made that decision, yes.

Q. Okay. Were you with him when he made that decision?

A. Yes.

Q. Okay. And what was communicated to Mr. Blake and the individuals that were with him at that point?

A. Prior to taking any law enforcement action, the sergeant and others there, I believe myself as well, we explained that you can protest elsewhere. You cannot block the doors. If you do not move, we will have to arrest you because you are impeding the public in creating a safety issue. And we told the entire group including the defendant, Mr. Blake this multiple, multiple times.

Q. And after you had communicated to the protestors including Mr. Blake that if they did not move they would be arrested, what effect did that have, if any, on the individuals blocking the door?

A. At that time there were four individuals sitting with their arms interlinked and one individual after hearing a couple of the warnings that you will be arrested if you don't move, she got up and moved. Mr. Blake and the other two gentlemen readjusted and re-interlocked their arms.

Q. So even then Mr. Blake and two other individuals did not move from blocking the door.

A. That's correct.

Q. So what did you -- what did law enforcement do at that point?

A. At that point after -- again, there were -- there were more warnings after the female did move. There

were still more warnings, more opportunities given. And they were not heeded by the defendant or any of the two other gentlemen so all three of them were taken into custody.

Q. Including Mr. Blake?

A. Including Mr. Blake.

Q. The Kenosha County Public Safety Building, is that located in Kenosha County, Wisconsin?

A. Yes, it is.

MR. SEMPF: I don't have anything else.

THE COURT: Thank you. Attorney Motley?

**CROSS-EXAMINATION BY MS. MOTLEY:**

Q. Detective George, what was your working hours on April 25th of 2021?

A. At that time I was assigned to second shift so it was either two p.m. to 10 p.m. or three p.m. to 11 p.m. I don't recall exactly.

Q. Okay. And you testified earlier that there -- the reason why Mr. Blake received a ticket for disorderly -- or was arrested for disorderly conduct, correct?

A. I don't know what-- I did not specifically arrest him myself. I don't know what his precise charges were.

Q. Okay. But you testified earlier that one of your

issues was that he was preventing the public from entering, exiting the building; is that correct?

A. That's correct.

Q. And you witnessed that yourself.

A. Yes, I did.

Q. Okay. And you wrote a report with regards to persons who Mr. Blake was preventing from entering, exiting the building; is that correct?

A. That's correct, I wrote a report.

Q. Okay. And one of those people that you identified in the report was a Bonnie Cunningham. Was she the woman who was trying to submit a report that was prevented from entering the building by Mr. Blake?

A. That's correct.

Q. Okay. And you said you witnessed that at around -- sometime around four or something?

A. I believe it was around four p.m., yes.

Q. Okay. And you also testified that there was another female, a Judith Devine who was prevented from entering the building; is that correct?

A. I was given that information by the records clerks when I took a statement from them.

Q. Okay. And what else did the record clerk tell you about Judith Devine?

MR. SEMPF: I guess I'll object, hearsay.

MS. MOTLEY: Your Honor, she wrote a report on this.

MR. SEMPF: It's still hearsay.

MS. MOTLEY: It's --

THE COURT: Is it being offered for the truth of the matter?

MS. MOTLEY: Yes. Your Honor, I'd ask to allow me to present Detective George with her report to refresh her memory if that will help with regards to this line of questioning.

THE COURT: Well, I don't think the issue is whether or not she knows that. It's whether or not that information is hearsay evidence that's otherwise --

MS. MOTLEY: Okay.

THE COURT: If there's not an exception for it to come in, then I'm not going to allow it.

MS. MOTLEY: Okay. I'll withdraw it.

THE COURT: All right.

BY MS. MOTLEY:

Q. So you yourself did not speak with Bonnie Cunningham, correct?

A. I myself did speak with Bonnie Cunningham, yes.

Q. You did?

A. Yes.

Q. And she told -- and you escorted her because she

wasn't able to enter the building because of Mr. Blake.

A. I escorted her to a secure door, yes, because she could not get in through the public doors.

Q. Okay. And there were video cameras that were showing this protest outside the Public Safety Building, correct?

A. I imagine so, yes. There are cameras outside the building.

Q. Okay.

MS. MOTLEY: I'd like to show to the court some videos of the protests outside that building.

THE COURT: County's position?

MR. SEMPF: Well, that's possibly relevant but I think a foundation has to be laid.

THE COURT: Right. If it's going to be during certain times that she can testify to that she was -- that she was there, then certainly this witness can testify to that. But as the County has suggested, there's going to need the proper foundation laid for this -- for it to come in with this witness.

MS. MOTLEY: Sure. Okay.

BY MS. MOTLEY:

Q. You've already testified that you -- Bonnie Cunningham was prevented from entering the building because of Mr. Blake, correct?

A. Because of the protestors at the door, yes.
Q. So you're changing up a little bit now. The question is you testified earlier that Bonnie Cunningham was not able to enter the building because of Mr. Blake, who is the one that we're all here for today, correct?
A. That's not quite what I said, no. I said that I escorted her due to protestors at the door and that later in the evening it was the defendant who I saw blocking the door.
Q. So you said earlier-- So you did-- So are you withdrawing your testimony earlier when you said Bonnie Cunningham, you had to personally escort her directly into the building because Mr. Blake and other protestors were preventing her from entering? That -- that was incorrect?
A. I escorted her personally to a secure door. At the time that I made contact with her at the door I did not stop and specifically scrutinize each individual seated blocking the door.
Q. Okay. So we're talking about Mr. Blake. You did not witness that, correct, Mr. Blake preventing Bonnie Cunningham from entering the building, right?
A. At that time I did not look at the individuals seated so I could not say for certain that Mr. Blake was seated at that door at that time.

Q. Okay. And you didn't witness any other individuals like Judith Devine, who was also a member of the public, being prevented from entering a building because of Mr. Blake.

A. I did witness other individuals being prevented, yes. I did not witness Miss Judith Devine.

Q. Judith Devine, who is in your report.

A. Correct. I did not witness her, no. I did witness other individuals.

Q. Okay. But Bonnie Cunningham and Judith Devine are the only two individuals who you have specifically named in your report that weren't allowed to enter the building because of Mr. Blake, right?

A. That sounds correct.

Q. Okay.

MS. MOTLEY: So now I'd like to-- I set the foundation. I'd like to play a video, please.

MR. SEMPF: I don't think she's laid a foundation.

THE COURT: What -- what -- which portion-- What video are you showing?

MS. MOTLEY: I'm showing Bonnie Cunningham trying to enter the building on April 25th of 2021. She's already testified she wasn't able to enter because of Mr. Blake. She -- she didn't personally-- I don't

know. She's flip flopped. So I think the jurors are entitled to see Bonnie Cunningham being prevented from entering the building and what Mr. Blake was doing when that happened.

THE COURT: Well, I wouldn't necessarily characterize it as flip flopping but I'll allow the playing of the video. And if the witness can properly identify it and to her experience, then she can testify to that extent.

MS. MOTLEY: Thank you, your Honor.

