

_____

In the matter of:

**Justin Blake**
**vs.**
**David Beth, et al.**

Case No.: 22-CV-970

Witness: Tanya Mclean

Date: September 27, 2023

Court Reporter: Alice Barbeln

_____

790 North Milwaukee Street, Suite 100-C
Milwaukee, WI 53202
414.585.8128
www.creamcityreporting.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

--------------------------------------------------------
JUSTIN BLAKE,
            Plaintiff,
     -vs-
DAVID BETH in his individual capacity and
official capacity, COUNTY OF KENOSHA, a
municipal corporation, KYLE BISSONNETTE in
his official capacity, JACOB DICELLO in
his official capacity, GLORIA GALVAN in
her official capacity, DEREEMEYUN HAYNES
in his official capacity, JEREMY MAY in    Case No.
his official capacity, JESSICA BERGMANN in  22-CV-970
her individual and official capacity,
VISITING NURSE CARE, INC., KENOSHA
VISITING NURSE ASSOCIATION, JOHN DOE
OFFICERS in Kenosha County Sheriff's
Department 1-10, JANE DOE MEDICAL
PROFESSIONALS in their individual and
official capacities, WISCONSIN COUNTY
MUTUAL INSURANCE COMPANY, ABC INSURANCE
COMPANY,
            Defendants.
--------------------------------------------------------

          Examination of TANYA MCLEAN,

taken at the instance of Defendants David Beth,

County of Kenosha, Kyle Bissonnette, Jacob Dicello,

Gloria Galvan, Dereemeyun Haynes, and Jeremy May,

under and pursuant to the Federal Rules of Civil

Procedure, before ALICE M. BARBELN, a Registered

Professional Reporter and Notary Public in and for

the State of Wisconsin, at Crivello, Nichols & Hall,

S.C., 710 North Plankinton Avenue, Milwaukee

Wisconsin, on September 27, 2023, commencing

at 12:32 p.m. and concluding at 1:24 p.m.

A P P E A R A N C E S

CADE LAW GROUP, LLC, by
MR. NATHANIEL CADE, JR.,
MS. KIM MOTLEY, (Appeared via Zoom.)
2525 North Terrace Avenue,
Milwaukee, Wisconsin 53211,
appeared on behalf of the Plaintiff.

CRIVELLO, NICHOLS & HALL, S.C., by
MS. BRIANNA J. MEYER,
710 North Plankinton Avenue, Suite 500,
Milwaukee, Wisconsin 53202,
appeared on behalf of Defendants David Beth, County
of Kenosha, Kyle Bissonnette, Jacob Dicello, Gloria
Galvan, Dereemeyun Haynes, and Jeremy May.

BORGELT, POWELL, PETERSON & FRAUEN, S.C., by
MR. BRIAN W. BAIRD,
Pabst Boiler House,
1243 North 10th Street, Suite 300,
Milwaukee, Wisconsin 53205,
appeared via Zoom on behalf of Defendants Jessica
Bergmann, Visiting Nurse Care, Inc., and Kenosha
Visiting Nurse Association.

Note:  The witness appeared via Zoom.

* * * * *

I N D E X

Examination:                                            Page

By Ms. Meyer.....................................   3
By Mr. Cade......................................  36

Exhibits Identified:                                    Page

Exhibit 4 -  Notice of Deposition..............  14

Disposition Of Original Exhibit:

Attached To Original Transcript

* * * * *

```
1                TRANSCRIPT OF PROCEEDINGS
2                    TANYA MCLEAN, called as a witness
3        herein, having been first duly sworn on oath,
4        was examined and testified as follows:
5                        EXAMINATION
6    BY MS. MEYER:
7    Q    Ms. McLean, my name is Brianna Meyer.  I'm one
8         of the attorneys for the county defendants in
9         this lawsuit.  Have you ever had your
10        deposition taken before?
11   A    No.
12   Q    There is a couple of ground rules that I want
13        to go over before we get started and hopefully
14        that makes everything go a lot smoother for
15        everyone, okay?
16   A    Okay.
17   Q    The first rule, only one person can talk at a
18        time.  Alice is our court reporter.  She does a
19        great job, but we have to make sure that only
20        one person is talking at a time because she
21        cannot write down two voices at once; is that
22        fair?
23   A    Yes.
24   Q    So it's natural to want to jump in; I'm guilty
25        of it a lot too, but I'll do my best to let you
```

```
 1            finish your answer, and you just do your best
 2            to let me ask my question.
 3   A    Okay.
 4   Q    Second one, you are doing a great job, but
 5            verbal answers we need to every question.
 6            Shaking head, a "yes" or a "no," we can see it
 7            because you are over Zoom, but Alice can't put
 8            that down into the transcript, so we need to
 9            have a verbal answer to every question, all
10            right?
11   A    Okay.
12   Q    Last thing is that if you answer my question,
13            I'm going to assume that you understand my
14            question, so if you don't understand, please
15            let me know.  Sometimes my questions can be a
16            little wonky, and that's not on purpose, it's
17            just a bad question on my end, so if you don't
18            understand what I'm asking, please let me know,
19            and I'm happy to clarify, all right?
20   A    Yes.
21   Q    Perfect.  Can you spell your name for the
22            record?
23   A    Tanya, T-A-N-Y-A, McLean, M-C-L-E-A-N.
24   Q    What's your date of birth?
25   A    2/16/73.
```

1   Q    And where do you live right now?

2   A    In Kenosha, 6020 18th Avenue, 53143.

3   Q    Who do you live there with?

4   A    My grandsons and youngest son is still at home.

5   Q    And how many kids do you have?

6   A    Four.

7   Q    All boys?

8   A    No, two girls, two boys.

9   Q    And the youngest son still lives there, right?

10  A    Yes.

11  Q    Are the grandkids that live there his kids, or

12       are they one of your other children's children?

13  A    One of my other children's children.

14  Q    How many grandkids do you have in total?

15  A    Three.

16  Q    Let's talk briefly about your education.

17       What's the highest level of education that

18       you've completed?

19  A    I have a master's degree -- a couple of

20       master's degrees.

21  Q    In what fields?

22  A    One is in education in social policy, and the

23       other one is a master's in social work.

24  Q    What's your current occupation?

25  A    I'm an executive director and an educator.

1    Q    Where are you working?

2    A    I'm an executive director for Leaders of

3         Kenosha, and I'm also employed by Kenosha

4         Unified School District.

5    Q    How long have you been with Leaders of Kenosha?

6    A    Three years.

7    Q    And what about Kenosha Unified?

8    A    2014.

9    Q    Besides from this incident, have you ever been

10        arrested?

11   A    Yes, years ago, maybe about 15 years ago.

12   Q    Was that in connection with a protest, or

13        something else?

14   A    Not in connection with a protest.

15   Q    Do you have any criminal convictions?

16   A    No.

17   Q    Prior to this deposition, did you meet with

18        anyone?

19   A    No.

20   Q    Did you speak to anyone before this deposition?

21   A    No.

22   Q    Did you speak to Attorney Motley at all?

23   A    No.

24   Q    I got an e-mail today from Attorney Motley

25        explaining that you didn't know where the

1    deposition was going to be held.  How did --

2    did you convey that to Attorney Motley?

3  A    I did.  I thought you meant in terms of this

4    case.  The papers were misplaced that were

5    served, so I needed to know where to go, and I

6    just assumed she would know; so -- I didn't

7    know who else to reach out to.

8  Q    As far as the substance of what we are talking

9    about today, so this case in general, did you

10    speak with Attorney Motley?

11  A    No.

12  Q    And I'll ask the same about the other

13    attorneys, so Attorney Cade is here, did you

14    speak with him at all?

15  A    No, I don't even know him.

16              MR. CADE:  That hurts.

17              THE WITNESS:  Sorry.

18              MR. CADE:  Wow, straight to the

19    heart.

20  BY MS. MEYER:

21  Q    Same question for Attorney Baird?

22  A    No.  I don't know him either.

23  Q    How many times have you met Attorney Motley?

24  A    Just a few, just -- I just know of her.  I

25    never like met with her -- I mean, just kind of

1    in passing, like, I just know who she is.

2  Q  There was testimony earlier about a meeting

3     that was held after Justin Blake's arrest.  Did

4     you attend that meeting?  And I'll be more

5     clear if that helps, a meeting with Attorney

6     Motley?

7  A  Yeah, but I don't -- it wasn't like a formal

8     meeting, like -- yeah.  To be honest, I don't

9     remember the details.

10 Q  Do you remember who was there?

11 A  Maybe Justin.  Honestly, I can't tell you the

12    date or time; I can vaguely remember.  I have a

13    lot going on; so --

14 Q  Fair enough, but I have to ask, do you remember

15    any of the substance of that meeting?

16 A  Just basically about what happened with the

17    arrest and, you know, stuff like that.

18 Q  Walk me through that conversation.

19 A  The conversation was just about what happened,

20    you know, I mean, we were protesting, and

21    Justin was arrested, and then he was released.

22    I mean, there were really no in-depth details.

23    I mean, I was there, and there was some other

24    people there.  I mean, what happened, happened.

25    I mean, it's on film.  And I don't -- I mean, I

1  wasn't in the jail with Justin, so I'm not

2  privy to what was happening in the jail, so

3  that would be a conversation between Justin and

4  Attorney Motley, so just kind of what happened

5  outside.

6  Q   We will talk more about what happened outside

7      later.

8          Have you been in touch with Mr. Blake

9      at all about this lawsuit?

10 A   No.

11 Q   Have you been in touch with anyone about this

12     lawsuit?

13 A   No.

14 Q   Have you read any news reports about this

15     lawsuit?

16 A   No.

17 Q   We have talked about Mr. Blake, and that's

18     Justin Blake, for the record.  How do you know

19     Justin Blake?

20 A   My organization organized for his nephew when

21     he was shot in the back seven times by Rusten

22     Sheskey.

23 Q   Just so the record is clear, what do you mean

24     by your "organization organized for his

25     nephew?"

1   A   We organize protests.  I'm an organizer as well

2       within my organization.  We organized protests,

3       and, you know, events around the shooting of

4       Jacob Blake.

5   Q   And what sort of protests and events do you --

6       we will start with broad questions.  Do you

7       know about how many?

8   A   I have no idea.  Lots.

9   Q   Of both protests and events?

10  A   Yes.

11  Q   What kind of events are we talking about?

12  A   Social justice events.

13  Q   Can you explain to me what you mean by that?

14      Was there a potluck?  Was there a --

15  A   No, they were protests outside, you know,

16      marching in the streets.  I mean, we could have

17      been -- I mean, we have done a lot.  I don't

18      know, just protests.  I mean, you know what a

19      protest is.

20  Q   I do.  I'm asking besides protests.  You said

21      protests and events.  So besides protests, what

22      sort of events?

23  A   Well, they are like -- you know, we have

24      protests and then before the protest, we might

25      have a speaker.  That's considered an event.