THE COURT: Are you all able to see the screen okay or do you want me to dim the lights? Everyone is shaking their head yes, yes, yes? Okay. If you can't see at some point, just let me know to the members of the jury.

MR. SEMPF: Just so we're-- I mean, we're trying to make a record here. Is this an exhibit? Is it marked? Is it --

THE COURT: Fair point. Is this Defense Exhibit 1?

MS. MOTLEY: Yes, please.

THE COURT: Okay. And can you -- wherever you're starting it, please note for the record the timestamp or however, some way to denote it so we know where you're starting it for the record.

MS. MOTLEY: All right. Thank you, your Honor. And I apologize, your Honor, I'd like to publish this to the jury.

THE COURT: Yes, that's -- that's fine. And then to the witness, are you able to see the screen okay?

THE WITNESS: Yes.

THE COURT: Okay.

MS. MOTLEY: So what I'd like to mark is this as Defense Exhibit No. 1. This is a video outside the Public Safety Building on April 25th of 2021 taken at 4:53 p.m. Does --

MR. SEMPF: Actually I'm going to object to that. She can't lay her own foundation here. The issue is whether the witness recognizes this as an exhibit.

THE COURT: Right, he's correct. So she's going to have to testify that is what it's purported to be and that she recognizes that to be true and correct in order for that to be played through this witness.

MS. MOTLEY: Okay.

BY MS. MOTLEY:

Q. Do you recognize what we're looking at right now?

A. This is an image of the front public entrance of the Public Safety Building.

Q. Okay. And do you recognize this image taken on

April 25th of 2021?

MR. SEMPF: Again, I'm going to object. She -- she's assuming the date based on what the image is displaying. If the witness can recognize that as being an authenticate video that occurred that day, that's fine; but I don't think she can say this is when this video was taken, can you recognize that and have it come in as evidence.

MS. MOTLEY: And, your Honor, I'd ask for a little latitude. With the plaintiff he has been able to question on generally -- generalities so far. So I don't think there's any dispute that this is what this is. I received it from them.

THE COURT: Right. So here's the thing. Is there any dispute as to of what this video is?

MR. SEMPF: It -- it looks like-- Well, it just went off. What --

THE COURT: I understand the foundational objection you're making --

MR. SEMPF: Sure.

THE COURT: -- but for purposes of-- Instead of a separate witness called and then recalling this witness back after it's been -- the foundation's been laid for it in a separate manner, I find this manner to be much more efficient to simply have --

MR. SEMPF: Sure.

THE COURT: -- Detective George testify to it if she does recognize it and her understanding to be what was taking place on April 25th of 2021.

MR. SEMPF: Sure. And I'm not trying to be difficult, your Honor. I'm just -- I'm just pointing out that this witness may not -- certain dates are being fed to her, and she may not have any independent recollection.

THE COURT: Right. Once we get the video pulled back up here.

MS. MOTLEY: Sorry, your Honor.

THE COURT: That's okay. I know it's tricky sometimes.

(Brief pause)

(Video on screen)

THE COURT: All right. Detective George, do you generally recognize that to be the scene outside the Public Safety Building on April 25th of 2021?

THE WITNESS: It does appear consistent with that, yes.

THE COURT: All right. You can go ahead and play the video.

BY MS. MOTLEY:

Q. Detective George, before I play this video do you

recognize anyone in this video?

A. No.

Q. Okay. And you see four individuals sitting down. Are any of those individuals Mr. Blake?

A. I -- I can't tell from here.

Q. Okay.

MS. MOTLEY: Let me play the video.

(Exhibit No. 1 played)

Q. I'm going to stop it. Do you see this individual wearing the red, black and green mask that I have the arrow at?

A. Yes, I do.

Q. Would you agree that that individual is in fact Justin Blake?

A. I -- I can't see from here. Can I approach?

THE COURT: If you want to go down and take a look and then come back to the witness stand, sure.

(Witness gets up from witness stand to move closer to TV screen)

BY MS. MOTLEY:

Q. So just for the record the individual standing up, not sitting in front of the door where my arrow is with this red, black and green, that would be Justin Blake, correct?

A. If you say it is then I believe it, but I cannot

identify that person with the place.

Q. Do you believe that any of the sitting individuals are Justin Blake?

A. I truly don't know either. All their faces are obscured with masks.

Q. So let me just play.

(Exhibit No. 1 played)

Q. Okay. So the individual coming to the door, that is Bonnie Cunningham, correct?

A. I could not identify her if I saw her in person, but it is a correct time frame for her having arrived although I don't remember a child being with her.

Q. Okay. And you see Bonnie Cunningham, she's pushing the doorbell or something, correct?

A. The female is pushing the doorbell.

Q. And April 25, 2021, that was on a Sunday, correct?

A. Yes.

Q. So typically on Sundays there isn't as much traffic or people coming in and out of the building, correct?

A. I could not speak to that.

Q. Okay. And you see the building, there's sort of wood that's in front of it, correct?

A. That's correct.

Q. And this was during COVID when people didn't have access freely to public buildings, correct?

A. That's incorrect.

Q. Okay. So why -- why are those boards there? Is that normal?

A. They were broken during the protest.

Q. They were broken during the protest eight months prior in August and the county didn't fix those for eight months because the protests, is that what you're saying?

A. The county did not fix those. They were not fixed by that time, no.

Q. Okay. So people couldn't go through those wooden doors. This wasn't necessarily the only door that the public was entering, correct?

A. That's incorrect. That was still the only public entrance. It was just boarded up for safety because the windows were still shattered.

Q. Okay. Well, even if the -- the doors were boarded up, we don't see Justin Blake blocking the doors, do we?

A. I cannot identify anyone. They're all masked up. I can't tell.

Q. Do you see anyone blocking the doors for Miss Bonnie Cunningham as you put in your report from being

prevented from entering the building?

MR. SEMPF: Object to the question. She has not been able to identify that individual as Bonnie Cunningham.

MS. MOTLEY: She actually testified that she believes that's her. She doesn't remember the small child but she does believe that's her.

MR. SEMPF: She said the time frame --

THE COURT: -- was consistent with it.

MR. SEMPF: Yeah.

THE COURT: So if you could just rephrase the question. So go ahead.

BY MS. MOTLEY:

Q. So would you agree that Bonnie Cunningham is not being "prevented," quote, unquote from entering the building?

MR. SEMPF: That's my objection. She's -- she's asserting something that hasn't been established.

MS. MOTLEY: Your Honor, she already asserted this in her testimony when plaintiff's counsel was questioning her and said that Bonnie Cunningham was prevented from entering the building because of Mr. Blake and other protestors.

THE COURT: Right, but your question is based off of the video and the witness has stated that

she can't confirm that that is that person but stated that it matches the time frame in which she had reported to. So if the question is whether or not the person in that video is prevented, that's one thing; but to answer the question of this witness directly if that is the -- the individual that you named, I don't -- I believe the County is correct that she can't properly answer that question.

MS. MOTLEY: Okay.