1      Protesting is actually doing -- you know,

2      walking, protesting in the streets, or we could

3      be protesting peacefully in a park.  Speakers,

4      people coming, you know, to get information out

5      about what happened to Jacob Blake.  We wanted

6      justice for Jacob Blake, and whatever action we

7      were planning that day, then that's the event

8      that took place.  I mean, it's all public

9      record.  You can go look and see what it is,

10     and then you would know exactly what it was

11     verbatim.

12  Q  I understand.  And today it's just so that I

13     know, and I can ask questions about your

14     personal knowledge, so it's not what's on

15     public record; it's what you know and what you

16     remember, so that's why I'm asking.

17  A  Well, there is -- I mean, in three years, there

18     has been a lot.  We have done tons of stuff

19     over the last three years, and for me to detail

20     every single one of them, that would be

21     impossible.  Lots of stuff in Kenosha, stuff in

22     other places, I mean, you know, that's what we

23     do.

24  Q  Do you organize protests and events for other

25     instances, other instances of interactions with

1    police?  I'm just trying to get --

2  A    Absolutely, absolutely.  I mean, Justin's

3       family is not the only one.  We organize with

4       Planned Parenthood, different organizations.

5       It just depends on what justice we are seeking

6       at that time.  What's happening, who it's for,

7       so, yes, I am an organizer.  I'm a social

8       justice organizer.

9  Q    And are your efforts focused in Wisconsin, or

10      are they nationwide?

11 A    Wisconsin.

12 Q    Is there a board?  You said you are an

13      executive director.  Is there a board for

14      Leaders of Kenosha?

15 A    Yes.

16 Q    How many people sit on that board?

17 A    Three.

18 Q    And who are they?

19 A    Why does that matter?

20 Q    I need you to answer the question.

21 A    Myself, Erica Ness, and Alvin Owens.

22 Q    Erica, the --

23 A    I have a question.  Let me ask this.  So if I

24      don't want to answer something, I don't have to

25      answer something, correct?  Like this is --

 1    this is a civil thing, so let's just be -- I
 2    want to be direct with you, and you asking me
 3    how many kids I have and -- I don't see how
 4    this is relevant to Justin's case, so I know
 5    that if I don't want to answer something, you
 6    are not a judge, I don't have to answer, so
 7    let's be clear on that.
 8              MR. CADE:  Ms. McLean, this is
 9    Attorney Cade.  I'm one of the attorneys for
10    Mr. Blake.  If you don't answer, she can go to
11    court and get a court order, and then we have
12    to do this all over again, and it just prolongs
13    the process.  If there is something improper
14    that she asks, I'll make an objection, and I
15    can advise you whether to answer it if it's
16    something improper.  Asking how many children
17    you have, though, is not an improper question.
18              THE WITNESS:  But it's silly, and
19    it's a waste of time.
20              MR. CADE:  I understand, ma'am, trust
21    me, I understand, but it's permitted.
22              THE WITNESS:  Okay.
23              MR. CADE:  I would be the first to
24    object if it was improper as would Ms. Motley.
25              THE WITNESS:  I didn't say it's

1        improper; it's just silly, and I know that's
2        the purpose, and that's what lawyers do, so
3        let's get on with it.
4   BY MS. MEYER:
5   Q    Ms. McLean, you were served with a notice of
6        deposition, correct?
7   A    Yes.
8   Q    We will mark this as Exhibit 4.  And do you
9        remember -- I think you said before we went on
10       the record that the papers got lost in the
11       shuffle, so I'm not sure if you have it in
12       front of you right now?
13  A    I don't.
14  Q    Okay.  Do you remember on the notice that it
15       asked to -- for a production of documents as
16       well?
17  A    Yes.
18  Q    Okay.  Did you have any responsive documents to
19       the request?
20  A    No.
21  Q    Okay.  We have talked about the fact that you
22       are an organizer that organizes protests and
23       different events.  Before these protests and
24       other events, do you host meetings with
25       individuals who are hoping to partake in the

1          events?

2     A    What do you mean?

3     Q    Like is there any way -- how do you distribute

4          information to people who want to get involved

5          in your events?

6     A    Social media and then other groups share the

7          information and people attend.

8     Q    And is there ever a meeting prior to a protest

9          to explain the goals or what might happen?

10    A    Do you mean with people who are attending?

11    Q    With anybody.

12    A    If I'm holding something with another

13         organization, I might meet with another

14         organizer, but in terms of when people show up

15         to a protest, no.

16    Q    Are you aware of any meeting that occurred

17         before the protest that happened on April 25th

18         of 2021?

19    A    Do you mean a meeting that happened before the

20         action happened at the police station?

21    Q    Correct.

22    A    I don't remember the exact -- okay.  Yes,

23         myself and Reverend Barker, Justin, met to talk

24         about the action, yes.

25    Q    And what was discussed at that meeting?

1  A    What we were going to do.

2  Q    Can you give me details of that?  What was the

3       plan?

4  A    Go to the police station, deliver a list of

5       demands to -- I can't remember if it was the

6       sheriff or the police chief.  We wanted to talk

7       to them about the demands, and we weren't going

8       to leave until we spoke to someone.

9  Q    Did you have a person in mind that you wanted

10      to speak to, or was it anyone involved?

11 A    No.  I just said the police chief or the

12      sheriff.

13 Q    Was the list of demands a written-out list that

14      you had?

15 A    Yes.

16 Q    What was on the list of demands?

17 A    Well, No. 1, Rusten Sheskey being fired, and

18      don't ask me what else was on there.  I don't

19      remember.

20 Q    Do you still have that document?

21 A    No.  It was given to someone in the police

22      station.

23 Q    Do you know who it was --

24 A    Or sheriff's.  I have no idea because someone

25      else took it in, and I don't even remember who

1          did that.

2    Q    You don't know who took in the list of demands?

3    A    No, I don't remember.

4    Q    What else did you discuss at your meeting with

5         yourself and Reverend Barker and Justin?

6    A    That's it.

7    Q    Was there a plan about what type of protest

8         would be occurring?

9    A    No.  They were going to go -- we weren't

10        leaving until we talked with someone, so that

11        was the goal, to talk to someone.

12   Q    Was anyone else at that meeting?

13   A    Not that I recall, no.

14   Q    Was there any other meetings regarding going to

15        the police station on April 25th?

16   A    No.

17   Q    Okay.  So have you ever met Joseph Cardinali?

18   A    Yeah, I know Joe.

19   Q    How do you know him?

20   A    He's attended events, and, I mean, I know him

21        from the community.

22   Q    So he gave testimony earlier about there was a

23        meeting before this protest where it was

24        discussed that there would be a sit-in and

25        rights were gone over.  Were you present at

1    that meeting?

2  A   I can't remember if Joe was at the meeting that

3      I had.  I don't remember.  Joe may have well --

4      very well talked to Justin or whoever else.  I

5      don't recall.  Joe wasn't here, so, no.

6  Q   At any point did you speak to anyone who was

7      going to attend the protest about what kind of

8      rights they had going into the protest?

9  A   I mean, we hold rights trainings all the time,

10     so, I mean, I don't know if there was one

11     specific, but we hold -- over the past three

12     years, we have held rights training, so I don't

13     know if Joe could have been at one of those.

14     That's very common.  People need to know their

15     rights.

16 Q   Is the rights training conducted by Leaders of

17     Kenosha or by another group?

18 A   No, it's done by ACLU and -- I mean, there are

19     other groups that do it, but primarily it was

20     ACLU.

21 Q   What happens at these rights trainings?

22 A   People are explained what their rights are and

23     what they have a right to when encountering the

24     police.

25 Q   And does that include, you know, what questions

1          to answer or what police are allowed to ask?

2          I'm just trying to get an idea of what happens

3          at these meetings.

4     A    Yes.

5     Q    And you are not aware of one happening before

6          the protest on April 25th of 2021?

7     A    No.

8     Q    Okay.  Did you speak to anyone besides Reverend

9          Barker and Justin about this planned protest on

10         April 25, 2021?

11    A    No.

12    Q    Did you ever see any of the Facebook postings

13         about a protest, if there were any?

14    A    Yes.  If something's going out for Leaders of

15         Kenosha's page, normally I would see it.

16         But -- and, to be honest, I think there was

17         maybe one that -- you know, honestly, I don't

18         know if -- I can't remember if we did one or

19         not because -- I don't remember.

20    Q    Do you know how other individuals would have

21         found out about the protest if it wasn't from

22         Leaders of Kenosha?

23              MR. CADE:  Objection, calls for

24         speculation.  The witness may answer.  You can

25         answer, ma'am.

1           THE WITNESS:  Oh, okay.  Well, I

2     mean, others who -- Joe could have told

3     someone.  Reverend could have told someone.

4     Justin could have told someone.  I mean, word

5     of mouth.

6           MR. CADE:  And, Ms. McLean, just so

7     you know -- this is Attorney Cade -- you might

8     hear me make an objection.  Obviously, I'm not

9     your attorney, so I can't instruct you not to

10    answer.  The only reason I'm making the

11    objection, ma'am, is for the record.  At some

12    point the Court may review the transcript, or

13    if there is an issue.  All I'm doing is, if I

14    think there is something wrong, I make an

15    objection, but, other than that, I'll let you

16    know, go ahead and answer the question, okay?

17          THE WITNESS:  So if I don't want to

18    answer, I don't have to, or I still have to

19    answer?

20          MR. CADE:  No, as I said before, then

21    we go through the whole rigmarole of them

22    getting a court order, and then you've got

23    potential sanctions.  It's just easier to

24    answer.  I'm making the objection for other

25    reasons, but, once I make the objections, you

1     are then entitled -- or you then have to answer

2     the question.

3               THE WITNESS:  Okay.

4               MR. CADE:  I just wanted to clarify

5     that for you.

6               THE WITNESS:  All right.  Thank you.

7               MR. CADE:  You are welcome.

8   BY MS. MEYER:

9   Q    Ms. McLean, do you know how many individuals

10       were involved in this protest on April 25th?

11  A    Just four.

12  Q    And who were those individuals?

13  A    Billie, Joe, Justin, and Rev Barker.

14  Q    And for the record, is that Billie Violet?

15  A    Yes.

16  Q    And Joseph Cardinali?

17  A    Yes.  Oh, Monica Cummings, she showed up.  She

18       wasn't a part of it, but she brought us some

19       hot chocolate or whatever.

20  Q    Is that C-U-M-M-I-N-G-S?

21  A    C who?

22  Q    For her last name, the spelling.

23  A    Yes, C-U-M-M-I-N-G-S.

24  Q    Okay.  And it's my understanding that the group

25       met at a barber shop before going to the public

1       safety building; is that right?

2   A   They may have.  I didn't meet with them at the

3       barber shop.

4   Q   And by "they," you are referring to the three

5       other individuals that you listed?

6   A   Yes, yes.

7   Q   When did you meet up with the group?

8   A   I just showed up at the police station.  I

9       don't know the exact time or -- I showed up.

10  Q   Morning, afternoon?

11  A   I mean, shortly after it started, so I don't

12      remember the exact time we got there.  I think

13      it was morning.  I mean, midmorning.