BY MS. MOTLEY:

Q. So the person in this video may be Bonnie Cunningham; is that correct?

A. That's correct.

Q. Okay. And the person in this video, the time frame matches up the time frame when you met with Bonnie Cunningham to escort her into the building as well, correct?

A. That is correct.

Q. So I'm going to continue to play the video.

(Exhibit No. 1 played)

Q. So I paused it. When you come into the door on April 25th of 2021, that's a Sunday, correct?

A. Yes.

Q. And a person couldn't just open the door themselves. They were required to push the button in

order to gain entry; is that correct?

A. The records department had specifically locked the doors that day around three p.m. to control the flow of traffic in and out.

Q. Okay.

A. So I don't know as to Sundays. I believe the door is open to the public because the records department has to be open to the public but I'm not certain.

Q. But you're not certain if Mr. Blake was at -- outside protesting at three p.m. also on April 25th of 2021, correct?

A. At three p.m.? I don't know who was there at three p.m., no.

Q. So you don't know if he's the reason why the records decided to lock the doors, correct?

A. Correct.

Q. Okay. So let's continue to play.

(Exhibit No. 1 played)

Q. Pausing it again. So do you see the individual that's still standing here with the red, black and green mask?

A. Yes, I do.

Q. Okay. Is that person who is Justin Blake, has he -- based on what you can see in this video is he

preventing this woman from entering the -- the building?

MR. SEMPF: I'm going to object. She -- she indicated that she could not identify the individual as Justin Blake.

THE COURT: Right, so the objection as to the form of the question is sustained. So you're going to have to rephrase the question.

BY MS. MOTLEY:

Q. So the person that's wearing this red, black and green mask that's standing up, do you see him?

A. I do.

Q. Okay. And you stated in earlier testimony that if I say so that's Justin Blake, that -- that was your answer, correct?

A. That's correct.

Q. Is there any reason for you to believe that that's not Justin Blake?

A. If you are telling me it is, there's no reason for me not to believe that.

Q. Okay. Great. Now, this person that you believe may be Justin Blake, do you see him at any -- in any way interacting with this woman at the door?

A. In this video, no, I do not.

Q. Okay. Do you see him in any way preventing the woman at the door from entering the building?

A. In this video, no, I do not.
Q. Let's continue to play it.
(Exhibit No. 1 played)
Q. The woman walking away from the building, you indicated that you may have escorted her into the building, correct?
A. Correct.
Q. Okay. So let's play it.
(Exhibit No. 1 played)
Q. So we don't see you coming up to her in this video, correct?
A. That's correct.
Q. Okay. So where did you meet her?
A. If I recall correctly from my report the records people sent her over to a different side of the building which we call the east side of the building and that's where I met her.
Q. So you were at a completely different side of the building so you can't say for certain if Justin Blake prevented anyone from entering the building at this time, correct?
A. I was around the corner, yes.
Q. So you can't say for certain that Mr. Blake prevented anyone from entering the building at this time, correct?

A. At this time, correct.
Q. Okay. Thank you.
MS. MOTLEY: We're done with the video.
BY MS. MOTLEY:
Q. Now, you indicated that you talked to Bonnie Cunningham and did you record that conversation?
A. Did I record it? No.
Q. Okay. Did you -- but you said that she told you that she wasn't allowed to enter the building, correct?
A. I said that she was there to make a report for a battery.
Q. Okay. But again, your testimony today right now you cannot say for certain that it was Mr. Blake who prevented her from entering the building; is that correct?
A. That's correct.
MS. MOTLEY: I have nothing further. Thank you.
THE COURT: Any redirect?
MR. SEMPF: Yes.

**REDIRECT EXAMINATION BY MR. SEMPF:**

Q. The information that you had was that the protestors stopped Miss Cunningham from going in, correct?
A. That's correct.

Q. And when you said that Mr. Blake was blocking the door, you were talking about later that evening when you made the arrest.

MS. MOTLEY: Objection, misstates her testimony. That's not what she said earlier.

MR. SEMPF: I haven't misstated anything, your Honor.

THE COURT: Overruled. You can answer the question.

THE WITNESS: I'm sorry, can you repeat the question?

MR. SEMPF: Sure.

BY MR. SEMPF:

Q. When you-- You testified earlier that Mr. Blake was blocking the door along with a number of other individuals. Do you recall that testimony?

A. I do.

Q. What time did you observe Mr. Blake blocking the door with other individuals?

A. As I described when I described Mr. Blake blocking the door, it was later in the evening around nine p.m., perhaps a little bit later.

Q. Okay. And that's something you personally observed the defendant, Justin Blake blocking the doors to the Kenosha County Public Safety Building?

A. That's correct.

MR. SEMPF: I don't have anything else.

THE COURT: Thank you. Attorney Motley?

MS. MOTLEY: I have nothing further. Thank you.

THE COURT: All right. Thank you for your testimony here today.

THE COURT: County's next witness?

MR. SEMPF: Sergeant Pittsley.

THE COURT: Sergeant Pittsley?

MR. SEMPF: Yes, sir.

(Witness excused, exits courtroom)

(Witness enters courtroom, takes witness stand)

THE COURT: If you could please raise your right hand and state and spell your name?

SERGEANT PITTSLEY: Michael, M-i-c-h-a-e-l, Pittsley, P-i-t-t-s-l-e-y.

SERGEANT MICHAEL PITTSLEY, being first duly sworn on oath to tell the truth, the whole truth, and nothing but the truth, testified as follows:

THE WITNESS: I do.

THE COURT: All right. Thank you. Please be seated. You can adjust the chair and microphone as you need to. And to the County, as you're ready.

MR. SEMPF: Thank you.

**DIRECT EXAMINATION BY MR. SEMPF:**

Q. Good afternoon, sir.

A. Good afternoon.

Q. You are Sergeant Pittsley?

A. That is correct.

Q. Where do you work, sir?

A. Kenosha County Sheriff's Office.

Q. And in what capacity were you working with the Kenosha County Sheriff's Office?

A. Right now?

Q. Yes.

A. I'm a first shift patrol sergeant.

Q. How long have you been so employed?

A. Twelve years, since 2013.

Q. Is that your totality of law enforcement experience?

A. Yes.

Q. Do you know an individual by the name of Justin Blake?

A. Yes.

Q. How do you know that individual?

A. Just prior calls.

Q. Prior calls. The individual that I've identified as Justin Blake and you've indicated that you know

through prior calls, is -- do you see that individual anywhere in the courtroom?

A. Yes.

Q. Could you please point to where he's at and describe what he's wearing?

A. He's sitting right next to the female attorney and he's wearing a checkered shirt.

MR. SEMPF: Your Honor, I'd ask that the record reflect this witness has identified the defendant.

THE COURT: Any objection?

MS. MOTLEY: No.

THE COURT: So noted.