14  Q   And that was to the public safety building?

15  A   Yes.

16  Q   When you got to the public safety building,

17      what did you see?

18  A   Just them sitting outside.

19  Q   Where were they sitting?

20  A   In front of the safety building.

21  Q   Were they sitting in front of the doors?

22  A   They were sitting -- yes, in front of the

23      entrance, uh-huh.

24  Q   And were you there for their entire protest, or

25      did you come and go throughout the protest?

1   A   No, I was there the entire protest.

2   Q   Did you sit with them?

3   A   I did.

4   Q   While you were sitting in front of the public

5       safety building, did anyone try to enter or

6       exit the building?

7   A   Later that afternoon towards evening, someone

8       tried to enter to go in to pay a bond or bail

9       or whatever.

10  Q   Was that person a civilian, to the best of your

11      knowledge, was it a member of the police force?

12  A   It was a civilian.  They were there to pay a

13      fine, so of course they were a civilian.

14  Q   Were they able to access the building?

15  A   They were.

16  Q   Okay.  So you saw them enter the building?

17  A   Yes.  She entered the building.  It was a

18      female, yes.

19  Q   Did she say anything to you or to the group of

20      protestors?

21  A   No.

22  Q   Anyone else that you saw try to enter or exit

23      the public safety building that day?

24  A   No.  It was a Sunday, so it wasn't like during

25      the week, high traffic.  I think another person

1      showed up to pay a bond, but I can't remember

2      what happened.  I don't remember what happened.

3  Q   So the four of you are sitting outside the

4      building.  At any point, did you have contact

5      with law enforcement?

6  A   Later that evening.

7  Q   Okay.

8  A   Right before the arrest.

9  Q   So, correct me if I'm wrong, is the only time

10     you had contact with the law enforcement

11     when --

12 A   Yes, we were out there all day.

13 Q   Ms. McLean, you need to let me finish my

14     question.  I know you think -- and it's human

15     nature to know where people are going, but we

16     have to keep a record, okay?

17          So my question is, the first time you

18     encountered law enforcement officers is when

19     they arrested your co-protestors?

20 A   Yes.

21 Q   Do you remember if they were police officers,

22     sheriff's deputies?

23 A   Sheriff's.  We were on sheriff property, so it

24     was a sheriff.

25 Q   And did you speak directly with the deputies?

1   A      I did.

2   Q      Okay.  Do you remember who you spoke with?

3   A      No.

4   Q      Do you remember the content of that

5          conversation?

6   A      Yes.

7   Q      Can you explain that to me?

8   A      They just wanted everyone to leave, and we

9          explained to them, you know, we wanted to speak

10         with someone inside the building, that the

11         demand had been sent in, and we weren't leaving

12         until we spoke with someone.

13  Q      And what did the deputy say in response?

14  A      They were, you know, they just wanted to --

15         they just wanted us to go, so they just kept,

16         "We just really want you to go.  We understand.

17         We understand what's going on, but, if you

18         don't leave, then you are going to be

19         arrested."

20  Q      And did anyone leave in response to the deputy

21         saying that?

22  A      No.

23  Q      And was everyone arrested?

24  A      No.

25  Q      Who was arrested?

1    A    Justin, Joe, and Rev Barker.

2    Q    And you weren't arrested?

3    A    No.

4    Q    Did anyone explain to you why you were not

5         arrested?

6    A    I wasn't in the same space to be arrested.  The

7         dynamics were set up -- they were in front of

8         the building.  That's not what I was doing.

9    Q    Okay.  So then help me bridge the gap because

10        the last time we talked about it, you were

11        sitting with them.  What were you doing at that

12        time?

13   A    Well, because when it was time for the police

14        to say "you are moving," I wasn't sitting

15        there, so I was not arrested.

16   Q    Where were you at the time?

17   A    Standing up.

18   Q    Okay.

19   A    On a public sidewalk.  You can stand in front

20        of the safety building.  It's not against the

21        law.

22   Q    I'm not insinuating that it was, Ms. McLean.

23        I'm just asking you questions.

24   A    Okay.

25   Q    You were sitting with the protestors, and at

```
1          some point you stood up.  Is that the only
2          movement --
3   A      Uh-huh.
4   Q      Is that the only movement you had?
5   A      What do you mean "is that the only movement I
6          had"?
7   Q      When you moved from sitting in front of the
8          public safety building to the sidewalk, was
9          that the only movement you had during the
10         protest?
11  A      Yes.
12  Q      And at the time the officer showed up, you were
13         standing on the sidewalk speaking to them; is
14         that correct?
15  A      Yes.
16  Q      Okay.  And you were not arrested because you
17         were on the public sidewalk?
18  A      Yes.
19  Q      Did you hear the officers interact with any of
20         the other protestors?
21  A      Do you mean Justin, Joe, or Rev?
22  Q      Unless there were other -- those were the three
23         protestors that you listed previously.  If
24         there were other ones --
25  A      I mean, I heard them saying, "You have to move
```

1          or we are going to arrest you. "

2     Q    Did you hear Justin, Joseph, or Rev Barker say

3          anything back?

4     A    No.  They never spoke.

5     Q    Okay.  And then what happened?

6     A    They were arrested.

7     Q    Did you see the officers place handcuffs on

8          Justin, Joseph, and Rev Barker?

9     A    I did.

10    Q    And then what did you see?

11    A    They went to jail.

12    Q    Did you see them go to jail?

13    A    I mean, they took them in the back of the paddy

14         wagon, so I assumed they went to jail.

15    Q    So you witnessed the officers place Justin,

16         Joe, and Rev Barker into the back of a wagon?

17    A    Yes.

18    Q    Okay.  Did you see any interactions between

19         your co-protestors and deputies as they were

20         placing them into the wagon?

21    A    Yes.

22    Q    What did you see?

23    A    I mean, I saw them when they were picking them

24         up off the ground, and they were extremely

25         rough with them, and they were extremely rough

1       putting them in the paddy wagon as well.

2   Q   Can you describe that for me?  What did you see

3       that made you think that they were being

4       extremely rough?

5   A   How they were -- how they were handling them.

6       It was rough.  I mean, that's very simple.

7       Like what do you -- how do you --

8   Q   What actions did you witness that, in your

9       mind, said, "oh, that's rough"?

10  A   Because I know in my brain, right, this is -- I

11      know what rough to me looks like, if someone

12      comes and grabs me and is rough with me.  I've

13      seen -- I've seen people arrested before and

14      rough is rough.  I don't know how you want me

15      to characterize "rough."  He was rough with

16      them, pulling on them, yanking on them.  It's

17      not like they were being uncooperative.  It was

18      just rough.

19  Q   When you say "pulling on them," pulling on who?

20  A   All three of them.  We are talking about

21      Justin, Joe, and Rev, so all three of them.

22  Q   And pulling what?

23  A   Their body.

24  Q   Their arms?

25  A   Their shoulder, their arms, and they were very

1    rough with them.  Let me say this:  They were

2    very rough with Justin more so -- let me take

3    that back.  With Rev Barker, they weren't, you

4    know, it was just, you know, they grabbed him,

5    whatever.  Justin, they were very rough with.

6  Q  Okay.  What was the difference between how they

7    were treating --

8  A  I mean --

9  Q  Ms. McLean, I'm sorry, but you got to let me

10   get my question out for the record, okay.

11         What was the difference between how you

12   witnessed the officers treat Rev Barker with

13   how they treated Mr. Blake?

14 A  I don't know how to characterize that for you.

15   They were just extremely rough with him.

16 Q  Did they -- did you witness anyone push any of

17   the protestors?

18 A  The way he grabbed Justin was not the same as

19   he grabbed Rev Barker.  It was very different.

20 Q  Can you explain those differences to me?

21 A  No.

22 Q  Okay.  Do you know, prior to the protest, was

23   there any discussion about "what happens if we

24   get arrested"?

25 A  Well, you don't have to talk, that's part of

1      your rights.  You don't have to -- you know

2      this; you are a lawyer.  I mean, they don't

3      have to speak to law enforcement.

4  Q   Was that discussed between the protestors prior

5      to the protest?

6  A   The part about just being silent?

7  Q   Anything about --

8  A   Yes, yes.  It was discussed, yes, yes.  They

9      weren't going to talk to the police, yes.

10 Q   So the plan was to not speak to police,

11     correct?

12 A   That's always the plan.  We don't ever talk to

13     the police.  When we protest, we never talk to

14     the police, so it's not a plan, it's just kind

15     of inferred.  We don't talk to the police.

16 Q   I'm trying to figure out if there was an actual

17     discussion had about it.

18 A   We don't talk to the police, so, no, that was

19     just -- we know not to talk to the police.

20 Q   Okay.  And I might be phrasing it inartfully.

21     I'm trying to figure out if there was an actual

22     discussion between protestors that you were

23     present for where there was a discussion of,

24     "We will not speak to police"?

25 A   And I'm telling you again, that's just always

1        our thing, we don't talk to the police.

2   Q    Okay.  So you do not remember any specific

3        discussion, correct?

4   A    I didn't say I didn't remember.  I'm saying

5        that is always the discussion.

6   Q    Okay.  When was this discussion?

7   A    I don't know.  That's something that was

8        heavily discussed over the past couple of

9        years.

10  Q    Did you ever talk about this personally with

11       Mr. Blake?

12  A    Not talking to the police?

13  Q    Yes.

14  A    Again, those are discussions we have all the

15       time about not talking to the police in terms

16       of us protesting.  If you are arrested, I mean,

17       that was a very -- like protestors know, you

18       don't talk to the police.

19  Q    So, yes, you did have a discussion with

20       Mr. Blake prior to this protest?

21  A    Sure.

22  Q    Did you have a discussion with Mr. Blake prior

23       to the protest of the potential for arrest?

24  A    Yes.  When you protest, there is always a

25       potential for arrest.

```
1   Q    What did you say to Mr. Blake about that?

2   A    That if he's arrested that we will get him out

3        of jail, I mean, that's just something we know

4        when you are protesting, you have a potential

5        to go to jail.

6   Q    What was the plan?  You said, "we will get him

7        out of jail."  What was the plan to get him out

8        of jail if he was arrested?

9   A    Pay his bond.

10  Q    Who was going to pay that?

11  A    More than likely, I would have paid the bond to

12       go get him out.

13  Q    What about with the other protestors, was there

14       a plan in place for if they got arrested?

15  A    Go bond them out.

16  Q    Again, you would be the one to pay that, or

17       someone else?

18  A    Yeah, I mean, I was willing to go pay, but, you

19       know, both of them had significant others that

20       were also willing to pay, so it just -- whoever

21       got there first, basically.

22  Q    Did you post bond for any of the three

23       protestors that were arrested in this case?

24  A    No.

25  Q    Okay.  Were you asked to post bond for any of
```

1          them?