BY MR. SEMPF:

Q. Sergeant, I want to direct your attention to April 25th of 2021. Were you on duty on that date?

A. Yes.

Q. What was -- what was the nature of your duties on the 25th?

A. Third shift patrol sergeant.

Q. Okay. At some point did you have contact with Mr. Blake that evening?

A. Yes.

Q. Okay. Tell me about the circumstances of which that you had contact with Mr. Blake on that evening.

A. As I started my shift I came in and I was informed of a few people sitting in front of the main entrance to the Public Safety Building here in Kenosha, and I -- it was determined at that point that these subjects needed to move or they would be arrested.

Q. All right. Prior to arresting the individuals that were sitting in front of the Kenosha County Public Safety Building, had you informed them that they needed to move?

A. Yes.

Q. Okay. What did you tell them?

A. I don't know my exact verbiage, but it was something along the lines of hey, we would like you to move. You can continue your peaceful protest. You just need to move from in front of the door just a couple feet to the left or to the right.

Q. And the problem was that they were blocking the door?

A. That's correct.

Q. When you explained to them what the-- I'm sorry. Was-- Of the individuals that were blocking the door when you were discussing this matter with them, was Mr. Blake one of those individuals?

A. Yes.

Q. Okay. When you were explaining to these

individuals that they needed to move, that they couldn't block the door, did they move?

A. No.

Q. Okay. At some point after that did you attempt to negotiate with them to get them to move?

MS. MOTLEY: Objection, vague. Who is they, them? Who are we talking about?

THE COURT: If you could simply rephrase the question.

MR. SEMPF: Sure.

BY MR. SEMPF:

Q. After the defendant and his cohorts failed to move --

MS. MOTLEY: Objection to cohorts. We're here for Mr. Blake again.

THE COURT: Overruled given the previous rulings. You can continue with the question.

MR. SEMPF: Thank you.

BY MR. SEMPF:

Q. After the defendant and his cohorts failed to move, did law enforcement, meaning you, attempt to negotiate with Mr. Blake and his cohorts in an effort to reach a compromise?

A. Yes.

Q. Did they move?

A. No.

Q. After the compromise attempt failed, what happened next?

A. It was decided that the individuals who were continuing to sit in front of the door would be arrested.

Q. Okay. Did -- did you explain to Mr. Blake and his cohorts that if they failed to move they would be arrested?

A. Yes.

Q. At that point did Mr. Blake move?

A. No.

Q. And so what resulted?

A. He was arrested.

Q. What county and state is the Kenosha County Public Safety Building located in?

A. Kenosha, Wisconsin.

MR. SEMPF: Okay. I don't have anything else.

THE COURT: Thank you. Attorney Motley?

**CROSS-EXAMINATION BY MS. MOTLEY:**

Q. Sergeant Pittsley, you indicated that you were working on April 25th of 2021, correct?

A. According to the report, yes.

Q. Yes. And what were your working hours that day?

A. Nine to five a.m., nine p.m. to five a.m.

Q. Okay. Nine p.m. to five a.m. And you indicated that you did write a report about what happened on April 25th of 2021, correct?

A. Correct.

Q. Okay. And in your report do you recall why Mr. Blake was protesting?

A. In my report do I recall why?

Q. Yes.

A. No.

Q. Okay. Do you know why Mr. Blake was protesting?

A. I take that back. I believe it was to speak with chief -- KPD Chief Larsen.

Q. Okay. And just for your recollection, was it -- do you recall Mr. Blake was protesting in reference to Officer Rusten Sheskey who's the one that shot his nephew Jacob Blake?

A. Correct.

Q. And in your report-- You wrote a complete and accurate report, correct?

A. Yes.

Q. Okay. And in your report you noted that you talked to people on April 25th of 2021, correct?

A. Correct.

Q. Do you recall who you spoke with on April 25th of

2021?

A. In regards to what?

Q. In regards to asking people to leave the protest.

A. It was a group but they had a spokesperson.

Q. Do you recall who that person was?

A. I believe the report said her name was Tanya.

Q. Okay. And you spoke with Tanya and what did you tell Tanya?

A. Honestly the whole time we were just trying to compromise. I did not want to arrest them. I just wanted them to move from the door.

Q. Okay.

A. So the whole time was kind of a compromise trying to see what we could get.

Q. But you never spoke with Mr. Blake, correct?

A. It was-- I was talking to the group and she would answer.

Q. But you never spoke to Mr. Blake because it's not in your report, right?

A. He was present.

Q. Okay.

MS. MOTLEY: Your Honor, I'd like to submit to the court and label this Defense Exhibit 2 which is Sergeant Pittsley's report. May I approach?

THE COURT: Yes.

(Exhibit No. 2 handed to witness)

BY MS. MOTLEY:

Q. Sergeant Pittsley, do you remember that document that I -- that you now have that's labeled as Defense Exhibit 2?

A. Yes.

Q. Okay. And in this document this is your report that you wrote, correct?

A. Correct.

Q. And the report is three pages, correct?

A. Correct.

Q. Okay. In this report could you please identify what Mr. Blake said to you when you told him to leave from in front of the building?

A. There's nothing listed.

MR. SEMPF: I guess I'm going to object to-- That question calls for hearsay.

MS. MOTLEY: It doesn't. It's his report.

MR. SEMPF: She's asked what Mr. Blake said. Anything --

MS. MOTLEY: I said in his report.

MR. SEMPF: It's still hearsay.

MS. MOTLEY: Your Honor --

THE COURT: Overruled. I'll allow it to stand. You may continue.

BY MS. MOTLEY:

Q. In your report could you please read for all of us what you specifically said to Mr. Blake?

A. (Witness looking at report). So the report would be more of a vague statement and not word for word what I said to the group.

Q. Okay. But it's fair to say that in this report you have nothing where you're talking specifically to Mr. Blake, correct?

A. I would say I'm talking to him but he's not talking back.

Q. Okay. So I just asked you in your report where does it identify what you said specifically to Mr. Blake.

A. Correct. It's not specific to the exact words.

Q. Okay. Well, what did you say specifically to him that you wrote down in this accurate report that you wrote?

A. It's generalized so I can't tell you what the specifics are.

Q. So the only thing in your report that you have in quotes is that you spoke with "Tanya," quotes. That's the only person you identified specifically that you spoke to in this report; isn't that correct?

A. In the report, yes.

Q. And based off of what you witnessed on April 25th of 2021, you did not see Mr. Blake specifically preventing anyone from entering the building; isn't that correct?

A. I did not, no.

Q. And based off what you observed on April 25th of 2021, you didn't see anyone specifically being prevented from exiting the building by Mr. Blake; is that correct?

A. I would say that if somebody did exit the building, it would prevent them. Now, did somebody attempt to open the door? No, but if somebody did it would prevent them.

Q. Okay. But you didn't see anyone try to open the door and was preventing them from doing that on April 25th of 2021, correct?

A. Correct.

Q. And you indicated that Mr. Blake was arrested, correct?

A. Correct.

Q. And when he was arrested he voluntarily got up, was placed in handcuffs, correct?

A. Correct.

Q. So he wasn't fighting or anything like that. He wasn't uncooperative, correct?

A. There was some concern over it but no.

Q. And if he had done that you certainly would have put that in your report that he was being uncooperative, correct?

A. Correct.

Q. Okay.

MS. MOTLEY: I have nothing further. Thank you.