2    A     No.

3    Q     Have you spoken to Mr. Blake after his arrest?

4    A     Yes.

5    Q     Have you spoken about his arrest?

6    A     Yes.

7    Q     What were those discussions?

8    A     I mean, could you be a little more specific?

9          There is lots of things.  I need you to be more

10         specific.

11   Q     The first conversation you had with Mr. Blake

12         after his arrest, when was it?

13   A     As soon as he was released.

14   Q     And what did Mr. Blake say to you?

15   A     That he was in pain, that they hurt him, that

16         they kept him in some chair, strapped in the

17         whole entire time he was there.

18   Q     Okay.  And what did you say back to Mr. Blake?

19   A     That I encouraged him to seek medical attention

20         right away.

21   Q     Do you know if he did?

22   A     I don't know if he went immediately.  I know at

23         some point he went.  I don't know exactly when.

24   Q     Was there anything else discussed about

25         Mr. Blake's arrest during that first

```
 1        conversation?
 2   A    In terms of what?  I wish you would just kind
 3        of -- in terms of what?
 4   Q    I'm just trying to learn information.  I wasn't
 5        at the conversation, and I'm asking you --
 6   A    No, we talked about what happened.  You know,
 7        they put him in the chair.  He said he needed
 8        to go to the bathroom, and then there was -- he
 9        talked about one of the people in the jail, an
10        African American, who just -- who implied that
11        what they were doing to him was wrong and that
12        he felt bad and that they kept him in a room in
13        this chair and how much pain he was in.  He
14        just really talked about that because they hurt
15        him.
16   Q    Does he know -- and I know this is a couple
17        layers.  Did he tell you who expressed to him
18        that he felt like what was happening was wrong?
19   A    I mean, he didn't know him personally.  He
20        worked in the -- he was someone who worked in
21        the jail.
22   Q    Did he tell you any specifics about what this
23        person said or did to make him feel like this
24        person believed what they were doing was wrong?
25   A    I don't recall.
```

Gramann Reporting, Ltd.
414.585.8128

1   Q    Okay.  Did you have any other conversations

2        with Mr. Blake about his arrest?

3   A    No.

4   Q    Just the one time right after his arrest?

5   A    I mean, no, we have talked -- I mean, it's,

6        "I'm in pain.  I'm hurt.  They did this to me."

7        The same conversation several times.

8   Q    Do you know how many?  More than five?

9   A    No.  I have no idea.

10  Q    Have you talked to Mr. Blake about this lawsuit

11       at all?

12  A    No.

13  Q    Have you talked to anyone else about this

14       lawsuit?

15  A    No.

16            MS. MEYER:  Let me just check my

17       notes real quick, but I might be done, but I'm

18       not promising anything until I check my notes,

19       okay?

20            THE WITNESS:  Okay, all right.

21            MS. MEYER:  I don't have any more

22       questions for you, but Attorney Cade might.

23            THE WITNESS:  Okay.

24                 EXAMINATION

25  BY MR. CADE:

1   Q    Ms. McLean, I will be as prompt and quick as

2        possible.  I'm only going to ask you a few

3        questions.  Let me pull up my notes.

4   A    Okay.

5   Q    Just so I'm clear, on April 25, 2021, the time

6        of the protest, you were not arrested, correct?

7   A    No.

8   Q    Were you there in any capacity either on behalf

9        of your organization or another organization,

10       or were you there as a protester?

11  A    I mean, I was there as a protester, yeah, both,

12       yes to both.

13  Q    Okay.  You witnessed the arrest of Mr. Blake,

14       Mr. Cardinali, and Rev Barker, correct?

15  A    Yes.

16  Q    At the time they were arrested, did you have a

17       belief or understanding that the individuals

18       who were arresting Mr. Blake knew who he was?

19            MS. MEYER:  Objection, calls for

20       speculation.

21            MR. CADE:  You can answer.

22            THE WITNESS:  Absolutely, they knew

23       who he was.

24  BY MR. CADE:

25  Q    And why do you say "absolutely they knew who he

1       was"; what's the basis?

2  A    I mean, we protested, Justin front and center,

3       in Kenosha for -- from August until April.  I

4       mean, front and center all the time.  They knew

5       who he was.  Did I hear anyone say they knew

6       who he was?  No, but I had a -- I had a

7       conversation with one of the sheriffs.  There

8       was a bunch of them out there.

9  Q    I'm sorry, you said "one of the sheriffs," one

10      of the deputies?

11  A    Yes, one of the deputies, not the sheriff, one

12      of the deputies, because they wanted -- they

13      kept asking me who he was, and I'm like, "You

14      know exactly who he is," and they were like,

15      "We need you to tell us who he is," like

16      implying that "we know, you can just say who he

17      is."  And I would just say to them, "You know

18      who he is."  And it just kind of went like

19      that.

20  Q    Okay.  Now, you had said in response to earlier

21      questions from Ms. Meyer that you viewed or

22      believed they were being rough with the

23      individuals when they were arresting them.  Can

24      you describe that?

25  A    Again, you know, it was just how they handled

Gramann Reporting, Ltd.
414.585.8128

1         Justin.

2    Q    Sure.  Let me rephrase.

3    A    There was a lot more force than the other two.

4    Q    Let me rephrase.  Maybe this will help.

5              I presume that you've been present for

6         lots of protests since the shooting of Jacob

7         Blake, fair?

8    A    Yes.

9    Q    And in that time, so since August I believe it

10        was 23rd of 2020, you have witnessed a number

11        of people being arrested by the police or the

12        sheriff's deputies?

13   A    Yes.

14   Q    And I would imagine all of the people being

15        arrested, you've seen a panoply, a cornucopia

16        of arrests, some of lightly saying, "Hey, you

17        are under arrest," and others violently

18        slamming to the ground, jerking arms behind the

19        backs, being arrested, things like that?

20   A    Yes.

21   Q    Okay.  So with that, knowing you've seen the

22        light touch and the heavy hand, when you say

23        they were being rough with Mr. Blake

24        especially, where would you put it on that

25        continuum?

1   A    Extra heavy hand.

2   Q    Okay.  So describe that, they -- did they jerk

3        him up, did they slam him to the ground, did

4        they slam him against the wall?  What did you

5        observe?

6   A    Yes.  When they grabbed him, he grabbed him

7        really, really forcefully, and Justin was just

8        trying to get up, and, like he just -- he

9        grabbed him very, very forcefully, like -- and

10       then, like I said, the door was behind him, and

11       then Justin kind of -- like when he grabbed

12       him, he went into the door, and I -- because I

13       even was saying, "Why are you being so rough

14       with him?  You are being rough.  He's not

15       resisting.  Stop being so rough."  So -- and

16       then he got up, and then they were -- when they

17       put him -- when they were trying to, like

18       walking him to the van and getting ready to put

19       him in the van, they kind of like, you know,

20       you got to step up, and you are in handcuffs,

21       and they just were rough in how they were

22       putting him in the back of the van.  I wish I

23       could be more helpful in terms of "rough."

24  Q    Sure.  You are very helpful.

25              Let me ask you this:  When you

1     specifically told and you uttered the

2     statements "You are being too rough with him,"

3     was that to the officer or officers who were

4     arresting Mr. Blake?

5  A   Yes.  And I said that to them while they were

6     getting him up off the ground and then when

7     they were going to put him into the van, they

8     were being -- I'm like, "You guys are being so

9     rough."  And, you know, "You don't have to do

10    that.  He's not resisting."  I kept saying

11    that, but they ignored me.

12  Q   Was it one -- how many officers, one, two, or

13    more that were arresting Mr. Blake

14    specifically?

15  A   There were two, and then when he was going to

16    the van, there were two -- there were a

17    bunch -- there were at least five or six out

18    there.  There might have even been more that

19    ended up coming because a lot more came, so

20    there were at least five or six out there.

21  Q   Right, but I'm -- I'm not talking about who was

22    present.  I'm more --

23  A   Two people.

24  Q   I want to focus on who put hands on Mr. Blake

25    that you said was being too rough.

1   A    Two people.

2   Q    Okay.  And these were sheriff's deputies?

3   A    Yes.

4   Q    Did they ever, when you made the statement,

5        "You are being too rough," did they ever

6        respond or acknowledge your statement or in any

7        way show that they understood what you were

8        saying to them?

9   A    No.  They just ignored me.

10  Q    You had indicated that Mr. Blake, upon release,

11       made some statements to you.  Can you clarify

12       what those were?

13  A    He told me that he was in pain, and I asked him

14       why, and he said they had him strapped into the

15       chair the entire time.  And I did ask him, I'm

16       like, "You didn't go through a

17       (unintelligible), like they didn't put you in a

18       holding cell?"  He said, "No."  They kept him

19       in the chair the whole entire time, and, you

20       know, he was there -- he was not released early

21       like the other ones.  They kept him.  He was

22       released many, many hours after Joe and Rev

23       Barker.  And so he said that they kept him in

24       that chair the whole entire time.

25  Q    Did you ever --

1   A    And then I told him that he, you know, he

2        needed to seek medical attention, and, you

3        know, he agreed, and I -- I don't remember

4        exactly when Justin ended up going and seeing

5        the doctor; I don't remember.  I wasn't with

6        him when he did that.

7   Q    Sure.  I understand, ma'am.  Perfectly fine.

8                    One thing I want to clarify, I know

9        you had said that you did not give Mr. Blake's

10       name to the deputy asking it.  Did you hear or

11       did anyone else indicate to the deputy who

12       Mr. Blake is?  Did you hear anyone utter his

13       name?

14  A    Did anybody say Justin's name?  I'm thinking

15       someone did.  I just can't put my -- I can't

16       picture who it was.  Like -- because at this

17       point, you know, a few people had showed up

18       and -- I believe so, yes.  I can't recall who

19       it was.

20  Q    The two officers who arrested Mr. Blake, can

21       you describe -- for the sheriff's deputies, can

22       you describe them, white, black, short, tall,

23       facial hair, racial make-up?

24  A    They were white males.  That's all I remember.

25       White males.

1   Q    Okay.  Nothing in terms of height or other

2        facial or distinctive features, tattoos or

3        anything like that?

4   A    No, and it was dark, so, no.

5   Q    Let me ask you this:  Did you witness Mr. Blake

6        resisting arrest or anything?

7   A    No.

8   Q    Did you witness Mr. Blake being disruptive or

9        engaging in self-injurious behavior?

10  A    No.

11  Q    Did you witness Mr. Blake trying to injure

12       others?

13  A    No.

14  Q    Did you witness Mr. Blake interfering with the

15       sheriff's deputies in terms of arresting or

16       taking any official action?

17  A    No.

18  Q    Did you see him attempting to damage property?

19  A    No.

20  Q    Was he being assaultive?

21  A    No.

22  Q    The reason given for the arrest was purportedly

23       that the doors for the Kenosha Police

24       Department were being blocked.  Did you see

25       whether anyone was denied access to the

1       building?

2   A   Yeah, no one was denied access.  Because it was

3       a -- because of the time, like you had to be

4       buzzed in the building anyway, so it wasn't --

5       the door was locked, so it wasn't the -- it

6       wasn't the work hours or whatever, so the door

7       was locked anyway.