THE WITNESS: Thank you.

THE COURT: Any redirect?

MR. SEMPF: Just briefly, your Honor.

**REDIRECT EXAMINATION BY MR. SEMPF:**

Q. Sergeant, you -- you had said that you were communicating with the group through a spokesperson?

A. That's correct.

Q. You also said repeatedly that you were speaking to the group?

A. That's correct.

Q. Okay. Where was -- when you were communicating with this spokesperson where is Mr. Blake?

A. I would say six to eight feet in front of me.

Q. Okay. And where were -- where were the other two individuals that were arrested?

A. Right next to him.

Q. Okay. So the-- What I'm -- the sense I'm getting is you're speaking to a spokesperson and then

there are these individuals of which Mr. Blake is included who are blocking the door; is that fair?

A. Yes.

MR. SEMPF: All right. I don't have anything else.

THE COURT: Anything based on that?

**RECROSS-EXAMINATION BY MS. MOTLEY:**

Q. You testified that Mr. Blake did not -- you did not witness him preventing anyone from entering or exiting the building, correct?

A. Specifically trying to enter while I was there seeing it with my eyes, no.

Q. Okay. And the plaintiff has used -- or the district attorney has used blocking the building. You didn't witness Mr. Blake specifically blocking anyone from entering or exiting the building, correct?

A. I would say if I tried to enter the building it was blocked.

Q. But you didn't see Mr. Blake specifically blocking you or anyone else from entering the building.

A. He was sitting right in front of me blocking the door when I was talking to him.

Q. Okay. However, again, you did not see anyone -- Mr. Blake blocking anyone from entering or exiting the building, correct?

MR. SEMPF: I'm going to object. This has been asked and answered.

THE COURT: Overruled. You can answer the question.

THE WITNESS: Yes. Could you ask the question again?

MS. MOTLEY: Actually this has been asked and answered. I'll withdraw. Thank you.

THE COURT: Anything else?

MS. MOTLEY: No.

THE COURT: All right. Anything based on that?

MR. SEMPF: No.

THE COURT: All right. Thank you for your testimony here today, sir.

THE WITNESS: Thank you.

THE COURT: County's next witness?

MR. SEMPF: I'll call Deputy Bissonnette.

(Witness excused, exits courtroom)

(Deputy Bissonnette enters courtroom, takes witness stand)

THE COURT: And good afternoon, sir. If you could raise your right hand and state and spell your name?

DEPUTY BISSONNETTE: Kyle Bissonnette. It's

K-y-l-e. Last name B-i-s-s-o-n-n-e-t-t-e.

DEPUTY KYLE BISSONNETTE, being first duly sworn on oath to tell the truth, the whole truth, and nothing but the truth, testified as follows:

THE WITNESS: I swear.

THE COURT: All right. Thank you. You can have a seat. You can adjust the chair and microphone as you need to. And to the County, as you are ready.

MR. SEMPF: Thank you.

**DIRECT EXAMINATION BY MR. SEMPF:**

Q. Sir, good afternoon.
A. How's it going?
Q. You are Deputy Bissonnette?
A. Yes.
Q. Where do you work, sir?
A. The Kenosha County Sheriff's Office.
Q. This may sound a little silly considering the question I just asked you but in what capacity?
A. I'm a deputy.
Q. How many years in law enforcement experience do you have?
A. About seven.
Q. Do you know an individual by the name of Justin Blake?
A. I do.

Q. How do you know that individual?
A. I arrested him.
Q. You know him through making an arrest?
A. Yes.
Q. The individual that I've identified as Justin Blake and you've indicated that you know through making an arrest, do you see that individual anywhere in the courtroom?
A. I do.
Q. Could you please point to where he's at and describe what he's wearing.
A. This gentleman over here in the blue and white shirt with the glasses on.
Q. Where is he seated?
A. On the left side of the table on my left.
MR. SEMPF: Your Honor, I'd ask that the record reflect that this witness has identified the defendant.
THE COURT: Any objection?
MS. MOTLEY: No objection.
THE COURT: So noted.
BY MR. SEMPF:
Q. Deputy, I want to direct your attention to April 25th of 2021. Were you on duty on that date?
A. I was.

Q. What -- what were you doing around 9:40 shortly before 10:00 on that date?

A. I just started my shift and I was in the sergeant's office. I was just informed that there was a protest outside the PSB, Public Safety Building, and I was going to assist with trying to disband the protest.

Q. All right. When you-- Did you actually-- Where was the location of the protest?

A. Outside the Public Safety Building front doors on the south side of the building.

Q. All right. Is that building located in Kenosha County, Wisconsin?

A. Yes.

Q. When you-- Did you actually go to that location?

A. Yes.

Q. What did you see when you went to that location?

A. I saw a group of people sitting outside of the front doors of the Public Safety Building.

Q. Was the defendant one of those individuals?

A. Yes.

Q. How many other individuals if you know were also standing in front of the doors to the Public Safety Building?

A. I believe it was three to four others.

Q. Were they blocking the doors or something else?

A. Yes, they were sitting directly in front of the doors.

Q. Was there an attempt to get these individuals to move?

MS. MOTLEY: I'm going to object, your Honor. It's again vague - they, them, protestors. We're here again for Mr. Blake specifically.

THE COURT: I think the question is relatively clear and understood. So if the witness is confused, they can certainly ask for clarification. Otherwise, the Court is going to allow the question to stand. So, sir, you can answer the question.

MS. MOTLEY: Your Honor, if I may. If we could set it to a timeline because we did see a video where Justin Blake was not sitting in front of the building. I think that is important for the jurors to know what we're talking about.

MR. SEMPF: I've asked him what he saw and he's indicated what he saw. I don't know that I'm restricted by setting a time.

THE COURT: You're not and he'll be available for cross-examination. So you can answer the question to the extent that you are able to, sir. Go ahead.

THE WITNESS: Could you repeat the question?

MR. SEMPF: Sure.

BY MR. SEMPF:

Q. My question goes to when you went to the Kenosha County Public Safety Building, I asked you who -- what did you see?

A. There were several people sitting outside of the front doors of the Public Safety Building.

Q. And was Mr. Blake, the defendant, one of those individuals?

A. Yes.

Q. And where were they sitting?

A. Just in front of the entrance doors.

Q. Okay. Were they blocking the door?

A. Yes.

Q. Okay. Was there an attempt made to make -- to request that those individuals move?

A. I believe a supervisor talked to them and gave them several warnings to move. I was not there specifically for what was said, but I know that there was warnings given.

Q. Okay. When you arrived in front of the doors were the individuals still there?

A. Yes.

Q. Including Mr. Blake.

A. Yes.

Q. And they were blocking the doors.

A. Yes.

Q. And what did you do based on what you were observing?

A. I stood there and waited for orders to make an arrest. Like I said, they gave several warnings to vacate the -- the front doors of the building. After several warnings were given, we were told to make an arrest and that's when I approached and took Justin Blake in custody.