8   Q   So it was after hours, and if you wanted

9       access, you had to buzz, and at the buzzing, be

10      let in?

11  A   Right.  When the young lady came, she had to be

12      buzzed in.

13  Q   Okay.  And you said this young lady who was

14      buzzed in, was she able to get in past the

15      protestors?

16  A   She did.

17              MR. CADE:  Those are my questions.

18      Thank you.

19              MS. MEYER:  Brian, do you have

20      anything?

21              MR. BAIRD:  Nothing for me.

22              MS. MEYER:  Okay.  I don't have

23      anything either.

24          (Proceedings concluded at 1:24 p.m.)

25

1  STATE OF WISCONSIN  )
                       ) SS:
2  COUNTY OF MILWAUKEE )

3

4

5           I, ALICE M. BARBELN, a Registered

6  Professional Reporter and Notary Public in and for

7  the State of Wisconsin, do hereby certify that the

8  above deposition of TANYA MCLEAN was recorded by me

9  on September 27, 2023, and reduced to writing under

10  my personal direction.

11           I further certify that I am not a

12  relative or employee or attorney or counsel of any

13  of the parties, or a relative or employee of such

14  attorney or counsel, or financially interested

15  directly or indirectly in this action.

16           In witness whereof I have hereunder set

17  my hand and affixed my seal of office at Milwaukee,

18  Wisconsin, this 2nd day of October, 2023.

19

20

21

22                    _____
                                   Notary Public
23                      In and for the State of Wisconsin

24

25  My Commission Expires:  September 1, 2025.

**WORD INDEX**

**< 1 >**
**1** 16:*17* 46:22
**1:24** 1:*1* 45:*24*
**10th** 2:*11*
**1-10** 1:*1*
**12:32** 1:*1*
**1243** 2:*11*
**14** 2:*21*
**15** 6:*11*
**18th** 5:2

**< 2 >**
**2/16/73** 4:*25*
**2014** 6:*8*
**2020** 39:*10*
**2021** 15:*18* 19:*6, 10*
37:*5*
**2023** 1:*1* 46:*9, 18*
**2025** 46:22
**22-CV-970** 1:*1*
**23rd** 39:*10*
**25** 19:*10* 37:5
**2525** 2:*3*
**25th** 15:*17* 17:*15*
19:*6* 21:*10*
**27** 1:*1* 46:*9*
**2nd** 46:*18*

**< 3 >**
**3** 2:*18*
**300** 2:*11*
**36** 2:*18*

**< 4 >**
**4** 2:*21* 14:*8*

**< 5 >**
**500** 2:*6*
**53143** 5:2
**53202** 2:*7*
**53205** 2:*11*
**53211** 2:*4*

**< 6 >**
**6020** 5:2

**< 7 >**

**710** 1:*1* 2:*6*

**< A >**
**ABC** 1:*1*
**able** 23:*14* 45:*14*
**Absolutely** 12:2
37:*22, 25*
**access** 23:*14* 44:*25*
45:*2, 9*
**acknowledge** 42:*6*
**ACLU** 18:*18, 20*
**action** 11:*6* 15:*20,*
*24* 44:*16* 46:*15*
**actions** 29:*8*
**actual** 31:*16, 21*
**advise** 13:*15*
**affixed** 46:*17*
**African** 35:*10*
**afternoon** 22:*10* 23:*7*
**ago** 6:*11*
**agreed** 43:*3*
**ahead** 20:*16*
**ALICE** 1:*1* 3:*18*
4:*7* 46:*5*
**allowed** 19:*1*
**Alvin** 12:*21*
**American** 35:*10*
**answer** 4:*1, 9, 12*
12:*20, 24, 25* 13:*5, 6,*
*10, 15* 19:*1, 24, 25*
20:*10, 16, 18, 19, 24*
21:*1* 37:*21*
**answers** 4:*5*
**anybody** 15:*11* 43:*14*
**anyway** 45:*4, 7*
**Appeared** 2:*3, 4, 7,*
*12, 14*
**April** 15:*17* 17:*15*
19:*6, 10* 21:*10* 37:*5*
38:*3*
**arms** 29:*24, 25* 39:*18*
**arrest** 8:*3, 17* 24:*8*
28:*1* 32:*23, 25* 34:*3,*
*5, 12, 25* 36:*2, 4*
37:*13* 39:*17* 44:*6, 22*
**arrested** 6:*10* 8:*21*
24:*19* 25:*19, 23, 25*
26:*2, 5, 6, 15* 27:*16*
28:*6* 29:*13* 30:*24*
32:*16* 33:*2, 8, 14, 23*

**37:*6, 16*** 39:*11, 15, 19*
43:*20*
**arresting** 37:*18*
38:*23* 41:*4, 13* 44:*15*
**arrests** 39:*16*
**asked** 14:*15* 33:*25*
42:*13*
**asking** 4:*18* 10:*20*
11:*16* 13:*2, 16* 26:*23*
35:*5* 38:*13* 43:*10*
**asks** 13:*14*
**assaultive** 44:*20*
**ASSOCIATION** 1:*1*
2:*13*
**assume** 4:*13*
**assumed** 7:*6* 28:*14*
**Attached** 2:*21*
**attempting** 44:*18*
**attend** 8:*4* 15:*7* 18:*7*
**attended** 17:*20*
**attending** 15:*10*
**attention** 34:*19* 43:*2*
**Attorney** 6:22, *24*
7:*2, 10, 13, 21, 23* 8:*5*
9:*4* 13:*9* 20:*7, 9*
36:22 46:*12, 14*
**attorneys** 3:*8* 7:*13*
13:*9*
**August** 38:*3* 39:*9*
**Avenue** 1:*1* 2:*3, 6*
5:*2*
**aware** 15:*16* 19:*5*

**< B >**
**back** 9:*21* 28:*3, 13,*
*16* 30:*3* 34:*18* 40:22
**backs** 39:*19*
**bad** 4:*17* 35:*12*
**bail** 23:*8*
**BAIRD** 2:*10* 7:*21*
45:*21*
**BARBELN** 1:*1* 46:*5*
**barber** 21:*25* 22:*3*
**Barker** 15:*23* 17:*5*
19:*9* 21:*13* 26:*1*
28:*2, 8, 16* 30:*3, 12,*
*19* 37:*14* 42:*23*
**basically** 8:*16* 33:*21*
**basis** 38:*1*

**bathroom** 35:*8*
**behalf** 2:*4, 7, 12* 37:*8*
**behavior** 44:*9*
**belief** 37:*17*
**believe** 39:*9* 43:*18*
**believed** 35:*24* 38:22
**BERGMANN** 1:*1*
2:*12*
**best** 3:*25* 4:*1* 23:*10*
**BETH** 1:*1* 2:*7*
**Billie** 21:*13, 14*
**birth** 4:*24*
**BISSONNETTE** 1:*1*
2:*8*
**black** 43:22
**BLAKE** 1:*1* 9:*8, 17,*
*18, 19* 10:*4* 11:*5, 6*
13:*10* 30:*13* 32:*11,*
*20, 22* 33:*1* 34:*3, 11,*
*14, 18* 36:*2, 10* 37:*13,*
*18* 39:*7, 23* 41:*4, 13,*
*24* 42:*10* 43:*12, 20*
44:*5, 8, 11, 14*
**Blake's** 8:*3* 34:*25*
43:*9*
**blocked** 44:*24*
**board** 12:*12, 13, 16*
**body** 29:*23*
**Boiler** 2:*10*
**bond** 23:*8* 24:*1*
33:*9, 11, 15, 22, 25*
**BORGELT** 2:*8*
**boys** 5:*7, 8*
**brain** 29:*10*
**BRIAN** 2:*10* 45:*19*
**BRIANNA** 2:*6* 3:*7*
**bridge** 26:*9*
**briefly** 5:*16*
**broad** 10:*6*
**brought** 21:*18*
**building** 22:*1, 14, 16,*
*20* 23:*5, 6, 14, 16, 17,*
*23* 24:*4* 25:*10* 26:*8,*
*20* 27:*8* 45:*1, 4*
**bunch** 38:*8* 41:*17*
**buzz** 45:*9*
**buzzed** 45:*4, 12, 14*
**buzzing** 45:*9*

**< C >**

**CADE** 2:2, *18* 7:*13,
*16, 18* 13:*8, 9, 20, 23*
19:*23* 20:*6, 7, 20*
21:*4, 7* 36:22, *25*
37:*21, 24* 45:*17*
**called** 3:2
**calls** 19:*23* 37:*19*
**capacities** 1:*1*
**capacity** 1:*1* 37:8
**Cardinali** 17:*17*
21:*16* 37:*14*
**CARE** 1:*1* 2:*12*
**Case** 1:*1* 7:*4, 9* 13:*4*
33:*23*
**cell** 42:*18*
**center** 38:2, *4*
**certify** 46:*7, 11*
**chair** 34:*16* 35:7, *13*
42:*15, 19, 24*
**characterize** 29:*15*
30:*14*
**check** 36:*16, 18*
**chief** 16:6, *11*
**children** 5:*12, 13*
13:*16*
**children's** 5:*12, 13*
**chocolate** 21:*19*
**Civil** 1:*1* 13:*1*
**civilian** 23:*10, 12, 13*
**clarify** 4:*19* 21:*4*
42:*11* 43:8
**clear** 8:5 9:*23* 13:7
37:5
**come** 22:*25*
**comes** 29:*12*
**coming** 11:*4* 41:*19*
**commencing** 1:*1*
**Commission** 46:*22*
**common** 18:*14*
**community** 17:*21*
**COMPANY** 1:*1*
**completed** 5:*18*
**concluded** 45:*24*
**concluding** 1:*1*
**conducted** 18:*16*
**connection** 6:*12, 14*
**considered** 10:*25*
**contact** 24:*4, 10*
**content** 25:*4*
**continuum** 39:*25*

**conversation** 8:*18, 19*
9:*3* 25:5 34:*11* 35:*1,
5* 36:7 38:7
**conversations** 36:*1*
**convey** 7:*2*
**convictions** 6:*15*
**co-protestors** 24:*19*
28:*19*
**cornucopia** 39:*15*
**corporation** 1:*1*
**correct** 12:*25* 14:6
15:*21* 24:9 27:*14*
31:*11* 32:3 37:6, *14*
**counsel** 46:*12, 14*
**COUNTY** 1:*1* 2:7
3:8 46:2
**couple** 3:*12* 5:*19*
32:8 35:*16*
**course** 23:*13*
**COURT** 1:*1* 3:*18*
13:*11* 20:*12, 22*
**criminal** 6:*15*
**Crivello** 1:*1* 2:*4*
**Cummings** 21:*17*
**C-U-M-M-I-N-G-S**
21:*20, 23*
**current** 5:*24*