Q. Okay. You -- you actually arrested the defendant?

A. Yes.

Q. Okay. Was-- Did he go willingly?

A. I tried to assist him up to his feet, and he kind of dead weighted so I had to forcefully lift him up. And as I approached, they also all locked arms kind of in a -- it appeared in a way to make it harder for us to take them in custody.

Q. All right. Would you characterize that as minimal though?

A. Yes.

Q. He ultimately-- He may have done some minor things but at the end of the day he -- he willingly submitted to arrest.

A. Yes, I would say so.

Q. All right. Is the-- What county and state is the Kenosha County Public Safety Building located in?

A. Kenosha, Wisconsin.

MR. SEMPF: I don't have anything else.

THE COURT: All right. Thank you. Attorney Motley?

**CROSS-EXAMINATION BY MS. MOTLEY:**

Q. Now, Officer Bissonnette, do you recall what your working hours were on April 25th of 2021?

A. It should have been 9:45 to six in the morning.

Q. 9:45 p.m. to six a.m.

A. Yes.

Q. Okay. And we just heard testimony from you that Mr. Blake was cooperative when he was placed under arrest, correct?

A. Yes.

Q. And he wasn't violent. He wasn't combative. He wasn't any of those things, correct?

A. Correct.

Q. And you indicated that you were not there for the warnings that were given to people that were out there to move from the area; is that correct?

A. From what I understand there was warnings given hours prior to my arrival, and then when I was standing

there there was some kind of warning given again.

Q. So my question is were you there and did you hear the warnings that were given to the individuals when they were in front of the building?

A. When I was standing outside the building, yes, I heard some kind of warning.

Q. Who gave the warning?

A. I believe it was Sergeant Pittsley.

Q. Okay. And do you recall exactly what his warning was?

A. I don't recall exactly what it was, but I know it was something along the lines of you need to leave or you will be arrested.

Q. And do you recall if -- if Sergeant Pittsley talked to a Tanya on that date?

A. I don't recall.

Q. Okay. Do you recall sergeant -- or do you recall Sergeant Pittsley specifically talking with Mr. Blake on that date?

A. I don't recall.

Q. Okay. And you indicated that Mr. Blake was arrested because he was preventing people from entering the building; is that correct?

A. Correct.

Q. Okay. And do you recall who he-- Did you

witness him preventing anyone from entering the building?

A. I was only there for a short time so I didn't see anybody specifically.

Q. Okay. Did you see anybody being prevented from exiting the building because of Mr. Blake?

A. I wouldn't know. I wasn't inside the building.

Q. Okay. Did you see-- And you arrested Mr. Blake because you were ordered to arrest him, correct?

A. Correct.

Q. All right.

MS. MOTLEY: I have nothing further. Thank you.

THE COURT: Anything based on that?

MR. SEMPF: No.

THE COURT: All right. Thank you for your testimony here today, sir. You are excused.

THE WITNESS: Thank you, sir.

(Witness excused, exits courtroom)

THE COURT: County's next witness?

MR. SEMPF: Deputy Koschnitzke.

(Deputy Koschnitzke enters courtroom, takes witness stand)

THE COURT: Come on up and work your way over to my right over here. If you could raise your

right hand and state and spell your name?

DEPUTY KOSCHNITZKE: Brian Koschnitzke, B-r-i-a-n. Last name K-o-s-c-h-n-i-t-z-k-e.

DEPUTY BRIAN KOSCHNITZKE, being first duly sworn on oath to tell the truth, the whole truth, and nothing but the truth, testified as follows:

THE WITNESS: I do.

THE COURT: Thank you. Please have a seat. You can adjust the chair and microphone as you need to. And to the County, as you are ready.

MR. SEMPF: Thank you, your Honor.

**DIRECT EXAMINATION BY MR. SEMPF:**

Q. Good afternoon, sir.

A. Good afternoon.

Q. You are Deputy, and I apologize, I'm going to butcher your name, is it Koschnitzke?

A. Yes.

Q. All right. Are you employed, sir?

A. Yes.

Q. Where?

A. Kenosha County Sheriff's Office.

Q. And in what capacity are you employed with the Kenosha County Sheriff's Office?

A. As a deputy.

Q. How many years of law enforcement experience do

you have?

A. Currently six.

Q. Do you know an individual by the name of Justin Blake?

A. Yes.

Q. How do you know that individual?

A. I know him from this case.

Q. Okay. You had contact with him regarding this case?

A. Correct.

Q. The individual that I've identified as Justin Blake and you've indicated that you know in contact with on this case, is -- do you see the individual anywhere in the courtroom?

A. Yes.

Q. Where is he?

A. Sitting at the defendant's table.

Q. And what's he wearing?

A. Glasses and a plaid -- blue plaid shirt.

MR. SEMPF: Your Honor, I'd ask that the record reflect this witness has identified the defendant.

THE COURT: Any objection?

MS. MOTLEY: No.

THE COURT: So noted.

BY MR. SEMPF:

Q. Deputy, I want to direct your attention to April 20 -- April 25th of 2021. Were you working on that date?

A. Yes.

Q. What were the nature -- what was the nature of your duties around 9:40, 10:00 in the evening on that date?

A. So at that time I had come in with regard to an overtime page, and at the time it was basically campus security due to protest.

Q. All right. Where was the protest?

A. It was centered around the front of the Public Safety Building.

Q. The Kenosha County Public Safety Building?

A. Correct.

Q. What county and state is the Kenosha County Public Safety Building located in?

A. Kenosha County, Wisconsin.

Q. And did you actually go to that location?

A. Yes.

Q. When you went to that location, what did you observe?

A. I observed several people, four people sitting on the ground with their backs against the main entrance to

the Public Safety Building and several other people around them.

Q. The four individuals that were sitting down, were they blocking the door?

A. Yes.

Q. Was the defendant one of those individuals?

A. Yes.

Q. Was there any attempt to try to get them to move?

A. Yes.

Q. Tell me about that.

A. Deputy Mancl and I at one point went out there, talked to them, asked them about moving, asked them if they would move; and we were essentially told that they would not until their demands were met.

Q. Was there an attempt to negotiate with those individuals including Mr. Blake in order to get them to move?

A. Yes.

Q. And tell me about that.

A. So after we were originally told by them, Deputy Mancl and I, that they weren't going to move, we forwarded the information to our supervisors. And then another attempt was made with Sergeant Pittsley, Deputy now Detective George and I also going out there and more attempts were made to come to a compromise.

Q. Okay. Were -- was a compromise able to be reached?
A. No.
Q. So the individuals did not move.
A. Correct.
Q. At some point were you told if they didn't move they were going to be arrested?
A. Yes.
Q. And that includes Mr. Blake.
A. Yes.
Q. When the individuals including Mr. Blake were told that they were going to be arrested if they continued to block the Public Safety Building entrance, did they move?
A. One of them moved. One of the four moved but not Mr. Blake.
Q. Mr. Blake did not move.
A. Correct.
Q. All right. So at that point what decision did law enforcement make?
MS. MOTLEY: Objection, your Honor. This is hearsay. He did not arrest Mr. Blake. He was dealing with the other two individuals so this goes to hearsay.
MR. SEMPF: I think -- I think-- If the objection is hearsay, he can testify what he was told

for the purpose of showing what effect it had on him. It's an effect on the listener situation. If he also observed the defendant being arrested, that's permissible. I mean, he can say that that's what he saw.