**< D >**
**damage** 44:*18*
**dark** 44:*4*
**date** 4:*24* 8:*12*
**DAVID** 1:*1* 2:7
**day** 11:7 23:*23*
24:*12* 46:*18*
**Defendants** 1:*1* 2:*7,
12* 3:8
**degree** 5:*19*
**degrees** 5:*20*
**deliver** 16:*4*
**demand** 25:*11*
**demands** 16:5, *7, 13,
16* 17:2
**denied** 44:*25* 45:2
**Department** 1:*1*
44:*24*
**depends** 12:5
**Deposition** 2:*21* 3:*10*
6:*17, 20* 7:*1* 14:6
46:8

**deputies** 24:22, *25*
28:*19* 38:*10, 11, 12*
39:*12* 42:2 43:*21*
44:*15*
**deputy** 25:*13, 20*
43:*10, 11*
**DEREEMEYUN** 1:*1*
2:8
**describe** 29:2 38:*24*
40:2 43:*21, 22*
**detail** 11:*19*
**details** 8:*9, 22* 16:2
**DICELLO** 1:*1* 2:8
**difference** 30:6, *11*
**differences** 30:*20*
**different** 12:*4* 14:*23*
30:*19*
**direct** 13:2
**direction** 46:*10*
**directly** 24:*25* 46:*15*
**director** 5:*25* 6:2
12:*13*
**discuss** 17:*4*
**discussed** 15:*25*
17:*24* 31:4, *8* 32:8
34:*24*
**discussion** 30:*23*
31:*17, 22, 23* 32:3, *5,
6, 19, 22*
**discussions** 32:*14*
34:7
**Disposition** 2:*21*
**disruptive** 44:*8*
**distinctive** 44:*2*
**distribute** 15:*3*
**DISTRICT** 1:*1* 6:*4*
**doctor** 43:5
**document** 16:*20*
**documents** 14:*15, 18*
**DOE** 1:*1*
**doing** 4:*4* 11:*1*
20:*13* 26:8, *11* 35:*11,
24*
**door** 40:*10, 12* 45:5,
*6*
**doors** 22:*21* 44:*23*
**duly** 3:*3*
**dynamics** 26:7

**< E >**

**earlier** 8:2 17:*22*
38:*20*
**early** 42:*20*
**easier** 20:*23*
**EASTERN** 1:*1*
**education** 5:*16, 17, 22*
**educator** 5:*25*
**efforts** 12:*9*
**either** 7:*22* 37:*1*
45:*23*
**e-mail** 6:*24*
**employed** 6:*3*
**employee** 46:*12, 13*
**encountered** 24:*18*
**encountering** 18:*23*
**encouraged** 34:*19*
**ended** 41:*19* 43:*4*
**enforcement** 24:*5, 10,
18* 31:*3*
**engaging** 44:*9*
**enter** 23:5, *8, 16, 22*
**entered** 23:*17*
**entire** 22:*24* 23:*1*
34:*17* 42:*15, 19, 24*
**entitled** 21:*1*
**entrance** 22:*23*
**Erica** 12:*21, 22*
**especially** 39:*24*
**evening** 23:7 24:6
**event** 10:*25* 11:7
**events** 10:3, 5, *9, 11,
12, 21, 22* 11:*24*
14:*23, 24* 15:*1, 5*
17:*20*
**exact** 15:*22* 22:*9, 12*
**exactly** 11:*10* 34:*23*
38:*14* 43:*4*
**Examination** 1:*1*
2:*17* 3:5 36:*24*
**examined** 3:*4*
**executive** 5:*25* 6:2
12:*13*
**Exhibit** 2:*21* 14:8
**Exhibits** 2:*20*
**exit** 23:6, *22*
**Expires** 46:*22*
**explain** 10:*13* 15:9
25:7 26:*4* 30:*20*
**explained** 18:*22* 25:9

explaining 6:25
expressed 35:17
Extra 40:1
extremely 28:24, 25
 29:4 30:15

< F >
Facebook 19:12
facial 43:23 44:2
fact 14:21
fair 3:22 8:14 39:7
family 12:3
far 7:8
features 44:2
Federal 1:1
feel 35:23
felt 35:12, 18
female 23:18
fields 5:21
figure 31:16, 21
film 8:25
financially 46:14
fine 23:13 43:7
finish 4:1 24:13
fired 16:17
first 3:3, 17 13:23
 24:17 33:21 34:11,
 25
five 36:8 41:17, 20
focus 41:24
focused 12:9
follows 3:4
force 23:11 39:3
forcefully 40:7, 9
formal 8:7
found 19:21
Four 5:6 21:11 24:3
FRAUEN 2:8
front 14:12 22:20,
 21, 22 23:4 26:7, 19
 27:7 38:2, 4
further 46:11

< G >
GALVAN 1:1 2:8
gap 26:9
general 7:9
getting 20:22 40:18
 41:6

girls 5:8
give 16:2 43:9
given 16:21 44:22
GLORIA 1:1 2:8
go 3:13, 14 7:5 11:9
 13:10 16:4 17:9
 20:16, 21 22:25 23:8
 25:15, 16 28:12 33:5,
 12, 15, 18 35:8 42:16
goal 17:11
goals 15:9
going 4:13 7:1 8:13
 16:1, 7 17:9, 14 18:7,
 8 19:14 21:25 24:15
 25:17, 18 28:1 31:9
 33:10 37:2 41:7, 15
 43:4
grabbed 30:4, 18, 19
 40:6, 9, 11
grabs 29:12
grandkids 5:11, 14
grandsons 5:4
great 3:19 4:4
ground 3:12 28:24
 39:18 40:3 41:6
GROUP 2:2 18:17
 21:24 22:7 23:19
groups 15:6 18:19
guilty 3:24
guys 41:8

< H >
hair 43:23
Hall 1:1 2:4
hand 39:22 40:1
 46:17
handcuffs 28:7 40:20
handled 38:25
handling 29:5
hands 41:24
happen 15:9
happened 8:16, 19,
 24 9:4, 6 11:5 15:17,
 19, 20 24:2 28:5
 35:6
happening 9:2 12:6
 19:5 35:18
happens 18:21 19:2
 30:23

happy 4:19
HAYNES 1:1 2:8
head 4:6
hear 20:8 27:19
 28:2 38:5 43:10, 12
heard 27:25
heart 7:19
heavily 32:8
heavy 39:22 40:1
height 44:1
held 7:1 8:3 18:12
help 26:9 39:4
helpful 40:23, 24
helps 8:5
hereunder 46:16
Hey 39:16
high 23:25
highest 5:17
hold 18:9, 11
holding 15:12 42:18
home 5:4
honest 8:8 19:16
Honestly 8:11 19:17
hopefully 3:13
hoping 14:25
host 14:24
hot 21:19
hours 42:22 45:6, 8
House 2:10
human 24:14
hurt 34:15 35:14
 36:6
hurts 7:16

< I >
idea 10:8 16:24
 19:2 36:9
Identified 2:20
ignored 41:11 42:9
imagine 39:14
immediately 34:22
implied 35:10
implying 38:16
impossible 11:21
improper 13:13, 16,
 17, 24 14:1
inartfully 31:20
incident 6:9
include 18:25

in-depth 8:22
indicate 43:11
indicated 42:10
indirectly 46:15
individual 1:1
individuals 14:25
 19:20 21:9, 12 22:5
 37:17 38:23
inferred 31:15
information 11:4
 15:4, 7 35:4
injure 44:11
inside 25:10
insinuating 26:22
instance 1:1
instances 11:25
instruct 20:9
INSURANCE 1:1
interact 27:19
interactions 11:25
 28:18
interested 46:14
interfering 44:14
involved 15:4 16:10
 21:10
issue 20:13

< J >
JACOB 1:1 2:8
 10:4 11:5, 6 39:6
jail 9:1, 2 28:11, 12,
 14 33:3, 5, 7, 8 35:9,
 21
JANE 1:1
JEREMY 1:1 2:8
jerk 40:2
jerking 39:18
JESSICA 1:1 2:12
job 3:19 4:4
Joe 17:18 18:2, 3, 5,
 13 20:2 21:13 26:1
 27:21 28:16 29:21
 42:22
JOHN 1:1
Joseph 17:17 21:16
 28:2, 8
JR 2:2
judge 13:6
jump 3:24

**justice** 10:*12* 11:*6*
12:*5, 8*
**JUSTIN** 1:*1* 8:*3, 11,*
*21* 9:*1, 3, 18, 19*
15:*23* 17:*5* 18:*4*
19:*9* 20:*4* 21:*13*
26:*1* 27:*21* 28:*2, 8,*
*15* 29:*21* 30:*2, 5, 18*
38:*2* 39:*1* 40:*7, 11*
43:*4*
**Justin's** 12:*2* 13:*4*
43:*14*

**< K >**
**keep** 24:*16*
**KENOSHA** 1:*1* 2:*8,*
*12* 5:*2* 6:*3, 5, 7*
11:*21* 12:*14* 18:*17*
19:*22* 38:*3* 44:*23*
**Kenosha's** 19:*15*
**kept** 25:*15* 34:*16*
35:*12* 38:*13* 41:*10*
42:*18, 21, 23*
**kids** 5:*5, 11* 13:*3*
**KIM** 2:*3*
**kind** 7:*25* 9:*4* 10:*11*
18:*7* 31:*14* 35:*2*
38:*18* 40:*11, 19*
**knew** 37:*18, 22, 25*
38:*4, 5*
**know** 4:*15, 18* 6:*25*
7:*5, 6, 7, 15, 22, 24*
8:*1, 17, 20* 9:*18* 10:*3,*
*7, 15, 18, 23* 11:*1, 4,*
*10, 13, 15, 22* 13:*4*
14:*1* 16:*23* 17:*2, 18,*
*19, 20* 18:*10, 13, 14,*
*25* 19:*17, 18, 20* 20:*7,*
*16* 21:*9* 22:*9* 24:*14,*
*15* 25:*9, 14* 29:*10, 11,*
*14* 30:*4, 14, 22* 31:*1,*
*19* 32:*7, 17* 33:*3, 19*
34:*21, 22, 23* 35:*6, 16,*
*19* 36:*8* 38:*14, 16, 17,*
*25* 40:*19* 41:*9* 42:*20*
43:*1, 3, 8, 17*
**knowing** 39:*21*
**knowledge** 11:*14*
23:*11*

**KYLE** 1:*1* 2:*8*

**< L >**
**lady** 45:*11, 13*
**LAW** 2:*2* 24:*5, 10,*
*18* 26:*21* 31:*3*
**lawsuit** 3:*9* 9:*9, 12,*
*15* 36:*10, 14*
**lawyer** 31:*2*
**lawyers** 14:*2*
**layers** 35:*17*
**Leaders** 6:*2, 5* 12:*14*
18:*16* 19:*14, 22*
**learn** 35:*4*
**leave** 16:*8* 25:*8, 18,*
*20*
**leaving** 17:*10* 25:*11*
**level** 5:*17*
**light** 39:*22*
**lightly** 39:*16*
**list** 16:*4, 13, 16* 17:*2*
**listed** 22:*5* 27:*23*
**little** 4:*16* 34:*8*
**live** 5:*1, 3, 11*
**lives** 5:*9*
**LLC** 2:*2*
**locked** 45:*5, 7*
**long** 6:*5*
**look** 11:*9*
**looks** 29:*11*
**lost** 14:*10*
**lot** 3:*14, 25* 8:*13*
10:*17* 11:*18* 39:*3*
41:*19*
**Lots** 10:*8* 11:*21*
34:*9* 39:*6*