MS. MOTLEY: Your Honor, this is the same objection that the DA gave to us with regards to Officer Allison George who was not able to testify as to what others were saying.

THE COURT: What was the exact question?

MR. SEMPF: I -- I wanted to know if Mr. Blake was arrested. That's my question.

THE COURT: Do you know if Mr. Blake was arrested?

THE WITNESS: Yes.

THE COURT: All right. I'll allow it to stand. Go ahead.

BY MR. SEMPF:

Q. Was Mr. Blake arrested?

A. Yes.

Q. Was he arrested in your presence?

A. Yes.

Q. You saw him arrested?

A. Yes.

Q. And this was after multiple attempts to get him

to move away from that door.

A. Yes.

MR. SEMPF: I don't have anything else.

THE COURT: Thank you. Attorney Motley?

**CROSS-EXAMINATION BY MS. MOTLEY:**

Q. Now, Officer, I'm sorry, I don't want to butcher your last name either.

A. Understood.

Q. What is your rank again?

A. Deputy.

Q. Deputy. Deputy Koschnitzke, do you recall what your hours of work were on April 25th of 2021?

A. My normal hours?

Q. Yes.

A. 21:45 to 06:00.

Q. So 9:45 p.m. to six a.m., correct?

A. Yes, ma'am.

Q. And this was a Sunday, correct?

A. Correct.

Q. And you wrote a report with regards to what you witnessed on April 25th of 2021, correct?

A. Yes.

Q. And the reason why Mr. Blake was arrested was because he was preventing people from entering the building; is that correct?

A. That's my understanding.

Q. Okay. And in your report did you talk to anybody that was prevented from entering the building on April 25th of 2021?

A. One individual.

Q. Who was that individual?

A. I believe her name was Judith Devine.

Q. Judith Devine. So you spoke with Judith Devine and she told you that she was prevented from entering the building on April 25th of 2021.

A. Yes.

Q. And did she tell you that just -- did Judith Devine tell you she was prevented from entering the building because Mr. Blake specifically did not allow for her to enter the building?

MR. SEMPF: Objection, hearsay. I let this go the first time. She's persisting. This is hearsay.

MS. MOTLEY: Your Honor, this is not hearsay. He said he spoke with Judith Devine himself and he wrote a report about it.

MR. SEMPF: What Miss Devine said is a statement being offered for its truth. It's hearsay.

MS. MOTLEY: Your Honor, it's not. This is the same leeway that they've been given in terms of what these officers with the they, them, protestors,

whatchamacallit, you know. We're here for Mr. Blake. We'd ask for the same latitude.

THE COURT: That's not-- Those are apples and oranges. This question directly calls for a hearsay response. So unless there's some other basis for it or some other exception for it, the Court's going to uphold the objection.

MS. MOTLEY: Okay.

BY MS. MOTLEY:

Q. Now, Deputy, you spoke with Judith Devine on April 25th of 2021, correct?

A. Yes.

Q. And you wrote a report with regards to your conversation with Judith Devine on April 25th of 2021, correct?

A. Parts of it, yes.

Q. And in your report-- Do you recall what you put in your report with regards to your interactions with Judith Devine on April 25th of 2021?

MR. SEMPF: I'm going to object. I think she's trying to back door the hearsay in by wording it as what did you document in your report. If she's trying to get at what Miss Devine may or may not have said to the officer, that's hearsay. It doesn't matter if he documented it in the report or not.

MS. MOTLEY: Your Honor, it absolutely does matter if he documented it in his report and that's what I'm questioning on is his specific report, which is the same latitude that the plaintiff's attorneys have been getting with these officers and what they're hearing and seeing and what other people are saying to them that they testified to. So I believe because I'm asking specifically about what he put in his report with regards to Judith Devine, that the objection should be overruled.

THE COURT: Right, but the question is still to a direct -- you want to know directly what this individual said to him. Doesn't matter if he wrote it down or if he -- if anything else, but it's -- it's calling for a hearsay response for what this person directly said to him.

So that -- that direct question calls for a hearsay response. It's being offered for the truth of the matter. So unless there's some other -- again, unless there's some other reason it's being offered for, the Court's going to again sustain the objection.

BY MS. MOTLEY:

Q. Deputy, what did you witness Mr. Blake do on April 25th of 2021 in preventing anyone from entering the building?

A. Other than just sitting there, nothing.
Q. And it's your testimony today that Mr. Blake was arrested simply because he was preventing people from entering, exiting the building, correct?
A. To my knowledge, yes.
Q. And to your knowledge on April 25th of 2021 people in Kenosha County could peacefully protest, correct?
A. Absolutely.
Q. And on April 25th of 2021 did you witness Mr. Blake protesting not peacefully?
A. I witnessed him sitting there and that will be my answer.
MS. MOTLEY: Okay. I have nothing further. Thank you.
THE COURT: Any redirect?
MR. SEMPF: Just a clarification.

**REDIRECT EXAMINATION BY MR. SEMPF:**

Q. Mr. Blake was blocking the door.
A. Correct.
Q. You may not have seen somebody try to go in or try to go out but he and his cohorts were blocking the door.
MS. MOTLEY: Objection, your Honor.
MR. SEMPF: What's the grounds?

MS. MOTLEY: The grounds is vague, irrelevant. We're here for Mr. Blake. A timestamp of when he witnessed this.

THE COURT: Overruled. You can answer the question to the extent that you're able to.

THE WITNESS: Can you repeat it again?

MR. SEMPF: Sure.

BY MR. SEMPF:

Q. Regardless of whether you saw an actual disturbance, regardless of whether you saw Mr. Blake actually stopping somebody from going in, he and his cohorts were blocking the door.

A. Yes.

Q. Okay.

MR. SEMPF: I don't have anything else.

THE COURT: Anything based on that, counsel?

MS. MOTLEY: No.

THE COURT: All right. Thank you for your testimony here today, sir. You're excused.

(Witness excused, exits courtroom)

THE COURT: County's next witness?

MR. SEMPF: I think I'm going to rest on that.

THE COURT: All right. So what we'll do then is this is a good spot for us to take a break,

allow you all to stretch your legs a little bit, use the washroom if you need to.

Reminder, you're not to discuss the case, anything you've heard or seen here so far. And then the Court is going to discuss a couple of things with the attorneys and then have you back out here to continue on. So I'm imagining it shouldn't be more than approximately 15 minutes or so before we have you back out here. So with that, I'm going to have you retire to the jury room.

(Jury exits courtroom)

THE COURT: All right. Thank you. Jury has been excused. You all may be seated. All right. Does defense have any motions it wishes to make at this time?