**< M >**
**ma'am** 13:*20* 19:*25*
20:*11* 43:*7*
**make-up** 43:*23*
**making** 20:*10, 24*
**males** 43:*24, 25*
**marching** 10:*16*
**mark** 14:*8*
**master's** 5:*19, 20, 23*
**matter** 12:*19*
**MCLEAN** 1:*1* 3:*2, 7*
4:*23* 13:*8* 14:*5* 20:*6*

21:*9* 24:*13* 26:*22*
30:*9* 37:*1* 46:*8*
**M-C-L-E-A-N** 4:*23*
**mean** 7:*25* 8:*20, 22,*
*23, 24, 25* 9:*23* 10:*13,*
*16, 17, 18* 11:*8, 17, 22*
12:*2* 15:*2, 10, 19*
17:*20* 18:*9, 10, 18*
20:*2, 4* 22:*11, 13*
27:*5, 21, 25* 28:*13, 23*
29:*6* 30:*8* 31:*2*
32:*16* 33:*3, 18* 34:*8*
35:*19* 36:*5* 37:*11*
38:*2, 4*
**meant** 7:*3*
**media** 15:*6*
**MEDICAL** 1:*1*
34:*19* 43:*2*
**meet** 6:*17* 15:*13*
22:*2, 7*
**meeting** 8:*2, 4, 5, 8,*
*15* 15:*8, 16, 19, 25*
17:*4, 12, 23* 18:*1, 2*
**meetings** 14:*24*
17:*14* 19:*3*
**member** 23:*11*
**met** 7:*23, 25* 15:*23*
17:*17* 21:*25*
**MEYER** 2:*6, 18* 3:*6,*
*7* 7:*20* 14:*4* 21:*8*
36:*16, 21* 37:*19*
38:*21* 45:*19, 22*
**midmorning** 22:*13*
**Milwaukee** 1:*1* 2:*4,*
*7, 11* 46:*2, 17*
**mind** 16:*9* 29:*9*
**misplaced** 7:*4*
**Monica** 21:*17*
**Morning** 22:*10, 13*
**MOTLEY** 2:*3* 6:*22,*
*24* 7:*2, 10, 23* 8:*6*
9:*4* 13:*24*
**mouth** 20:*5*
**move** 27:*25*
**moved** 27:*7*
**movement** 27:*2, 4, 5,*
*9*
**moving** 26:*14*
**municipal** 1:*1*

**MUTUAL** 1:*1*

**< N >**
**name** 3:*7* 4:*21*
21:*22* 43:*10, 13, 14*
**NATHANIEL** 2:*2*
**nationwide** 12:*10*
**natural** 3:*24*
**nature** 24:*15*
**need** 4:*5, 8* 12:*20*
18:*14* 24:*13* 34:*9*
38:*15*
**needed** 7:*5* 35:*7*
43:*2*
**nephew** 9:*20, 25*
**Ness** 12:*21*
**never** 7:*25* 28:*4*
31:*13*
**news** 9:*14*
**Nichols** 1:*1* 2:*4*
**normally** 19:*15*
**North** 1:*1* 2:*3, 6, 11*
**Notary** 1:*1* 46:*6, 22*
**Note** 2:*14*
**notes** 36:*17, 18* 37:*3*
**Notice** 2:*21* 14:*5, 14*
**number** 39:*10*
**NURSE** 1:*1* 2:*12, 13*

**< O >**
**oath** 3:*3*
**object** 13:*24*
**objection** 13:*14*
19:*23* 20:*8, 11, 15, 24*
37:*19*
**objections** 20:*25*
**observe** 40:*5*
**Obviously** 20:*8*
**occupation** 5:*24*
**occurred** 15:*16*
**occurring** 17:*8*
**October** 46:*18*
**office** 46:*17*
**officer** 27:*12* 41:*3*
**OFFICERS** 1:*1*
24:*18, 21* 27:*19* 28:*7,*
*15* 30:*12* 41:*3, 12*
43:*20*
**official** 1:*1* 44:*16*
**Oh** 20:*1* 21:*17* 29:*9*

**okay** 3:*15, 16* 4:*3, 11*
13:22 14:*14, 18, 21*
15:22 17:*17* 19:*8*
20:*1, 16* 21:*3, 24*
23:*16* 24:*7, 16* 25:2
26:*9, 18, 24* 27:*16*
28:*5, 18* 30:*6, 10, 22*
31:*20* 32:2, *6* 33:*25*
34:*18* 36:*1, 19, 20, 23*
37:*4, 13* 38:*20* 39:*21*
40:2 42:2 44:*1*
45:*13, 22*
**once** 3:*21* 20:*25*
**ones** 27:*24* 42:*21*
**order** 13:*11* 20:22
**organization** 9:*20, 24*
10:2 15:*13* 37:9
**organizations** 12:*4*
**organize** 10:*1* 11:*24*
12:*3*
**organized** 9:*20, 24*
10:2
**organizer** 10:*1* 12:*7,*
*8* 14:22 15:*14*
**organizes** 14:22
**Original** 2:*21*
**outside** 9:*5, 6* 10:*15*
22:*18* 24:*3*
**Owens** 12:*21*

**< P >**
**p.m** 1:*1* 45:*24*
**Pabst** 2:*10*
**paddy** 28:*13* 29:*1*
**Page** 2:*17, 20* 19:*15*
**paid** 33:*11*
**pain** 34:*15* 35:*13*
36:*6* 42:*13*
**panoply** 39:*15*
**papers** 7:*4* 14:*10*
**Parenthood** 12:*4*
**park** 11:*3*
**part** 21:*18* 30:*25*
31:*6*
**partake** 14:*25*
**parties** 46:*13*
**passing** 8:*1*
**pay** 23:*8, 12* 24:*1*
33:*9, 10, 16, 18, 20*
**peacefully** 11:*3*

**people** 8:*24* 11:*4*
12:*16* 15:*4, 7, 10, 14*
18:*14, 22* 24:*15*
29:*13* 35:9 39:*11, 14*
41:*23* 42:*1* 43:*17*
**Perfect** 4:*21*
**Perfectly** 43:*7*
**permitted** 13:*21*
**person** 3:*17, 20* 16:9
23:*10, 25* 35:*23, 24*
**personal** 11:*14* 46:*10*
**personally** 32:*10*
35:*19*
**PETERSON** 2:*8*
**phrasing** 31:*20*
**picking** 28:*23*
**picture** 43:*16*
**place** 11:*8* 28:*7, 15*
33:*14*
**places** 11:22
**placing** 28:*20*
**Plaintiff** 1:*1* 2:*4*
**plan** 16:*3* 17:*7*
31:*10, 12, 14* 33:*6, 7,*
*14*
**Plankinton** 1:*1* 2:*6*
**Planned** 12:*4* 19:*9*
**planning** 11:*7*
**please** 4:*14, 18*
**point** 18:*6* 20:*12*
24:*4* 27:*1* 34:*23*
43:*17*
**police** 12:*1* 15:*20*
16:*4, 6, 11, 21* 17:*15*
18:*24* 19:*1* 22:*8*
23:*11* 24:*21* 26:*13*
31:*9, 10, 13, 14, 15, 18,*
*19, 24* 32:*1, 12, 15, 18*
39:*11* 44:*23*
**policy** 5:*22*
**possible** 37:*2*
**post** 33:*22, 25*
**postings** 19:*12*
**potential** 20:*23*
32:*23, 25* 33:*4*
**potluck** 10:*14*
**POWELL** 2:*8*
**present** 17:*25* 31:*23*
39:*5* 41:*22*

**presume** 39:*5*
**previously** 27:*23*
**primarily** 18:*19*
**Prior** 6:*17* 15:8
30:*22* 31:*4* 32:*20, 22*
**privy** 9:*2*
**Procedure** 1:*1*
**PROCEEDINGS** 3:*1*
45:*24*
**process** 13:*13*
**production** 14:*15*
**Professional** 1:*1* 46:6
**PROFESSIONALS**
1:*1*
**prolongs** 13:*12*
**promising** 36:*18*
**prompt** 37:*1*
**property** 24:*23* 44:*18*
**protest** 6:*12, 14*
10:*19, 24* 15:8, *15, 17*
17:*7, 23* 18:*7, 8* 19:*6,*
*9, 13, 21* 21:*10* 22:*24,*
*25* 23:*1* 27:*10* 30:22
31:*5, 13* 32:*20, 23, 24*
37:*6*
**protested** 38:*2*
**protester** 37:*10, 11*
**protesting** 8:*20* 11:*1,*
*2, 3* 32:*16* 33:*4*
**protestors** 23:*20*
26:*25* 27:*20, 23*
30:*17* 31:*4, 22* 32:*17*
33:*13, 23* 45:*15*
**protests** 10:*1, 2, 5, 9,*
*15, 18, 20, 21, 24*
11:*24* 14:*22, 23* 39:*6*
**Public** 1:*1* 11:*8, 15*
21:*25* 22:*14, 16* 23:*4,*
*23* 26:*19* 27:*8, 17*
46:*6, 22*
**pull** 37:*3*
**pulling** 29:*16, 19, 22*
**purportedly** 44:*22*
**purpose** 4:*16* 14:*2*
**pursuant** 1:*1*
**push** 30:*16*
**put** 4:*7* 35:*7* 39:*24*
40:*17, 18* 41:*7, 24*
42:*17* 43:*15*

**putting** 29:*1* 40:22

**< Q >**
**question** 4:*2, 5, 9, 12,*
*14, 17* 7:*21* 12:*20, 23*
13:*17* 20:*16* 21:2
24:*14, 17* 30:*10*
**questions** 4:*15* 10:6
11:*13* 18:25 26:*23*
36:22 37:*3* 38:*21*
45:*17*
**quick** 36:*17* 37:*1*