MS. MOTLEY: No, your Honor.

THE COURT: All right. And then to defense, do you know for your case-in-chief how many or what the plan is for witnesses?

MS. MOTLEY: We may have two witnesses, your Honor.

THE COURT: Okay. And they're here you believe and ready to go?

MS. MOTLEY: I believe so. I'll have to check.

THE COURT: Okay. Certainly. Certainly.

How long do you anticipate their testimony being?

MS. MOTLEY: I think it's going to be quick.

THE COURT: Okay. All right. So we'll take a break to allow everybody to use the washroom and what not. Anything from the County that we need to address before we --

MR. SEMPF: I do have one thing.

THE COURT: Yes.

MR. SEMPF: Is one of the defense witnesses Mr. Cardinali?

MS. MOTLEY: No.

MR. SEMPF: Then I don't have anything else.

THE COURT: Okay. All right. If you could just be back in here about 10 minutes or so so we can continue on and we'll go from there.

MS. MOTLEY: Thank you.

THE COURT: Thank you so much.

MS. MOTLEY: Your Honor, could we say 3:00? It's about 12 minutes.

THE COURT: Yes, that will be perfect. Three o'clock.

(Recess taken)

THE COURT: Court is recalling Kenosha County versus Justin Blake. All of the appearances are the same. State has rested. Are we ready to bring the

jury in and start the defense's case-in-chief?

MS. MOTLEY: Yes.

THE COURT: Let's bring them on out.

(Jury enters courtroom)

THE COURT: Thank you. Please be seated. Welcome back out, ladies and gentlemen of the jury. As you recall the County has rested their case-in-chief and now we move onto the defense's case-in-chief. And to that end, Attorney Motley, your first witness?

MS. MOTLEY: Thank you, your Honor. The defense would like to call Judith Devine, please.

(Ms. Devine enters courtroom, takes witness stand)

THE COURT: Good afternoon. If you could raise your right hand and state and spell your name?

MS. DEVINE: Okay. I am Judith Devine, D-e-v-i-n-e.

MS. JUDITH DEVINE, being first duly sworn on oath to tell the truth, the whole truth, and nothing but the truth, testified as follows:

THE WITNESS: Yes.

THE COURT: All right. Thank you. Please have a seat. You can adjust the chair and microphone as you need to, and just make sure you speak up loud and clear when answering questions, okay?

THE WITNESS: Okay.

THE COURT: All right. And, Attorney Motley, as you're ready.

**DIRECT EXAMINATION BY MS. MOTLEY:**

Q. Good afternoon, Miss Devine.

A. Good afternoon.

Q. Thank you for being here today. Before I get started I -- I want you to go to April 25th of 2021. Do you recall that day?

A. Yes.

Q. And on April 25th of 2021, do you recall going to the Kenosha Public Safety Building?

A. Yes, I do.

Q. And why did you go to the Kenosha Public Safety Building that day?

A. I needed to get a report.

Q. Okay. And that was on a Sunday, correct?

A. You know, I don't quite remember if it was or not.

Q. Okay. And when you went to the Public Safety Building on April 25th of 2021, do you recall seeing any people outside the building?

A. Yes.

Q. And what were they doing?

A. They were sitting. A couple were standing and

they were just kind of chit-chatting, not loud or anything. They weren't blocking the sidewalk. And I just walked up and actually they said hello and one gentleman opened the door for me.

Q. One gentleman opened the door to the safety building for you.

A. Yes.

Q. And that was one of the protestors?

A. I guess. I mean, he was with them.

Q. Okay. And do you recall on that day anyone preventing you from entering the building?

A. Oh, no. Absolutely not. Actually they opened the door for me.

Q. Okay. Do you recall anyone preventing you from exiting the building that day?

A. No, not at all. They asked if I wanted coffee when I was leaving.

Q. Did you have coffee with them?

A. No, no. I had to get home.

Q. And you weren't outside that day protesting with them, correct?

A. No. I really wasn't aware what they were there for.

Q. Okay. And you're here today and you're not subpoenaed, correct?

A. No, I'm not.
Q. You just kindly decided to come after I called you and asked you to be here, correct?
A. Yes.
Q. So if there was a police report that said that you had to climb over people to get into the building, that's not true, is it?
A. Oh, no. Absolutely not.
Q. If there's a police report that said that you told the police that you were prevented from entering the building, that's also not true, is it?
A. No, actually I didn't see any police outside.
Q. And when you entered the building inside, did any of the police ask you if you had been prevented from entering or exiting the building?
A. There was only maybe the teller behind the window. I didn't see any police.
Q. Okay.
MS. MOTLEY: I have nothing further. Thank you.
THE COURT: Okay.
(Witness begins to get up)
THE COURT: Hold on. Other counsel might have some questions.

**CROSS-EXAMINATION BY MR. SEMPF:**

Q. Miss Devine, good afternoon.
A. Good afternoon.
Q. I just want to -- I just want to make sure I have your testimony. So what I heard was you -- you came to the Public Safety Building on the 25th of April 2021, right?
A. Mm-hmm.
Q. And you said that you came there to get a report?
A. Yes, I did.
Q. And you said that-- Do you know-- I thought you said that somebody opened the door for you?
A. One of them. I don't know. It was a gentleman.
Q. Okay. You know that it was a gentleman -- a gentleman opened the door for you.
A. Well, he didn't do anything or say anything. He just said let me get the door. That's it so I just --
Q. You don't know who that was.
A. No, absolutely not.
Q. And did you actually go through that door?
A. Yes.
Q. And then you were able to get your report?
A. Yes.
MR. SEMPF: Okay. Thank you. I don't have anything else.
THE COURT: Anything based on that?

MS. MOTLEY: I do, your Honor. Just real quick.

**REDIRECT EXAMINATION BY MS. MOTLEY:**

Q. Do you know Mr. Justin Blake, the man to my right?

A. No, I don't.

Q. Do you recall seeing him on April 25th of 2021?

A. Well, he has his sunglasses on so I'm not really-- I don't think I did. I may have but it's been a while.

Q. Okay.

MS. MOTLEY: I have nothing further. Thank you very much.

THE COURT: Anything based on that?

MR. SEMPF: No.

THE COURT: All right. Thank you so much for your testimony here today. You're free to go.

(Witness excused, exits courtroom)

THE COURT: All right. Then your next witness?

MS. MOTLEY: Your Honor, at this point the defense would rest.

THE COURT: All right. Does the County have any rebuttal testimony it wishes to put on?

MR. SEMPF: No.

(Proceedings continued)

STATE OF WISCONSIN )
) SS:
COUNTY OF KENOSHA )

I, TRACY A. CZARNECKI-KOZMER, an official court reporter in and for the Circuit Court of Kenosha County, do hereby certify that the foregoing is a true and correct partial transcript of a portion of the proceedings had and testimony taken in the above-entitled matter, as the same are contained in my original machine shorthand notes on said trial or proceeding.

Dated this 3rd day of April, 2025.

Electronically filed by Tracy A. Czarnecki-Kozmer, RPR.