**< R >**
**racial** 43:*23*
**reach** 7:*7*
**read** 9:*14*
**ready** 40:*18*
**real** 36:*17*
**really** 8:22 25:*16*
35:*14* 40:*7*
**reason** 20:*10* 44:22
**reasons** 20:*25*
**recall** 17:*13* 18:*5*
35:*25* 43:*18*
**record** 4:22 9:*18, 23*
11:*9, 15* 14:*10* 20:*11*
21:*14* 24:*16* 30:*10*
**recorded** 46:*8*
**reduced** 46:*9*
**referring** 22:*4*
**regarding** 17:*14*
**Registered** 1:*1* 46:*5*
**relative** 46:*12, 13*
**release** 42:*10*
**released** 8:*21* 34:*13*
42:*20, 22*
**relevant** 13:*4*
**remember** 8:*9, 10, 12,*
*14* 11:*16* 14:*9, 14*
15:22 16:*5, 19, 25*
17:*3* 18:2, *3* 19:*18,*
*19* 22:*12* 24:*1, 2, 21*
25:*2, 4* 32:*2, 4* 43:*3,*
*5, 24*
**rephrase** 39:*2, 4*
**Reporter** 1:*1* 3:*18*
46:*6*
**reports** 9:*14*
**request** 14:*19*

resisting 40:*15*
41:*10* 44:6
respond 42:6
response 25:*13*, 20
38:20
responsive 14:*18*
Rev 21:*13* 26:*1*
27:*21* 28:2, *8*, *16*
29:*21* 30:*3*, *12*, *19*
37:*14* 42:22
Reverend 15:*23* 17:5
19:*8* 20:*3*
review 20:*12*
right 4:*10*, *19* 5:*1*, 9
14:*12* 18:*23* 21:6
22:*1* 24:8 29:*10*
34:20 36:4, *20* 41:*21*
45:*11*
rights 17:*25* 18:8, *9*,
*12*, *15*, *16*, *21*, *22* 31:*1*
rigmarole 20:*21*
room 35:*12*
rough 28:*25* 29:*4*, *6*,
*9*, *11*, *12*, *14*, *15*, *18*
30:*1*, *2*, *5*, *15* 38:22
39:*23* 40:*13*, *14*, *15*,
*21*, *23* 41:2, *9*, *25*
42:*5*
rule 3:*17*
Rules 1:*1* 3:*12*
Rusten 9:*21* 16:*17*

< S >
S.C 1:*1* 2:*4*, *8*
safety 22:*1*, *14*, *16*, *20*
23:*5*, *23* 26:*20* 27:*8*
sanctions 20:*23*
saw 23:*16*, *22* 28:*23*
saying 25:*21* 27:*25*
32:*4* 39:*16* 40:*13*
41:*10* 42:*8*
School 6:*4*
seal 46:*17*
Second 4:*4*
see 4:*6* 11:*9* 13:*3*
19:*12*, *15* 22:*17* 28:*7*,
*10*, *12*, *18*, *22* 29:*2*
44:*18*, *24*
seeing 43:*4*

seek 34:*19* 43:2
seeking 12:*5*
seen 29:*13* 39:*15*, *21*
self-injurious 44:*9*
sent 25:*11*
September 1:*1* 46:*9*,
*22*
served 7:*5* 14:*5*
set 26:7 46:*16*
seven 9:*21*
Shaking 4:*6*
share 15:*6*
sheriff 16:*6*, *12*
24:*23*, *24* 38:*11*
sheriffs 38:7, *9*
Sheriff's 1:*1* 16:*24*
24:*22*, *23* 39:*12* 42:2
43:*21* 44:*15*
Sheskey 9:*22* 16:*17*
shooting 10:*3* 39:6
shop 21:*25* 22:*3*
short 43:22
shortly 22:*11*
shot 9:*21*
shoulder 29:*25*
show 15:*14* 42:7
showed 21:*17* 22:*8*,
*9* 24:*1* 27:*12* 43:*17*
shuffle 14:*11*
sidewalk 26:*19* 27:*8*,
*13*, *17*
significant 33:*19*
silent 31:*6*
silly 13:*18* 14:*1*
simple 29:*6*
single 11:*20*
sit 12:*16* 23:2
sit-in 17:*24*
sitting 22:*18*, *19*, *21*,
*22* 23:*4* 24:*3* 26:*11*,
*14*, *25* 27:*7*
six 41:*17*, *20*
slam 40:*3*, *4*
slamming 39:*18*
smoother 3:*14*
social 5:*22*, *23* 10:*12*
12:*7* 15:*6*
something's 19:*14*
son 5:*4*, *9*
soon 34:*13*

Sorry 7:*17* 30:*9*
38:*9*
sort 10:*5*, *22*
space 26:*6*
speak 6:*20*, *22* 7:*10*,
*14* 16:*10* 18:6 19:*8*
24:*25* 25:*9* 31:*3*, *10*,
*24*
speaker 10:*25*
Speakers 11:*3*
speaking 27:*13*
specific 18:*11* 32:2
34:*8*, *10*
specifically 41:*1*, *14*
specifics 35:*22*
speculation 19:*24*
37:*20*
spell 4:*21*
spelling 21:*22*
spoke 16:*8* 25:*2*, *12*
28:*4*
spoken 34:*3*, *5*
SS 46:*1*
stand 26:*19*
Standing 26:*17* 27:*13*
start 10:*6*
started 3:*13* 22:*11*
State 1:*1* 46:*1*, *7*, *22*
statement 42:*4*, *6*
statements 41:*2*
42:*11*
STATES 1:*1*
station 15:*20* 16:*4*,
*22* 17:*15* 22:*8*
step 40:*20*
stood 27:*1*
Stop 40:*15*
straight 7:*18*
strapped 34:*16* 42:*14*
Street 2:*11*
streets 10:*16* 11:2
stuff 8:*17* 11:*18*, *21*
substance 7:*8* 8:*15*
Suite 2:*6*, *11*
Sunday 23:*24*
sure 3:*19* 14:*11*
32:*21* 39:*2* 40:*24*
43:*7*
sworn 3:*3*

< T >
take 30:2
taken 1:*1* 3:*10*
talk 3:*17* 5:*16* 9:6
15:*23* 16:6 17:*11*
30:*25* 31:*9*, *12*, *13*, *15*,
*18*, *19* 32:*1*, *10*, *18*
talked 9:*17* 14:*21*
17:*10* 18:*4* 26:*10*
35:6, *9*, *14* 36:*5*, *10*,
*13*
talking 3:*20* 7:*8*
10:*11* 19:*29* 20* 32:*12*,
*15* 41:*21*
tall 43:*22*
TANYA 1:*1* 3:*2*
4:*23* 46:*8*
T-A-N-Y-A 4:*23*
tattoos 44:*2*
tell 8:*11* 35:*17*, *22*
38:*15*
telling 31:*25*
terms 7:*3* 15:*14*
32:*15* 35:*2*, *3* 40:*23*
44:*1*, *15*
Terrace 2:*3*
testified 3:*4*
testimony 8:*2* 17:*22*
Thank 21:*6* 45:*18*
thing 4:*12* 13:*1*
32:*1* 43:*8*
things 34:*9* 39:*19*
think 14:*9* 19:*16*
20:*14* 22:*12* 23:*25*
24:*14* 29:*3*
thinking 43:*14*
thought 7:*3*
Three 5:*15* 6:6
11:*17*, *19* 12:*17*
18:*11* 22:*4* 27:*22*
29:*20*, *21* 33:*22*
time 3:*18*, *20* 8:*12*
12:6 13:*19* 18:9
22:*9*, *12* 24:*9*, *17*
26:*10*, *12*, *13*, *16*
27:*12* 32:*15* 34:*17*
36:*4* 37:*5*, *16* 38:*4*
39:*9* 42:*15*, *19*, *24*

45:*3*

**times** 7:*23* 9:*21* 36:*7*
**today** 6:*24* 7:*9*
11:*12*
**told** 20:*2, 3, 4* 41:*1*
42:*13* 43:*1*
**tons** 11:*18*
**total** 5:*14*
**touch** 9:*8, 11* 39:*22*
**traffic** 23:*25*
**training** 18:*12, 16*
**trainings** 18:*9, 21*
**Transcript** 2:*21* 3:*1*
4:*8* 20:*12*
**treat** 30:*12*
**treated** 30:*13*
**treating** 30:*7*
**tried** 23:*8*
**trust** 13:*20*
**try** 23:*5, 22*
**trying** 12:*1* 19:*2*
31:*16, 21* 35:*4* 40:*8,*
*17* 44:*11*
**two** 3:*21* 5:*8* 39:*3*
41:*12, 15, 16, 23* 42:*1*
43:*20*
**type** 17:*7*

**< U >**
**uh-huh** 22:*23* 27:*3*
**uncooperative** 29:*17*
**understand** 4:*13, 14,*
*18* 11:*12* 13:*20, 21*
25:*16, 17* 43:*7*
**understanding** 21:*24*
37:*17*
**understood** 42:*7*
**Unified** 6:*4, 7*
**unintelligible** 42:*17*
**UNITED** 1:*1*
**utter** 43:*12*
**uttered** 41:*1*

**< V >**
**vaguely** 8:*12*
**van** 40:*18, 19, 22*
41:*7, 16*
**verbal** 4:*5, 9*
**verbatim** 11:*11*

**viewed** 38:*21*
**violently** 39:*17*
**Violet** 21:*14*
**VISITING** 1:*1* 2:*12,*
*13*
**voices** 3:*21*
**vs** 1:*1*

**< W >**
**wagon** 28:*14, 16,* 20
29:*1*
**Walk** 8:*18*
**walking** 11:*2* 40:*18*
**wall** 40:*4*
**want** 3:*12, 24* 12:*24*
13:*2, 5* 15:*4* 20:*17*
25:*16* 29:*14* 41:*24*
43:*8*
**wanted** 11:*5* 16:*6, 9*
21:*4* 25:*8, 9, 14, 15*
38:*12* 45:*8*
**waste** 13:*19*
**way** 15:*3* 30:*18* 42:*7*
**week** 23:*25*
**welcome** 21:*7*
**well** 10:*1, 23* 11:*17*
14:*16* 16:*17* 18:*3, 4*
20:*1* 26:*13* 29:*1*
30:*25*
**went** 14:*9* 28:*11,* 14
34:*22, 23* 38:*18*
40:*12*
**whereof** 46:*16*
**white** 43:*22, 24, 25*
**willing** 33:*18, 20*
**WISCONSIN** 1:*1*
2:*4, 7, 11* 12:*9, 11*
46:*1, 7, 18, 22*
**wish** 35:*2* 40:*22*
**witness** 2:*14* 3:*2*
7:*17* 13:*18, 22, 25*
19:*24* 20:*1, 17* 21:*3,*
*6* 29:*8* 30:*16* 36:*20,*
*23* 37:*22* 44:*5, 8, 11,*
*14* 46:*16*
**witnessed** 28:*15*
30:*12* 37:*13* 39:*10*
**wonky** 4:*16*
**word** 20:*4*

**work** 5:*23* 45:*6*
**worked** 35:*20*
**working** 6:*1*
**Wow** 7:*18*
**write** 3:*21*
**writing** 46:*9*
**written-out** 16:*13*
**wrong** 20:*14* 24:*9*
35:*11, 18, 24*

**< Y >**
**yanking** 29:*16*
**Yeah** 8:*7, 8* 17:*18*
33:*18* 37:*11* 45:*2*
**years** 6:*6, 11* 11:*17,*
*19* 18:*12* 32:*9*
**young** 45:*11, 13*
**youngest** 5:*4, 9*

**< Z >**
**Zoom** 2:*3, 12, 14* 4:*7*

Gramann Reporting, Ltd.
414.585.8128